IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ZOETICS, INC. and ZOEMAIL, LLC, | ) | |
| | ) | |
| Plaintiffs and Counterclaim Defendants, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-108 (JJF) |
| | ) | |
| YAHOO!, INC., | ) | |
| | ) | |
| | ) | |
| Defendant and Counterclaim Plaintiff. | ) | |

## YAHOO! INC.'S NOTICE OF DEPOSITION OF ZOËTICS, INC. PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 30(b)(6)

PLEASE TAKE NOTICE THAT pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure and the Local Civil Rules of this Court, Defendant and Counterclaim Plaintiff Yahoo! Inc. ("Yahoo!") will take the deposition upon oral examination of Plaintiff and Counterclaim defendant Zoëtics, Inc. ("Zoëtics"). The deposition will be taken at the offices of Morrison & Foerster, LLP, 1290 Avenue of the Americas, New York, New York 10104-0050, or other mutually agreeable location, commencing March 11, 2008 at 9:30 a.m., and will continue day-to-day until completed. The deposition will be taken before a notary public or other officer authorized to administer oaths in the State of New York, and will be recorded by stenographic means, audiotaped and videotaped.

Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Zoëtics shall designate one or more of its officers, directors, managing agents, or other persons to testify as to all matters known or reasonably available to Zoëtics with respect to each of the Topics of Examination set forth in Exhibit A. Zoëtics is requested to identify each person so designated and to set forth the matters on which that person will testify on or before March 5, 2008.

To the extent that they have not already been produced in response to Yahoo!'s First Set of Requests for the Production of Documents, dated April 9, 2007 ("Yahoo!'s Document Request"), Yahoo! requests that the documents concerning the Topics of Examination responsive to Yahoo!'s Document Request be immediately produced. Yahoo! expressly reserves the right to re-open the deposition if documents or information requested by Yahoo! are produced or identified at the beginning of, during, or after the deposition and were not otherwise produced to Yahoo! a reasonable time in advance of the deposition.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ James W. Parrett, Jr.*

_____
Mary B. Graham (#2256)
James W. Parrett, Jr. (#4292)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
302.658.9200
jparrett@mnat.com

OF COUNSEL:

Michael A. Jacobs
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA  94105
415.268.7000

Matthew M. D'Amore
Kyle W.K. Mooney
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, NY  10104
212.468.8000

Dated:  February 28, 2008

*Attorneys for Yahoo!, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2008, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF which will send electronic notification of such filing to the following:

> Josy W. Ingersoll, Esquire
> YOUNG CONAWAY STARGATT & TAYLOR, LLP
> The Brandywine Building
> 1000 West Street, 17th Floor
> Wilmington, DE  19801

Additionally, I hereby certify that true and correct copies of the foregoing were caused to be served on February 28, 2008 upon the following individuals in the manner indicated:

**BY HAND & E-MAIL**

Josy W. Ingersoll, Esquire
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE  19801

**BY E-MAIL**

Paul K. Vickrey, Esquire
NIRO, SCAVONE, HALLER & NIRO
181 W. Madison St., Suite 4600
Chicago, IL  60602

*/s/ James W. Parrett, Jr.*

James W. Parrett, Jr. (#4292)

510320

# EXHIBIT A

# EXHIBIT A

## Definitions

1.      "Zoëtics" means Zoëtics, Inc., any predecessor or successor company, joint venture, partnership, corporation or business entity, and any directors, officers, agents, employees, accountants, attorneys, consultants or representatives of Zoëtics, Inc., or any predecessor or successor, including, without limitation, all persons acting or purporting to act on behalf of, or who are subject to the direction and control of, any of the foregoing, whether currently or formerly.

2.      "ZoEmail" means ZoEmail, LLC, any predecessor or successor company, joint venture, partnership, corporation or business entity, and any directors, officers, agents, employees, accountants, attorneys, consultants or representatives of ZoEmail, LLC, or any predecessor or successor, including, without limitation, all persons acting or purporting to act on behalf of, or who are subject to the direction and control of, any of the foregoing, whether currently or formerly.

3.      "Plaintiffs" means Zoëtics and ZoEmail (as defined above), or Zoëtics or ZoEmail, whichever construction is broader in the context of the particular request and as necessary to bring within the scope of a particular request any documents that might otherwise be construed to be outside its scope.

4.      "Yahoo!" means Yahoo! Inc., any predecessor or successor company, joint venture, partnership, corporation or business entity, and any directors, officers, agents, employees, accountants, attorneys, consultants or representatives of Yahoo! Inc., or any predecessor or successor, including, without limitation, all persons acting or purporting to act on

behalf of, or who are subject to the direction and control of, any of the foregoing, whether currently or formerly.

5.    "AT&T" means AT&T Corporation, any predecessor or successor company, joint venture, partnership, corporation or business entity, and any directors, officers, agents, employees, accountants, attorneys, consultants or representatives of AT&T Corporation, or any predecessor or successor, including, without limitation, all persons acting or purporting to act on behalf of, or who are subject to the direction and control of, any of the foregoing, whether currently or formerly.

6.    "Litigation" refers to the above-captioned action commenced by Zoëtics and ZoEmail with the filing of a Complaint in the United States District Court for the District of Delaware on February 21, 2006 (C.A. No. 06-108).

7.    "Patents-In-Suit" means U.S. Patent No. 5,930,479, entitled "Communications Addressing System" and U.S. Patent No. 6,993,574, entitled "Web-Based Communications Addressing System."

8.    "Prior Art" means any knowledge or learning, or any evidence thereof, that existed on or before the filing date of a patent application (or priority date), and that relates to (a) the patent application or resulting patent, (b) the subject matter of the patent application or resulting patent or (c) any principles, processes, methodologies or devices referenced in the patent application or resulting patent.  "Prior Art" may take any form and shall include, without limitation, articles, publications, contracts, presentation materials, products, product-related documents, marketing materials, educational materials, public uses, pamphlets, manuals, devices, instruments, and U.S. and foreign patents and patent applications.

9.    "Bankruptcy Proceeding" means the bankruptcy proceeding initiated by Zoëtics, Inc. in the United States Bankruptcy Court for the Southern District of New York by its filing of a voluntary petition for relief under Chapter 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, on October 20, 2004, *In re Zoëtics, Inc.*, Case No. 04-16747 (JMP).

10.    "AddressGuard" means the AddressGuard™ email feature provided by Yahoo! and alleged by Plaintiffs in the Complaint to infringe the Patents-In-Suit.

11.    "IPA" means the Intellectual Property Agreement executed by AT&T and Zoëtics on or about May 13, 2002.

12.    "Disclosure Statement" means the "Disclosure Statement Dated February 7, 2007 for Zoëtics, Inc.'s Third Amended Plan of Reorganization Dated January 30, 2007," Docket No. 212, (*In re Zoëtics, Inc.*, Case No. 04-16747 (JMP)), attached herewith as Exhibit B.

13.    "Person" means any natural person or any business, legal, or governmental entity or association, or any other person cognizable at law, including, without limitation, any corporation, firm, organization, partnership, joint venture, sole proprietorship, and any agents or employees of the foregoing.

14.    "Concerning" or "relating to" shall be construed in their broadest possible sense and shall include, without limitation, all matters or things which constitute, pertain to, evidence, describe, discuss, are connected to, arise from, reflect, summarize, evaluate, refer to (directly or indirectly) or comment on the subject or object of the discovery request.

15.    "Document" or "documents" shall have the broadest possible meaning permitted by Federal Rules of Civil Procedure 26 and 34 and the relevant case law and shall include,

without limitation, any electronically stored information, and any "writings," "recordings," and "photographs," as defined by Federal Rule of Evidence 1001.

16.     "Communication" or "communications" shall be construed in their broadest possible sense and shall include, without limitation, any of the following:  (a) any written letter, memorandum, e-mail or other document; (b) any telephone call; (c) any conversation or meeting; and (d) any transmittal of information by any means whatsoever (in the form of facts, ideas, inquiries, or otherwise).

17.     "Any" or "each" should be understood to include and encompass "all."  The term "any" includes both "any" and "every."  "All" should be understood to include and encompass "any."  Words in any gender shall include the other gender.

18.     "And," "or," and "and/or" shall be construed in the conjunctive and disjunctive sense as necessary to bring within the scope of a request any documents that might otherwise be construed to be outside its scope.

19.     "Including" means including without limitation.

**<u>Topics of Examination</u>**

1.    Zoëtics' document retention policies.

2.    The location, identity, and custody of documents relating to the Patents-In-Suit (including the conception, development and reduction to practice of the alleged inventions claimed in the Patents-In-Suit) or otherwise relevant to the claims and defenses in this action.

3.    Zoëtics preservation of, destruction or loss of, search for, and production of documents relevant to the claims and defenses in this Litigation, including documents responsive to Yahoo!'s First Set of Requests for the Production of Documents, dated April 9, 2007.

4.    The formation of ZoEmail and the circumstances under which ZoEmail was formed.

5.    The identity, relationship to Zoëtics and responsibilities of any person with knowledge concerning these Topics of Examination.

6.    Investment in and ownership of Zoëtics, including the identity of investors or owners, the kind and value of such investment or ownership interest, and negotiations with investors or owners concerning such investment or ownership interests.

7.    ZoEmail's agreements with and relationship with Zoëtics.

8.    Development of any alleged invention disclosed or claimed in the Patents-In-Suit, including the conception and reduction to practice of the alleged inventions claimed in the Patents-In-Suit.

9.    Zoëtics' and ZoEmail's effort to develop and commercialize the ZoEmail anti-spam product, any "Address Keys" based anti-spam product, or any other anti-spam or message-filtering product, software, system or service.

10.    Prosecution of the claims of the Patents-In-Suit.

5

11.     Reexamination of the claims of the Patents-In-Suit, including Zoëtics' basis for concluding that none the claims of U.S. Patent No. 5,930,479 should be invalidated by reexamination and any related analysis performed by Russell Brand as discussed, for example, on page 20 of the Disclosure Statement.

12.     The initial public disclosure and initial public use (in the United States and outside the United States) of the subject matter recited in each claim of the Patents-In-Suit.

13.     The initial manufacture, initial offer for sale, initial sale or initial shipment (in the United States and outside of the United States) of any alleged invention claimed in, or any product, software, system or service embodying any alleged invention claimed in the Patents-In-Suit.

14.     Prior Art to the Patents-In-Suit known to Zoëtics or ZoEmail.

15.     Investigations, tests, studies, reviews, analyses or opinions of counsel relating to the alleged or perceived value, validity, enforceability, infringement, or marketability of the Patents-in-Suit.

16.     Zoëtics' relationship with AT&T.

17.     Zoëtics' first awareness of the Patents-In-Suit, and its analyses, communications and discussions relating to the Patents-In-Suit or any related intellectual property prior to the acquisition of the Patents-In-Suit and related intellectual property from AT&T.

18.     Zoëtics' acquisition of the Patents-In-Suit and related intellectual property from AT&T and all agreements relating thereto.

19.     The software acquired by Zoëtics under the IPA and the "lab-based software" referenced in Zoëtics, Inc's Disclosure Statement for its First Amended Plan of Reorganization,

dated September 5, 2006 (page 10) (filed in the Bankruptcy Proceeding) and any attempt by Zoëtics and/or ZoEmail to license, develop, commercialize or market said software.

20.     The reasons for, proceedings relating to, and events leading to Zoëtics' voluntary petition for relief under Chapter 11 of the United States Code, 11 U.S.C. §§ 101 et seq., on October 20, 2004, in the Bankruptcy Court for the Southern District of New York (*In re Zoëtics, Inc.*, Case No. 04-16747 (JMP)).

21.     Discussions with AT&T relating to Zoëtics' failure to pay AT&T for the Patents-In-Suit and related intellectual property.

22.     Discussions or negotiations with AT&T concerning Zoëtics' obligations to AT&T or AT&T's claim in Zoëtics' Bankruptcy Proceeding, including any discussion or negotiation concerning the restructuring, reduction, or discharge of Zoëtics' obligations to AT&T.

23.     The ownership, title, transfer, license or assignment of any rights associated with the Patents-In-Suit, including any potential or actual transfers, licenses and assignments.

24.     Any licensing of or other transfer of rights to ZoEmail or any other company or person to practice or enforce the Patents-in-Suit.

25.     The identity of any product, software, system or service embodying or based on any alleged invention claimed in the Patents-In-Suit and any other anti-spam or message-filtering product, software, system or service not embodying or based on any alleged invention claimed in the Patents-In-Suit.

26.     Zoëtics' and ZoEmail's design, development, testing, operation, marketing, and sale of any product, software, system or service embodying or based on any alleged invention claimed in the Patents-In-Suit.

27.    Sales, pricing, revenue and profitability of any product, software, system or service offered by Zoëtics or ZoEmail embodying or based on any alleged invention claimed in the Patents-In-Suit.

28.    Licensing by or between Zoëtics and ZoEmail of patents, trade secrets, intellectual property or other technical "know how" relating to the Patents-In-Suit, or any product, software, system or service embodying or based on any alleged inventions claimed in the Patents-In-Suit.

29.    Zoëtics' and ZoEmail's pre-filing and subsequent investigation, analysis or assessment of AddressGuard or any other Yahoo! product, software, system or service that allegedly infringes the Patents-In-Suit, including any comparison of AddressGuard or any other Yahoo! product, software, system or service to the claims of the Patents-In-Suit.

30.    The damages that Zoëtics and ZoEmail claim to have suffered or will suffer as a result of any alleged infringement of the Patents-In-Suit, including market demand for and profitability of any product, software, system or service embodying or based on any alleged invention claimed in the Patents-In-Suit, and the availability of competitive and non-infringing alternatives to any such product, software, system or service.

31.    Any studies, investigations or analysis concerning the actual or projected value to Zoëtics or ZoEmail of the Patents-In-Suit, any product, software, system or service embodying or based on any of the alleged inventions claimed in the Patents-In-Suit, or any estimated or projected award in this Litigation (including the calculation of damages resulting from Yahoo!'s alleged infringement discussed on pages 19-21 of the Disclosure Statement).

32.    Any sale or effort to sell an interest in this Litigation by Zoëtics or ZoEmail, or to obtain investment or other value based on any projected or potential recovery in this Litigation.

33.    Communications with advisors or consultants of Zoëtics or ZoEmail, or other third parties, regarding Yahoo!, the Patents-In-Suit or this Litigation.

34.    Zoëtics and ZoEmail's communications with Telcordia regarding the subject of the Patents-In-Suit, or any embodiment of Address Keys or any other anti-spam or message-filtering technology, including the identity of the "experts" referenced in the Disclosure Statement (at 2) and the "software development program" referenced in the Disclosure Statement (at 3).

35.    Zoëtics and ZoEmail's work with Creative IP Solutions concerning the subject of the Patents-In-Suit or any embodiment of Address Keys or any other anti-spam or message-filtering technology, including the work referenced in the Disclosure Statement (at 2-3, 20-25).

36.    Zoëtics and ZoEmail's work with DE Miles & Company concerning the subject of the Patents-In-Suit or any embodiment of Address Keys or any other anti-spam or message-filtering technology, including the work referenced in the Disclosure Statement (at 2-3).

37.    Zoëtics and ZoEmail's work with Arising Inc. and/or Arising Group concerning the subject of the Patents-In-Suit, or any embodiment of Address Keys or any other anti-spam or message-filtering technology.

38.    Zoëtics' "Standards Task Force" discussed on page 3 of the Disclosure Statement.

39.    The "proprietary research" commissioned by Patrick Tighe discussed on page 11 of the Disclosure Statement.

40.    Any application of the "New Product Development Process" relating to the subject of the Patents-In-Suit, any embodiment of Address Keys or any other anti-spam or message-filtering technology as discussed, for example, on page 11 of the Disclosure Statement.

41.    The "quantitative [c]oncept [t]est" discussed on page 11 of the Disclosure Statement.

42.    Zoëtics, Joel Tucciarone's and Patrick Tighe's work in 2000 and 2001 to evaluate the business opportunity for anti-spam technology, their efforts to develop, identify, acquire or create anti-spam technology during that time period, their discovery and analysis of the "Channels" system developed by Robert J. Hall, as discussed on page 11 of the Disclosure Statement.

43.    The deal structures discussed between Zoëtics and AT&T for the purchase of intellectual property including the Patents-In-Suit.

44.    Zoëtics' and ZoEmail's development and "difficulties" with the Intellectual Property acquired from AT&T, as discussed on page 13 of the Disclosure Statement.

45.    Zoëtics' valuations of "The Intellectual Property," including the Patents-In-Suit, as discussed on page 15 of the Disclosure Statement.

46.    Zoëtics' analysis of and discussions with potential licensees discussed on pages 23-28 and 36-37 of the Disclosure Statement.

47.    Zoëtics' efforts to liquidate, sell the business, restructure debt, raise equity, or otherwise reorganize as discussed, for example, on pages 30-33 of the Disclosure Statement.

48.    The identify of the alleged "not less than 20 known infringers" referenced on page 19 of the Disclosure Statement and any investigation, studies or analyses by Zoëtics or ZoEmail concerning the any product, software, system or service of these alleged "known infringers," including any comparison or such products, software, systems or services with the claims of the Patents-In-Suit.

# EXHIBIT B

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
In re

       ZOETICS, INC.

                              Case No. 04-16747

                              Chapter 11

                Debtor.
------------------------------------------------------x

**DISCLOSURE STATEMENT DATED**
**FEBRUARY 7, 2007 FOR ZOETICS, INC.'S**
**THIRD AMENDED PLAN OF REORGANIZATION**
**DATED JANUARY 30, 2007**

**Counsel for Debtor:**

**B. Lane Hasler, P.C.**
**80 Broad Street**
**5th Floor**
**New York, NY 10004**
**Tel: 212-837-7977**

# TABLE OF CONTENTS

I. <u>INTRODUCTION</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      A.    **<u>Executive Summary of Plan of Reorganization</u>** . . . . . . . . . . . . . . . . . 1

      C.    <u>Notice to Creditors Regarding Disclosure Statement</u> . . . . . . . . . . . . . . . 5

               1.    Disclosure Statement Purpose . . . . . . . . . . . . . . . . . . . . . 5

               2.    Source of Information for Disclosure Statement . . . . . . . . 5

               3.    Disclosure Statement Relationship with the Plan. . . . . . . 6

               4.    Disclosure Statement Authorized . . . . . . . . . . . . . . . . . . . 6

      D.    <u>Disclosure Statement Enclosures</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      E.    <u>Voting Procedures, Ballots and Voting Deadlines</u> . . . . . . . . . . . . . . . . . 7

               1.    The Ballots . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

               2.    Delivery of Ballots . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

               3.    Approval of Plan Over Class Objection . . . . . . . . . . . . . 7

      F.    <u>Hearing on and Objections to Confirmation</u> . . . . . . . . . . . . . . . . . . . . 7

               1.    Confirmation Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

               2.    Deadline for Filing Objections to Confirmation . . . . . . . . 8

      G.    <u>Recommendation</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

II.    <u>BACKGROUND INFORMATION</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      A.    <u>Summary Description of Debtor</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      B.         <u>Industry Background</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      C.    <u>History of Debtor</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

III.    <u>THE REORGANIZATION CASE</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      A.    <u>Commencement and Administration of the Chapter 11 Case</u> . . . . . . . . 14

               1.    The Chapter 11 Filing . . . . . . . . . . . . . . . . . . . . . . . . . . 14

               2.    Summary of Debtor's Assets . . . . . . . . . . . . . . . . . . . . . 14

      4.    Representation of Debtor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

               5.    The Creditors' Committee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

               6.    Actions to Preserve the Going-Concern Value of Debtor's Business

                    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

               7.    Financial Performance of Debtor in the Chapter 11 Case . . . . . . . . . . 27

      B.    <u>Formulation of Chapter 11 Plan</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

               1.    Identification of Business Constraints . . . . . . . . . . . . . . 29

               2.    Debtor's Options . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

               8.    Description of Reorganized Debtor . . . . . . . . . . . . . . . . 32

[continued on next page]

IV.  SUMMARY OF THE PLAN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
    A.    Overview of the Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
    B.    Classification of Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
            1.    Administrative Claims and Priority Tax Claims . . . . . . . 36
            2.    Creditor's Claims and Interests . . . . . . . . . . . . . . . . . . . . 37
    C.    Impairment and Acceptance or Rejection of the Plan . . . . . . . . . . . . . 37
            1.    Presumed Acceptance of the Plan by Unimpaired Classes
                  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
            2.    Acceptance of the Plan by Impaired, Voting Classes . . . . 38
    D.    Classification and/or Treatment of Claims . . . . . . . . . . . . . . . . . . . . . 38
            1.    Administrative Expenses, Fees Payable Under Title 28,
                  Priority Claims (non-tax claims) and DIP Loan Claims
                  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
            2.    Class 1 -- Allowed Priority Claims . . . . . . . . . . . . . . . . . 39
            3.    Class 1 -- DIP Loan Claims/Exit Funding Claims . . . . . . 40
            4.    Class 2(a) -- Other Allowed Secured Claims . . . . . . . . . 41
            5.    Class 2(b) -- . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
            6.    Class 2(c) -- JDT Secured Claim . . . . . . . . . . . . . . . . . . 43
            7.    Class 3(a) -- Allowed General Unsecured Claims . . . . . . 44
            8.    Class 3(b) -- Administrative Convenience Claims . . . . . . 44
            9.    Class 4 -- Equity Interests and Interests of the Holders of
                  Common Stock . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
    E.    Executory Contracts and Miscellaneous Claims . . . . . . . . . . . . . . . . . 46
            1.    Executory Contracts and Unexpired Leases . . . . . . . . . . 46
            2.    Employee Claims and Compensation and Benefit Programs
                  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
            3.    Disputed Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
            4.    Directors' and Officers' Indemnification . . . . . . . . . . . . . 47
    F.    Means for Execution of the Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
            5.    Obligations of the Reorganized Debtor . . . . . . . . . . . . . . 48
            6.    Cancellation of Notes and Instruments . . . . . . . . . . . . . . 49
            7.    Preservation of Rights of Action . . . . . . . . . . . . . . . . . . 49
            8.    Objections to Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
            9.    Plan Distributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
    G.    Other Documents and Actions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
    H.    Effects of Confirmation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
            1.    Discharge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
    I.    Modification of the Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
    J.    Withdrawal of the Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
    K.    Conditions to the Confirmation Date and Effective Date of the Plan . . . 54
    L.    Consequences in the Event that the Effective Date of the Plan Does Not
          Occur . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

V.   CONFIRMATION AND CONSUMMATION PROCEDURE . . . . . . . . . . . . . . . . . . . . . . 55
     A.     Classification and Effects of Reclassification . . . . . . . . . . . . . . . . . . . . . 55
     B.     Acceptance of the Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
     C.     Confirmation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
     1.     The Plan Complies With All Provisions of the Bankruptcy Code . . . . . . 56
     2.     The Plan Is Proposed In Good Faith . . . . . . . . . . . . . . . . . . . . . . . . . . 57
     3.     Acceptance by Impaired Class . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
     4.     Feasibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
     5.     Best Interests Test  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
     D.     Confirmation Without Acceptance by all Impaired Classes  . . . . . . . . . . 57
     E.     Chapter 7 Liquidation Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

VII.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN . . 59

VIII. VOTING INSTRUCTIONS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
     A.     Record Date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
     B.     Withdrawal of Votes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
     C.     Incomplete Ballots  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
     D.     Deadline for Voting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
     E.     Additional Instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

VIV.  CERTAIN FEDERAL INCOME TAX CONSIDERATIONS . . . . . . . . . . . . . . . . . . 60
     A.     Certain Tax Consequences to Debtor  . . . . . . . . . . . . . . . . . . . . . . . . . . 61
            1.  Utilization of Debtor's Net Operating Loss Carryovers and Built-in
            Losses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
     2.     Accrued Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63
     3.     Alternative Minimum Tax . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63
     B.     Certain Tax Consequences to Creditors . . . . . . . . . . . . . . . . . . . . . . . . . 63

IX.   CONCLUSION AND RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
In re

    ZOETICS, INC.
                                            Case No. 04-16747
                                            Chapter 11

                        Debtor.
------------------------------------------------------x

**DISCLOSURE STATEMENT DATED
FEBRUARY 7, 2007 FOR ZOETICS, INC.'S
THIRD AMENDED PLAN OF REORGANIZATION
DATED JANUARY 30, 2007**

## I. INTRODUCTION

Zoetics Inc., ( "*Debtor*"), filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*"), with the United States Bankruptcy Court for the Southern  District of New York, on October 20, 2004 (the "*Petition Date*").  Debtor submits this Disclosure Statement, pursuant to Section 1125(b) of the Bankruptcy Code, to all Debtor's Creditors and Equity Interests in connection with the solicitation of acceptances of Debtor's Third Amended Plan of Reorganization Dated January 30, 2007 (the "*Plan*"), a copy of which is attached hereto as Exhibit 1 and incorporated herein by reference.  Unless otherwise defined herein, all capitalized terms used herein shall have the meanings ascribed to them in the Plan.

> **Please read this Disclosure Statement and the Plan carefully and follow the instructions set forth below to vote on the Plan.  Debtor believes that the Plan provides the best recoveries possible for the Holders of Claims against Debtor and strongly recommends that you vote to accept the Plan.**

> **AN EXECUTIVE SUMMARY OF THE PLAN FOLLOWS ON PAGES 2-8.**

**PLEASE REVIEW THE RISK FACTORS SET FORTH
AT THE END OF THE EXECUTIVE SUMMARY**

### A.      Executive Summary of Plan of Reorganization

Debtor has two lines of business, first the development and sale of products based on intellectual property governing electronic messaging protocols which are designed to stop unwanted messages (ie: spam) (the "E-Messaging Business") and second the design and implementation of marketing and product-development programs for third party companies (the "Marketing Business").

Debtor's primary assets are the Intellectual Property used in the E-Messaging Business and certain causes of action against third parties that Debtor alleges are infringing upon the Intellectual Property.

Due to significantly more sophisticated spamming techniques, it is now estimated that unwanted e-mails have increased from 50% of all e-mail in 2004 to 90% of all e-mail today.  The New York Times, December 6, 2006.  Debtor's E-Messaging Business uses proprietary techniques based on its intellectual property to completely protect both the internet service providers and the end e-mail users from unwanted messages, including the new forms of spam which have emerged over the past year.

The E-Messaging Business is currently focused on licensing applications of the Intellectual Property for e-mail applications, creating and licensing new applications of the Intellectual Property  and also enforcing such rights against parties that Debtor believes infringe its rights. According to experts at Telcordia (the former Bell Telephone Labs), Debtor's anti-e-mail spam technology known as Address Keys is transferable with appropriate development into telephony applications which will allow control of unwanted cellular telephone messages, spam text messages in particular, and mulit-media content.

Debtor has engaged in an extensive review of its business operations and potential reorganization scenarios, including the sale of substantially all of its assets or obtaining equity investments, all in order to maximize value for Creditors and Equity Interests.  After examining all aspects of its business and after extensive negotiations with its primary creditor, AT&T Corp., Debtor concluded that Creditors and Equity Interests would be best served by reorganizing Debtor's operations to focus on the E-Messaging Business.[1]

In the past three months since the Debtor filed its Second Amended Plan of Reorganization dated November 6, 2006, Debtor has undergone significant changes in order to "reboot" itself with a focus on its E-Messaging Business.   The motivating factors for this shift were the recognition that Debtor's intellectual property has application in a much wider range of applications which will create a much larger marketplace combined with changes in the unwanted messaging environment which significantly increase the demand for a solution such as that which Debtor can provide.   During this period, Debtor has promoted Patrick Tighe to the position of President and the refocus of its efforts from the Marketing Business to the E-Messaging Business. Debtor has worked with Creative IP Solutions and its principal Chris Leisner to develop licensing opportunities for the intellectual property and Debtor's products both existing and potential.

---

1  While the Marketing Business has historically been profitable, Debtor's principal, Joel Tucciarone, recently suffered a serious illness which has required his temporary withdrawal from ordinary operations; thereby leading Debtor to bring the Marketing Business to a temporary standstill.  Debtor believes that upon Mr. Tucciarone's return, the Marketing Business will be restored to historic levels of operation.

Debtor has worked with Doug Miles of DE Miles & Company to raise equity for the restructuring of Debtor's businesses.  Debtor is entering into a software development program with Telcordia (originally Bell Telephone Labs) for the creation of additional applications embodying Debtor's intellectual property with respect to telephony.  Debtor has established a Standards Task Force to integrate Debtor's Address Keys technology into email and telephony markets as the standard for anti-spam protection.

Debtor believes that its reorganization will result in a very profitable business which will allow it to pay its creditors in full with interest.   The table below projects recoveries for Holders of Allowed Claims and Equity Interests based upon the following assumptions:  (1) Confirmation Date of March 31, 2007; and (2) realization of licensing revenues from the Intellectual Property.  The outcome of legal action to enforce the Intellectual Property has no impact on the projected recoveries to creditors other than to allow an earlier payment if legal action results in cash proceeds to Debtor during the first three years after the Effective Date of the Plan.

**Distributable Assets[2/]**

| | | | |
|---|---|---|---|
| (1) | Cash | $ | 15,000 |
| (2) | Exit Funding | $ | 485,000 |
| (3) | Equity Investment - Committed | $ | 450,000 |
| (4) | Notes to Be Issued[3/] | $ | 6,553,162 |
| | Total Available for Claimants | $ | 7,503,162 |

**Liabilities**

| | | | |
|---|---|---|---|
| (1) | Administrative Claims | ($ | 400,000) |
| (2) | Priority Claims[4/] | ($ | 10,344) |
| (3) | Administrative Convenience Class Claims[5/] | ($ | 35,505) |

---

2    As of December 31, 2006.

3    Pursuant to the Plan, creditors are to receive Promissory Notes in the principal amount of the Allowed Claim plus simple interest at 7% per year.

4    Priority Claims are comprised of tax claims of $834.70 and wage claims of $9,500.

5    General Unsecured Creditors with claims less than $5,000 will receive an immediate one time payment of 50% of the face amount of their Claim.  General Unsecured Creditors with claims greater than $5,000 may elect to reduce their claim to $5,000 and thereby accept Administrative Convenience Class treatment.   Debtor estimates that general unsecured creditors with claims of $10,000 or less will elect Administrative Convenience Class treatment.   Attached as Schedule IVD8(d) is a list of all such creditors.  Based on this Schedule, Debtor would owe

(continued...)

(4)     Secured Claims
     (a) Other Secured Claims         ($           0)
     (b) AT&T Secured Claim        ($   4,700,000)*
     (c) JDT Secured Claims         ($      94,700)
(5)     General Unsecured Claims    ($   1,758,462)
     Non-Administrative Convenience Class
Total Liabilities                 $     6,999,011

* plus interest.

### Distribution to Equity Interests

Debtor's existing common stock will be cancelled and the holders will receive one share of Reorganized Debtor Stock for each share of existing common stock. All other equity interests including options will be canceled and receive no distribution under the Plan.

### Post-Plan Debtor Operations

Debtor will emerge from bankruptcy with its major focus on the e-messaging line of business with a dedicated management team working with outside consultants to generate licensing revenue to pay its obligations under the Plan. Debtor will be responsible for implementing the Plan which includes prosecuting Avoidance Actions and making distributions to the Holders of Allowed Claims. Based on its revenue projections, Debtor anticipates that the foregoing projects and final administration of the Chapter 11 Case will be accomplished within 3 years following the Confirmation Date, but in no event later than 5 years following the Confirmation Date.

**Debtor believes that the Plan represents the best option available to Debtor and its Creditors and the Equity Interest and maximizes the value that can be realized for Debtor's assets. Accordingly, Debtor urges your acceptance of the Plan.**

B.     <u>Parties Receiving the Disclosure Statement</u>

This Disclosure Statement is being delivered to the Holders of all Claims and Equity Interests. Debtor asserts that only Claims in Classes 2(b), 2(c), 3(a) and 4 are impaired under the Plan, and, therefore, only the Holders of such Claims and Interests are entitled to vote to accept or reject the Plan.

---

5(...continued)
$35,505.24 to satisfy 27 creditors.

Claims in Classes 1 and 2(a) are unimpaired, therefore, the Holders thereof are conclusively presumed to have accepted the Plan in respect of such Claims. The Holders of such claims are therefore not entitled to vote on the Plan.

C.    Notice to Creditors Regarding Disclosure Statement

1.    Disclosure Statement Purpose

The purpose of this Disclosure Statement is to provide the Holders of Claims and Equity Interests with adequate information to enable them to make a reasonably informed decision with respect to the Plan before voting to accept or reject the Plan.

THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN. No solicitation of votes may be made except pursuant to this Disclosure Statement, and no person has been authorized by the Bankruptcy Court or Debtor to use or disclose any information concerning Debtor other than the information contained herein.

2.    Source of Information for Disclosure Statement

Debtor has provided all financial information contained in this Disclosure Statement pertaining to Debtor and the Reorganized Debtor. NONE OF THE FINANCIAL INFORMATION CONTAINED HEREIN HAS BEEN THE SUBJECT OF A CERTIFIED AUDIT. This Disclosure Statement is accurate to the best of Debtor's knowledge, information and belief. Debtor, however, is unable to warrant or represent that the information contained herein is without inaccuracies.

This Disclosure Statement contains certain forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended, including statements regarding expected future revenue. Forward-looking statements are statements other than historical information or statements of current condition. Some forward-looking statements may be identified by use of terms such as "believes," "anticipates," "intends," or "expects." These forward-looking statements relate to the plans, objectives and expectations of Reorganized Debtor for future operations. In light of the risks and uncertainty inherent in all future projections, the inclusion of forward-looking statements in this Disclosure Statement should not be regarded as a representation by Debtor or any other person that the objectives or plans of Debtor will be achieved. Debtor undertakes no obligation to release publicly the result of any future revisions it may make to forward-looking statements to reflect events or circumstances after the date hereof or to reflect the occurrence of unanticipated events.

3.      Disclosure Statement Relationship with the Plan.

This Disclosure Statement contains information supplementary to the Plan and is not intended to supplant or substitute for the Plan itself.  THE DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE SPECIFIC AND DETAILED INFORMATION SET FORTH IN THE PLAN.  If any inconsistencies are perceived between the information contained in this Disclosure Statement and the terms of the Plan or any exhibit thereto, then the actual terms of the Plan as set forth therein shall control.

4.      Disclosure Statement Authorized

On February 6, 2007, after notice and a hearing, the Bankruptcy Court approved this Disclosure Statement as containing adequate information to enable Holders of Claims and Interests in Classes to make an informed judgment concerning acceptance or rejection of the Plan. THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE EITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.

D.      Disclosure Statement Enclosures

Accompanying this Disclosure Statement are copies of the following:

(I)     The Order: (a) approving the Disclosure Statement; (b) the time for filing Ballots to accept or reject the Plan; (c) the date, time and place of the hearing to consider Confirmation of the Plan and related matters; and (d) setting the deadline for filing any objections to Confirmation of the Plan; and

(ii)    A Ballot by which holders of Claims in Classes 2(b) and 3(a)  and Equity Interests in Class 4 may vote to accept or reject the Plan and by which Holders of Class 3(a) General Unsecured Claims may elect to have such Claims treated as Class 3(b) Administrative Convenience Claims.

E.      Voting Procedures, Ballots and Voting Deadlines

1.      The Ballots

If you are the Holder of a Claim in Classes 2(b), 2(c)  or 3(a) or Equity Interests in Class 4, after carefully reviewing this Disclosure Statement, please: (a) complete all of the information on the enclosed Ballot; (b) indicate your acceptance or rejection of the Plan; and (c) sign the Ballot where indicated.  Return the signed original Ballot (copies will not be accepted) as described in Section E2 below.

DisclStmt3rdAmdPlanFinal.wpd              6

If you are the Holder of a Class 3(a) General Unsecured Claim, you may also elect Class 3(b) Administrative Convenience Class Treatment by checking the box on the ballot.

        2.       Delivery of Ballots

FOR YOUR BALLOT TO BE COUNTED, THE ORIGINAL SIGNED BALLOT MUST BE COMPLETED AS SET FORTH IN SECTION E1 ABOVE AND DELIVERED EITHER BY HAND, BY MAIL OR BY EXPRESS SERVICE SO AS ACTUALLY RECEIVED BY THE CLERK OF THE UNITED BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, ALEXANDER HAMILTON CUSTOMS HOUSE, ONE BOWLING GREEN, NEW YORK, NEW YORK, 10004 BY 4:30 P.M. EASTERN TIME, ON APRIL 25, 2007.

If you have any questions regarding the procedure for voting your Claim, please contact Debtor's counsel, B. Lane Hasler P.C., 80 Broad Street, Fifth Floor, New York, New York, 10004, telephone 212-837-7977 facsimile 212-837-7922.

        3.       Approval of Plan Over Class Objection

If any class votes to reject the Plan, Debtor intends to seek confirmation of the Plan pursuant to Section 1129(b) of the Bankruptcy Code which allows confirmation over the rejection of the Plan by a Class of creditors or interest holders if certain requirements set forth in such section are met.

        F.       <u>Hearing on and Objections to Confirmation</u>

        1.       Confirmation Hearing

The hearing on Confirmation of the Plan (the "Confirmation Hearing") has been set for May 9, 2007 at 10:00 a.m. Eastern Time, United States Bankruptcy Court, Alexander Hamilton Customs House, One Bowling Green, New York, New York, 10004.

        2.       Deadline for Filing Objections to Confirmation

The date by which all objections to Confirmation of the Plan must be (a) filed with the Bankruptcy Court and (b) received by the parties listed in the order approving the Disclosure Statement has been set at 4:30 p.m., Eastern Time, on April 25, 2007. The failure of any person to file with the Bankruptcy Court and serve on such parties timely objections shall preclude such person from objecting to Confirmation of the Plan.

G.    Recommendation

DEBTOR BELIEVES THAT CONFIRMATION OF THE PLAN IS DESIRABLE AND IN THE BEST INTERESTS OF CREDITORS AND EQUITY INTERESTS.

The Plan provides for the realization of the highest available value for Debtor's assets and an efficient distribution of that value to Holders of Allowed Claims with the residual value available for Equity Interests.  Any alternative to confirmation of the Plan, such as conversion to a chapter 7 liquidation or attempts by another party in interest to file a plan, would result in significant delays, costs and would result in significantly lower distributions to Holders of Unsecured Claims and no distribution to Equity Interests.  FOR THESE REASONS, DEBTOR URGES YOU TO RETURN YOUR BALLOT ACCEPTING THE PLAN.

**H.    Risk Factors**

**Debtor's ability to fulfill its obligations under the Plan, in particular its ability to make the payments promised to creditors under the Plan, are subject to the following risk factors:**

**1.    Ability to Raise Equity.   The Plan requires that Debtor raise equity in the amounts set forth on the attached Pro Forma Financial Statement and that such equity is raised at the required time frame.  There is no assurance that Debtor will be able to raise such equity.**

**2.    Ability to Realize Revenue From Licensing the Intellectual Property.  The Plan requires that Debtor enter into licensing agreements pursuant to which the licensees pay fees to Debtor for the use of the Intellectual Property. The amounts of such projected licensing revenue are set forth on the attached Pro Forma Financial Statement.  There is no assurance that Debtor will be able to realize such licensing revenue.**

**3.    Minimum Payments to AT&T.  The Plan requires that Debtor make payments to AT&T Corp. in a minimum amount of $100,000 per quarter.  If Debtor fails to make any such quarterly payment, AT&T Corp. will have the right to foreclose on the AT&T Collateral, which includes the Intellectual Property, thereby making it unlikely that Debtor will be able to meet the projected funding and revenue projections set forth in the attached Pro Forma Financial Statement.**

**4.    Technological Changes.   Debtor's believes that its Intellectual Property provides a unique means of governing messaging on the Internet and in other messaging systems such as telephony (ie: cellular telephones).  There is no assurance that a competing technology may not emerge which would undercut the competitive advantage of Debtor's Intellectual Property or that the underlying systems of the Internet and wireless messaging systems will not change in such a manner as to render Debtor's Intellectual Property of less value.**

     **5.**    **Patent Re-examination.  Yahoo! Corporation has filed an application with the United States Trademark and Patent Office seeking to have declared invalid one of the patents which comprise Debtor's Intellectual Property.  If such patent is declared invalid in whole or in material part, this would undercut Debtor's ability to realize the funding and licensing revenue projections set forth on the attached Pro Forma Financial Statement.**

## II.  BACKGROUND INFORMATION

    A.    <u>Summary Description of Debtor</u>

       Debtor has two lines of business, first the development and sale of products based on intellectual property governing messaging protocols (the "E-Messaging Business") and second the design and implementation of marketing and product-development programs for third party companies (the "Marketing Business").

       Debtor's primary assets are the Intellectual Property  used in the E-Messaging Business and certain causes of action against third parties that Debtor alleges are infringing upon the Intellectual Property.

       The E-Messaging Business is currently focused on creating and licensing new applications of the Intellectual Property and also enforcing such rights against parties that Debtor believes infringe its rights.  The Marketing Business has historically provided sufficient revenue to cover the operating expenses of both lines of business, but now Debtor has shifted its focus toward the E-Messaging Business which will be its primary line of business.

    B.        <u>Industry Background</u>

       The E-Messaging Business is a line of business in a category that includes all systems and software related to email and applications that control over spam.   Debtor competes within the anti-spam email system segment of the messaging category ($2-3 billion industry) in its E-Messaging line of business and in the consulting segment of the Marketing Business.  Debtor in its E-Messaging line of business had successfully arranged for the Intellectual Property to be brought to market in a webmail application, which was hailed by PC Magazine, About.com, Forbes, USA Today, New York Times, et al. as one of the most effective approaches for controlling access to the email inbox (AKA blocking spam) ever created.

       In the E-Messaging Business, revenue is received from licensing the Intellectual Property (primarily patents and software) and receiving royalties. Debtor also expects to receive significant revenue if it is successful in its legal actions or licensing efforts against entities accused of infringement of the Intellectual Property (e.g., Yahoo! Inc.).  Debtor believes that, while there are competitive challenges in the E-Messaging Business that relate to the uniqueness and differentiation of Debtor's anti-spam system having been undercut by inappropriate patent infringement by companies like Yahoo! Inc., the current spam conditions in the marketplace have

changed in a manner which invites additional options for message control.  The current conditions are such that new spamming techniques have increased spam e-mail to an estimated 90% of all e-mail processed by e-mail service providers.  The New York Times December 6, 2006.  In this environment,  there is more than enough room for two companies with similar anti-spam approaches to prosper.  For example, Hotmail (Microsoft Network's e-mail system) would employ a different anti-spam system than its competitor Yahoo! Inc. in order to offer a different e-mail product to its users.  Thus, Hotmail is a potential customer for Debtor's anti-spam solution.

The Marketing Business is a line of business in a category that  includes consulting firms, agencies and other providers that provide such professional service to companies, institutions and not-for-profit organizations, and, in the case of Debtor, primarily to the Fortune 1000.  Debtor competes in the consulting segment of the Marketing Business.   In the Marketing Business, Debtor has served major nationally known brand name clients, major not-for-profit organization as well as mid-size and a few smaller businesses/ ventures — with steady growth in the practice since its inception.

C.    History of Debtor

The Early Days:

Debtor was founded in 1988 by Joel D. Tucciarone, who had been at Wunderman Worldwide, division of Young & Rubicam for 10 years, serving as Senior Vice President, Director of Strategic Marketing.  At the suggestion and investment of a former client, Mr. Donal Carroll, Chairman of publicly traded P. J. Carroll & Co. of Dublin Ireland, Mr. Tucciarone started Debtor as a marketing consulting firm.

Joel Tucciarone has been a database/direct marketing innovator who has created and advised over one hundred Fortune 1000 corporations (including Philips Electronics, Procter & Gamble, Kraft, Time Warner, Avon, M&M's/Mars) and other major Brands on how to create value with their product and relationship assets.

Debtor's Corporate Structure:

Debtor is a New York corporation.    Debtor operates the E-Messaging Business through a minority owned subsidiary ZoEmail, LLC.  Debtor operates the Marketing Business through a wholly-owned subsidiary, Relational Marketing®, Inc., which is also a New York corporation. The trademark "relational marketing" was granted by the USPTO in 1989.  Given the keen focus of brands on the development of the customer relationship, this trademark is judged to be a significant benefit for Debtor and asset for the Marketing Business.

Purchase of the IP

In 1999, when spam was only 9% of email traffic, Joel Tucciarone recognized that there was only one direction unsolicited email was going and that was up. He reasoned that: a) normal postage-based "junk mail" constituted 43% of all mail in U.S. post boxes and that b) with email there is no economic constraint to distribution, as there is with junk mail; hence c) the 9% of e-mail as spam experienced in 1999 was likely to go well above half of all email. In fact, in 2003, spam hit 60% of all email traffic and current research reports indicate spam has increased 50% and is now 90% of all e-mail (The New York Times, December 6, 2006).

Debtor committed the resources and profits from the Marketing Business to identify the solution to what could threaten to destroy the utility of email as a communications medium.

Joel Tucciarone shared his insights and vision with his long time business associate Patrick Tighe who, with thirty-five new product successes under his belt (totaling over $2 billion in sales for a dozen corporations), would act as the litmus test. Patrick Tighe commissioned proprietary research (a major national quantitative study) and confirmed in late 1999 that well over 60% of all email users were "Bothered" by spam e-mail and half of these were "Very Bothered". Both Joel Tucciarone and Patrick Tighe were amazed with these findings as they had seen very few product categories where the "Top Box" dissatisfaction rate was so high. Obviously, there was a consumer need that was not being addressed and adequately served.

In the first quarter of 2000, Patrick Tighe applied the discipline of his "New Product Development Process" — thirty plus years in the making — to further assess consumer perceptions, define needs and, eventually, executed a quantitative Concept Test on a proposed system of personal control over spam to evaluate the business opportunity.

Debtor committed to incubate anti-spam technology and to identify, acquire or create the genuine breakthrough solution to unsolicited email, where the consumer would be empowered and fully in control over who could access his/her inbox.

Faced with the identification of a huge market need and a recognition of the weaknesses of other approaches to fighting spam (including, white lists, black lists, challenge response and other such filtering approaches), the search for a powerful, viable solution continued.

It was in 2001 that Joel Tucciarone discovered a technology solution and associated patent at AT&T Labs. This was the "Channels" system developed by Dr. Robert J. Hall, which interposed an unguessable letter/number sequence as part of a user's email address for outside correspondence. Joel Tucciarone and his team concluded that the patent was so foundational that no "Address Key" based systems would have been possible to do without that patent. Subsequently, independent patent citation analysis has shown that the Hall patent has been cited in subsequent patents over 50 times in 7 years which qualifies it for "pioneering" patent status (less than 1% of all patents according to CHI Research).

Fortunately, Debtor through its Marketing Business had provided strategic consulting for the Office of the President of AT&T Corp. which opened the door for Debtor to acquire the Hall patent.  Negotiations took 16 months and went through three different deal structures.

On May 14, 2002, Debtor purchased from AT&T Corp. (a) U.S. Patent No. 5,930,479; Record:  111671   Filed: 10/21/1996 / Inventor: Robert J. Hall / Communications Addressing System / Application No.  09/884,646: Record ID 2001-0323 / Filed: 6/19/2001 / Inventor: Robert J. Hall / Web-based Communications Addressing System and Method and any divisionals, continuations, continuations-in-part, reissues, extensions or reexaminations, thereof and any foreign counterparts thereto filed or issued before, on, or after the date hereof, in any jurisdiction of the world; (b) U.S. Copyright Registration No. TXU 945-297 covering a computer program / Author as a Work Made For Hire for Seller: Robert J. Hall / Title: "E-Mail Channels System" and all renewals thereof; (c) "Subject Software" as defined in Exhibit C to the Security Agreement, dated May 2002, between Debtor and AT&T Corp.; (d) proprietary information related to sub-sections (a) and (b) of this definition including trade secrets or other technical information expressed in the source code of the Subject Software, including all documented features, and any other documentation, information or knowledge expressed therein (the "Intellectual Property").  The purchase was documented by an Intellectual Property Agreement (the "IPA") pursuant to which title to the Intellectual Property passed to Debtor with the payment of $50,000 paid to AT&T Corp. on the Closing Date.  The total price for the purchase of the IP was $5,200,000.

Debtor's Relationship With ZoEmail, LLC

Debtor determined that the development of applications for the Intellectual Property would benefit from additional funding beyond just available revenues from the Marketing Business.  Debtor, through Joel Tucciarone's professional and personal network, brought together over two dozen investors who agreed to contribute not only cash, but their expertise and contacts.  Debtor determined to segregate the development of applications in a separate entity, therefore, ZoEmail, LLC ("ZoEmail"), a Delaware limited liability company , was formed.  The board of managers and investors include the former CEO of one of the Divisions of Philips Electronics, the President of Kraft's Gevalia Kaffe business and Dennis Hayes, the inventor of the PC modem, who serves on ZoEmail's Advisory Board

Debtor licensed the Intellectual Property to ZoEmail for use in the e-mail category of message control.   It is through ZoEmail that Debtor's E-Messaging Business is engaged in the e-mail segment of message control.   Debtor holds approximately 17% of the equity in ZoEmail, although no shareholders of Debtor serve as officers or managers of ZoEmail.   The remaining 83% of ZoEmail is held by over 50 investors both individual and entities.

ZoEmail Develops the Intellectual Property

ZoEmail retained Jeff Huang, CEO of The Arising Group in New York, an IT development firm to create an e-mail application embodying the Intellectual Property. Chester Chee served as Senior Systems Development Director for this project having just completed a multi-year stint as one of the three top developers of Instinet, associated with Reuters at the time. The development team also included Dr. Robert J. Hall, the inventor of the underlying "Channels" technology and member of the staff of AT&T Labs who provided assistance under a PSA Agreement with the AT&T Labs.

ZoEmail's Difficulties With the Intellectual Property

The software system Debtor purchased from AT&T Corp. and which embodied the patented Intellectual Property turned out to be non-commercializable. While it "worked" in principle, it was not a system that could be readily deployed for consumers. Debtor's technical team worked for about eight months to commercialize the software, but in the end had to scrap the AT&T Corp. system which Debtor had purchased. This unexpected circumstance cost Debtor market entry time as Debtor had to build a total system from scratch — ultimately in a webmail embodiment launched in February 2004.

ZoeMail E-mail Product

ZoEmail found the solution for an e-mail service through the work of Kevin Milani whose experience in non-Microsoft Windows-based operating systems allowed him to conceive of a webmail embodiment for the Intellectual Property built upon an open source Linux platform. This webmail system was christened the "Address Key" system and the development work was completed in January 2004.

The ZoEmail E-mail Service was brought to market in February 2004 to the following press response:

> About.com
>     10 Email Services Reviewed Ranked #1: ZoEmail
> PC Magazine
>     Editor rating: Four Stars!
> The New York Times
>     "Spam-fighting experts have long advised having multiple email accounts…
>     but this is likely to become unnecessary with ZoEmail…"

Debtor's Financial Difficulties

During the period February 2004 through September 2004, Debtor lost approximately $300,000 in operating cash receipts, and $1,400,000 in current year licensing income related to the E-Messaging Business. Debtor's management maintained financial viability by increasing revenue from the Marketing Business and by funding provided by Debtor's equity holder.

Debtor's management was focused on the E-Messaging Business to the detriment of the Marketing Business. The E-Messaging Business encountered a number of difficulties not the least of which was the highly promoted introduction during this time by Yahoo! Inc. of its AddressGuard email feature that Debtor asserts is a direct infringement in violation of the patent which Debtor acquired from AT&T Corp. The result of the Yahoo! Inc. promotion (including hundreds of millions of email "tags" to Yahoo! Inc. email sent by its email users) was that the competitive differentiation of the ZoEmail service based on Debtor's patent was destroyed and its economic value potential diminished.

Debtor believes that Yahoo! Inc. has infringed Debtor's patent and so put Yahoo! Inc. on notice within approximately 2 months of Debtor learning that Yahoo! Inc. had brought its AddressGuard feature to market. Debtor believes this Yahoo! Inc. AddressGuard feature resulted in a loss of competitive edge for ZoEmail as exclusive U.S. licensee for email of the Intellectual Property which in turn impacted Debtor' own economics at the time—these included impacts on new subscriber acquisitions and importantly, on investor interest.

The loss of potential licensing revenue is estimated in the $10's of millions from 2004 to the present and is now the subject of the patent infringement litigation filed in Delaware in March 2006 by Debtor and ZoEmail against Yahoo! Inc. The E-Messaging Business was impacted to the degree that operations continued at a low burn, given the loss of competitive differentiation and the loss of its anti-spam unique story. This diminishment has meant significant loss of current revenue to Debtor estimated at over $2.5 million through end of 2005.

### III.  THE REORGANIZATION CASE

#### A.  Commencement and Administration of the Chapter 11 Case

##### 1.  The Chapter 11 Filing

On October 20, 2004, Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Bankruptcy Court. Since that date, Debtor has remained in possession of its property and continued to operate its business as a Debtor-In-Possession as provided by Section 1107 and 1108 of the Bankruptcy Code.

##### 2.  Summary of Debtor's Assets

As of the Petition Date, Debtor's Schedules of Assets and Liabilities reflected assets in the aggregate amount of $8,100,000 at full book value. As of November 30, 2006, Debtor estimates that its assets are worth $5,600,000, the difference being due to depreciation and the write-down of uncollectible accounts receivable.

Debtor's principal assets consist of the following:

(1) The Intellectual Property.  Debtor owns certain patents and copyrights including U.S. Patent No. 5,930,479; Record 111671 filed 10/21/1996 and Application No. 09/884,646, Record ID 2001-9323 filed 6/19/2001 which on January 31, 2006 was granted Patent 6,993,574B2 and U.S. Copyright Registration No. TXU 945-297.  Debtor's basis in the Intellectual Property is not less than the $5,200,000 purchase price stated in the IPA.  The Intellectual Property has the potential to generate income from two sources (a) licensing to third party users and (b) enforcement against third party infringers.    Debtor is working with Creative IPSolutions, an intellectual property evaluation and licensing development company, to define the value of the Intellectual Property and securing licensing agreements for the Intellectual Property.  The potential licensing opportunities are described more fully below.    Debtor has retained the patent enforcement law firm of Niro Scavone Haller & Niro ("Niro") to enforce Debtor's rights in the intellectual property.   The enforcement actions are also more fully described below.  Debtor values the Intellectual Property at its book value of $5,200,000 with a "fire sale" valuation of 10% less costs or $500,000.

(2) Equipment utilized in Debtor's operations (the "Equipment") which consists of office furniture, computers and similar equipment.  Debtor's basis in the equipment is not less than $307,000 based on its purchase price less depreciation.  Debtor conducted an internal appraisal of the Equipment utilizing comparable equipment sales which values the Equipment as of June 30, 2006 at a liquidation value of $90,000.

(3) Accounts receivable generated by Debtor's business.  Debtor's accounts receivable are concentrated in just a few accounts and are generally collected within 30 to 60 days.   Debtor's average monthly amount of accounts receivable during this Chapter 11 Case has been  $70,000 to $80,000 and have reached as high as $140,000 during peak season.

(4) Membership Units in Relational Marketing, LLC.  Debtor owns 100% of the membership units in Relational Marketing, LLC.  Given Debtor's business model described above in Section IIC, no separate value is ascribed to this asset since the assets and liabilities of Relational Marketing, LLC are consolidated with Debtor's assets and liabilities.

(5) Membership Units in ZoEmail.  Debtor owns approximately 17% of the membership units in ZoEmail.   Given that ZoEmail is a licensee of the Intellectual Property and presently applies such rights in an e-mail service which competes with Yahoo! Inc., the value of the membership units is dependant on the outcome of litigation instituted by the Debtor in the United States District Court for the District of Delaware against Yahoo! Inc in March 2006 (the "Yahoo! Litigation").   Debtor values its membership interest in ZoEmail at $1,000,000 based on Debtor's minimal expected outcome of the Yahoo! Litigation and the resulting continuation of the ZoEmail e-mail business and at $0 on a liquidation basis given a lack of interested buyers.

(6) Other Avoidance Actions.  Under Sections 547 and 550 of the Bankruptcy Code, Debtor is authorized to recover monies paid to creditors during the 90-day period before the

Petition Date. These payments are considered to be "preferential", since Debtor was able to select which creditors to pay at the expense of other creditors. Since the Plan proposes to pay all creditors in full with interest, Debtor will not seek to recover any preferential transfers under Section 547 of the Bankruptcy Code.

Debtor has presented each of the foregoing categories of assets in an effort to break-down its assets in the traditional manner presented on a balance sheet and in a disclosure statement. Debtor, however, believes that its assets are worth far more on a going-concern basis when utilized in the Marketing Business and the E-Messaging Business. Debtor is encouraged by the recent sale of two anti-spam filter companies which offer a different alternative to solving the spam problem than that offered by Debtor, but nonetheless were sold for $340 million in the case of Brightmail and $830 million in the case of Ironpost.

3.     Summary of Debtor's Liabilities

Debtor's liabilities are approximately $7,200,000 and are composed of the following (which are more fully described below):

Administrative Expense Claims: Debtor owes approximately $336,000 in professional fees and other costs incurred during the Chapter 11 Case and $75,000 in ordinary trade payables.

Priority Claims: Debtor owes approximately $10,344 in priority claims comprised of $844 in taxes and $9,500 in pre-Petition Date wages to employees.

Secured Claims: Debtor owes approximately $4,794,700 in principal to the holders of the following Secured Claims: (a) Other Secured Claims, $0 since Debtor is unaware of any such claims; (b) $4,700,000 in principal amount to AT&T Secured Claim; and (c) $94,700 in principal amount to JDT Secured Claim. The Plan provides for Debtor to pay interest on the foregoing at 7% per annum.

General Unsecured Claims Over $10,000: Debtor owes $1,758,462 to holders of general unsecured claims, not including 27 claims held by creditors whose claims are less than $10,000.

General Unsecured Claims Under $10,000: Debtor owes $99,439 to holders of general unsecured claims under $10,000. The maximum claim qualifying for inclusion in the Administrative Convenience Class of general unsecured claims is $5,000. Debtor believes holders of claims $10,000 and under will elect to be treated as Administrative Convenience Class Claims based on the Plan providing for payment of 50% of the face value of Administrative Convenience Class Claims on the Effective Date. Attached as Schedule IVD8(d) is a list of all such creditors

4.      Representation of Debtor

Debtor has been represented in the Chapter 11 Case by the law firm of B. Lane Hasler, P.C.   Debtor has been represented by the law firm of Eckert Seamans Chernin & Mellott, LLC with respect to intellectual property matters.   Debtor has been represented by the law firm of Niro Scavone Haller & Niro in respect of enforcement of rights in the Intellectual Property.   The Bankruptcy Court authorized the retention of each of these firms.

5.      The Creditors' Committee

An official committee of unsecured creditors (the "Committee") was appointed by the Office of the United States Trustee in this Chapter 11 Case.   The Committee is comprised of the following entities:

> Arthur Trotman, Chairman
> Ellen Batzel Palm-Lies
> Michael Oyster.

6.      Actions to Preserve the Going-Concern Value of Debtor's Business

a.      Investigation of Secured Claims

After the Petition Date, Debtor's counsel evaluated the asserted validity, priority and extent of the Secured Claims.   Debtor's counsel's investigation concluded  that (a) Joel Tucciarone has a valid, first priority, properly perfected security interest in and lien upon substantially all of Debtor's assets to secure the JDT Secured Claim; and (b) the liens claimed by AT&T Corp. were potentially avoidable as preferential transfers under Section 547 of the Bankruptcy Code.   In order to avoid the cost and risk of litigation, however, Debtor has agreed to recognize the liens asserted by AT&T Corp. in return for a restructuring of the payment provisions under the IPA.[6/]   In order to assist in this effort, Joel Tucciarone has agreed that the JDT Secured Claim will be treated as junior and subordinate to the AT&T Secured Claim and the AT&T Collateral

---

6  Debtor filed an objection to AT&T Corp.'s proof of claim in order to contest the claimed secured status.   Debtor also filed an adversary complaint seeking damages from AT&T Corp related to the filing of the security document.   These pleadings were filed in order to meet the two year statute of limitations in the Bankruptcy Code.   Debtor has entered into a Tolling Agreement with AT&T which allows Debtor to withdraw these pleadings without prejudice to the right to refile them.   By withdrawing these pleadings, Debtor and AT&T Corp. can focus on the approval of a consensual plan of reorganization.

b.      Restructuring Business Operations

Business Segmentation

Debtor's management's focus initially was on correcting business line confusion, particularly accounting functions.   Debtor has segregated (1) the Marketing Business in its Relational Marketing subsidiary and (2) its E-Messaging Business with the (a) license enforcement and new product development in Debtor and (b) the E-Messaging Business e-mail applications through its investment in ZoeMail.  Debtor closed its books as of the Petition Date and started with a fresh ledger.  All income and expenses are being recorded in accordance with applicable accounting practices as between its business lines.

Marketing Business

The restructuring of the Marketing Business took top priority after the Petition Date, since the Marketing Business had the best potential for bringing in immediate operating cash flow. Debtor's management focused first on stabilizing the Marketing Business which had suffered as Debtor allocated resources to the E-Messaging Business.  Debtor utilized cash available to pay its employees and continue on a cash on delivery basis with vendors and suppliers.  Debtor's management met with its principal clients in the Marketing Business to assure them of Debtor's continued ability to service their needs.

Debtor's next business operations task was to enhance revenues in the Marketing Business.  Debtor in late 2004 and early 2005 undertook a serious new business initiative to re-invigorate its consulting business, which had received reduced management focus while the ZoEmail business proposition was getting prepared to launch in market in early 2004.  During 2005 and 2006, Debtor's management aggressively pursued new business opportunities by reaching out to existing, former consulting clients and new market sectors.

Debtor also leveraged the experience of its Chief Executive Officer in the charitable/not-for-profit sector and began to secure assignments with mid-sized and major not-for-profit associations, and other 501(c)3 organizations including a year long and continuing multi-assignment with one of America's largest membership organizations.  These organizations have historically not had the marketing "bench strength" that is more typical of consumer/packaged goods companies and, thus, the ability of Debtor' Senior Associates to leverage its more sophisticated understanding and expertise in strategic planning, new product development and relational marketing has, over the last year and one half, proved attractive to these new clients for a new sector (not-for-profit/charitable organizations).

The overall new business efforts post-filing led to significant new projects from recognizable national brands, aggressive new market players and not-for-profit organizations with revenues to Debtor of over $2.2 million during the period through June 2006 totaling 27 assignments from 11 clients including:

1)      $15 Billion Packaged Goods Company:  This client generated multiple project assignments consisting of assignments in Direct Marketing, Business to Business, Catalog and eCommerce businesses for America's best known brands.

2)      Washington, DC-based Not-for-Profit — one of America's largest membership groups with multiple project assignments involving assignments in Strategic Vision, Strategic Planning, Web Initiative, New Products and Brand Strategy and Engagement, working closely with the Chief Marketing Officer and other SVP level executives.

3)      U.S. Government Agency:  This Washington DC based assignment is with a major U.S. government institution and its private sector support group.

4)      Major Religious TV Programmer:  A series of projects from 2005 on, involving Direct Marketing, Member Engagement and Research assignments.

During the period from the Petition Date through August 2006, the Marketing Business provided solid operating cash flow which supported the Marketing and E-Messaging lines of business.

E-Messaging Business

After Debtor stabilized and enhanced the Marketing Business, Debtor's management was able to turn to the E-Messaging Business.   There are three primary tasks in the E-Messaging Business (1) enforcement of Debtor's rights in the Intellectual Property;  (2) licensing the Intellectual Property, and (3) developing new applications for the Intellectual Property.

Enforcement Actions:

Debtor retained the Niro law firm to enforce the Intellectual Property against not less than 20 entities believed by Debtor to be infringing upon its rights.  Niro's strategic approach has been to focus on the largest alleged infringer in terms both of scope of alleged infringement and size of the business.   Debtor interviewed several law firms with national reputations in the patent and trademark fields and selected Niro based on its expertise in this area, the skill set of its attorneys and its track record of success.    Prior to accepting this assignment, Niro itself reviewed the Intellectual Property and the existing documentation that Debtor believes establishes infringement by Yahoo! Inc. and based on its review Niro agreed to represent Debtor on a contingency fee basis.  This is further illustration of the strength of Debtor's Intellectual Property.

Debtor, through Niro, contacted the largest alleged infringer, Yahoo! Inc. to attempt to negotiate a license of the Intellectual Property.    Debtor provided information responsive to Yahoo! Inc.'s requests in an attempt to demonstrate to Yahoo! Inc. that the e-mail service provided by Yahoo! Inc. utilized the Intellectual Property in its features.   Ultimately, Yahoo! Inc. dismissed Debtor's overtures.  Yahoo! Inc. claimed that Debtor's Intellectual Property was not infringed and was invalid, and asserted that a license was not required.

Debtor consequently commenced the Yahoo! Litigation.

In the Yahoo! Litigation, Debtor successfully defeated a motion by Yahoo! Inc. to have the case transferred to another district court and further defeated a motion to stay the case pending completion of this bankruptcy case. Yahoo! Inc. has since answered the Complaint, denied Debtor's allegations of infringement and validity and filed counter-claims seeking a declaratory judgment that the patents are invalid and not infringed.

In August 2006, Yahoo! Inc. has filed an application with the United States Patent and Trademarks Office for reexamination of U. S. Patent No 5,930,479 (which is one of the patents included within the Intellectual Property) which application for reexamination was granted on October 20, 2006. Debtor is encouraged by this action because it believes the patent will be affirmed and thus Debtor's case against Yahoo! Inc. will be significantly stronger in that Debtor strongly believes that the only issues will be technical issues of infringement (as opposed to the validity of the patent itself) and the amount of damages to be awarded to Debtor. Debtor is confident the patent will be reaffirmed during the reexamination because the patents originated with AT&T Corp., which has an excellent track record of having its patents upheld during reexamination.

Debtor believes that the reexamination process will take approximately 24 months based on statutory periods granted to the Patent and Trademark Office for review of the patent and for comment by Debtor and by Yahoo! Inc. Thus, it should be completed by August 2008. During this period, Debtor intends to proceed with the Yahoo! Litigation by completing the discovery phase of the case. This will allow the case to be ready for pre-trial motions when the re-examination is complete.

Debtor expects to be at trial in the Yahoo! Litigation at or around March 2009, depending on the tactics utilized by Yahoo! Inc. which may result in delay. Debtor will continue to respond to Yahoo! Inc.'s tactics by using every means possible to move this matter to final resolution. The Court in the Yahoo! Litigation has not yet set a schedule for the case.

Debtor is working with Russell Brand, nationally recognized in this subject area, as its technical advisor. Mr. Brand has reviewed the request for re-examination filed by Yahoo! Inc. and concludes that none of Debtor's direct patent claims should be invalidated by the re-examination request. Debtor notes that the request for re-examination includes an Affidavit of John R. Levine, whom Yahoo!, Inc. holds out to be a technical expert in this area, but Debtor believes Mr. Levine to be incorrect in his assertions.

Debtor has worked with Creative IP Solutions, its intellectual property advisor, in applying industry-recognized methods for evaluating damages arising from infringement of intellectual property to the claims of infringement asserted in the Yahoo! Litigation and concluded that once infringement is established, the most conservative damage model shows Debtor prevailing in the Yahoo! Litigation and receiving a damage award of not less than $38.6 million.

Of course, Yahoo! denies all liability and claims of damages and has informed Debtor that if Debtor establishes liability on the part of Yahoo! that Yahoo! intends to vigorously contest the amount of damages.   As stated earlier, Yahoo! has filed an answer and counter-claims in the litigation which evidence its intent to fight Debtor's claims.

Debtor has not valued the enforcement rights against the other non-Yahoo! Inc. alleged infringers because it has conserved its resources to focus on the Yahoo! Litigation.   However, Debtor believes that these non-Yahoo! Inc. enforcement actions have both merit and value.

Licensing Actions:

Debtor is working with an intellectual property evaluation and licensing development company, Creative IP Solutions, to secure licensing agreements for the Intellectual Property. Creative IP Solutions is recognized, both domestically and internationally, as a firm with a solid track record of assisting companies to understand, manage and leverage their intellectual property assets.   Creative IP Solutions has worked with Litton, Telcordia (formerly known as Bell Telephone Labs), Ford Global Technologies and other major corporations.  Chris Leisner, a principal and founder of Creative IP Solutions, is personally directing Debtor's project.

Mr. Leisner has utilized Creative IP Solutions intellectual property evaluation process to identify and conclude that the Intellectual Property has valuable applications well beyond the current in-market anti-spam email service.   The principal focus of such further applications is SMS telecommunications (cellular telephone text messaging).   Mr. Leisner has worked with Debtor to understand and refine the application of the Intellectual Property to current and projected uses in the cellular telephone market.

Mr. Leisner continues to research and develop contacts in the cellular telephone industry as potential candidates for entering into licensing arrangements with Debtor.    Mr. Leisner continues to work with Debtor to create presentations for such candidates in order to explain the application of the Intellectual Property and develop interest in a licensing arrangement.

Mr. Leisner has applied traditional technology transfer methodology to forecast projected revenues from such licensing arrangements which, based on information obtained to date, conservatively total $750,000 for 2007, $5.75 million for 2008 and $12 million for 2009.   These forecasts by Mr. Leisner and his team at Creative IP Solutions are included in Debtor's pro forma financial statements attached hereto as Exhibit IIIB7d(I).

Address Keys Anti-Spam Email — End User Opportunity:

The anti-spam marketplace has changed dramatically since Address Keys™ was introduced in early 2004.  While competitive anti-spam products/services have proliferated and created a $2–$3 billion global market, these competitive products remain much as they were in 2004, relying principally on optimized filtering approaches.  While this has led to some reductions at the end user level, spam still dominates an end user's inbox, particularly for the at home user

(100 million+) who does not have the sophisticated firewall devices to reduce spam such as do business enterprises.

In addition, spammers most recently have become significantly more sophisticated through the use of robotic spamming technology.   Furthermore, spammer offerings have become more sophisticated in their approach, e.g., phishing, using spoofed friends email addresses, image spam, and similar approaches.  As a result, 90˚% of all email carried by the service providers is now spam vs. the 60% in 2004, a very significant 50% increase.

Debtor believes, and this opinion is supported by outside subject matter experts, that the Address Key technology represents a Next Generation – Version 2.0 Anti-Spam System.  Based on significant new product development/ commercialization experience, it is the opinion of Debtor that Address Keys should be able to capture at least a 5% share of the current, but expanding, e-mail anti-spam market, resulting in revenues of $100,000,000 to $150,000,000.

However, the major impact of the increasing percentage of spam is not necessarily on the end user, but actually on the service provider. As pointed out in a December 6, 2006 New York Times article, service providers must now deal with the 90˚% of email which is spam inside their service system: they must receive it, store it, pass it from box to box and then finally send it on its way.  All of this has dramatically increased service provider's costs of anti-spam operations, particularly at the 90% level; be it for servers, bandwidth, or the human capital to run such.  This is not to say anything with regard to the inefficiencies/ineffectiveness spam creates in dealing with desired email and resulting increase of false positives (elimination of desired e-mails which have been mischaracterized as spam by the email service provider).

Address Keys technology stops spam and rejects it at the edge of the ISP/corporate network.  With Address Keys, spam never enters the service provider's system.  Operating cost savings/ enhancements to existing service provider systems, for such performance of stopping the spam at the edge of the "cloud," has been estimated at a 25+% reduction of service providers' anti-spam operating costs… a significant financial impact.  In addition, such a system would significantly reduce false positives which are currently occurring more frequently.  This is one of the reasons why one of the largest internet service providers has asked Debtor to present the Address Keys  technology to it at the beginning of 2007.

New Applications:

Debtor believes that its Intellectual Property protects the use of the Address Keys technology for applications in telephony:  text messaging, wireless and wired phones as well as for multimedia content via wireless, plus VoIP.

Wireless phones represent a significantly larger market and a much more personal communications tool than email. Users want control over these personal communications devices. However, in Japan and Europe, where wireless phones are significantly more advanced, a new threat of spam called wireless spam or text messaging spam has come to be.

In Japan and the EU respectively, 90% and 60% of all text messaging is spam. These insidious messages are beginning to pop up on U.S. wireless phones — currently they are estimated to represent 10% of text messaging and projected to become 60% by 2010. This is email spam all over again, but with the added negative that U.S. wireless subscribers will not only be interrupted by the pop-up nature of these intrusive messages, but will also have to pay for these spam text messages, as the U.S. wireless market is "Called Party Pays!"

What has been the approach to stop this invasion of personal phone privacy? — filters, similar to what is being used on email. A better solution is required. Debtor is working on the transfer of its Address Keys technology to telephony with Telcordia, current supplier of 80% of the software used in the United States telecom industry.

<u>Licensing Opportunity</u>

Debtor, through CreativeIPSolutions, has entered into initial confidential discussions with two potential licensees and/or buyers. These discussions are being conducted under non-disclosure and confidentiality agreements. One targeted licensee is a PDA device manufacturer, while the other, a software firm with a suite of email security services/products, is also a potential buyer. Discussions have progressed to the COO and CEO level, respectively. The PDA manufacturer has a conflict, which the parties may be able to resolve, while the software firm was definitely interested. Specifically, this firm told Debtor to return once the bankruptcy court had approved the re-organization plan. As a result of the success of these initial forays, Debtor with its new strategic direction has stepped back and created the following approach to entering the anti-spam marketplace via licensing.

Debtor's anti-spam solutions can be licensed within several markets and to several distinct types of companies. One way to organize its licensing strategies is to identify whether Debtor solution would be provided as an embedded hardware solution, or as a downloadable or web-based software solution. In some situations, the licensee may employ a combined/overall approach as indicated in the following analysis of target licensees. Please note that a number of these companies have cited Debtor's patents in their own patent applications several times over and therefore are prime licensing candidates.

[continued on next page]

Debtor' IP Licensing Strategy:
2007 Target Licensees  (Hardware, Software)

| Target Licensee | Wireline Email/ SMS Provider | Wireless Email/SMS Provider | Anti-Spam Support Supplier | Content Provider |
|---|---|---|---|---|
| Company 1* | S | S | - | - |
| Company 2* | - | - | H | - |
| Company 3 | - | - | - | S |
| Company 4 | S | - | S | - |
| Company 5 | - | - | - | S |
| Company 6* | H/S | - | S | - |
| Company 7* | H | H | - | - |
| Company 8* | S | S | - | S |
| Company 9 | - | H | S | - |
| Company 10* | H/S | H/S | - | S |
| Company 11* | H/S | H/S | - | - |
| Company 12 | S | S | - | - |

* Cited Debtor IP in its own patent applications

S means Software License.  H means Hardware License.

Debtor has determined not to reveal the identities of the target companies in this Disclosure Statement because to do so would reveal confidential business information which its competitors, including Yahoo!, Inc. will certainly use to Debtor's disadvantage.

    Specifically, revenue assumptions for the attached pro forma are based on and include the following:

    (A) "Licensing Revenues" associated with a non-exclusive license.  Debtor intends to execute these licenses whether or not it successfully sells any of its IP to the potential buyers.  The estimated licensing revenues are currently based on a "Relief From Royalty" approach (similar to a Purchase Price Allocation (SFAS 141) computation).  Actual royalty amounts derived from subsequent license negotiations will differ from this preliminary estimate; however, Debtor believes that this preliminary estimate is reliable because it uses valuation and accounting methods approved by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants.

    (B) "Field of Use Exclusivity Fee" for the initial licensee.  This fee will be determined subject to negotiations with the licensee and will likely take the form of both an up-front payment

as well as a quarterly licensee fee charged by Debtor.

(C) "Standstill Agreement/Option Fee" with the possible purchaser of certain IP of Debtor similar to an earnest money deposit on a real estate purchase.

Alternate Distribution Approach to Revenue

In addition to licensing, and given the availability of a functioning protype webmail service and subsequent equity funding (see Section 6 above), Debtor is considering alternative revenue approaches, such as applications service providers.

With the availability of the current web-based e-mail service and the ability to secure POP3 accounts, Debtor has four potential major channels of distribution across two main strategies: Business to Provider (B2P) and Business to User B2U): Major Portals and Websites, Tier II and Tier III ISPs, Affinity Groups/Organizations, plus Debtor's own site (B2U), Address Keys, for direct acquisition over the Web. The following outlines the approach to these channels.



The overall distribution efforts would be supported by two separate teams: a Sales Team that will sell the service into the respective distribution channel partners and a Technical Service Team that will support the integration of the e-mail service on to the respective distribution channel's site.

1.    Major Portals/Large Websites

There are over 750 major portals/websites with over 1,000,000 unique visitors per month. They have problems that Address Keys can more effectively solve than any other e-mail outsource providers, and that is one of the reasons why they will be interested in the Address Keys technology.  While ISPs have subscriber sourcing and retention issues, Web media properties like Portals have another issue—they receive no monthly committed subscriber income.  For these players, it is currently a game of eyeballs, frequency and length of stay when utilizing a website.  It is, however, becoming less of a game of eyeballs and more of a pay-for-performance (CTR) game that will add further stress to these sites' revenue streams.  To these Portals, Address Keys brings a number of opportunities/benefits: (A) Differentiation —no spam e-mail/enhanced anti-virus protection; (B) Frequency of visits—with a member accessing e-mail up to 4 times a day, users will be constantly reminded of the Host's Portal presence and what's "hot" on these sites could be

introduced via Banner Ads and the Promotional Panel on the e-mail site; and (C) Ability to outsource an e-mail service operation (operational barrier).

For example, the family portals would represent prime prospects, given their "wholesome" positioning, to say nothing of gender-based web interest sites. Given the existence of resources to pursue this approach, it is Debtor's objective to launch into this segment.

2. Tier II and III ISPs

AOL has 18 million subscribers. The next eleven ISPs (Tier II) have 49 million subscribers, which roughly equates to the remaining Tier III ISPs' having approximately 30 million subscribers. All of these ISPs have issues that Address Keys can mitigate, and these ISPs represent, in aggregate form, approximately 150+-million e-mail users. To put this spam problem in perspective, Earthlink, a Tier II ISP, is now having to deal with 26 billion emails a year, 90% of which, 23.5 billion, are spam. In an Internet world lacking differentiation--especially for Tiers II and III--Address Keys provides something new, different and more importantly, something very valuable. It offers a means of stopping *spam*, which is a #1 frustration for ISP subscribers; it significantly reduces operational costs that go to fight spam by conventional means — an increasing service provider problem; and it is valuable in terms of increasing and retaining subscribers.

3.    Affinity Groups/Organizations

Currently, there are over 5,000 affinity groups in the U.S. of any significant size with over 64% of the adult population—140,000,000—as members. Address Keys offers an attractive proposition to these groups in terms of a zero-spam e-mail service that is private-labeled for the Group (e.g., "powered by Address Keys™"), as a value-added member benefit. Thus, a direct proprietary communications channel is made possible for the members enrolled in a specific affinity group.

Unlike other web-related ventures focused on providing websites for Affinity Groups/Organizations, the Address Keys offer is a pragmatic one: a true utility that group members will use continually for their own needs—not just another affinity website to visit every once in a while.

The primary affinity groups identified can be broadly divided into three segments. They are, in order of priority, Family, Religious/Not-for-Profit Organizations and General/ Professional Affinity Groups.

A.    Family

We will prioritize the Affinity Groups in terms of their proclivity to deliver families.

The proposition that will be presented to these groups consists of a revenue-sharing plan from Address Keys revenues and the ability to allow these groups to communicate via e-mail more

frequently with their membership.

B.     Religious and Other Not-for-Profit Organizations

It is Debtor's intent to create an internal sales group to approach religious denominations and other not-for-profit organizations—particularly those with a family orientation. Debtor has an entré to a number of large entities in this segment.

C.     General/Professional

Debtor will use this same sales strategy on those affinity groups (General/Professional) that are not covered by the above two mega-groups.

Each Affinity Group will receive a percentage of the revenue stream derived from Address Keys. Percentage participations in these revenues will be tiered to encourage active promotion of the service by the Affinity Group.  Hence, the greater the percentage of Members adopting Address Keys, the higher the percentage of the revenue split.

Distribution Approach Summary

All of the distribution channels have similar problems that Address Keys can address such as the need for additional revenue, better/more communication/linkage to members/ subscribers/ visitors and, in the case of ISPs, a need for significant operational cost savings.  These approaches will be covered in greater detail in respective presentations to these distribution channel partners.

In addition, by segmenting the market and providing solutions unique to each channel's needs, Debtor's objective of attracting subscribers from the population base of each channel can be a minimal range in share of that channel's population.

Given the problems of each channel and the problems of the end users in these channels—current levels of spam and the anticipated increase of unsolicited commercial e-mail messages– Debtor's management views the opportunity to prosper from these channels as a viable business opportunity.

7.      Financial Performance of Debtor in the Chapter 11 Case

Debtor's net receipts and disbursements since the Petition Date (as reflected in the monthly operating reports filed by Debtor in the Chapter 11 Case) are set forth on Schedule IIIA8 attached hereto.

DisclStmt3rdAmdPlanFinal.wpd            29

B.      Formulation of Chapter 11 Plan

1.      Identification of Business Constraints

After the Petition Date, Debtor undertook a review of its cash flows, income sources and expense items.  As described above, Debtor took steps to increase its cash flows from the Marketing Business and reduce its overall costs in all businesses.  Finally, Debtor initiated steps to generate cash from the enforcement of the Intellectual Property.    The primary business constraints were identified as (1) generation of revenue from the E-Messaging Business; and (2) timing of revenue from the enforcement of Debtor's rights in the Intellectual Property.

2.      Debtor's Options

Debtor's options to deal with the business constraints were (a) liquidation, (b) sale of the business, (c) raising new equity investment, (d) restructuring of obligations to AT&T Corp., or a combination of sales, equity raising and the AT&T Corp. debt restructuring.

3.      Liquidation

Debtor's next step was to evaluate its post-filing financial results and trends in order to prepare pro forma results for operations which would allow Debtor to determine if a liquidation would yield any value for its unsecured creditors.  Debtor concluded that a liquidation would result in unsecured creditors receiving no value because (a) the primary value of the Marketing Business was in its going-concern ability to generate cash - which would be lost in a liquidation; and (b) a "fire-sale" of the patent with the added problem of the Yahoo! re-examination application would severely depress the sale price.

4.      Review of Sale of Business as Going-Concern

Debtor conducted an internal review of its competitors and market position to determine potential for a sale of the business.  Debtor initiated discussions with Devonwood Capital (whose principal had been head of private equity at Goldman Sachs for many years) and other investment sources, including, in particular, a Kansas City-based technology investment group and a Canadian investment broker with entrée to a major email messaging company, regarding the options and viability to sell its business.   The response received was that a deal was not then possible due to Debtor's small size, recent weak operating performance, coupled, on the messaging side, with the uncertainty over the AT&T Corp.'s lien status.

Prior to filing the Second Amended Plan of Reorganization, Debtor again undertook to test the market for a sale of its business as a going-concern and found that while curing the status of the AT&T Corp. liens was a positive development, Debtor's small size and the pending bankruptcy kept interested parties from pursuing a transaction.

5.      AT&T Corp. Restructuring

Since the Petition Date, Debtor has worked with AT&T Corp. To craft a consensual plan of reorganization.   The discussions immediately after the Petition Date resulted in a general outline regarding the requirements for a consensual plan of reorganization.

Plan negotiations were put on hold for a period of time while Debtor, through Niro, attempted one last time to work out a consensual resolution with Yahoo! Inc. of the alleged infringement.  Such a consensual arrangement would have satisfied AT&T Corp.'s claims in full. Once Yahoo! Inc. declined to negotiate and litigation was commenced, Debtor returned to AT&T Corp. to resume crafting a consensual plan of reorganization.

At this point in time, Debtor was unable to immediately resume negotiations because AT&T Corp. was itself undergoing a corporate transformation with its acquisition by SBC Corporation.

Once AT&T Corp. was in a position to resume negotiations, the parties worked out a plan of reorganization which recognizes AT&T Corp.'s security interest in the Intellectual Property while providing for payment of all creditors over time.

On June 28, 2006 Debtor filed what it believed was a plan of reorganization which satisfied AT&T Corp.'s desires.

Debtor, through its counsel, had further discussions with AT&T Corp., through its counsel, which resulted in a modification of the treatment of the AT&T Secured Claim.

Debtor revised its plan of reorganization and filed a First Amended Plan of Reorganization on September 5, 2006.

Debtor, through its counsel, had further discussions with AT&T Corp., through its counsel, which resulted in a modification of the treatment of the AT&T Secured Claim.

Debtor revised its plan of reorganization and filed an Amended Plan of Reorganization on January 30, 2007.

Debtor understands that AT&T Corp. supports the Plan and will vote to accept it.

6.      Review of Raising Take-out Financing and/or Equity

In the period shortly after the Petition Date, Debtor attempted to raise equity capital by first approaching entities and individuals which had previously invested funds in Debtor, then by approaching industry contacts and finally by utilizing third parties with apparent interest in the

industry.   Debtor was unsuccessful in raising any new equity primarily because of the unresolved issues with AT&T Corp. regarding the Intellectual Property.

Now that Debtor has reached an agreement with AT&T Corp., Debtor is working with Doug Miles and the firm DE Miles and Company, Inc. to (a) secure loans, (b) raise equity, or (c) a combination thereof.   Debtor has worked with Mr. Miles to identify potential sources of loans and of equity funding, has provided interested parties access to its bankruptcy pleadings and reports and has negotiated terms of various funding options..

Debtor is in negotiations with an equity funding source for the sale by Debtor of a participation in the Yahoo! Litigation which will be subordinate to the interests of AT&T Corp. in the Yahoo! Litigation which sale will close on the Effective Date and will provide Debtor with $485,000 (the "Exit Funding") thereby fully covering Debtor's projected Administrative Expense Claims, Priority Claims, Priority Tax Claims and initial payments to AT&T Corp. and the general unsecured creditor administrative convenience class.   Debtor may repurchase the participation for a purchase price that adjusts based on when Debtor exercises such repurchase right. This Exit Funding and the repurchase are reflected on the pro forma financial statements attached hereto as Exhibit IIIB7d(I).   Debtor intends to file a separate motion under Section 363 of the Bankruptcy Code seeking approval of this transaction.   Debtor would prefer to pay its Administrative Expenses through the raising of additional equity investment as this more cost-effective. Notwithstanding anything to the contrary contained herein, any exit funding will be subordinate to the interests of AT&T Corp. unless AT&T Corp. agrees otherwise in a writing signed by an authorized officer of AT&T Corp.

Debtor has reached agreement with TOB Ministries, Inc and Kochberg Brothers for an immediate equity contribution of $117,640 in the aggregate which funds are being used in support of Debtor's operations.  This equity investment is reflected on the pro forma financial statements attached hereto as Exhibit IIIB7d(I).

Debtor is documenting agreements with parties for the investment of not less than $450,000 (the "Committed Investments") to be received by Debtor during the first quarter of 2007.  The Committed Investments are reflected on the pro forma financial statements attached hereto as Exhibit IIIB7d(I).   Debtor shall reserve $150,000 of the Committed Investments in a separate account to be held as a reserve to pay Administrative Expense Claims should Debtor decide not to take the Exit Funding described above.[7]

Debtor is in negotiations with a variety of interested parties for the investment of not less than $11.5 million which funds are to be used in support of Debtor's E-Messaging Business and in

---

7  Debtor requires only $150,000 of equity to pay the Administrative Expense Claims because Debtor has an agreement with its two outside law firms that their Administrative Expense Claims will be paid over time if Debtor determines not to take the Exit Funding.

the development of new applications in telephony for the Intellectual Property.   Doug Miles of DE Miles and Company, Inc. is highly confident of his firm's ability to place this $11.5 million in equity during the quarters indicated on the pro forma financial statements attached hereto as Exhibit IIIB7d(I).   The bulk of this equity is earmarked for the development of new applications for the Intellectual Property, primarily in the area of cell phone text messaging "spam" and message control.  Debtor's program for such development is described in further detail below.

7.    Review of Increasing E-Messaging Business Revenue

The agreement with AT&T Corp. on a Plan of Reorganization also opened the door to a variety of license arrangements for the E-Messaging Business.  These actions are more fully described above, but bear repeating here as evidence of Debtor's strategy to fund its obligations under the Plan.

In addition, the development of new applications for the Intellectual Property in the area of cell phone messaging is projected to allow for a significant increase in licensing revenue.   Mr. Leisner and his team at Creative IP Solutions are in charge of this effort and the results are included in the pro forma financial statements attached hereto as Exhibit IIIB7d(I).

8.    Description of Reorganized Debtor

a.    Business

Debtor will remain in both business lines, the Marketing Business through its Relational Marketing subsidiary, and the E-Messaging Business through its current structure.

Debtor will be focused solely on the E-Messaging Line of business for the immediate post-confirmation period.  Debtor believes this line will be the most critical avenue for establishing and building significant future revenue.  Due to the recent illness of Mr. Tucciarone, his participation in the Marketing Business has been curtailed.  Debtor, therefore, has not taken on new consulting work, and the Marketing Business has been "sidelined" until Mr. Tucciarone resumes full participation in such projects, in addition to his other E-Messaging Business-related activities.  In an abundance of caution, Debtor has not projected revenue from the Marketing Business in the pro forma financial statements attached hereto as Exhibit IIIB7d(I), but believes that there will in fact be a return to historical levels of revenue once Mr. Tucciarone returns.

b.    Management

The management and compensation of management of Reorganized Debtor shall be as follows:

Annual

| Title | Compensation |
|---|---|
| Joel Tucciarone<br>Chief Executive Officer and<br>Chairman of the Board<br>of Directors | $150,000 |
| Patrick Tighe<br>President and<br>Chief Operating Officer<br>Member of the Board of Directors | $145,000 |
| Joel Tucciarone, Sr.<br>Secretary / Treasurer and<br>Member of the Board<br>of Directors | $ 40,000 |

Given the refocus of Debtor's business on the E-Messaging Business, Debtor has promoted Mr. Tighe to the position of President.   Mr. Tighe, who was brought into Debtor to aid in developing and launching new businesses for Debtor, has now become President/COO.  Mr. Tighe's background is in new business development starting with Johnson & Johnson, Brown & Williamson and Dole Food.  After his corporate service, he founded a New Products Venture company (7 of the 8 ventures were successful) that led him to become COO of a start-up medical products business.  This, in turn, brought him to Debtor to help launch new businesses for Debtor side, e.g., ZoEmail, and in a new products venture mode for the consulting side.

In total, during his career, Mr. Tighe has successfully launched some 36 out of 40 total products and services introduced, generating well over $2 Billion in new sales, all of which are attributable to his New Business Development Process, which has been optimized over three decades and is being applied to the opportunities at hand.

Aiding Mr. Tighe initially will be:

Chairman/Chief Executive Officer: Joel Tucciarone, the founder of Zoetics, Inc. with significant experience in enterprise strategy and customer relational marketing.

Acting Chief Technology Officer: Russell Brand – Acting CTO:  Mr. Brand is well-recognized, both domestically and internationally--particularly in Silicon Valley--as a distinguished security software  expert.

Software Development Team

Arising Group — This is the software development team which commercialized the current ZoEmail anti-spam web application Proof of Concept service.  Jeff Huang, 10 year

DisclStmt3rdAmdPlanFinal.wpd                    34

president, commands an experienced group of software developers including Chester Chee, recognized for his critical participation in commercializing the Reuters Instinet global stock transfer software system.

Telcordia - This is the former Bell Telephone Labs group which has a critical mass of engineers and related staff with expertise particularly in the area of telephony as well as the position of being the supplier of over 80% of the software used in the telecom industry.

Acting Chief Licensing Officer: Chris Leisner, founder and President of Creative IP Solutions. He and his team will lead the licensing effort to commercialize the various Address Keys technology applications.

Acting Chief Marketing Officer: Robert Urbain, significant experience in marketing with Kraft, General Foods, Dole and Tropicana.

Standards Officer: Dennis Hayes, developer of the Hayes modem and a pioneer in the Internet world.

      c.      Board of Directors

The Board of Directors will continue and consists of: Joel Tucciarone (Reorganized Debtor's Chairman and Chief Executive Officer), Joel Tucciarone, Sr. (Secretary and Treasurer), Patrick Tighe (Reorganized Debtor's President) and Arthur Trotman (former member of the Creditors' Committee).

      d.      Pro Forma Financial Statements

Debtor has prepared pro-forma financial statements that project the future financial performance of the Reorganized Debtor which projected financial statements are attached as Exhibit IIIB7d(I). Debtor has also prepared a pro-forma balance sheet which is attached as Exhibit IIIB7d(ii).

      e.      Marketing Business Summary

As described above, Debtor is completing its current projects in the Marketing Business, but is taking on no new projects. The Marketing Business will be sidelined until such time as Mr. Tucciarone returns to work. In an abundance of caution, Debtor has projected no going forward revenue from the Marketing Business in the pro forma financial statements attached hereto as Exhibit IIIB7d(I), but believes that there will in fact be a return to historical levels of revenue once Mr. Tucciarone is able to be more fully engaged in such projects for which future groundwork has already been laid.

      f.      E-Messaging Business Potential

In addition to the ZoEmail service, which is a webmail embodiment of the Intellectual Property, the foundational nature of the patented technology permits its application broadly to other forms of messaging and, importantly, for future application, telephony which is expected to transform the business.

Debtor is entering into agreements with Telcordia (formerly BellLabs) which, in conjunction with the software development firm of Arising, Inc., will take the Intellectual Property and create applications for use in cell phone text message control. Debtor has structured the development process and expenditures to coincide with the equity investments being managed by DE Miles and Company as described above.

The e-mail based opportunities to be pursued are as follows:

1)    Licensing to major ISP's/portals — Debtor is introducing the Intellectual Property to United States carriers/internet service providers such as AOL and Verizon (at their request) with others to follow.

2)    Affinity private-labeled webmail — by marrying ZoEmail's "zero spam" webmail with other functionalities and "niche added values," ZoEmail is creating a new kind of tool that major brands can use for relationship marketing. This embodiment gives brands their own direct, ongoing customer "connection" (for example AARP, with which Debtor has a prior relationship through the Marketing Business).

3)    Enterprise-integration into private and public enterprise email systems;

4)    International Licensing — country by country/region by region licensing to major factors in various locales, in particular, major ISP's/telecoms. Debtor has two such dialogues going on currently — for China and Korea.

The telephony-based opportunities to be pursued are as follows:

1)    Cellular Telephones: The Intellectual Property is applicable to all significant types of messaging, including SMS text messaging and newer wireless protocols such as multi-media applications.

2)    Personal Data Devices (e.g. Blackberry): The Intellectual Property is applicable to Instant Messaging and SMS messaging.

Given that there are 1.5-billion wireless devices in the world (and by 2007, an estimated 500-million Internet-equipped cell phones in China alone), the high leverage upside for the Intellectual Property would clearly involve wireless application. The scale of revenue from wireless licensing could dwarf the revenue from Debtor's core traditional email business.

In addition to the above, Debtor has put in place a Standards Team lead by Dennis Hayes, the developer of the Hayes/IBM modem, to develop Address Keys as a standard for anti-spam applications.

IV. <u>SUMMARY OF THE PLAN</u>

The Plan is the result of Debtor's diligent efforts to pay its Creditors in full consistent with the mandates of the Bankruptcy Code (including the absolute priority rule set forth in section 1129 thereof), other applicable law and the contractual agreements between Debtor and certain of its Creditors.

THE FOLLOWING IS A SUMMARY OF THE TERMS OF THE PLAN AND TRANSACTIONS ANTICIPATED TO OCCUR EITHER PURSUANT TO OR IN CONNECTION WITH CONFIRMATION OF THE PLAN. THIS SUMMARY ONLY HIGHLIGHTS THE SUBSTANTIVE PROVISIONS OF THE PLAN AND IS NOT INTENDED TO BE A COMPLETE DESCRIPTION OF THE PROVISIONS OF THE PLAN. CONSIDERATION OF THIS DISCLOSURE STATEMENT IS NOT A SUBSTITUTE FOR A FULL AND COMPLETE READING OF THE PLAN  AND ALL EXHIBITS THERETO WHICH ARE ANNEXED TO THIS DISCLOSURE STATEMENT AS EXHIBIT 1.

A.    <u>Overview of the Plan</u>

The Plan provides a distribution to each class of Allowed Claims. The Holders of Interests consisting of common stock will be left with their current interests through the issuance of Reorganized Debtor Stock. The Plan allows Debtor to realign its business operations and revenue with its liabilities. If the Plan is approved, Debtor will use (1) Cash on hand and from Exit Funding, Committed Investments and Capital Contributions to pay all Administrative Expense Claims, Priority Claims, and Priority Tax Claims in full, to make the initial Plan payment to AT&T Corp. on its Class 2(b) Claim, and to pay the allocated amount to general unsecured creditors electing Class 3(b) Administrative Convenience Class treatment; and (2) proceeds from the  E-Messaging Business to pay Creditors in full with interest.   Debtor projects paying all creditors in three years, by the close of 2009, but in no event later than five years from the date of confirmation of the Plan.

B.    Classification of Claims

1.    Administrative Claims and Priority Tax Claims

Administrative Claims and Priority Tax Claims are not classified since classification is not required under Section 1123(a)(1) of the Bankruptcy Code.

2.    Creditor's Claims and Interests

Creditor's Claims and  Interests are classified for all purposes, including voting (if applicable), confirmation and distribution pursuant to the Plan, as follows:

Class 1 - Priority Claims.  Class1 consists of all Claims arising prior to the Petition Date which are entitled to priority under Section 507(a) of the Bankruptcy Code other than Administrative Expense Claims, Priority Tax Claims and Claims under Section 507(a)(1) of the Bankruptcy Code.

Class 2(a) - Other Secured Claims.  Class 2(a) consists of the Secured Claims other than the AT&T Secured Claim, JDT Secured Claim and the DIP Loan Claim.

Class 2(b) - AT&T Secured Claim.  Class 2(b) consists of the AT&T Secured Claim.

Class 2(c) - JDT Secured Claim.  Class 2(c) consists of the JDT Secured Claim.

Class 3(a) - General Unsecured Claims.  Class 3(a) consists of the Unsecured Claims other than the Administrative Convenience Claims.

Class3(b) - Administrative Convenience Claims. Class 3(b) consists of the Administrative Convenience Claims.

Class 4 - Holders of Equity Interests.  Class 4 consists of Equity Interests.

C.    Impairment and Acceptance or Rejection of the Plan

1.    Presumed Acceptance of the Plan by Unimpaired Classes

Claims in Class 1 (Priority) and Class 2(a) (Other Secured Claims) are unimpaired under the Plan, because Holders of Allowed Claims in such Classes will receive payment in full or will retain all rights against Reorganized Debtor as such Holders possessed prior to the Petition Date. Each Holder of a Claim in Classes 1 and  2(a) is conclusively presumed to have accepted the Plan in respect of such Claims; accordingly, Holders of Claims in such Classes are not entitled to vote to accept or reject the Plan.

2.    Acceptance of the Plan by Impaired, Voting Classes

Class 2(b) (AT&T Secured Claim), Class 2(c) (JDT Secured Claim) Class 3(a) (General Unsecured Claims), Class 3(b) (Administrative Convenience Claims),  and Class 4 (Equity Interests) are impaired under the Plan because Holders of Claims in such Classes will not receive immediate payment in full of such Claims or retain all of its equity rights, therefore, each Holder of a Claim in such Classes is entitled to vote to accept or reject the Plan.

An impaired Class of Claims has voted to accept the Plan if: (a) at least two-thirds in amount of the Allowed Claims voting in such Class have voted to accept the Plan; and (b) more than one-half in number of the Holders of such Allowed Claims voting in such Class have voted to accept the Plan.

D.    Classification and/or Treatment of Claims

The Plan provides that a Claim in any Class is an Allowed Claim if: (I) the Holder of such Claim has timely filed a proof of claim for such Claim or such Claim has been or hereafter is listed by Debtor on its Schedules as liquidated in amount and not disputed or contingent; and (ii) in either case as to such Claim either: (a) no objection to the allowance thereof has been interposed on or before the date that is ninety days after the Effective Date or such other applicable limitation period fixed by the Bankruptcy Court; (b) as to which any objection has been determined by Final Order to the extent such objection is determined in favor of the respective Holder; or (c) which is allowed in the Plan.

The treatment of, and any consideration to be received by, each Holder of Allowed Claims pursuant to the Plan shall be in full satisfaction, settlement, release and discharge of the respective Claims of each such Holder, except as otherwise provided in the Plan or the Confirmation Order.

1.    Administrative Expenses, Fees Payable Under Title 28, Priority Claims (non-tax claims) and DIP Loan Claims

a.    Description of Claims

"Administrative Expense Claim" shall mean and be the collective reference to all costs and expenses of administration of the Chapter 11 Case entitled to priority in payment under Sections 503(b) and 507(a)(1) of the Bankruptcy Code and quarterly fees payable to the United States Trustee pursuant to 28 U.S.C. Section 1930.  Such Claims shall include all fees and expenses of counsel to Debtor and the Committee incurred after the Petition Date as well as all fees, costs and expenses (including attorneys' fees, costs and expenses) incurred after the Confirmation Date by Reorganized Debtor in connection with the implementation of the Plan.

"Priority Tax Claim" shall mean any Allowed Claim of a governmental unit of the kind specified in Section 507(a)(8) of the Bankruptcy Code.

b.      Treatment of Allowed Claims

Each Allowed Administrative Expense Claim shall be paid in full in Cash by Reorganized Debtor on the later of:  (a) the Effective Date; or (b) the date such Claim is Allowed by a Final Order, unless the Holder of such Claim consents to other treatment; provided, however, that such Allowed Administrative Expense Claims, as well as Allowed Priority Tax Claims, representing liabilities incurred in the ordinary course of business by Debtor shall be paid in accordance with the terms and provisions of the particular transactions and any agreements relating thereto; provided further, however, that Administrative Expense Claims for fees, costs and expenses (including attorneys' fees, costs and expenses) incurred by Reorganized Debtor in connection with the implementation of the Plan after the Confirmation Date shall be paid in Cash in full without further order of the Bankruptcy Court, as and when such Claims are incurred, unless the Holder of such Claim consents to other treatment.

Each Allowed Priority Tax Claim, plus interest accrued thereon from and after the Effective Date, shall be paid in Cash by Debtor at its election either (a) in full on the Effective Date; or (b) over a period not exceeding six (6) years after the date of assessment of the Claims in accordance with the following schedule: (I) each Allowed Priority Tax Claim shall bear interest from and after the Effective Date of the Plan at the rate assessed on unpaid taxes by the Department of Treasury; (ii) on the last day of each of March, June, September and December of each after the Effective Date of the Plan commencing with March 31, 2007, the Holder of such Allowed Priority Tax Claim will be paid the interest that has accrued on such Claim during the prior full quarter  plus 1/24th of the principal amount of such Claim until such Claim has been paid in full; and (iii) the entire principal amount of such Claim and all interest accrued thereon shall be paid in full on the date that is six (6) years after the date of assessment of such Claim; provided, however, that the Holder of such Claim and Debtor may consent to other treatment.

c.      Estimated Amount

The estimated amount of Administrative Expense Claims and fees payable under Title 28 is $400,000 held by two claimants and Priority Tax Claims are estimated at $944 held by one claimant.

2.      Class 1 -- Allowed Priority Claims

a.      Description of Claims

"Priority Claims" shall mean any Claim, other than an Administrative Expense Claim and Priority Tax Claims, to the extent such Claim is accorded priority in right of payment under Section 507(a) of the Bankruptcy Code.

           b.      Treatment of Allowed Claims

Pursuant to the Plan, Holders of Allowed Priority Claims are to be paid in Cash in full from Cash on hand, from cash on hand and Exit Funding, Committed Investments and Capital Contributions unless the Holder of an Allowed Priority Claim and Debtor agree upon different terms.  Allowed Priority Claims incurred post-Petition Date in the ordinary course of business may be paid by Debtor on the date any such Allowed Priority Claim is due by its terms, and any Allowed Priority Claims that are by law subject to alternative repayment over a period of time may be paid in a manner consistent with such law by Debtor.

           c.      Voting Status

Class 1 is unimpaired, and Holders of Class 1 Claims are conclusively presumed pursuant to Section 1126(f) of the Bankruptcy Code to have accepted the Plan; accordingly, Class 1 is not entitled to vote to accept or reject the Plan.

           d.      Estimated Amount

The estimated amount of Class 1 Priority Claims is $9,500 held by two claimants for pre-Petition Date wages.

         3.      Class 1 -- DIP Loan Claims/Exit Funding Claims

           a.      Description of Claims

"DIP Loan" shall mean the lender to Debtor prior to the Confirmation Date of funds to be utilized in the payment of Confirmation Date obligations and to provide working capital liquidity. Exit Funding shall mean the proceeds from the sale of assets or other funding sources. As of the date of this Disclosure Statement, Debtor has determined not to take a DIP Loan, but rather it has obtained Exit Funding.  Class 1 was created, and remains in the Plan, as a precaution in case a DIP Loan was found that offered terms more attractive to Debtor than the Exit Funding and such lender's terms fit the business plan.

           b.      Treatment of Allowed Claims

If Debtor were to obtain a DIP Loan, the its terms would provide that the holder of the DIP Loan Claim shall have its claim "ride through" the confirmation of the Plan and shall be paid after the Confirmation Date.

           c.      Voting Status

Class 1 is unimpaired, and Holders of Class 1 Claims, if any, are conclusively presumed pursuant to Section 1126(f) of the Bankruptcy Code to have accepted the Plan; accordingly, Class 1 is not entitled to vote to accept or reject the Plan.

d.      Estimated Amount

As of the date of this Disclosure Statement, Debtor has not taken the DIP Loan, thus the current amount due is $0.

4.      Class 2(a) -- Other Allowed Secured Claims

a.      Description of Claims

Class 2(a) consists of all Secured Claims, if any, of Holders other than AT&T Secured Claim and the JDT Secured Claim.  Debtor is not aware of the existence of any Holders of Class 2(a) Claims.  Notwithstanding that fact, Debtor has provided a separate Class for other secured creditors in order to avoid delays in the plan process should any such Holders exist.

b.      Treatment of Allowed Claims

On the Effective Date, except as otherwise agreed between Debtor and any Holder of an Allowed Class 2(a) Claim, Debtor shall, at Debtor's option, either (i) deliver possession to the Holder of an Allowed Class 2 Claim all property securing such Claim, or (ii) cure any default (other than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code) that occurred before or after the Petition Date, the occurrence of which entitles a Holder of an Allowed Class 2(a) Claim pursuant to any contractual provision or applicable law to demand or receive accelerated payment of such Claim, and the maturity of such Claim shall be reinstated as such maturity existed before such default.  Payments by Debtor necessary to cure any such defaults shall be made in Cash.   The Plan shall not otherwise alter the legal, equitable or contractual rights to which such Allowed Claims entitle the Holders thereof, including, but not limited to, such rights in any collateral securing such Claims as of the commencement of the Chapter 11 Case.   If it shall be determined by appropriate order of this Court that the Holder of an Allowed Class 2(a) Claim has a lien on any asset which is part of the AT&T Collateral then Debtor shall, within 30 days of such order, shall pay the amount of such Allowed Class 2(a) claim in full.

c.      Voting Status

Class 2 is unimpaired and Holders of Class 2(a) Claims, if any, are conclusively presumed pursuant to Section 1126(f) of the Bankruptcy Code to have accepted the Plan; accordingly, Class 2(a) is not entitled to vote to accept or reject the Plan.

d.      Estimated Amount

As of the date of this Disclosure Statement, Debtor is unaware of any party asserting a security interest in property of Debtor, other than the Holders of the AT&T Secured Claim and the JDT Secured Claim and consequently, Debtor estimates the amount of this class at $0.

5.      Class 2(b) -- AT&T Secured Claim

a.      Description of Claim

Class 2(b) consists of the Allowed Secured Claims of AT&T Corp., including principal, interest, costs and expenses.  Class 2(b) Claims are secured by a lien on the AT&T Collateral. The value of the AT&T Collateral assets exceeds the amount of the Class 2(b) Claims.  Therefore, Class 2(b) Claims is entitled to be paid interest and costs and expenses.

b.      Treatment of Allowed Claim

(i) After the Effective Date, the AT&T Secured Claim will continue to accrue interest and will continue to be secured by a first priority lien on all of the AT&T Collateral.  The AT&T Secured Claim will be paid (a) $100,000 on the Effective Date; and (b) on the last day of each calendar quarter until payment of the AT&T Secured Claim in full the greater of (1) $100,000 and (2) 50% of Net Marketing Operating Income which is all income unrelated to the Intellectual Property after payment of costs of operation, costs of collection (including attorney fees), interest and taxes plus 50% of Net E-Messaging Operating Income which is all income derived from the Intellectual Property after payment of costs of operation, costs of collection (including attorney fees) and interest and taxes related thereto.  The foregoing payments shall continue until the AT&T Secured Claim is paid in full with interest and costs.   AT&T Corp. has agreed that Debtor shall have the right one time - and one time only - to forego making a quarterly payment, provided Debtor gives written notice of such intent to AT&T Corp. Prior to the 15th day of the date such quarterly payment is due.

(ii) The due date by which the entire AT&T Secured Claim must be paid in full is the earlier of 90 days after the entry of a final non-appealable order by the highest ruling court in the litigation commenced by Debtor against Yahoo! Inc. in the United States District Court for the District of Delaware against Yahoo! Inc in March 2006 which results in sufficient net proceeds to pay the AT&T Secured Claim in full or five years after the Effective Date.

(iii)  Debtor releases any Avoidance Actions it has against AT&T Corp.

(iv) Debtor specifically grants to AT&T Corp. a first priority lien on the AT&T Collateral and the Yahoo! Litigation which lien shall be deemed perfected by entry of the Order confirming the Plan.  If requested by AT&T Corp., Debtor shall enter into a security agreement with T&T Corp. To memorialize the grant of this collateral.

(v)  Debtor agrees to provide a quarterly written summary of all Intellectual Property Enforcement Actions, including, without limitation, all potential litigations and the status of the application by Yahoo!, Inc. to the United States Office of Patents and Trademarks for re-examination of U.S. Patent No. 5,930,479; and

(vi) Debtor will use its best efforts to update AT&T Corp. in the potential Intellectual Property Enforcement Actions, including the Yahoo! Litigation.

c.      Voting Status

Class 2(b) is impaired and Holders of Class 2(b) Claims are entitled to vote to accept or reject the Plan.

d.      Estimated Amount

AT&T Corp. filed a proof of claim fixing the principal amount of the AT&T Secured Claim at $4,700,000 and also claiming interest and costs.   Debtor estimates the amount of the AT&T Secured Claim at this $4,700,000 principal amount plus interest and costs.  The Plan provides for Debtor to pay interest on the foregoing at 7% per annum.

6.      Class 2(c) -- JDT Secured Claims

a.      Description of Claim

Class 2(c) consists of the Allowed Secured Claim of Joel D. Tucciarone, including principal, interest, costs and expenses.  Class 2(c) Claims are secured by a lien on the JDT Collateral.  The value of the JDT Collateral assets exceeds the amount of the Class 2(c) Claim, therefore, Class 2(c) Claim is entitled to be paid interest and costs and expenses.

b.      Treatment of Allowed Claim

 After the Effective Date, the JDT Secured Claim will remain outstanding.  The JDT Secured Claim will be paid interest each quarter at 7% per annum and principal shall be paid in 20 equal quarterly installments provided all amounts then due AT&T Corp. under this Plan have been paid.  If Debtor should fail to pay any amount due AT&T Corp. then no further payments shall be made on the JDT Secured Claim.  Notwithstanding anything to the contrary contained herein, the JDT Secured Claim is subordinate to the AT&T Secured Claim.

c.      Voting Status

Class 2(c) is impaired and Holders of Class 2(c) Claim is entitled to vote to accept or

reject the Plan.

        d.      Estimated Amount

The amount of the JDT Secured Claim is $94,700 plus interest and costs.

        7.      Class 3(a) -- Allowed General Unsecured Claims

        a.      Description of Claims

Class 3(a) consists of all Allowed Claims other than Claims included in Classes 1, 2 or 3(b).  Class 3(a) Allowed General Unsecured Claims consist primarily of Allowed Claims of trade creditors for goods and services provided to Debtor prior to the Petition Date and in one case a claim for repayment of an unsecured loan.

        b.      Treatment of Allowed Claims

Each of the Holders of Allowed Class 3(a) Claims will receive a Promissory Note with its principal amount being the amount of the Holder's Allowed Class 3(a) Claim, bearing simple interest at 7% per year and payable  in 20 quarterly payments commencing March 30, 2007 with each payment being equal to such holder's pro rata share of 25% of the Reorganized Debtor's Net Available Cash received during the prior calendar quarter.

Debtor proposes to pay Class 3(a) Allowed General Unsecured Claims in full with interest.

Holders of Class 3(a) General Unsecured Claims may elect on the ballots accompanying the Disclosure Statement and the Plan to receive the treatment under Class 3(b) Administrative Convenience Claims.

        c.      Voting Status

Class 3(a) is impaired, and Holders of Class 3(a) General Unsecured Claims are entitled to vote on the Plan.

        d.      Estimated Amount

The amount, excluding disputed amounts, of Class 3(a) General Unsecured Claims is estimated to be $1,858,500.  Debtor anticipates that actual General Unsecured Claims will be less because of elections by Holders to receive treatment as Class 3(b) Administrative Convenience Class Claims.  There are 63 creditors in Class 3(a) of which Debtor anticipates that 27 will elect to receive treatment as Class 3(b) Administrative Convenience Class Claims leaving 36 creditors in Class 3(a).

8.      Class 3(b) -- Administrative Convenience Claims

      a.      Description of Claims

Class 3(b) Claims consist of any Allowed Unsecured Claim in the amount of $5000.00 or less, or any Allowed Unsecured Claim which the Holder of such claim elects to reduce to the amount of $5000.00.

      b.      Treatment of Allowed Claims

The Holders of Allowed Class 3(b) Claims shall be paid on the Effective Date of the Plan, from Cash on hand generated by Debtor prior to the Effective Date of the Plan, cash received from an equity investor and/or proceeds from the Exit Funding, Committed Investments and Capital Contributions, $0.50 for each $1.00 of Allowed Claim held by such Holder in full and final satisfaction of all Claims of such Holder.  If the aggregate amount of Allowed Class 3(b) Administrative Convenience Claims exceeds $100,000, then Debtor may elect to either (a) still pay each Holder $0.50 for each $1.00 of Allowed Claim held by such Holder in full and final satisfaction of all Claims of such Holder; or (b) cancel Class 3(b) in which case each Holder will be treated under Class 3(a).

      c.      Voting Status

Class 3(b) is impaired, and Holders of Class 3(b) Administrative Convenience Claims are entitled to vote on the Plan.

      d.      Estimated Amount

Debtor's Schedule F, General Unsecured Creditors, and the Official Claims Register list 27 Claims which are less than $10,000 and which Debtor expects Holders of these 27 Claims to elect to have their Claims treated as Class 3(b) Claims.  The total face amount of these 27 claims is $99,438.58.  Attached as Schedule IVD8(d) is a list of all such creditors.

9.      Class 4 -- Equity Interests and Interests of the Holders of Common Stock

      a.      Description of Claims

Class 4 consists of all Equity Interests.

      b.      Treatment of Claims

Pursuant to the Plan, the Holders of Interests in Class 4 will not receive or retain

any property under the Plan on account of such Equity Interests other than common stock interests which will be cancelled and the holders of common stock will receive one share of Reorganized Debtor Stock for every share of existing common stock.  As of the Effective Date, all options to obtain shares of common stock of Debtor and any other financial instrument relating to equity in Debtor will be canceled.

            c.        Voting Status

Class 4 is impaired and the Holders of such Claims are entitled to vote on the Plan.

      E.      <u>Executory Contracts and Miscellaneous Claims</u>

            1.        Executory Contracts and Unexpired Leases

An executory contract is one where performance remains due by Debtor and the other parties to the contract.  The Bankruptcy Code gives Debtor the power after the Petition Date, subject to the approval of the Bankruptcy Court, to assume or reject executory contracts and unexpired leases.  All executory contracts and unexpired leases shall be deemed rejected by Debtor unless:  (a) expressly assumed by Debtor with Bankruptcy Court approval on or before the Effective Date; (b) subject to a motion to assume pending on the Effective Date; or (c) identified on a list to be filed with the Bankruptcy Court, on or before the Effective Date, as to be assumed; provided, however, that in the event that after the Confirmation Date, a party to an alleged executory contract or unexpired lease of Debtor contends that such contract or lease was deemed rejected by operation of Section 7.1 of the Plan, Debtor (i) shall have the right to dispute such contention and to seek a Bankruptcy Court order regarding whether such contract or lease was executory or unexpired and (ii) shall have the right to assume such lease or contract if it is determined by the Bankruptcy Court that such contract or lease is executory or unexpired.

Debtor's only known executory contract is a License Agreement with ZoEmail that is to be assumed pursuant to the Plan.

Debtor has no known leases.

At the present time, Debtor does not believe that it has any remaining executory contracts or unexpired leases that will be assumed or rejected.  If an executory contract or unexpired lease is rejected, the other party to the agreement may file a proof of claim with respect to a Claim for damages by reason of the rejection.  Any proof of claim with respect to Claims under an executory contract or unexpired lease that has been rejected must be filed with the Bankruptcy Court within 30 days after the rejection by Debtor of such contract or lease.  A Claim under an executory contract or unexpired lease which has been rejected shall constitute a Class 3(a) Claim to the extent it is allowed by the Bankruptcy Court.  To the extent that Debtor is a party to any executory contract that is deemed an illegal contract, such illegal contract shall be deemed rejected as of the Confirmation Date, and the other party to such contract shall not be entitled to

any Claim arising therefrom against Debtor or the Reorganized Debtor.

2.      Employee Claims and Compensation and Benefit Programs

Debtor does not believe it has any employee benefit plans or programs.  However, in order to provide for any such plans or programs which might exist, pursuant to the Plan, Debtor rejects all Debtor's employee benefit plans and programs.  On and after the Effective Date, pursuant to Section 1129(a)(13) of the Bankruptcy Code, the Reorganized Debtor will continue to pay any retiree benefits, as that term is defined in Section 1114 of the Bankruptcy Code, at the level established pursuant to subsection (e)(1) or (g) of Section 1114 of the Bankruptcy Code, at any time prior to Confirmation of the Plan, for the duration of the period Debtor has obligated itself to provide such benefits.  Debtor does not believe that it is obligated to pay any retiree benefits.

3.      Disputed Claims

Debtor or the Reorganized Debtor may object to the allowance of Claims filed with the Bankruptcy Court.  Objections will be litigated to a Final Order; however, Debtor or the Reorganized Debtor may compromise and settle any objections to Claims, subject to the approval of the Bankruptcy Court, and may seek Bankruptcy Court estimation of disputed Claims pursuant to section 502(c) of the Bankruptcy Code, which section permits estimation of any contingent or unliquidated claim, the fixing or liquidation of which would unduly delay the administration of the Chapter 11 Case.

As of the date of this Disclosure Statement, Debtor believes that it has filed all objections to Claims of which 1 objection remains pending, but Debtor reserves the right to file additional objections to Claims.

4.      Directors' and Officers' Indemnification

The Plan provides that any obligation of Debtor to indemnify its present directors or officers pursuant to Debtor's Articles of Incorporation, Debtor's Bylaws, applicable state law, or specific agreement shall be assumed by Debtor, except for claims based upon allegations of material misrepresentations or fraudulent misrepresentations, regardless of whether indemnification is owed in connection with an event occurring prior to, upon or subsequent to the Petition Date.

F.      Means for Execution of the Plan

1.      Distributions Under Plan.

The Plan provides for distributions of six types of assets: (a) existing assets which may be distributed to Allowed Class 2 Other Secured Claims; (b) Cash to be distributed to Holders of Administrative Expense Claims, Priority Tax Claims, Priority Claims, Class 2(b) AT&T Secured Claim, and Class 3(b) Administrative Convenience Claims, such Cash to be provided from Cash

on hand at the Confirmation Date, the DIP Loan/Exit Funding, Committed Investments and Capital Contribution, (c) promissory notes to be distributed to Holders of Class 2(b) AT&T Secured Claim, Class 2(c) JDT Secured Claim and Class 3(a) Unsecured Claims; (d) revenues of the Marketing Business and (e) proceeds of actions to enforce Debtor's rights in the Intellectual Property and collections on Avoidance Actions.

   2.  Exit Funding

   As described in Section IIIB6 above, Debtor has reached agreement with a funding source for the sale by Debtor on the Effective Date of a participation in the Yahoo! Litigation subordinate to AT&T Corp.'s interest in the Yahoo! Litigation.   The sale will result in Debtor receiving $485,000 which will be used to pay Administrative Expense Claims, Priority Claims, Priority Tax Claims and initial payments to AT&T Corp. and the general unsecured creditor administrative convenience class.    Debtor has the right to repurchase the participation from Oasis for a price which adjusts depending on when Debtor exercises the repurchase right.  Debtor intends to exercise the repurchase right by making quarterly payments to Oasis during the period from the second quarter of 2008 through the second quarter of 2009.  If the Debtor receives no net proceeds from the Yahoo! Litigation, then Debtor owes the funding source nothing.

   Debtor does not require the proceeds from this Exit Funding in order to pay its Administrative Expense Claims because (1) Debtor has sufficient Committed Investments to pay its Administrative Expense Claims in full other than those of its two law firms; and (2) in such event, Debtor's two law firms have agreed to be paid over time after confirmation of a Plan.

   3.  Committed Investments

   As described in Section IIIB6 above, Debtor has reached agreement with certain investors to make equity contributions during the first quarter of 2007 which may be used to fund operations and, to the extent required, payments under the Plan.

   4.  Capital Contribution

   On the Effective Date, Debtor's existing holders of common stock  will contribute $25,000 in cash to be used to pay Administrative Expense Claims and/or for working capital purposes.

   5.  Obligations of the Reorganized Debtor

   The Reorganized Debtor shall administer its business and property from and after the Effective Date.  Except as otherwise provided herein, including without limitation the provisions for continuing liens in favor of the Holders of Class 2 Secured Claims on the Effective Date, all assets of Debtor's estate shall vest in the Reorganized Debtor free and clear of all liens, Claims, Encumbrances and Interests, but subject to rights of Holders of Allowed Claims to obtain distributions provided in the Plan.

The Reorganized Debtor shall be responsible:  (a) for making the distributions of Cash in accordance with the Plan; (b) the prosecution of actions to enforce Debtor's rights in the Intellectual Property, (c) the prosecution of the Avoidance Actions, and (d) for the affairs of the Reorganized Debtor from and after the Effective Date.  The Reorganized Debtor shall have the exclusive power, on behalf of and in the name of Debtor, to prosecute, defend, compromise, settle or otherwise deal with all litigations.

The Reorganized Debtor may retain such personnel or professionals (including, without limitation, legal counsel, financial advisors or other agents) as it deems appropriate, and compensate such professionals without prior approval of the Bankruptcy Court.  Professionals so retained need not be "disinterested" as that term is defined in the Bankruptcy Code and, specifically, may include, without limitation, counsel to Debtor.

      6.      Cancellation of Notes and Instruments

On the Effective Date, the respective rights and obligations of Debtor and each Holder of a Claim or an Equity Interest shall be terminated and canceled except to the extent of a right to receive a distribution under the Plan and as to the rights of Holders of Class 2 Secured Claims  to continued liens on certain of Reorganized Debtor's assets.  Notwithstanding anything to the contrary in the Plan or this Disclosure Statement, AT&T Corp. will retain all of its rights under its Pre-Petition documentation and its first priority security interest in the AT&T Collateral and the Yahoo! Litigation and the proceeds thereof.

      7.      Preservation of Rights of Action

Except as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement entered into in connection with the Plan, in accordance with Section 1123(b) of the Bankruptcy Code, Debtor shall transfer to the Reorganized Debtor all of Debtor's (whether as debtor or debtor-in-possession) right to enforce any claims, rights and causes of action including, without limitation, all rights under Bankruptcy Code  Sections 329, 510, and 544 through 550 inclusive.  The Reorganized Debtor may, in its sole discretion, pursue or refrain from pursuing those rights or causes of action, as appropriate, in accordance with what is in the best interests of the Reorganized Debtor.

Debtor has undertaken a review of causes of action under Sections 544 to and including 548 of the Bankruptcy Code.  This review resulted in one action being brought against Privit Financial Corp. to recover an alleged constructively fraudulent conveyance under Section 548 of the Bankruptcy Code which action was settled for 50% of the claimed amount and this settlement was approved by order of the Court.  Debtor believed that it had an action against Intel Corporation for recovery of an alleged constructively fraudulent conveyance under Section 548 of the Bankruptcy Code which it brought, but subsequently withdrew upon presentation of documentation by Intel Corporation.  Debtor has brought an action against AT&T Corp. for an alleged constructively fraudulent conveyance under Section 548, but such action did not seek

recovery of funds, rather the removal of a security interest.  This action is settled pursuant to the Plan through the agreement by AT&T Corp. to support the Plan and accept payments over time. Debtor does not believe that it has any claims for recovery of preferential transfers under Section 547 of the Bankruptcy Code which exceed $10,000 and, in any event, since the Plan proposes to pay general unsecured creditors 100% of their claims plus interest, Debtor does not believe it is in its best interest or the best interest of its creditors and estate to seek recovery of preferential transfers under such circumstances.

    8.   Objections to Claims

   Objection to Claims, including Administrative Expense Claims, shall be filed with the Bankruptcy Court and served upon the Holder of such Claim within such time as may be fixed by the Bankruptcy Court.

    9.   Plan Distributions

    a.   Distribution of Property Under the Plan.

    (1)   Interim and Final Distributions.  As soon as practicable on or after the Effective Date, the Cash shall be disbursed by Reorganized Debtor in the manner and priority set forth in the Plan.  Reorganized Debtor has the authority to make such interim distributions as it may determine to be appropriate pending a final distribution.  Reorganized Debtor shall hold sufficient funds in reserve for distribution to Holders of Claims to which an objection has been filed.  Upon entry of a Final Order resolving any objection to a Claim, Reorganized Debtor may make any required distribution to the Holder of such Claim.  Upon entry of a Final Order resolving all objections to allowance of Claims, a final distribution shall be made to all Holders of Allowed Claims entitled thereto.  All accrued and future claims for expenses incurred by any entities employed by Reorganized Debtor to implement the Plan shall be paid by Reorganized Debtor.  Provisions for treatment of Disputed Claims, contingent Claims and Unliquidated Administrative Expense Claims are set forth in Article VIII of the Plan.

    (2)   Manner of Payment Under the Plan. The Cash distributions made pursuant to the Plan shall be in U.S. dollars by checks drawn on domestic banks selected by the Reorganized Debtor, or by wire transfer from a domestic bank selected at the Reorganized Debtor's option, the choice of check or wire to be at the Reorganized Debtor's sole discretion.

    (3)   Delivery of Distributions and Undeliverable or Unclaimed Distributions.

    (a)  Delivery of Distributions In General.  Distributions to holders of Allowed Claims made by check shall be distributed by first class mail, postage pre-paid,  as follows: (I) at the addresses set forth on the respective proofs of claim filed by such Holders; (ii) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtor after the date of any related proof of claim; or (iii) at the address reflected on Debtor's Schedules of Assets and Liabilities if no proof of claim is filed and the Reorganized Debtor has not received

DisclStmt3rdAmdPlanFinal.wpd    51

a written notice of a change of address.

(b)  Undeliverable Distributions.

i)  Holding and Investment of Undeliverable Property.  If the distribution to the Holder of any Claim is returned to a Reorganized Debtor as undeliverable, no further distribution shall be made to such Holder unless and until Reorganized Debtor is notified in writing of such Holder's then current address.  Except as provided herein, undeliverable distributions shall remain in the possession of Reorganized Debtor until such time as a distribution becomes deliverable or such distribution becomes subject to Section 7.2(b) of the Plan.

ii)  Distribution of Undeliverable Property and Failure to Claim Undeliverable Property.  Any Holder of an Allowed Claim who does not assert a claim for an undeliverable distribution held by a Reorganized Debtor within one year after the Effective Date shall no longer have any Claim to or in such undeliverable distribution, and shall be forever barred from receiving any distributions under the Plan.  In such cases, any property held for distribution on account of such Claims shall be returned to or retained by Reorganized Debtor and be deemed paid or tendered to Reorganized Debtor, free from any restrictions thereon.  Nothing contained in the Plan shall require Debtor or Reorganized Debtor to attempt to locate any Holder of an Allowed Claim.

(c)  Time of Payments.  All payments under this Plan shall be made on or prior to December 31 of each year until all plan payments are made in full, except for those payments which are specifically required to be made on the Effective Date.

b.  Compliance With Tax Requirements.  In connection with the Plan, to the extent applicable, Reorganized Debtor shall comply with all withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.

c.  Setoffs.  Debtor or Reorganized Debtor may, but shall not be required to, set off against any Allowed Claim claims of any nature that Debtor or Reorganized Debtor may have against the Holder of such Allowed Claim; provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim against Debtor or Reorganized Debtor shall constitute a waiver or release by Debtor or Reorganized Debtor of any claim that Debtor or Reorganized Debtor may possess against such Holder.

G.  Other Documents and Actions

Debtor and the Reorganized Debtor may execute such documents and take such other action as is necessary to effectuate the transactions provided for in the Plan.

H.     Effects of Confirmation

1.          Discharge

The Plan provides that, upon the Effective Date, the provisions of the Plan shall bind all Holders of Claims and Equity Interests, whether or not they accept the Plan, and discharge Debtor and the Reorganized Debtor from all Claims that arose before the Petition Date except as to the rights of Holders of Claims to receive a distribution under the Plan. The distributions provided for Creditors shall not be subject to any Claim by another Creditor by reason of any assertion of a contractual right of subordination. In addition, the distribution shall be in exchange for and in complete satisfaction, discharge and release of all Claims that Creditors may have against Debtor and the Reorganized Debtor or any of their assets or properties, and any such Creditor shall be precluded from asserting against Debtor or the Reorganized Debtor or any of their assets any other or further Claims based on any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.

2.          Retained Jurisdiction. Notwithstanding entry of the Confirmation Order or the Effective Date having occurred, the Bankruptcy Court will retain jurisdiction of all matters arising out of, and related to, the Chapter 11 Case and the Plan pursuant to, and for the purposes of, Sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

a. to determine all questions and disputes regarding title to the assets of Debtor and the Reorganized Debtor, all causes of action, controversies, disputes or conflicts, whether or not subject to any pending action as of the Effective Date, between Debtor, the Reorganized Debtor and any other party, including, without limitation, any right to recover assets pursuant to the provisions of the Bankruptcy Code;

b. to modify the Plan after the Effective Date pursuant to the Bankruptcy Code and the Bankruptcy Rules;

c. to enforce and interpret the terms and conditions of the Plan;

d. to enter such orders, including, but not limited to, such future injunctions as are necessary to enforce the respective title, rights and powers of Debtor and the Reorganized Debtor, and to impose such limitations, restrictions, terms and conditions on such title, rights and powers as the Bankruptcy Court may deem necessary;

e. to enter an order closing the Chapter 11 Case;

f. to supervise a distribution of Cash or property pursuant to the Plan;

g. to correct any defect, cure any omission or reconcile any inconsistency in the Plan or the Confirmation Order as may be necessary to implement the purposes and intent of the

Plan;

        h.  to determine any and all objections to the allowance of Claims;

        i.  to determine any and all applications for allowances of compensation and reimbursement of expenses and the reasonableness of any fees and expenses authorized to be paid or reimbursed under the Bankruptcy Code or the Plan;

        j.  to determine any motions pending on the Effective Date for the rejection, assumption or assumption and assignment of any Executory Contract, to hear and determine, and, if need be, to liquidate any and all Claims arising therefrom, and to adjudicate any other issues arising under Section 7.1 of the Plan;

        k.  to determine any and all applications, motions, adversary proceedings and contested matters that may be pending on the Effective Date;

        l.  to consider any modification of the Plan, whether or not the Plan has been substantially consummated, to remedy any defect or omission or reconcile any inconsistency in any order of the Bankruptcy Court, to the extent authorized by the Plan or the Bankruptcy Court;

        m.  to determine all controversies, suits and disputes that may arise in connection with the interpretation, enforcement or consummation of the Plan;

        n.  to consider and act on the compromise and settlement of any claim against or cause of action by or against Debtor arising under or in connection with the Plan;

        o.  to issue such orders in aid of execution of the Plan to the extent authorized by Section 1142 of the Bankruptcy Code;

        p.  to determine such other matters as may be set forth in any order or orders confirming the Plan or which may arise in connection with the Plan or any order or orders confirming the Plan;

        q.  to administer the AT&T Secured claim, JDT Secured Claim and Other Secured Claims and any matters related thereto; and

        r.  to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated.

        3.        Additional Jurisdiction.  If the Bankruptcy Court abstains from exercising jurisdiction or is otherwise without jurisdiction over any matter arising out of the Chapter 11 Case, including without limitation the matters set forth in this Article, this Article shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

4.        Failure of Bankruptcy Court to Exercise Jurisdiction.  If the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction, or is otherwise without jurisdiction over any matter arising out of the Chapter 11 Case, including any of the matters set forth in the Plan, the Plan shall not prohibit or limit the exercise of jurisdiction by any other court of competent jurisdiction with respect to such matter.

I.        Modification of the Plan

If and to the extent that Debtor determines it necessary or desirable in order to consummate the Plan, Debtor may seek to amend or modify the Plan or waive the terms of the Plan at any time prior to the Confirmation Date in the manner provided for by Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 or as otherwise permitted by law without additional disclosure pursuant to Section 1125 of the Bankruptcy Code, except as the Bankruptcy Court may otherwise order.  The potential impact of any such amendment or modification on the Holders of Claims and Equity Interests cannot now be foreseen, but may include a change in the economic impact of the Plan on some or all of the Classes or a change in the relative rights of such Classes.  If any of the terms of the Plan are amended in a manner determined by Debtor to constitute a material change, or which adversely affects distributions to Holders of Allowed Claims, Debtor will, to the extent required by the Bankruptcy Code, promptly disclose any such amendment in a manner reasonably calculated to inform the Holders of Allowed Claims which are impaired by such amendment.

If, after receiving the requisite acceptances but prior to Confirmation of the Plan, Debtor were to seek to modify such Plan, Debtor could use such previously solicited acceptances only if: (i) all adversely affected Creditors accepted the modifications in writing; or (ii) the Bankruptcy Court determined, after notice to the Committee, the Office of the United States Trustee and other designated parties, that such modifications were *de minimis* or purely technical or otherwise did not adversely change the treatment of Holders of accepting Claims.

J.        Withdrawal of the Plan

Debtor reserves the right to revoke or withdraw the Plan at any time before the Confirmation Date.  If Debtor revokes or withdraws the Plan prior to the Confirmation Date, or if the Confirmation Date or the Effective Date does not occur, then the Plan shall be deemed null and void.  In such event, nothing contained herein shall be deemed to constitute an admission of validity, waiver or release of any claims by or against Debtor or any other Person or prejudice in any manner the rights of Debtor or any Person in any proceeding involving Debtor.

K.        Conditions to the Confirmation Date and Effective Date of the Plan

1.        Each of the following shall be a condition precedent to the Confirmation Date:

a.  The Confirmation Order shall approve in all respects all of the provisions, terms and conditions of the Plan; and

DisclStmt3rdAmdPlanFinal.wpd            55

b. The Confirmation Order and the Plan shall be in form and substance satisfactory to Debtor in its sole discretion.

2.    Each of the following shall be a condition precedent to the Effective Date of, and consummation of, the Plan:

a.  The Confirmation Date shall have occurred;

b.  No stay shall be in effect with respect to the Confirmation Order;

c.  The Confirmation Order shall be a Final Order, unless waived by Debtor; and

d.  All documents, agreements and instruments required for the consummation of the Plan have been executed, are not subject to dispute and are valid and legally binding obligations of the parties thereto.

L.    Consequences in the Event that the Effective Date of the Plan Does Not Occur

In the event that the Effective Date of the Plan does not occur on or before June 1, 2007: (a) all property of Debtor's estate and all property of the Reorganized Debtor or its estate shall revest in Debtor's estate; (b) the Plan, automatically without further order of the Bankruptcy Court, shall be, and shall be deemed, null and void, with no force or legal effect whatsoever; and (c) the Confirmation Order, automatically without further order of the Bankruptcy Court, shall be, and shall be deemed, null, void and vacated, with no force or legal effect whatsoever.

V.  CONFIRMATION AND CONSUMMATION PROCEDURE

A.    Classification and Effects of Reclassification

Debtor is required under section 1122 of the Bankruptcy Code to classify the Claims and Equity Interests of its Creditors and Holders of Interest into Classes that contain Claims and Equity Interests that are substantially similar to the other Claims or Equity Interests in such Class. While Debtor believes that it has classified all Claims and Equity Interests in compliance with the provisions of section 1122 of the Bankruptcy Code, it is possible that a Creditor or Holder of an Interest may challenge Debtor's classification of Claims or Equity Interests and the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.  In such event, it is the present intention of Debtor to modify the Plan to provide for whatever reasonable classification might be required by the Bankruptcy Court for Confirmation and to use the acceptances received by Debtor from any Person pursuant to this Disclosure Statement, to the extent permitted by the Bankruptcy Court, for the purpose of obtaining the approval of the Class or Classes of which such Person is ultimately deemed to be a member.

Any reclassification of Claims required by the Bankruptcy Court could adversely affect the Class in which such Claim was initially classified and/or any other Classes under the Plan by

changing the composition of such Classes and the required vote thereof for approval of the Plan. Furthermore, a reclassification of Claims after approval of the Plan could necessitate the resolicitation of a completely new plan of reorganization.

B.     Acceptance of the Plan

As a condition to confirmation of a plan of reorganization, the Bankruptcy Code generally requires that each impaired class of claims or equity interests accept the plan.  Classes of claims and equity interests that are not impaired under a plan are deemed to have accepted the plan and are not entitled to vote.  Classes of claims and equity interests that are impaired and will receive or retain no property under the plan are deemed to have rejected the plan.

Classes 1 and 2(a) are unimpaired and, therefore, the Holders of Claims in such Classes are conclusively presumed pursuant to Section 1126(f) of the Bankruptcy Code to have accepted the Plan.  Accordingly, the votes of Holders of Claims in Classes 1 and 2(a) are not being solicited.

Classes 2(b), 2(c), 3(a), 3(b) and 4 are impaired and, therefore, the Holders of Claims in Classes 2(b), 2(c), 3(a) and 3(b) and Interests in Class 4 are entitled to vote to accept or reject the Plan.

The Bankruptcy Code defines acceptance of a plan by a Class of claims as acceptance by holders of two-thirds in dollar amount and more than one-half in number of the allowed claims of that Class that timely voted on a plan.  A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

A vote to accept or reject the Plan can occur *only* by proper submission of a duly executed Ballot.  Failure of a Holder of a Claim to vote does *not* constitute a vote to reject the Plan by that Holder.

C.     Confirmation

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing.  At the confirmation hearing, the Bankruptcy Court will confirm the Plan only if all the requirements of Section 1129(a) of the Bankruptcy Code are met.  Among the requirements for confirmation of the Plan under Section 1129(a) of the Bankruptcy Code are that: (i) the Plan (and Debtor, as the Plan proponent) complies with the applicable provisions of the Bankruptcy Code; (ii) the Plan was proposed in good faith and not by means forbidden by law; (iii) there is acceptance by at least one Class of impaired Creditors; (iv) the Plan is feasible; and (v) the Plan meets the best interests of creditors test.

1.      The Plan Complies With All Provisions of the Bankruptcy Code

The Plan complies with all provisions of the Bankruptcy Code.  Specifically, the Plan contains all the mandatory provisions required by Section 1123(a) of the Bankruptcy Code and satisfies certain discretionary provisions set forth in Section 1123(b) of the Bankruptcy Code.

2.      The Plan Is Proposed In Good Faith

The Plan is the result of Debtor's good faith attempt to provide for payment in full of its Creditors in light of the fact that a liquidation will result in a minimal distribution to Creditors.

3.      Acceptance by Impaired Class

Class 2(b), 3(a) and 3(b) Claims and Class 4 Interests are impaired and shall receive property under the Plan and, therefore, are entitled to vote on the Plan.  The Bankruptcy Code defines acceptance of a plan by a Class of claims as acceptance by holders of two-thirds in dollar amount and more than one-half in number of the claims of that Class that timely voted on a plan.

4.      Feasibility

For confirmation of a plan, the Bankruptcy Code requires a finding that confirmation is not likely to be followed by liquidation or the need for further financial reorganization.  Based upon its financial projections, Debtor believes that the Reorganized Debtor will not require further financial reorganization after the Confirmation Date.

5.      Best Interests Test

Even if the Plan is accepted by each Class of Impaired Claims, in order to confirm the Plan the Bankruptcy Court must independently determine that the best interests test under Section 1129(a)(7) of the Bankruptcy Code (the "Best Interests Test") is satisfied.  The Best Interests Test requires that either: (a) each member of an impaired Class of Claims or Equity Interests has accepted the Plan; or (b) the Plan will provide any non-accepting member a recovery that has a value equal to at least the value of the distribution that such non-accepting member would receive if Debtor were liquidated under Chapter 7 of the Bankruptcy Code.  Recoveries under the Plan are substantially better than those in a liquidation under Chapter 7, therefore satisfying the Best Interests Test.  See "Chapter 7 Liquidation Analysis" set forth below.

D.      Confirmation Without Acceptance by all Impaired Classes

If any Class rejects the Plan, Debtor will seek to have the Plan confirmed pursuant to Section 1129(b) of the Bankruptcy Code which provides that, so long as at least one impaired Class has accepted the Plan, Debtor may seek confirmation of the Plan over the rejection of a Class of creditors or equity interests.  Debtor also reserves the absolute right to seek Confirmation of the Plan under Section 1129(b) of the Bankruptcy Code if the Plan cannot be

consensually confirmed.  To obtain such confirmation, Debtor must demonstrate to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to any dissenting Class.

The "unfair discrimination" test requires, among other things, that the Plan recognize the relative priorities among Creditors and Holders of Equity Interests established under the Bankruptcy Code.  The Plan does recognize such relative priorities because all creditors are receiving a 100% distribution plus interest unless such creditors elect to receive a lower distribution.

The Bankruptcy Code establishes different a "fair and equitable" test for creditors and equity interest holders.  In essence, a plan is fair and equitable with respect to a Class of unsecured claims if, among other things, the holder of any claim or interest junior in priority to the unsecured claims receives nothing under the plan.  The Plan satisfies this provision of the Bankruptcy Code.  Similarly, the Plan satisfies the Bankruptcy Code's requirements for confirmation over the objection of a Class of equity security holders.

E.     Chapter 7 Liquidation Analysis

Typically, a Chapter 7 liquidation consists of the liquidation of a debtor's assets and business by a court-appointed Chapter 7 trustee. If a debtor's business cannot be readily marketed on a going-concern basis, the trustee will terminate the activities of such business and attempt to realize maximum value for such debtor's assets.  In any case, the net proceeds of such dispositions will ultimately be distributed to creditors in accordance with statutory priorities.

The net proceeds from the liquidation of debtor's assets would be used to pay the costs and expenses of administering the Chapter 7 case (e.g., the statutory fees of the trustee, the fees and costs of counsel and other professionals, including professionals retained by the trustee, brokers retained by the trustee, asset disposition expenses and litigation costs), and then to satisfy debtor's secured and unsecured creditors in accordance with their respective priorities.

Debtor believes that in a Chapter 7 liquidation, a trustee would not recover as great a value for Debtor's assets and the fees and expenses of a trustee and the trustee's professionals would further erode the available assets.  Attached hereto as Exhibit VE is a liquidation analysis based upon the book values of Debtor's assets and liabilities as of September 30, 2006, which analysis reveals that in a liquidation, Holders of Class 3(a) Claims (General Unsecured Creditors) will receive no distribution.

Creditors will receive more under the Plan than they would in a liquidation for several reasons.  First, the Holders of Secured Claims have security interests in and liens upon substantially all of Debtor's assets to secure claims in excess of $4.7 million.  Therefore, for unsecured creditors to receive anything in a Chapter 7 liquidation, a Trustee - unfamiliar with Debtor's assets and business - would have to realize in excess of $4.7 million.  Debtor is unaware of any existing entity that would pay a Chapter 7 trustee $4.7 million for Debtor's assets. Accordingly, Holders of Allowed General Unsecured Claims would receive nothing in a Chapter 7

liquidation.  Under the Plan, however, Holders of Allowed General Unsecured Claims and Administrative Convenience Claims will receive Cash in the full amount of their claims plus interest.

## VII.   ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed or consummated, the theoretical alternatives include, (a) a different plan of reorganization, (b) dismissal of the Chapter 11 Case, or (c) liquidation of Debtor under Chapter 7 of the Bankruptcy Code.

Debtor believes that if it were successful in avoiding the AT&T Corp.  lien then it would be able to propose a plan that would result in payment in full of Creditors.   However, Debtor would be required to expend significant time and resources to attacking AT&T's Corp.'s asserted secured claim with no certainty of success and such litigation would unduly delay Debtor's emergence from bankruptcy and would impede Debtor's ability to raise licensing revenue and equity for the development of new applications for the Intellectual Property and consequently putting Debtor in danger of being unable to emerge from bankruptcy.  Therefore, Debtor believes that the Plan as proposed offers the most certain and quickest payout to creditors.

Debtor believes that upon a dismissal of the Chapter 11 Case, AT&T Corp. will take immediate action to seize Debtor's assets thereby resulting in no distribution to other creditors.

If no plan can be confirmed, the Chapter 11 Case may be converted to a case under Chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of Debtor for distribution in accordance with priorities established by the Bankruptcy Code.  As discussed in detail above, Debtor believes that liquidation under Chapter 7 would result in Holders of Allowed General Unsecured Claims receiving nothing.

## VIII.   VOTING INSTRUCTIONS

### A.     Record Date

A Record Date for voting purposes has been established for the Holders of Classes  2(b), 3(a), 3(b) and 4.  THE RECORD DATE FOR VOTING ON THE PLAN IS FEBRUARY 6, 2007. To be entitled to vote, the Holder of any Class 2(b), 3(a) and 3(b) claim against or Class 4 interest in Debtor must be the Holder of such claim or interest as of the close of business on the Record Date and must otherwise properly and timely submit the Ballot sent to such Holder.

### B.     Withdrawal of Votes

Any Holder who has previously filed prior to the deadline for voting a properly completed Ballot, may revoke and change such vote by filing a notice of revocation or change with the Clerk of the Court with a copy to Debtor all prior to the deadline for voting.  In the case where more than one timely, properly completed Ballot is received, only the one which bears the latest date will be counted.

In order to be valid, a notice of revocation or change must: (i) specify the name of the Holder who submitted the Ballot; (ii) contain the description of the Claims to which the Ballot relates and the aggregate principal amount thereof; and (iii) be signed by the Holder in the same manner as on the Ballot. Debtor expressly reserves the absolute right to contest the validity of any revocation or change of Ballots.

After expiration of the deadline for voting, no Ballot may be revoked or changed.

C.       Incomplete Ballots

Any Ballot received which does not indicate either an acceptance or rejection of the Plan shall be deemed to constitute an acceptance of the Plan.

D.       Deadline for Voting

TO BE COUNTED, YOUR BALLOTS MUST BE RECEIVED BY THE CLERK OF THE UNITED STATES BANKRUPTCY COURT BY 4:30 P.M. EASTERN TIME ON APRIL 25, 2007.

E.       Additional Instructions

For certain other voting instructions, Holders of Claims and Equity Interests should review carefully and follow the instructions set forth on the Ballot and Holders of Class 3(a) General Unsecured Claims who wish to elect treatment as Class 3(b) Convenience Class Claims should review carefully and follow the instructions set forth on the Ballot.

## VIV.   CERTAIN FEDERAL INCOME TAX CONSIDERATIONS

The following discussion is a summary of certain U.S. federal income tax consequences expected to result from the implementation of the Plan. This discussion is based on the Internal Revenue Code of 1986, as amended (the "Code"), as in effect on the date of this Disclosure Statement and on United States Treasury Regulations in effect (or in certain cases, proposed) on the date of this Disclosure Statement, as well as judicial and administrative interpretations thereof available on or before such date. All of the foregoing are subject to change, which could apply retroactively and could affect the tax consequences described below. There can be no assurance that the Internal Revenue Service (the "IRS") will not take a contrary view with respect to one or more of the issues discussed below, and no ruling from the IRS has been or will be sought with respect to any issues which may arise under the Plan. The following summary is for general information only and does not purport to address all of the U.S. federal income tax consequences that may be applicable to Debtor. The following discussion does not address state, local or foreign tax considerations that may be applicable to Debtor.

A.     Certain Tax Consequences to Debtor

1.   Utilization of Debtor's Net Operating Loss Carryovers and Built-in Losses

Section 382 of the Code imposes an annual limitation on the amount of taxable income of a "loss corporation" that may be offset by net operating loss carryovers ("NOLs") and certain built-in losses (referred to collectively as pre-change loss) that are attributable to the period preceding an "ownership change." In general, if an ownership change occurs, the amount of taxable income of the loss corporation after the change that may be offset by pre-change losses will not exceed the product of the value of the company's stock immediately before the change and the Federal long-term tax exempt rate (the "Section 382 Limitation"). If a loss corporation that has undergone an ownership change does not continue its business enterprise (or use a significant portion of its historic business assets) for the two year period beginning on the change date, the Section 382 Limitation will be zero. As of December 31, 2005, Debtor's federal net operating loss carryforward of approximately $61,000. Consequently, Debtor is a loss corporation.

An ownership change will occur if one or more "5-percent shareholders" (shareholders who own (directly or indirectly) 5% or more of the loss corporation stock) increase their ownership, in the aggregate, by more than fifty percentage points during the three-year "testing period" (generally, the prior three years). Changes in direct and beneficial ownership of each 5-percent shareholder are taken into account in determining whether an ownership change occurs. For this purpose, shareholders who directly own less than 5% of the loss corporation stock are grouped together and treated as a single 5-percent shareholder referred to as a "public group." Additional public groups are created by certain types of transactions. A loss corporation is required to determine whether an ownership change has occurred on each testing date. A testing date occurs upon any event that affects the ownership of stock by a 5-percent shareholder. Thus, a testing date will result from a public offering of stock, the issuance of an option, or a stock for debt exchange. Except as may be provided in regulations to be issued, shifts in ownership attributable solely to fluctuations in the relative fair market value of different classes of stock are not taken into account.

In determining whether an ownership change occurs, it is necessary to evaluate each 5-percent shareholder's ownership of "stock." The determination of the percentage of stock owned by any person is made on the basis of the relative fair market value of the stock owned to the total fair market value of the stock outstanding. For this purpose, the term "stock" generally does not include any stock that is not entitled to vote, is limited and preferred as to dividends and does not participate in corporate growth to any significant extent, has redemption and liquidation rights which do not exceed the stock's issue price (except for a reasonable redemption or liquidation premium), and is not convertible into another class of stock. In addition, options or similar interests may be treated as resulting in a deemed acquisition of stock on the date of their issuance or transfer if a principal purpose of the issuance, transfer or structuring of the option (alone or in combination with other arrangements) is to avoid or ameliorate the impact of an ownership change. Further, Treasury regulations contain broad authority for the

re-characterization of certain "non-stock" ownership interests as stock if, upon issuance or transfer to or by a 5-percent shareholder, the ownership interest offers a potential significant participation in the corporation's growth.

If a loss corporation has two (or more) ownership changes, any losses attributable to the period preceding the earlier ownership change are treated as pre-change losses with respect to both ownership changes. As a result, the later ownership change may result in a lesser (but never a greater) Section 382 Limitation with respect to such losses. Debtor's management expects to take the position that, for purposes of determining Debtor's Section 382 Limitation, Debtor has not undergone an ownership change.

Section 382(l)(5) of the Code provides an exception to the Section 382 Limitation described above. In particular, section 382(i)(5) provides that this limitation does not apply if (i) the loss corporation is under the jurisdiction of a court in a Title 11 case, and (ii) the shareholders and creditors of the old loss corporation (determined immediately before such ownership change) own (after such ownership change and as a result of being shareholders or creditors immediately before such change) stock representing at least 50% of the vote and value of the new loss corporation.

If the requirements of section 382(l)(5) are not satisfied, or the loss corporation elects not to apply it, then section 382(l)(6) of the Code provides a special rule for insolvency transactions. Section 382(l)(6) provides that the value of the loss corporation, for purposes of determining the amount of Section 382 Limitation, shall reflect the increase in value of the loss corporation resulting from the surrender or cancellation of creditor claims in the transaction. Section 1.382-9(j) of the Regulations provides that for purposes of section 382(l)(6), the value of the loss corporation will equal the lesser of the value of the stock of the loss corporation immediately after the ownership change or the value of the loss corporation's pre-change assets.

Section 382(l)(1) of the Code provides that certain capital contributions are not taken into account in determining the value of the loss corporation if the principal purpose of the contribution is to avoid or increase the Section 382 Limitation. Moreover, there is a presumption that capital contributions made during the two year period ending on the change date are part of a plan to avoid or increase the Section 382 Limitation. However, if section 382(l)(6) applies, Treas. Reg. Section 1.382-9(k)(4) provides that section 382(l)(1) does not apply in determining the value of the stock of the loss corporation immediately after the ownership change.

Upon consummation of the Plan, Debtor will not undergo an ownership change within the meaning of section 382 of the Code. Thus, it is expected that the requirements of section 382(l)(5) of the Code will apply.

Several significant issues affect the analysis of the availability of Debtor's pre-Petition Date loss to offset post-Confirmation Date income. First, the IRS may challenge Debtor's position regarding an ownership change. Second, the IRS may challenge the calculation of Debtor's value for purposes of determining the limitation on the use of NOLS.

DisclStmt3rdAmdPlanFinal.wpd                    63

Due to the subjective nature of some of the critical determinations, and the lack of substantial legislative, judicial, or administrative guidance relating to the above-described issues, no assurance can be provided that Debtor's NOL carryovers and built-in losses (if any) will be available to offset income following consummation of the Plan.

2.      Accrued Interest

To the extent that there exists accrued but unpaid interest on the indebtedness owing to Holders of Allowed Claims, and to the extent that such accrued but unpaid interest has not previously been deducted by Debtor, portions of payments made in consideration for the indebtedness underlying such Allowed Claims which is allocated to accrued but unpaid interest should be deductible by Debtor.  To the extent Debtor has previously taken a deduction for accrued but unpaid interest, any amounts so deducted which are not ultimately paid will be treated as cancellation of indebtedness income.  Debtor will then be required to reduce its tax attributes as described above.

3.      Alternative Minimum Tax

In general, an alternative minimum tax ("AMT") is imposed on a corporation's minimum taxable income at a 20% rate to the extent such tax exceeds the corporation's regular U.S. federal income tax.  For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated.  In particular, even though a corporation might otherwise be able to offset all of its taxable income for regular tax purposes by available NOL carryforwards, only 90% of a corporation's taxable income for AMT purposes may be offset by available NOL carryforwards (as computed for AMT purposes).  In addition, if a corporation has undergone an ownership change within the meaning of section 382, and the corporation has a net unrealized built-in loss (within the meaning of section 382(h)), then the adjusted basis of each asset of the corporation immediately after the ownership change, for AMT purposes, shall be its proportionate share of the fair market value of the assets of the corporation immediately before the ownership change.

Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against its regular U.S. federal income tax liability in future taxable years when the corporation is no longer subject to AMT.

B.      Certain Tax Consequences to Creditors

Holders of Allowed Claims may realize income, gain, loss, or deduction as a result of the Plan.  The outcome depends on Debtor completing its Plan.  Such income, gain, loss or deduction may or may not be recognized, depending upon the circumstances giving rise to the Claims, the type of consideration received, and their federal income tax accounting method.

THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF HIS PARTICULAR CIRCUMSTANCES AND INCOME TAX SITUATION.  THE TAX CONSEQUENCES TO EACH CLAIM HOLDER WILL VARY BASED ON THE HOLDER'S CIRCUMSTANCES.  ACCORDINGLY, EACH CLAIM HOLDER SHOULD CONSULT WITH A TAX ADVISOR AS TO THE SPECIFIC TAX CONSEQUENCES TO SUCH HOLDER OF THE PLAN, INCLUDING THE APPLICATION AND EFFECT OF FEDERAL, STATE, LOCAL, FOREIGN AND OTHER TAX LAWS.

IX.  <u>CONCLUSION AND RECOMMENDATION</u>

Voting on the Plan by each Holder of a Claim or Equity Interest entitled to vote is important.  After carefully reviewing the Plan and this Disclosure Statement, please indicate your vote on the enclosed Ballot and return it in the pre-addressed envelope provided for this purpose. **Debtor urges Holders of Impaired Claims and Equity Interests to vote to accept the Plan and to evidence such acceptance by returning their Ballots so that they will be received as provided herein no later than April 25, 2007.**

Date:  New York, New York
        February 7, 2007

Respectfully submitted,

**ZOETICS, INC.**

By:  _____/s/_____
Name: Patrick Tighe
Its:     President

Attorneys for Debtor

**B. Lane Hasler, P.C.**
**80 Broad Street**
**5th Floor**
**New York, NY 10004**
**Tel: 212-837-7977**

DisclStmt3rdAmdPlanFinal.wpd