IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ZOETICS, INC. and ZOEMAIL, LLC, | ) | |
| | ) | |
| Plaintiffs and Counterclaim Defendants, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-108 (JJF) |
| | ) | |
| YAHOO!, INC., | ) | |
| | ) | |
| Defendant and Counterclaim Plaintiff. | ) | |
| | ) | |

## NOTICE OF SUPBOENAS

PLEASE TAKE NOTICE THAT, pursuant to Rule 45 of the Federal Rules of Civil Procedure, Defendant, Yahoo!, Inc. is causing or has caused the attached subpoenas for documents (Tabs 1-2) to be served on the following:

| Tab | Company or Person | Date of Production |
|---|---|---|
| 1. | Russell L. Brand | April 28, 2008 |
| 2. | AT&T Corporation | May 9, 2008 |

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

OF COUNSEL:

Michael A. Jacobs
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
415.268.7000

Matthew M. D'Amore
Kyle W.K. Mooney
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, NY 10104
212.468.8000

Dated: April 18, 2008
2299292

*/s/ James W. Parrett, Jr.*

Mary B. Graham (#2256)
James W. Parrett, Jr. (#4292)
Benjamin J. Schladweiler (#4601)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
jparrett@mnat.com
302.658.9200

*Attorneys for Yahoo!, Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on April 18, 2008, I caused the foregoing to be electronically

filed with the Clerk of the Court using CM/ECF which will send electronic notification of such

filing to the following:

> Josy W. Ingersoll, Esquire
> YOUNG CONAWAY STARGATT & TAYLOR, LLP
> The Brandywine Building
> 1000 West Street, 17th Floor
> Wilmington, DE  19801

Additionally, I hereby certify that true and correct copies of the foregoing were

caused to be served on April 18, 2008 upon the following individuals in the manner indicated:

| **BY HAND** | **VIA E-MAIL** |
|---|---|
| Josy W. Ingersoll, Esquire | Paul K. Vickrey, Esquire |
| YOUNG CONAWAY STARGATT & TAYLOR, LLP | NIRO, SCAVONE, HALLER & NIRO |
| The Brandywine Building | 181 W. Madison St., Suite 4600 |
| 1000 West Street, 17th Floor | Chicago, IL  60602 |
| Wilmington, DE  19801 | |

*/s/ James W. Parrett, Jr.*

James W. Parrett, Jr. (#4292)

# TАB 1

□AO88 (Rev. 12/07) Subpoena in a Civil Case

# UNITED STATES DISTRICT COURT
### Northern District of California

ZOETICS, INC., AND ZOEMAIL, LLC

**SUBPOENA IN A CIVIL CASE**

V.

YAHOO! INC.

Case Number:[1] C.A. No. 06-108 (JJF)
District of Delaware

TO:   Russell L. Brand
2341 Spaulding Avenue,
Berkeley, CA 94703-1627

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below
to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition
in the above case.
Depositions will be taken before a notary public or other officer authorized to administer oaths, and may be recorded
by stenographic means, audiotaped, videotaped, and transcribed using real time interactive transcription (*e.g.*
LiveNote).

| PLACE OF DEPOSITION<br>Morrison & Foerster LLP, 425 Market Street<br>San Francisco, California 94105-2482 | DATE AND TIME<br>May 1, 2008<br>9:30 a.m. |
|---|---|

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the
place, date, and time specified below (list documents or objects):  See Exhibit A attached hereto.

| PLACE<br>Attn: Rebecca Snavely Saelao<br>Morrison & Foerster LLP, 425 Market Street<br>San Francisco, California 94105-2482 | DATE AND TIME<br>April 28, 2008<br>10:00 a.m. |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers,
directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the
matters on which the person will testify. Federal Rule of Civil Procedure 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)<br><br>Attorney for Defendant Yahoo! Inc. | DATE<br><br>April 18, 2008 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Matthew M. D'Amore, Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, NY 10104
Tel: (212) 468-8000

(See Federal Rule of Civil Procedure 45 (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

TAB
A

## EXHIBIT A

### Definitions

1.    "Zoëtics" means Zoëtics, Inc., any predecessor or successor company, joint venture, partnership, corporation or business entity, and any directors, officers, agents, employees, accountants, attorneys, consultants or representatives of Zoëtics, Inc., or any predecessor or successor, including, without limitation, all persons acting or purporting to act on behalf of, or who are subject to the direction and control of, any of the foregoing, whether currently or formerly.

2.    "ZoEmail" means ZoEmail, LLC, any predecessor or successor company, joint venture, partnership, corporation or business entity, and any directors, officers, agents, employees, accountants, attorneys, consultants or representatives of ZoEmail, LLC, or any predecessor or successor, including, without limitation, all persons acting or purporting to act on behalf of, or who are subject to the direction and control of, any of the foregoing, whether currently or formerly.

3.    "Plaintiffs" means Zoëtics and ZoEmail (as defined above), or Zoëtics or ZoEmail, whichever construction is broader in the context of the particular request and as necessary to bring within the scope of a particular request any documents that might otherwise be construed to be outside its scope.

4.    "Yahoo!" means Yahoo! Inc., any predecessor or successor company, joint venture, partnership, corporation or business entity, and any directors, officers, agents, employees, accountants, attorneys, consultants or representatives of Yahoo! Inc., or any predecessor or successor, including, without limitation, all persons acting or purporting to act on

behalf of, or who are subject to the direction and control of, any of the foregoing, whether currently or formerly.

5.    "AT&T" means AT&T Corporation, any predecessor or successor company, joint venture, partnership, corporation or business entity, and any directors, officers, agents, employees, accountants, attorneys, consultants or representatives of AT&T Corporation, or any predecessor or successor, including, without limitation, all persons acting or purporting to act on behalf of, or who are subject to the direction and control of, any of the foregoing, whether currently or formerly.

6.    "Yahoo! Litigation" refers to the above-captioned action commenced by Zoëtics and ZoEmail with the filing of a Complaint in the United States District Court for the District of Delaware on February 21, 2006 (C.A. No. 06-108).

7.    "Patents-In-Suit" means U.S. Patent No. 5,930,479, entitled "Communications Addressing System" and U.S. Patent No. 6,993,574, entitled "Web-Based Communications Addressing System."

8.    "Prior Art" means any knowledge or learning, or any evidence thereof, that existed on or before the filing date of a patent application (or priority date), and that relates to (a) the patent application or resulting patent, (b) the subject matter of the patent application or resulting patent or (c) any principles, processes, methodologies or devices referenced in the patent application or resulting patent. "Prior Art" may take any form and shall include, without limitation, articles, publications, contracts, presentation materials, products, product-related documents, marketing materials, educational materials, public uses, pamphlets, manuals, devices, instruments, and U.S. and foreign patents and patent applications.

9.    "Bankruptcy Proceeding" means the bankruptcy proceeding initiated by Zoëtics, Inc. in the United States Bankruptcy Court for the Southern District of New York by its filing of a voluntary petition for relief under Chapter 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, on October 20, 2004, *In re Zoëtics, Inc.*, Case No. 04-16747 (JMP).

10.    "AddressGuard" means the AddressGuard™ email feature provided by Yahoo! and alleged by Plaintiffs in the Complaint to infringe the Patents-In-Suit.

11.    "IP Assets" shall have the same meaning as in the "Security Agreement," attached hereto as Exhibit 1.

12.    "Disclosure Statement" means the "Disclosure Statement Dated February 7, 2007 for Zoëtics, Inc.'s Third Amended Plan of Reorganization Dated January 30, 2007," Docket No. 212, (*In re Zoëtics, Inc.*, Case No. 04-16747 (JMP)), attached hereto as Exhibit B.

13.    "Person" means any natural person or any business, legal, or governmental entity or association, or any other person cognizable at law, including, without limitation, any corporation, firm, organization, partnership, joint venture, sole proprietorship, and any agents or employees of the foregoing.

14.    "Concerning" or "relating to" shall be construed in their broadest possible sense and shall include, without limitation, all matters or things which constitute, pertain to, evidence, describe, discuss, are connected to, arise from, reflect, summarize, evaluate, refer to (directly or indirectly) or comment on the subject or object of the discovery request.

15.    "Document" or "documents" shall have the broadest possible meaning permitted by Federal Rules of Civil Procedure 26 and 45 and the relevant case law and shall include,

without limitation, any electronically stored information and any "writings," "recordings" or "photographs," as defined by Federal Rule of Evidence 1001.

16.    "Communication" or "communications" shall be construed in the broadest possible sense and shall include, without limitation, any of the following:  (a) any written letter, memorandum, email or other document; (b) any telephone call; (c) any conversation or meeting; and (d) any transmittal of information by any means whatsoever (in the form of facts, ideas, inquiries or otherwise).

17.    "Any" or "each" should be understood to include and encompass "all."  The term "any" includes both "any" and "every."  "All" should be understood to include and encompass "any."  Words of any gender shall include the other gender.

18.    "And," "or" and "and/or" shall be construed in the conjunctive and disjunctive sense as necessary to bring within the scope of a request any documents that might otherwise be construed to be outside its scope.

19.    "Including" means including without limitation.

20.    Whenever necessary to bring within the scope of a particular request documents that might otherwise be construed to be outside the scope of the request:

(a)    the use of a verb in its singular form shall be construed as the use of that verb in all other tenses;

(b)    the use of a word in its singular form shall be deemed to include within its use the plural form; and

(c)    the use of a word in its plural form shall be deemed to include within its use the singular form.

21.     Each requested document shall be produced in its entirety, along with any attachments, drafts and copies, including, without limitation, copies that differ by virtue of handwritten notes or markings. If a document responsive to any request cannot be produced in full, it shall be produced to the extent possible with an explanation stating why production of the remainder is not possible.

22.     Any document described herein shall be produced as it is kept in the usual course of business, including its original file folder with all similar markings intact, or organized and labeled to correspond to the categories identified in these requests pursuant to Rule 45(d) of the Federal Rules of Civil Procedure. Electronically stored information should be produced in native format, or such other format as to be agreed upon among the parties.

23.     If any document is withheld based on a claim of attorney-client privilege, work product immunity or for any other reason, a log identifying all such documents and providing the information required by Rule 45(d)(2) of the Federal Rules of Civil Procedure must be produced.

24.     These requests are ongoing and production of documents must be supplemented to the extent required by Rule 26(e) of the Federal Rules of Civil Procedure and the Local Civil Rules of this Court.

25.     These requests are subject to Local Rule 26.2 of the United States District Court for the District of Delaware, which provides that:

> If any documents are deemed confidential by the producing party and the parties have not been able to agree on an appropriate protective order, until a protective order is in effect, disclosure should be limited to members and employees of the firm of trial counsel who have entered an appearance, and, where appropriate, have been admitted pro hac vice. Such persons are under an obligation to keep such documents confidential and to use them only for purposes of litigating the case.

## Documents Requested

1.    All documents concerning the Patents-in-Suit.

2.    All documents concerning Prior Art to the Patents-In-Suit.

3.    All documents concerning the prosecution or reexamination of the Patents-in-Suit, or any continuation, continuation in part, divisional, or foreign application related thereto.

4.    All documents concerning the discovery, evaluation, examination, negotiations over and acquisition of the IP Assets, including but not limited to all documents received from AT&T.

5.    All documents concerning the Yahoo! Litigation, including but not limited to all documents and communications concerning the merits of the case, expected outcomes, and estimated recoveries.

6.    All documents concerning Zoëtics' and ZoEmail's actual or attempted development, commercialization, sale, or licensing of the Patents-in-Suit, the ZoEmail anti-spam product, any "Address Keys" based anti-spam product, any product or service embodying or based upon the Patents-in-Suit, or any other anti-spam or message-filtering product, software, system or service.

7.    All documents concerning successful or unsuccessful efforts to identify or obtain potential purchasers, investors, capital or financing in or for Zoëtics or ZoEmail, including but not limited to all correspondence, presentations and communications to or from potential investors, purchasers, or lenders.

EXHIBIT
1

JUL.26'2004 12:02 908 221 4492          AT&T LAW DEPT          #6668 P.001

FORM PTO-1595
Rev.6-93
OMB-0651-0011

# RECORDATION FORM COVER SHEET
## PATENTS ONLY

U.S.DEPARTMENT OF COMMERCE
Patent and Trademark Office

To the Director o the U.S. Patent and Trademark Office: Please record the attached documents or the new address(es) below.

| 1. Name of conveying party(ies): | 2. Name and address of receiving party(ies): |
|---|---|
| Zoetics, Inc. | Name:          AT&T Corp. |
| Execution Date: May 13, 2002 | Street Address: 32 Avenue of the Americas |
| Additional name(s) of conveying party(ies) attached? ☐ Yes ☒ No | City: New York   State: New York   ZIP: 10013-2412 |

**3. Nature of conveyance:**
☐ Assignment        ☐ Merger
☒ Security Agreement ☐ Change of Name
☐ Other

Additional name(s) & address(es) attached? ☐ Yes ☒ No

**4. Application number(s) or patent number(s):**

If this document is being filed together with a new application, the execution date of the application is _____

A. Patent Application No   09/354,646          B. Patent No. (s)   5,930,479

Additional numbers attached? ☐ Yes ☒ No

| 5. Name and address of party to whom correspondence concerning document should be mailed: | 6. Total number of applications and patents involved: 2 |
|---|---|
| Name:  Susan McGahan | 7. Total fee (37 CFR 3.41) $80.00 |
| Street Address:  AT&T Corp.<br>Room 3A240 | ☐ Enclosed |
| | X Authorized to be charged to deposit account |
| City: Bedminster  State: New Jersey  ZIP: 07921 | 8. Deposit account number: 01-2745 |
| Phone Number: 908-532-1995 | |
| Fax Number: 908-532-1219 | (Attach duplicate copy of this page if paying by deposit account) |
| Email Address: smchale@att.com | Authorized User Name: Susan McGahan |

DO NOT USE THIS SPACE

**9. Signature:**

_Susan McGahan_                                    7/26/04
                Signature                                   Date

Name of Person Signing:  Susan McGahan

Total number of pages including cover sheet, attachments, and document: 21

Documents to be recorded (including cover sheet) should be faxed to (703) 306-5995, or mailed to:
Mail Stop Assignment Recordation Services, Director of the USPTO, P.O. Box 1450, Alexandria, VA 22313-1450.
700101738

REEL: 014892 FRAME: 0516

## Schedule F
## Security Agreement

THIS SECURITY AGREEMENT is made as of the ____ day of _____, 2002 by and between Zostics, Inc., a New York corporation, (the "Debtor") and AT&T Corp., a New York corporation (the "Secured Party").

## WITNESSETH THAT:

WHEREAS, the Debtor has entered into simultaneously herewith an Intellectual Property Agreement as of the date hereof between the Secured Party and the Debtor, wherein the IP Assets (as hereinafter defined) have been assigned to Debtor in consideration for monetary payments to be paid to the Secured Party over an extended time period ; and

WHEREAS, to secure the payment of the indebtedness the Debtor owes to the Secured Party under the Intellectual Property Agreement, the Debtor and Secured Party shall enter into this Security Agreement covering the Collateral (as hereinafter defined);

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto hereby agree as follows:

Section 1. Definitions. The following terms shall have the following meanings:

"AT&T Patents" shall mean the United States patents and patent applications listed on Exhibit A attached hereto, including any divisionals, continuations, continuations-in-part, reissues, extensions or reexaminations, thereof and any foreign counterparts thereto filed or issued before, on, or after the date hereof, in any jurisdiction of the world.

"AT&T Copyright" shall mean the United States copyright registration listed on Exhibit B, and all renewals thereof.

"AT&T Know-How" shall mean all information about the Subject Software provided as of the Effective Date, orally or in writing by an AT&T researcher knowledgeable about the technology embodied in the Subject Software.

"Collateral" shall have the meaning ascribed to such terms in Section 2(a) below.

"Effective Date" shall be the date the Intellectual Property Agreement is executed.

"Fair Market Value" shall mean, with respect to payments received by Debtor for selling or otherwise providing a product or service that incorporates some or all of the IP Assets, the greater of (i) the payment actually collected obtained for selling or otherwise providing the product or (ii) the equivalent payment of any non-monetary exchange received in lieu of payment for providing a product. For the avoidance of doubt, the following events shall be exempted from the definition of Fair Market Value (a) internal uses by the employees of the Debtor for non-commercial purposes; and (b) commercial sales within the units of Debtor shall be treated under the "Internal Discounted Value" and (c) revenues paid as sales commissions to outside, unaffiliated third parties, including by way of example and not of limitation, media commissions paid to advertising agencies or media brokers.

"Gross Revenues" shall mean the sum of all Fair Market Value payments, Internal Discounted Value payments, or any other payments received by Debtor or any other company or person at the request of or on behalf of Debtor for selling or otherwise providing commercial product or services incorporating some or all of the IP Assets.

PATENT
REEL: 014892 FRAME: 0517

'UL.26'2004 12:03 908 221 4492          AT&T LAW DEPT                    #6668 P.003

"**Internal Discounted Value**" means payments received for selling or otherwise providing a product or services by Debtor to its Subsidiaries for commercial sales or distribution.

"**Interest Calculation**" shall have the meaning given to the term for Overdue Payments in Section 2.3 of the Intellectual Property Agreement.

"**IP Assets**" shall be a collective term meaning the AT&T Copyright, the AT&T Patents, the Proprietary Information and the Subject Software.

"**Maximum Surcharge**" shall mean a penalty payable to the Secured Party not to exceed a total amount of Two Million Five Hundred Thousand Dollars ($2,500,000) under Debtor's Revised Obligations for the right to extend the payment schedule beyond that set forth in the Obligations.

"**Proprietary Information**" shall mean trade secrets or other technical information expressed in the source code of the Subject Software, AT&T Copyright or contained in the AT&T Know-How, including all documented features, and any other documentation, information or knowledge expressed therein, which is owned by Secured Party as of the Effective Date and is not generally known to the public.

"**Obligations**" shall mean the Debtor's payment obligations described in Section 2 of the Intellectual Property Agreement as modified by Sections 21.2 and 21.3 of the Intellectual Property Agreement.

"**Security Interests**" shall have the meaning ascribed to such term in Section 2(b) in this Security Agreement.

"**Subject Software**" shall mean the software, including object code and source code, of the software listed on Exhibit C, attached hereto, and any new version, modification, adaptation, or derivative work thereof owned by the Secured Party on the Effective Date.

Section 2. The Security Interests.

(a)    In order to secure the due and punctual payment of the Obligations, the Debtor hereby pledges and assigns to the Secured Party, and grants to the Secured Party a continuing security interest in and lien on, all of the following rights, title and interests in the described intangible property, assets and rights (hereinafter collectively called the "Collateral"):

(A)    The IP Assets;

(B)    A percentage of Debtor's Gross Revenues to secure payment of the Accrued Unpaid Balance (defined in the Intellectual Property Agreement) due and owing the Secured Party under the Obligations in the Event of a Default, under the terms and otherwise as further set forth in Section 20 of this Security Agreement; and

(C)    All rights and remedies (including without limitation, all claims, damages and rights with respect to or arising out of any infringement of any of the IP Assets) which the Debtor might now or in the future exercise with respect to any of the foregoing. Notwithstanding anything contained in this Agreement, should Secured Party obtain by any proceeds by enforcement or exercise of its rights or remedies under this Section 2(a)(C) of the Security Agreement, the proceeds of such right or remedy shall first be used to reimburse Debtor for any attorney's fees and other costs incurred by Debtor in enforcing such right or remedy before the proceeds are distributed to the Secured Party.

(b)    The security interests granted pursuant to this Section 1 (the "Security Interests") are granted as security only and shall not subject the Secured Party to, or transfer to the Secured Party, or in any way affect

– 40 –
AT&T - Proprietary

PATENT
REEL: 014892 FRAME: 0518

or modify, any obligation or liability of the Debtor under any of the Collateral or any transaction which give rise thereto.

### Section 3. Filing; Further Assurances.

The Debtor will execute and deliver to Secured Party for filing and/or recording (in such manner and form as the Secured Party may require), or permit the Secured Party to file and record, in either case at the Secured Party's cost and expense, this Security Agreement (which the parties hereto agree shall be sufficient as a financing statement hereunder), any specific assignments or other paper that may be reasonably necessary or desirable, or that the Secured Party may request, in order to create, confirm, preserve, perfect or validate any Security Interest or to enable the Secured Party to exercise and enforce its rights hereunder or under applicable law with respect to any of the Collateral. The Debtor hereby appoints Secured Party as the Debtor's attorney-in-fact to execute in the name and on behalf of the Debtor such additional financing statements as the Secured Party may at any time reasonably request or require in respect of the Collateral. Upon satisfaction in full of the Obligations, Secured Party agrees to promptly take all action which may be necessary or useful to terminate any financing statements filed in connection with this Security Agreement.

### Section 4. Representations and Warranties of the Debtor.

The Debtor hereby represents and warrants to the Secured Party that all information, representations and warranties contained in Exhibit D attached hereto and made a part hereof are true, accurate and complete on the date hereof.

### Section 5. Covenants of the Debtor.

The Debtor hereby covenants and agrees that so long as any of the Obligations remain unpaid or unperformed:

(a)    The Debtor will not (either itself or through licensees) do any act, or omit to do any act, whereby the registration of any of the IP Assets may become abandoned or dedicated to the public.

(b)    Whenever the Debtor, either by itself or through any agent, employee, licensee or designee, shall file an application for the registration of a patent or copyright included within the IP Assets with the United States Patent and Trademark Office (the "PTO") or the United States Copyright Office or in any office or agency of any foreign country or political subdivision thereof, the Debtor shall report such filing to the Secured Party within five days after the last day of the calendar month in which such filing occurs. Upon request of the Secured Party, the Debtor shall execute and deliver any and all agreements, instruments, documents, and papers as the Secured Party may reasonably request to evidence the Secured Party's security interest in any patent, or copyright, and the goodwill and general intangibles, if any, of the Debtor relating thereto or represented thereby, and the Debtor hereby constitutes the Secured Party its attorney-in-fact to execute and file all such writings for the purpose of so evidencing the Secured Party's security interest (and the Secured Party agrees to notify the Debtor that any such filing has been made, provided that any failure to so notify shall not invalidate any such actions by the Secured Party), all lawful acts of such attorney being hereby ratified and confirmed; such power being coupled with an interest is irrevocable until the Obligations are paid in full. For the avoidance of doubt, Debtor's obligations under this paragraph do not relate to any patent or copyright related to the Debtor's "At My Request" technology or any other patent or copyright not part of the IP Assets.

(c)    In the event that any IP Asset included in the Collateral is materially infringed or misappropriated, the Debtor shall promptly notify the Secured Party after it learns thereof and shall take such actions as the Secured Party shall reasonably deem appropriate under the circumstances to protect such IP Asset.

(d)    The Debtor will defend the Collateral against all claims and demands of all persons (other than the Secured Party) at any time claiming any interest therein.

- 41 -
AT&T - Proprietary

**PATENT**
**REEL: 014892 FRAME: 0519**

JUL.26'2004 12:03 908 221 4492          AT&T LAW DEPT                    #6668 P.005

(e)     The Debtor will not change its corporate name, identity or structure, or jurisdiction of organization without forty-five (45) days' prior written notice to Secured Party and the execution, delivery and filing of such documents as reasonably required by the Secured Party.

### Section 6.  Records Relating to Collateral.

The Debtor will keep its records concerning the Collateral at its offices located at  270 Lafayette St., Suite 1202, New York, NY 10012, or at such other place or places of business as the Secured Party may approve in advance in writing.  The Debtor will hold and preserve such records and will permit representatives of the Secured Party at any time, on prior notice, during normal business hours to examine and furnish to the Secured Party, if requested, such information and copies of records regarding the Collateral in the possession or control of the Debtor as the Secured Party may from time to time reasonably request.

### Section 7.  Events of Default.

The Debtor shall be in default under this Security Agreement upon the occurrence of any one or more of the following events (each such event is herein referred to as an "Event of Default"), after receiving thirty (30) days prior notice from the Secured Party:

(a)     at such time as Secured Party shall be entitled to perfect or enforce this Security Agreement pursuant to Section 2.1, or 21.1 or 21.2 of the Intellectual Property Agreement ; or

(b)     any material representation or warranty herein contained shall have been untrue or misleading in any material respect at the time it was made and such breach is not cured within thirty (30) days after Debtor has received notice thereof from the Secured Party; or

(c)     any proceeding is instituted by or against the Debtor seeking to adjudicate it bankrupt or insolvent, or seeking reorganization, arrangement, adjustment or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking an appointment of a receiver, trustee, or other similar official for it or for any substantial part of its property and such proceeding is not stayed or dismissed within 90 days after commencement, or the Debtor takes any action to authorize or consent to any action described in this subsection (o).

### Section 8.  Remedies Upon Event of Default.

(a)     If any Event of Default shall have occurred, the Secured Party may exercise all the rights and remedies of a secured party under the Uniform Commercial Code of New York (whether or not the Uniform Commercial Code is in effect in the jurisdiction where such rights and remedies are exercised).  Without limiting the generality of the foregoing, Secured Party, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by law referred to below) to or upon the Debtor or any person or entity (all and each of which demands, defenses, advertisements and notices are hereby waived), may forthwith collect, receive, or realize upon the Collateral, or any part thereof, and/or may forthwith sell, lease, assign, license, or otherwise dispose of and deliver the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, exchange, broker's board or office of Secured Party or elsewhere upon such terms and conditions as it may deem advisable and at such prices it may deem best, for cash or on credit or for future delivery without assumption of any credit risk.  Secured Party shall have the right upon any such public sale or sales, and to the extent permitted by law, upon any such private sale of sales, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption in the Debtor, which right or equity is hereby waived or released.  The Secured Party may require the Debtor to make the Collateral available to the Secured Party at a place to be designated by the Secured Party which is reasonably convenient.

(b)     In addition to and as part of the rights set forth above, Debtor hereby agrees that if an Event of Default shall occur, Debtor shall take all actions necessary, appropriate or proper to transfer ownership of the Collateral or any part thereof to Secured Party or its assigns, including without limitation, filing any and all assignments

– 42 –
AT&T - Proprietary

PATENT
REEL: 014892 FRAME: 0520

JUL.26'2004 12:04 908 221 4492        AT&T LAW DEPT                #6668 P.006

of patent with the PTO and assignments of copyrights with the Copyright Office or any similar office or agency in any other country or any political subdivision thereof whether in the form attached hereto as Exhibits E and F, respectively, or such other form as is deemed by the Secured Party to be necessary, appropriate or proper under the circumstances.

(c)    Debtor hereby constitutes and appoints the Secured Party (and any officer, employee or agent of the Secured Party, with a full power of substitution) the Debtor's true and lawful attorney and agent in fact, in the name of the Debtor, the Secured Party or otherwise, for the sole use and benefit of the Secured Party, but at the sole cost and expense of Debtor, to exercise and take, at any time, and from time to time, after any Event of Default has occurred, all or any of the following powers and actions with respect to all or any of the Collateral (which power shall be in addition and supplemental to any powers, rights and remedies of the Secured Party described herein or otherwise available to the Secured Party under any other document or otherwise under applicable law):

(i)    any of the actions described in subsection (b) above;

(ii)    to demand, sue for, collect, receive and give acquittance for any and all moneys due to the Secured Party for payment of the accrual amount due under the Obligations as set forth in Section 20 of this Security Agreement; and

(iii)    to settle, compromise, compound, prosecute or defend any action or proceeding, with respect to infringement or otherwise.

Debtor covenants and agrees that any action described in this subsection (c) may be taken at the Secured Party's sole and absolute discretion, at any time and from time to time, and that Debtor hereby ratifies and confirms all actions taken.

(d)    The Debtor covenants and agrees that (i) the powers of attorney granted by this Agreement are coupled with an interest and shall be irrevocable until full and final payment in cash and performance of all the Obligations, (ii) said powers are granted solely for the protection of the Secured Party's interest and the Secured Party shall have no duty to exercise any of such powers, (iii) the decision whether to exercise any such powers and the manner of exercise shall be solely within the Secured Party's discretion, and (iv) neither Secured Party nor any of its directors, officers, employees or agents shall be liable for any act of omission or commission, or for any mistake or error judgment, in connection with any such powers, absent gross negligence or willful misconduct.

(e)    No remedy referred to in this Agreement is intended to be exclusive, and all rights and remedies contained herein shall be separate and cumulative and in addition to all other rights and remedies available to a secured party under other documents evidencing or securing any of the Obligations or otherwise applicable law, and the exercise of one shall not in any way limit or prejudice the exercise of any other such rights or remedies; and the Secured Party may exercise its remedies concurrently, independently or successively, without in any way affecting any other remedy.

<u>Section 9.  Application of Collateral and Proceeds.</u>

The proceeds of any sale of, or other realization upon, all or any part of the Collateral shall be applied in the following order of priorities:

(a)    first, to pay the expenses of such sale or other realization, including reasonable commission to any agents or brokers, and all expenses, liabilities and advances incurred or made by the Secured Party in connection therewith, and any other unreimbursed expenses for which the Secured Party is to be reimbursed pursuant to Section 10;

(b)    second, to the payment of the Obligations in such order and manner as the Secured Party, in its sole discretion, shall determine; and

– 43 –
AT&T - Proprietary

**PATENT**
**REEL: 014892 FRAME: 0521**

..26'2004 12:04 908 221 4492        AT&T LAW DEPT                        #6668 P.007

(c)        finally, unless applicable law otherwise provides, to pay to the Debtor, or its successors or assigns, or as a court of competent jurisdiction may direct, any surplus then remaining from such proceeds.

Section 10.  Expenses; Secured Party's Lien.

The Debtor will forthwith upon demand pay to the Secured Party the amount of any and all reasonable out-of-pocket expenses, including the reasonable fees and disbursements of the Secured Party's counsel and of any agents not regularly in the Secured Party's employ, and all other expenses of Secured Party (including, without limitation, court costs, and the allocated costs of Secured Party's in-house counsel), which the Secured Party may incur in connection with (a) the collection or other disposition of any of the Collateral, (b) the exercise by the Secured Party of any of the powers, rights or remedies conferred upon it hereunder or (c) any default on the Debtor's part hereunder.

Section 11.  Notices.

All notices, requests, demands and other communications provided for hereunder shall be in writing (including telegraphic communication) and mailed certified, return receipt requested, or telegraphed or delivered to the applicable party at the addresses indicated below:

(i)        If to the Debtor, to it at:
           Zoetics, Inc.
           270 Lafayette St., Suite 1202
           New York, NY 10012

           Attn:  Thelma Guy

    with a copy to:

           Andrew F. Blumenthal, Esq.
           250 West 57th Street  •  Suite 332
           New York, New York 10107
           Phone: (212) 245-3860
           Fax: (212) 956-5463
    And
           Stephen M. Foxman, Esq.
           Eckert Seamans Cherin & Mellott, LLC
           1515 Market St., 9th Floor
           Philadelphia, PA 19102
           Phone: (215) 851-8472
           Fax: (215) 851-8383

(ii)       If to the Secured Party, to it at:

           AT&T Labs
           180 Park Avenue
           Florham Park, NJ  07932
           Tel.: (973) 360-7300
           Fax: (973) 360-5800

           Attn:        Intellectual Property Vice President

    with a copy to:

           Susan McHale-McGahan, Esq.
           AT&T Corp.

                    – 44 –
           AT&T - Proprietary

                                        **PATENT**
                                        **REEL: 014892 FRAME: 0522**

JUL.26'2004 12:05 908 221 4492          AT&T LAW DEPT                    #6668 P.008

295 North Maple Avenue
Rm. 325211
Basking Ridge, NJ 07920

or, as to each party, at such other address as shall be designated by such parties in a written notice to the other party complying as to delivery with the terms of this Section. All such notices, requests, demands and other communications shall be deemed given upon the earlier to occur of (a) the third day following deposit thereof in the United States mail or deposit thereof with the telegraph company as aforesaid, or (b) receipt by the party to whom such notice is directed.

### Section 12. Waivers; Non-Exclusive Remedies.

No failure on the part of the Secured Party to exercise, and no delay in exercising, and no course of dealing with respect to, any right, power or remedy under this Security Agreement shall operate as a waiver thereof; nor shall any single or partial exercise by the Secured Party of any right, power or remedy under this Security Agreement exhaust the same or preclude any other right, power or remedy. The remedies in this Security Agreement are cumulative and are not exclusive of any other remedies provided by law or otherwise available to the Secured Party. The Debtor, to the extent it may lawfully do so, hereby consents to the jurisdiction of the courts of the State of New York and the United States District Court for the District of New York for the purpose of any suit or proceeding brought in connection with or respect to this Security Agreement.

### Section 13. Consent and Waiver.

(A)     THE DEBTOR HEREBY WAIVES TRIAL BY JURY IN ANY ACTION BROUGHT ON OR WITH RESPECT TO THIS SECURITY AGREEMENT. NEITHER THE DEBTOR NOR ANY ASSIGNEE OF OR SUCCESSOR TO THE DEBTOR, SHALL SEEK A JURY TRIAL IN ANY LAWSUIT, PROCEEDING, COUNTERCLAIM, OR ANY OTHER LITIGATION OR PROCEDURE BASED UPON, OR ARISING OUT OF, THIS SECURITY AGREEMENT OR THE DEALINGS OR THE RELATIONSHIP BETWEEN OR AMONG THE PARTIES HERETO. NO PARTY WILL SEEK TO CONSOLIDATE ANY SUCH ACTION, IN WHICH A JURY TRIAL HAS BEEN WAIVED, WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED. THE PROVISIONS OF THIS SECTION HAVE BEEN FULLY DISCUSSED BY THE PARTIES HERETO, AND THESE PROVISIONS SHALL BE SUBJECT TO NO EXCEPTIONS. NO PARTY HAS IN ANY WAY AGREED WITH OR REPRESENTED TO ANY OTHER PARTY THAT THE PROVISIONS OF THIS SECTION WILL NOT BE FULLY ENFORCED IN ALL INSTANCES. NOTWITHSTANDING THE FOREGOING, NO ACTION UNDER THIS AGREEMENT SHALL PROCEED IN A COURT IF AN ARBITRATION PROCEEDING HAS BEEN INITIATED BY EITHER PARTY UNDER THE INTELLECTUAL PROPERTY AGREEMENT, PROVIDED THAT SUCH ACTION RELATES TO THE CASH PAYMENT OBLIGATIONS OF DEBTOR UNDER SECTIONS 2.1 OR AS MODIFIED BY SECTIONS 21.2 - 21.3 OF THE INTELLECTUAL PROPERTY AGREEMENT ("CASH PAYMENT DEFAULT") OR THE FACTS AND CIRCUMSTANCES UNDERLYING ANY OTHER BREACH OF THE INTELLECTUAL PROPERTY AGREEMENT CLAIMED BY SECURED PARTY AS A BASIS FOR THE ENFORCEMENT OF THIS SECURITY AGREEMENT. AND SUCH ARBITRATION PROCEEDING HAS NOT BEEN TERMINATED OR DISMISSED. NO ACTION IN A COURT SHALL BE MAINTAINED UNDER THIS SECURITY AGREEMENT BASED UPON AN ALLEGED CASH PAYMENT DEFAULT OCCURRING UNDER THE INTELLECTUAL PROPERTY AGREEMENT IF IN AN ARBITRATION PROCEEDING UNDER THE INTELLECTUAL PROPERTY AGREEMENT SUCH CASH PAYMENT DEFAULT IS FOUND NOT TO EXIST.

(B)     THE DEBTOR CONSENTS TO THE JURISDICTION AND VENUE OF ANY LOCAL, STATE OR FEDERAL COURT LOCATED WITHIN THE STATE OF NEW YORK AND WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS UPON THE DEBTOR, AND CONSENTS THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, DIRECTED TO THE DEBTOR AT THE ADDRESS STATED ABOVE AND SERVICE SO MADE SHALL BE DEEMED TO BE COMPLETED THREE (3) DAYS AFTER THE SAME SHALL HAVE BEEN POSTED AS AFORESAID. THE DEBTOR WAIVES ANY OBJECTION TO VENUE OF ANY ACTION INSTITUTED

PATENT
REEL: 014892 FRAME: 0523

HEREUNDER AND CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY THE COURT. THE DEBTOR WAIVES, TO THE EXTENT PERMITTED BY LAW, ANY BOND OR SURETY OR SECURITY UPON SUCH BOND WHICH MIGHT, BUT FOR THIS WAIVER, BE REQUIRED OF THE SECURED PARTY. NOTHING CONTAINED IN THIS PARAGRAPH SHALL AFFECT THE RIGHT OF THE SECURED PARTY TO SERVE LEGAL PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR AFFECT THE RIGHT OF THE SECURED PARTY TO BRING ANY ACTION OR PROCEEDING AGAINST THE DEBTOR IN THE COURTS OF ANY OTHER JURISDICTION.

(C)    THE DEBTOR HEREBY WAIVES ALL DEFENSES AND RIGHTS TO INTERPOSE ANY SETOFF OR COUNTERCLAIM OF ANY NATURE EXCEPT ONLY A DEFENSE PERTAINING TO THE EXISTENCE OF AN EVENT OF DEFAULT OR A COUNTERCLAIM TO THE EXTENT THAT THE FAILURE TO SO ASSERT SUCH COUNTERCLAIM WOULD PERMANENTLY PRECLUDE THE PROSECUTION OR RECOVERY UPON THE SAME.

### Section 14.  Changes in Writing.

Neither this Security Agreement nor any provision hereof may be changed, waived, discharged or terminated orally, but only by a statement in writing signed by the party against which enforcement of the change, waiver, discharge or termination is sought.

### Section 15.  Choice of Law; Meaning of Terms.

This Security Agreement shall be construed in accordance with and governed by the internal laws (as opposed to conflict of law provisions) and decisions of the State of New York applicable to contracts made and performed in said State, except to the extent that remedies provided by the laws of any State other than New York are governed by the laws of said State. Unless otherwise defined herein, or unless the context otherwise requires, all terms used herein which are defined in the New York Uniform Commercial Code have the meanings therein stated.

### Section 16.  Marshalling; Payments Set Aside.

The Secured Party shall be under no obligation to marshall any assets in favor of the Debtor or any other party or against or in payment of any or all of the Obligations.  To the extent that the Debtor makes a payment or payments to the Secured Party or the Secured Party enforces its security interests or exercises its rights of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such enforcement or setoff had not occurred.

### Section 17.  Severability.

Any provision of this Security Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

### Section 18.  Headings.

The headings in this Security Agreement are for the purposes of reference only and shall not limit or otherwise affect the meaning, construction or effect of this Agreement or any provision of this Security Agreement.

PATENT
REEL: 014892 FRAME: 0524

.26'2004 12:06 908 221 4492        AT&T LAW DEPT                    #6660 P.010

### Section 19.  Ownership and Use of IP Assets by Secured Party After Event of Default.

If, upon an Event of Default, the Secured Party exercises its rights under Section 8 of this Security Agreement and all rights, title and interest in the IP Assets revert back to the Secured Party, then in addition to the provisions of Section 8 of this Security Agreement, the following shall occur, but only in the event that the Debtor had, prior to the Event of Default, paid to the Secured Party a minimum of One Million Dollars ($1,000,000) of the Obligations:

(a)      Seller hereby grants to Debtor as of the date that the Secured Party is deemed the owner of all the IP Assets the following licenses (hereinafter the "Debtor Post-Default Licenses"), subject to the limitations set forth in this Section 19 of the Security Agreement,

(i)      a non-exclusive, world-wide, license under the AT&T Patents, with a limited  right to sublicense as set forth in paragraph (c) below, to make, use, import, sell and offer to sell products and services;

(ii)      a non-exclusive, world-wide, license under the Subject Software, including the work registered in the AT&T Copyright, with a limited right to sublicense as set forth in paragraph (c) below, to use, copy, modify, develop Derivative Works, distribute, publicly perform or display works; and

(iii)      a non-exclusive, world-wide, license, with a limited  right to sublicense as set forth in paragraph (c) below to use and copy the Proprietary Information.

These licenses shall be non-transferable except as set forth in Section 15 of the Intellectual Property Agreement.

(b)      As consideration for the Debtor Post-Default Licenses, Debtor shall pay to Secured Party thirty days after the end of each quarter by the method in Section 2.2 of the Intellectual Property Agreement (which calendar quarter commences on the 1st day of the month in which Debtor is granted such licenses) the following royalties:

(i)      a seven percent (7%) royalty of Debtor's Gross  Revenues until the aggregate royalties paid under this paragraph (b) of the Security Agreement plus the amounts paid to Secured Party under the Cash Payments in the Intellectual Property Agreement equal to Seven Million Seven Hundred Thousand Dollars ($7,700,000); and

(ii)      a five percent (5%) royalty of Debtor's Gross  Revenues after Debtor has paid the Secured Party an aggregate amount of $7,700,000,  until  such amount reaches Ten Million Two Hundred Thousand Dollars ($10,200,000), which at that time, Debtor shall receive fully paid-up, royalty-free Debtor Post-Default Licenses.

(c)      The Debtor Post-Default Licenses shall be sublicensable to the extent it is necessary (i)  to support existing sublicenses before the Secured Party exercised its remedies under Section 8 and (ii) to support any sublicenses after the exercise of such rights to the extent necessary for Debtor to market, sell and permit use of any products it has or will develop under the IP Assets. For the avoidance of doubt, Debtor shall have no right to grant sublicenses to the IP Assets that would permit a third party to create its own products or develop new technology based on the IP Assets.

(d)      Debtor shall pay the Secured Party interest based on the Interest Calculation for any late royalty payments due under Section 19 of this Security Agreement.

(e)      Debtor shall prepare, maintain and make written reports to the Secured Party, at the address indicated in Section 11 of this Security Agreement, along with the royalty payment each quarter.  Each quarterly report shall indicate the amount of revenue received for the selling or otherwise providing commercial products or services incorporating some or all of the IP Assets, the accounts receivables, and any other information necessary to verify the

PATENT
REEL: 014892 FRAME: 0525

quarterly Gross Revenue of Debtor. Debtor shall keep detailed and accurate books, files and records, in electronic and paper form, adequate to determine and verify accurately the information contained in each quarterly report. The books and records shall be retained for at least five (5) years after the delivery to the Secured Party of the written report to which the books and records relate, provided there is no outstanding dispute regarding royalty fees, in which case said books and records shall be preserved by the Licensee pending the resolution of said dispute.

(f)    The Secured Party has the right to review and audit and/or to have reviewed and audited, upon reasonable notice and during normal business hours to Debtor, underlying documentation regarding all royalty payments due to the Secured Party under this Security Agreement up to once (1) times per year. Should Secured Party's audit conducted under this Section 19(f) find that the Debtor is in material non-compliance with the obligations set forth in Section 19(e), the Secured Party shall notify Debtor and Debtor shall (i) within five days of such notice cease using the IP Assets; and (ii) within five days of such notice cease selling products or services using the IP Assets to third parties; until the Debtor cures such breach of this Agreement, within thirty (30) days receipt of notice from the Secured Party.

### Section 20.  Accrual Amounts Owed By Debtor at the Time of the Event of Default.

As to any Accrued Unpaid Balance due and owing the Secured Party at the time of the Event of Default, Debtor shall pay to Secured Party, in addition to the royalty specified in Section 19 in this Security Agreement, at the times the royalty specified in Section 19 is payable, a royalty equal to 2% of the Gross Revenues of Debtor, until such time as Debtor satisfies the Accrued Unpaid Balance under the Obligations.

IN WITNESS WHEREOF, this Security Agreement has been executed by the parties hereto all as of the day and year first above written.

WITNESS:

_____          By _____
AT&T Corp.                         Name: JOHN K. KINGSTON
                                   Title: VP Vice President

_____          By _____
Zoetics, Inc.                      Name: JOEL D. IACCARONE
                                   Title: PRESIDENT

PATENT
REEL: 014892 FRAME: 0526

**EXHIBIT A**
**AT&T Patents**

**(See Schedule E to the Intellectual Property Agreement entered into between the Parties)**

**EXHIBIT B**
**Copyright Registrations**

**(See Schedule B to the Intellectual Property Agreement entered into between the Parties)**

**EXHIBIT C**
**Subject Software**

**(See Schedule C of the Intellectual Property Agreement entered into between the Parties)**

- 49 -
AT&T - Proprietary

PATENT
REEL: 014892 FRAME: 0527

:06 908 221 4492          AT&T LAW DEPT                    #6668 P.013

## EXHIBIT D
### Additional Representations And Warranties

1.  The exact title of the Debtor is: Zoetica, Inc.  The Debtor has not used any other corporate the previous ten (10) years.

2.  The Debtor uses in its business and owns the following trade names:

3.  The Debtor maintains its books and records relative to its accounts and its inventory at:

    270 Lafayette Street, New York, New York 10012

4.  The chief executive office of the Debtor is:

    270 Lafayette Street, New York, New York 10012

PATENT
REEL: 014892 FRAME: 0528

EXHIBIT E
Patent Assignment

This Assignment of Patent is by and between Zoetics, Inc. ("Zoetics"), having an office at 270 Lafayette Street, New York, New York 10012 ("Assignor") and AT&T Corp., a New York Corporation with an office located at 32 Avenue of the Americas, New York, New York 10013-2412 ("Assignee").

WHEREAS, Assignor is the owner of all right, title, and interest in and to the U.S. Patent No. 6,930,479 and pending U.S Application No. 09/884,846 (the "Patents").

WHEREAS, Assignee is desirous of acquiring all right, title, and interest in and to the Patents.

NOW THEREFORE, for good and valuable consideration, receipt and adequacy of which are hereby acknowledged, and intending to be legally bound hereby, Assignor hereby assigns to Assignee any and all of Assignor's right, title and interest in and to the Patents, including any division and continuation hereof and all corresponding foreign applications and patents, and Assignor hereby authorizes the Commissioner of Patents and Trademarks to issue any said United States Letters Patents that relate to the Patent to said Assignee, as the Assignee of the whole right, title and interest thereto.

IN WITNESS WHEREOF, Assignor has cause this Patent Assignment to be executed in a manner appropriate thereto effective as of _____, 200_.

ASSIGNEE                                    ASSIGNOR

Given at Basking Ridge                      Accepted at _____
New Jersey, USA
on _____                          on _____
AT&T Corp.                                  _____

By: _____                         By: _____

Name: _____                       Name: _____
Title:                                      Title:
Authorized Signatory                        Authorized Signatory

-51--
AT&T - Proprietary

**PATENT**
**REEL: 014892 FRAME: 0529**

## EXHIBIT F
### Copyright Assignment

For good and valuable consideration, the receipt of which are hereby acknowledged, to ZOETICS, INC, 270 Lafayette Street, New York, New York 10012 ("Zoetics"), sells, assigns, and transfers to AT&T CORP., 32 Avenue of the Americas, New York, New York 10032 ("AT&T"), its successors and assigns, absolutely and forever, the entire right, title, and interest in and to a Copyright Registration No. TXU 945-287 entitled E-Mail Channels System owned by Zoetics ("the Copyright"), including, without limiting the generality of the foregoing, any moral rights, and to have and to hold said Copyright and all rights of whatsoever nature thereunder existing. To the extent that any moral rights cannot be sold, assigned or transferred to AT&T, Zoetics waives for all time any assertion of such rights.

Zoetics represents and warrants that Zoetics is the sole and exclusive author of the Copyright, that Zoetics is the sole and exclusive owner of all right, title, and interest in and to the Copyright, and that Zoetics has not sold, assigned, or transferred any right, title, or interest in and to the Copyright to any other party.

IN WITNESS WHEREOF, AT&T has cause this Copyright Assignment to be executed in a manner appropriate thereto effective as of _____, 200_.

| AT&T CORP. | ZOETICS, INC. |
|---|---|
| | |
| Given at Basking Ridge | Accepted at _____ |
| New Jersey, USA | |
| on _____ | on _____ |
| | |
| | |
| | |
| By: _____ | By: _____ |
| | |
| Name: _____ | Name: _____ |
| Title: | Title: |
| Authorized Signatory | Authorized Signatory |

- 52 —
AT&T - Proprietary

**PATENT**
**REEL: 014892 FRAME: 0530**

.26'2004 12:07 908 221 4492        AT&T LAW DEPT        #666B P.016

**Schedule A**
**AT&T Patents**

*UNITED STATES*

U.S. Patent No. 5,930,479; Record: 111671   Filed: 10/21/1996
Inventor: Robert J. Hall
Communications Addressing System

Application No. 09/884,646; Record ID 2001-0323    Filed: 6/19/2001
Inventor: Robert J. Hall
Web-based Communications Addressing System and Method

PATENT
REEL: 014892 FRAME: 0531

.26'2004 12:07 908 221 4492        AT&T LAW DEPT                #6669 P.017

**Schedule B**
**AT&T Copyright**

*UNITED STATES*

U.S. Copyright Registration No. TXU 945-297 covering a computer program
Author as a Work Made For Hire for Seller: Robert J. Hall
Title: "E-Mail Channels System"

PATENT
REEL: 014892 FRAME: 0532

JUL.26'2004 12:07 908 221 4492          AT&T LAW DEPT                    #6668 P.018

## Schedule C
## Subject Software

The following software files shall be delivered to Buyer as of the Closing Date under this Agreement:

[In the following file listing, names ending in a slash ('/') character represent (sub)directories that group files logically. All other names designate files containing text or binary information.]

    ChannelsCD/

**Binary Files**

[This is the Java byte-code archive containing the "binary" form of the AT&T Labs Research's Email Channels System v. 1.8c]

    ChannelsCD/Channels.jar

**Documentation Files**

[Files whose name start with "ChannelsCD/doc/" are documentation and example files describing or illustrating the configuration and use of AT&T Labs Research's Email Channels System v. 1.8c.]

    ChannelsCD/doc/

[Textual installation, configuration and usage instructions:]
    ChannelsCD/doc/README.txt

[Sample configuration files for Bouncer/Host component:]
    ChannelsCD/doc/bhost/
    ChannelsCD/doc/bhost/ServerData/
    ChannelsCD/doc/bhost/ServerData/config
    ChannelsCD/doc/bhost/runbhost.bash

[Sample configuration files for PCA component:]
    ChannelsCD/doc/PCA/
    ChannelsCD/doc/PCA/UserData/
    ChannelsCD/doc/PCA/UserData/config
    ChannelsCD/doc/PCA/runPCA.bash

**Source Code Files**

[The files whose names start with "ChannelsCD/src/" comprise the Java source code files of AT&T Labs Research's Email Channels System v. 1.8c]

    ChannelsCD/src/

[Java package source files containing highest level application and control logic for Bouncer/Host component:]
    ChannelsCD/src/bhost/

- 33 -
AT&T - Proprietary

PATENT
REEL: 014892 FRAME: 0533

```
        ChannelsCD/src/bhost/app_bhost.java
        ChannelsCD/src/bhost/bhost.java
        ChannelsCD/src/bhost/controller_BHOST.java
        ChannelsCD/src/bhost/translator.java

    [Java package source files containing highest level application and
    control logic for PCA component:]
        ChannelsCD/src/chan/
        ChannelsCD/src/chan/app_chproxy.java
        ChannelsCD/src/chan/chproxy.java
        ChannelsCD/src/chan/chproxy_window.java
        ChannelsCD/src/chan/chproxy_window_details.java
        ChannelsCD/src/chan/chproxy_window_editor.java
        ChannelsCD/src/chan/chproxy_window_list.java
        ChannelsCD/src/chan/chproxy_window_pp_editor.java
        ChannelsCD/src/chan/chproxy_window_pw_editor.java
        ChannelsCD/src/chan/controller_PCA.java
        ChannelsCD/src/chan/initconfig.java
        ChannelsCD/src/chan/translator.java
        ChannelsCD/src/chan/uitest.java
        ChannelsCD/src/chan/warningBox.java

    [Java package source files for cryptographic utility classes and interfaces
    used by all components:]
        ChannelsCD/src/crypto/
        ChannelsCD/src/crypto/aes128.java
        ChannelsCD/src/crypto/CBCwithPKCS5Padding.java
        ChannelsCD/src/crypto/cryptoFn.java
        ChannelsCD/src/crypto/exception.java
        ChannelsCD/src/crypto/symCoderInputStream.java
        ChannelsCD/src/crypto/symmetricBlockCipher.java
        ChannelsCD/src/crypto/symmetricCoder.java

    [Java package source files for email proxy framework used to
    build all components:]
        ChannelsCD/src/proxy/
        ChannelsCD/src/proxy/checkMessageQueuesEvent.java
        ChannelsCD/src/proxy/console_window_quit.java
        ChannelsCD/src/proxy/controller.java
        ChannelsCD/src/proxy/proxy.java
        ChannelsCD/src/proxy/version.java

    [Java package source files containing miscellaneous utility classes,
    interfaces, and functions:]
        ChannelsCD/src/RJHTools/
        ChannelsCD/src/RJHTools/base64InputStream.java
        ChannelsCD/src/RJHTools/base64OutputStream.java
        ChannelsCD/src/RJHTools/bbs_init.java
        ChannelsCD/src/RJHTools/binaryPredicate.java
        ChannelsCD/src/RJHTools/binaryPredicate_String.java
        ChannelsCD/src/RJHTools/commandEvent.java
        ChannelsCD/src/RJHTools/config.java
        ChannelsCD/src/RJHTools/config_exception.java
        ChannelsCD/src/RJHTools/cons.java
        ChannelsCD/src/RJHTools/constants.java
        ChannelsCD/src/RJHTools/counter.java
        ChannelsCD/src/RJHTools/currentTime.java
        ChannelsCD/src/RJHTools/db.java
        ChannelsCD/src/RJHTools/db_exception.java
        ChannelsCD/src/RJHTools/db_key_mismatch.java
        ChannelsCD/src/RJHTools/db_property.java
```

PATENT
REEL: 014892 FRAME: 0534

26'2004 12:08 908 221 4492        AT&T LAW DEPT        #6668 P.020

```
ChannelsCD/src/RJHTools/db_property_BigInteger.java
ChannelsCD/src/RJHTools/db_property_Boolean.java
ChannelsCD/src/RJHTools/db_property_Integer.java
ChannelsCD/src/RJHTools/db_property_ListOfString.java
ChannelsCD/src/RJHTools/db_property_Object.java
ChannelsCD/src/RJHTools/db_property_RandomState.java
ChannelsCD/src/RJHTools/db_property_String.java
ChannelsCD/src/RJHTools/dbg.java
ChannelsCD/src/RJHTools/dbplist.java
ChannelsCD/src/RJHTools/dbtest.java
ChannelsCD/src/RJHTools/dshsl_holder.java
ChannelsCD/src/RJHTools/email_utils.java
ChannelsCD/src/RJHTools/encode257.java
ChannelsCD/src/RJHTools/event.java
ChannelsCD/src/RJHTools/eventException.java
ChannelsCD/src/RJHTools/eventQueue.java
ChannelsCD/src/RJHTools/eventQueueServer.java
ChannelsCD/src/RJHTools/eventQueueSubscriber.java
ChannelsCD/src/RJHTools/fn.java
ChannelsCD/src/RJHTools/getStringFromUser.java
ChannelsCD/src/RJHTools/getStringFromUser_Cancel.java
ChannelsCD/src/RJHTools/getStringFromUser_Done.java
ChannelsCD/src/RJHTools/indexedByteArray.java
ChannelsCD/src/RJHTools/line_buffer_Reader.java
ChannelsCD/src/RJHTools/list.java
ChannelsCD/src/RJHTools/mail_input_stream.java
ChannelsCD/src/RJHTools/mail_output_stream.java
ChannelsCD/src/RJHTools/msg.java
ChannelsCD/src/RJHTools/msg_body_table.java
ChannelsCD/src/RJHTools/msg_body_table_rec.java
ChannelsCD/src/RJHTools/msg_exception.java
ChannelsCD/src/RJHTools/msg_queue.java
ChannelsCD/src/RJHTools/msg_queue_manager.java
ChannelsCD/src/RJHTools/notifiable_window.java
ChannelsCD/src/RJHTools/POP3_getter.java
ChannelsCD/src/RJHTools/POP3_getter_exception.java
ChannelsCD/src/RJHTools/POP3_getter_process.java
ChannelsCD/src/RJHTools/POP3_server.java
ChannelsCD/src/RJHTools/POP3_server_exception.java
ChannelsCD/src/RJHTools/POP3e_getter.java
ChannelsCD/src/RJHTools/POP3e_getter_process.java
ChannelsCD/src/RJHTools/POP3e_server.java
ChannelsCD/src/RJHTools/POP3e_server_process.java
ChannelsCD/src/RJHTools/pushable.java
ChannelsCD/src/RJHTools/pusher.java
ChannelsCD/src/RJHTools/RandomBits.java
ChannelsCD/src/RJHTools/RandomState.java
ChannelsCD/src/RJHTools/rdir.java
ChannelsCD/src/RJHTools/rdirException.java
ChannelsCD/src/RJHTools/recomp.java
ChannelsCD/src/RJHTools/SMTP_recipient_translator.java
ChannelsCD/src/RJHTools/SMTP_sender.java
ChannelsCD/src/RJHTools/SMTP_sender_process.java
ChannelsCD/src/RJHTools/SMTP_server.java
ChannelsCD/src/RJHTools/SMTPServerException.java
ChannelsCD/src/RJHTools/SMTPServiceThread.java
ChannelsCD/src/RJHTools/stoppable.java
ChannelsCD/src/RJHTools/TCP_server.java
ChannelsCD/src/RJHTools/TCP_server_monitor.java
ChannelsCD/src/RJHTools/timer.java
ChannelsCD/src/RJHTools/yOrNp.java
```

AT&T - Proprietary

PATENT
REEL: 014892 FRAME: 0535

```
    ChannelsCD/src/RJHTools/yOrNp_No.java
    ChannelsCD/src/RJHTools/yOrNp_Yes.java
```

[Java package source files containing utility functions supporting
the logical functional theories used in implementing the components'
control modules:]

```
    ChannelsCD/src/Theories/
    ChannelsCD/src/Theories/BOUNCER.java
    ChannelsCD/src/Theories/CRYPTO.java
    ChannelsCD/src/Theories/HOST.java
    ChannelsCD/src/Theories/INTEGERS.java
    ChannelsCD/src/Theories/LISTS.java
    ChannelsCD/src/Theories/LOGICALS.java
    ChannelsCD/src/Theories/MSG.java
    ChannelsCD/src/Theories/PCA.java
    ChannelsCD/src/Theories/STRINGS.java
```

- 36 -
AT&T - Proprietary

PATENT
REEL: 014892 FRAME: 0536

/30/2003 16:45 FAX 412 566 6099      ECKERT SEAMANS                    ☒004

| Form PTO-1595<br>(Rev. 10/02)<br>OMB No. 0651-0027 (exp. 6/30/2005)<br>Tab settings ⇨⇨ ⇨      ▼        ▼          ▼ | RECORDATION FORM COVER SHEET<br>**PATENTS ONLY** | U.S. DEPARTMENT OF COMMERCE<br>U.S. Patent and Trademark Office |
|---|---|---|

To the Honorable Commissioner of Patents and Trademarks: Please record the attached original documents or copy thereof.

| 1. Name of conveying party(ies):<br><br>AT&T Corp. | 2. Name and address of receiving party(ies)<br><br>Name: Zoetics, Inc.<br><br>Internal Address: |
|---|---|

Additional name(s) of conveying party(es) attached? ☐ Yes ☑ No

| 3. Nature of conveyance: | |
|---|---|
| ☑ Assignment          ☐ Merger | Street Address: 270 Lafayette Street |
| ☐ Security Agreement   ☐ Change of Name | |
| ☐ Other_____ | City: New York    State: NY  Zip: 10012 |
| Execution Date:  June 6, 2002 | Additional name(s) & address(es) attached? ☐ Yes ☑ No |

4. Application number(s) or patent number(s):

If this document is being filed together with a new application, the execution date of the application is:_____

| A. Patent Application No.(s) 09/884,646 | B. Patent No.(s) 5,930,479 |
|---|---|

Additional numbers attached? ☐ Yes ☑ No

| 5. Name and address of party to whom correspondence<br>concerning document should be mailed:<br><br>Name:  David V. Radack, Esq.<br><br>Internal Address:_____<br><br>Eckert Seamans Cherin & Mellott, LLC<br><br>Street Address: 600 Grant Street, 44th Floor<br><br>City: Pittsburgh    State: PA  Zip: 15219 | 6. Total number of applications and patents involved:  ☐ 1 ☐<br><br>7. Total fee (37 CFR 3.41)...........$80.00<br><br>☐ Enclosed<br><br>☑ Authorized to be charged to deposit account<br><br>8. Deposit account number:<br><br>02-2556 |
|---|---|

| DO NOT USE THIS SPACE |
|---|

9. Signature.

| Nancy Bayne | _Nancy Bayne_ | July 30, 2003 |
|---|---|---|
| Name of Person Signing | Signature | Date |

Total number of pages including cover sheet, attachments, and documents:  ☐ 3 ☐

Mail documents to be recorded with required cover sheet information to:
Commissioner of Patents & Trademarks, Box Assignments
Washington, D.C. 20231

700038430

PATENT
REEL: 013835 FRAME: 0771

)/2003 16:45 FAX 412 566 6099          ECKERT SEAMANS                        ☒005



## Schedule D
### Patent Assignment

This Assignment of Patent is by and between AT&T Corp., a New York Corporation with an office located at 32 Avenue of the Americas, New York, New York 10013-2412 ("Assignor") and Zoetics, Inc. ("Zoetics"), having an office at 270 Lafayette Street, New York, New York 10012 ("Assignee").

WHEREAS, Assignor is the owner of all right, title, and interest in and to U.S. Patent No. 5,930,479 and pending U.S Application No. 09/884,646 (the "Patents").

WHEREAS, Assignee is desirous of acquiring all right, title, and interest in and to the Patents.

NOW THEREFORE, for good and valuable consideration, receipt and adequacy of which are hereby acknowledged, and intending to be legally bound hereby, Assignor hereby assigns to Assignee any and all of Assignor's right, title and interest in and to the Patents, including any division and continuation hereof and all corresponding foreign applications and patents, and Assignor hereby authorizes the Commissioner of Patents and Trademarks to issue any said United States Letters Patents that relate to the Patent to said Assignee, as the Assignee of the whole right, title and interest thereto.

IN WITNESS WHEREOF, Assignor has cause this Patent Assignment to be executed in a manner appropriate thereto effective as of _June 6_, 2002.

ASSIGNOR                                          ASSIGNEE

Given at Basking Ridge                            Accepted at _New York, New York_
New Jersey, USA
on _June 6, 2002_                                 on _June 12, 2002_
AT&T Corp.                                        _2:15 p.m._

By: _[signature]_                                 By: _[signature]_
Name: _John K. Kcobert_                           Name: _Joel D. Tucciarone_
Title: _IP Vice President_                        Title: _President_
Authorized Signatory                              Authorized Signatory

**PATENT**
**REEL: 013835 FRAME: 0772**

03 16:44 FAX 412 566 6099    ECKERT SEAMANS    ☒002

PTO/SB/97 (12-07)
Approved for use through 9/30/00. OMB 0651-0031
Patent and Trademark Office, U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

# ATTENTION: Assignment Recordation Services
## (703) 306-5995

### Certificate of Transmission under 37 CFR 1.8

# TOTAL PAGES ATTACHED: 3

I hereby certify that this correspondence is being facsimile transmitted to the Patent and Trademark Office

on _____ July 30, 2003 _____
        Date

_____
            Signature

Nancy Bayne
Typed or printed name of person signing Certificate

Note: Each paper must have its own certificate of transmission, or this certificate must identify each submitted paper.

Recordation Form Cover Sheet (two copies)
Assignment (one page)

Burden Hour Statement: This form is estimated to take 0.03 hours to complete. Time will vary depending upon the needs of the individual case. Any comments on the amount of time required to complete this form should be sent to the Chief Information Officer, Patent and Trademark Office, Washington, DC 20231. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Assistant Commissioner for Patents, Washington, DC 20231.

PATENT
RECORDED: 07/30/2003                REEL: 013835 FRAME: 0773

TAB 2

AO88 (Rev. 12/07) Subpoena in a Civil Case

**Issued by the**

# UNITED STATES DISTRICT COURT

### SOUTHERN DISTRICT OF NEW YORK

ZOETICS, INC. and ZOEMAIL, LLC

V.

YAHOO! INC.

**SUBPOENA IN A CIVIL CASE**

Case Number:[1]  C.A. No. 06-108 (JJF)
District of Delaware

TO:  AT&T Corporation
32 Avenue of the Americas
New York, NY. 10013-2412

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):  **See Exhibit A attached hereto.**

| PLACE  Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, NY  10104 | DATE AND TIME  May 9, 2008  10:00 a.m. |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rule of Civil Procedure 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| Attorney for Defendant Yahoo! Inc. | April 18, 2008 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Matthew M. D'Amore, Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, NY  10104    tel:  (212) 468-8000

(See Federal Rule of Civil Procedure 45 (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

TAB
A

## EXHIBIT A

## Definitions and Instructions

1.      "AT&T" means AT&T Corporation, any predecessor or successor company, joint venture, partnership, corporation or business entity, and any directors, officers, agents, employees, accountants, attorneys, consultants or representatives of AT&T Corporation, or any predecessor or successor. "AT&T" further includes any past or present division, company, corporation or other business entity affiliated with AT&T Corporation, or owned by AT&T Corporation in whole or in part or that owns AT&T Corporation in whole or in part.

2.      "Zoëtics" means Zoëtics, Inc., any predecessor or successor company, joint venture, partnership, corporation or business entity, and any directors, officers, agents, employees, accountants, attorneys, consultants or representatives of Zoëtics, Inc., or any predecessor or successor. "Zoëtics" further includes any past or present division, company, corporation or other business entity affiliated with Zoëtics, Inc. or owned by Zoëtics, Inc. in whole or in part or that owns Zoëtics, Inc. in whole or in part. "Zoëtics" specifically includes any principal, agent, attorney or consultant, including, but not limited to, Joel Tucciarone, Russell Brand, Patrick Tighe, Creative IP Solutions, DE Miles, Arising Group, Telecordia, B. Lane Hasler, or Eckert Seamans Cherin and Mellott LLC, operating on behalf of or pursuant to retention by Zoëtics.

3.      "ZoEmail" means ZoEmail LLC, any predecessor or successor company, joint venture, partnership, corporation or business entity, and any directors, officers, agents, employees, accountants, attorneys, consultants or representatives of ZoEmail LLC, or any predecessor or successor. "ZoEmail" further includes any past or present division, company, corporation or other business entity affiliated with ZoEmail LLC or owned by ZoEmail LLC in

whole or in part or that owns ZoEmail LLC in whole or in part. "ZoEmail" specifically includes any principal, agent, attorney or consultant, including, but not limited to, Joel Tucciarone, Russell Brand, Patrick Tighe, Creative IP Solutions, DE Miles, Arising Group, Telecordia, B. Lane Hasler or Eckert Seamans Cherin and Mellott LLC, operating on behalf of or pursuant to retention by ZoEmail.

4.    "Yahoo!" means Yahoo! Inc., any predecessor or successor company, joint venture, partnership, corporation or business entity, and any directors, officers, agents, employees, accountants, attorneys, consultants or representatives of Yahoo! Inc. or any other predecessor or successor. "Yahoo!" further includes any past or present division, company, corporation or other business entity affiliated with Yahoo! Inc. or owned by Yahoo! Inc. in whole or in part or that owns Yahoo! Inc. in whole or in part.

5.    "Patents-In-Suit" means U.S. Patent No. 5,930,479, entitled "Communications Addressing System" and U.S. Patent No. 6,993,574, entitled "Web-Based Communications Addressing System", attached hereto as Exhibits 1 and 2 respectively.

6.    "Related Applications and Patents" means (a) any United States or foreign patent application from or through which any of the Patents-In-Suit claim priority, and any predecessors, continuations, continuations-in-part or divisionals of any of the foregoing patent applications (including any rejected, abandoned or pending applications), as well as any United States or foreign patents that issued on any of the aforementioned patent applications; and (b) any United States or foreign patent applications that claim priority from or through any of the Patents-In-Suit, including any predecessors, continuations, continuations-in-part or divisionals of any of the foregoing patent applications (including any rejected, abandoned or pending

2

applications), as well as any United States or foreign patents that issued on any of the aforementioned patent applications.

7.    "Prior Art" means any knowledge or learning, or any evidence thereof, that existed on or before the filing date of a patent application (or priority date), and that relates to (a) the patent application or resulting patent, (b) the subject matter of the patent application or resulting patent or (c) any principles, processes, methodologies or devices referenced in the patent application or resulting patent.

8.    "Security Agreement" means the Security Agreement between AT&T and Zoëtics dated 2002 and attached hereto as Exhibit 3.

9.    "IPA" means the Intellectual Property Agreement, dated May 13, 2002, between AT&T and Zoëtics and referenced in the Security Agreement.

10.    "IP Assets" shall have the same meaning as in the Security Agreement.

11.    "Bankruptcy Proceeding" means the bankruptcy proceeding initiated by Zoëtics, Inc. in the United States Bankruptcy Court for the Southern District of New York by its filing of a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*, on October 20, 2004, *In re Zoëtics, Inc.*, Case No. 04-16747 (JMP).

12.    "Disclosure Statements" means any of the disclosure statements filed or distributed by Zoëtics in the Bankruptcy Proceeding, including, without limitation, (a) Zoëtics' Disclosure Statement for its First Amended Plan of Reorganization, dated September 5, 2006; (b) Zoëtics' Disclosure Statement for its Second Amended Plan of Reorganization, dated November 6, 2006; (c) Zoëtics' Disclosure Statement for its Third Amended Plan of Reorganization, dated January 31, 2007; and (d) any disclosure statement distributed pursuant to the Bankruptcy Court's March 13, 2007 Order.

3

13.    "Reorganization Plans" means any of the reorganization plans filed or distributed by Zoëtics in the Bankruptcy Proceeding, including, without limitation, (a) Zoëtics' Chapter 11 Plan of Reorganization, filed June 29, 2006; (b) Zoëtics' First Amended Plan of Reorganization, filed September 5, 2006; (c) Zoëtics' Second Amended Plan of Reorganization, filed November 6, 2006; (d) Zoëtics' Third Chapter 11 Plan of Reorganization, filed January 31, 2007; and (e) any plan of reorganization distributed with the disclosure statement distributed pursuant to the Bankruptcy Court's March 13, 2007 Order.

14.    "AddressGuard" means the AddressGuard™ email feature provided by Yahoo! and alleged by Plaintiffs in the Complaint to infringe the Patents-In-Suit.

15.    "Person" means any natural person or any business, legal or governmental entity or association, or any other person cognizable at law, including, without limitation, any corporation, firm, organization, partnership, joint venture, sole proprietorship or any agent or employee of the foregoing.

16.    "Concerning" or "relating to" shall be construed in the broadest possible sense and shall include, without limitation, all matters or things which constitute, pertain to, evidence, describe, discuss, are connected to, arise from, reflect, summarize, evaluate, refer to (directly or indirectly) or comment on the subject or object of the discovery request.

17.    "Document" or "documents" shall have the broadest possible meaning permitted by Federal Rules of Civil Procedure 26 and 45 and the relevant case law and shall include, without limitation, any electronically stored information and any "writings," "recordings" or "photographs," as defined by Federal Rule of Evidence 1001.

18.    "Communication" or "communications" shall be construed in the broadest possible sense and shall include, without limitation, any of the following:  (a) any written letter,

4

memorandum, email or other document; (b) any telephone call; (c) any conversation or meeting; and (d) any transmittal of information by any means whatsoever (in the form of facts, ideas, inquiries or otherwise).

19.    "Any" or "each" should be understood to include and encompass "all." The term "any" includes both "any" and "every." "All" should be understood to include and encompass "any." Words of any gender shall include the other gender.

20.    "And," "or" and "and/or" shall be construed in the conjunctive and disjunctive sense as necessary to bring within the scope of a request any documents that might otherwise be construed to be outside its scope.

21.    "Including" means including without limitation.

22.    Whenever necessary to bring within the scope of a particular request documents that might otherwise be construed to be outside the scope of the request:

(a)    the use of a verb in its singular form shall be construed as the use of that verb in all other tenses;

(b)    the use of a word in its singular form shall be deemed to include within its use the plural form; and

(c)    the use of a word in its plural form shall be deemed to include within its use the singular form.

23.    Each requested document shall be produced in its entirety, along with any attachments, drafts and copies, including, without limitation, copies that differ by virtue of handwritten notes or markings. If a document responsive to any request cannot be produced in full, it shall be produced to the extent possible with an explanation stating why production of the remainder is not possible.

5

24.    Any document described herein shall be produced as it is kept in the usual course of business, including its original file folder with all similar markings intact, or organized and labeled to correspond to the categories identified in these requests pursuant to Rule 45(d) of the Federal Rules of Civil Procedure.  Electronically stored information should be produced in native format, or such other format as to be agreed upon among the parties.

25.    If any document is withheld based on a claim of attorney-client privilege, work product immunity or for any other reason, a log identifying all such documents and providing the information required by Rule 45(d)(2) of the Federal Rules of Civil Procedure must be produced.

26.    These requests are ongoing and production of documents must be supplemented to the extent required by Rule 26(e) of the Federal Rules of Civil Procedure and the Local Civil Rules of this Court.

27.    These requests are subject to Local Rule 26.2 of the United States District Court for the District of Delaware, which provides that:

> If any documents are deemed confidential by the producing party and the parties have not been able to agree on an appropriate protective order, until a protective order is in effect, disclosure should be limited to members and employees of the firm of trial counsel who have entered an appearance, and, where appropriate, have been admitted pro hac vice.  Such persons are under an obligation to keep such documents confidential and to use them only for purposes of litigating the case.

## Documents Requested

1.    All documents concerning the conception, development and reduction to practice of the Patents-In-Suit or the Related Applications and Patents.

2.      All documents concerning the prosecution of the Patents-In-Suit or the Related Applications and Patents, including, but not limited to, documents prepared, reviewed or relied upon in deciding to apply for such patents.

3.      All documents concerning the reexamination of the Patents-In-Suit.

4.      All documents concerning the development, operation or functionality of the technology, software or other intellectual property developed by Robert J. Hall relating to the subject matter of the Patents-In-Suit, including, but not limited to, the "Channels" or "Email Channels" systems or any predecessors, prototypes, or embodiments thereof.

5.      All documents now or ever previously available or stored at (including all subfolders and related files):

- ftp://research.att.com/dist/hall

- http:/pcalvoid.research.att.com

6.      All documents concerning projects involving Robert J. Hall and relating to email addressing or spam filtering technology dated prior to February 1, 2006.

7.      All documents, including all patents or printed publications, dated prior to February 1, 2006 and concerning the use of disposable, variable, or extended addresses to filter, screen, route, classify or direct emails, text messages, telephone calls or other messages.

8.      All documents, dated prior to February 1, 2006, concerning the Patents-In-Suit, the Related Applications and Patents or the subject matter of the inventions disclosed or claimed therein.

9.      All documents concerning testing, beta testing, or disclosure of the subject matter disclosed and/or claimed in the Patents-In-Suit.

10.     All documents concerning the sale, offer for sale, or publication of the subject matter disclosed and/or claimed in the Patents-In-Suit.

ny-805120

11.    All documents concerning Sendmail, qmail or other Prior Art to the Patents-In-Suit or the Related Applications and Patents, including such art known to AT&T or ever asserted against such patents or applications by any third party or patent office.

12.    All documents concerning the Andrew Message System, including, but not limited to, the "FLAMES Programmers Guide," the "FLAMES.help files," and other supporting material.

13.    All documents concerning the alleged inventorship of the subject matter disclosed and/or claimed in the Patents-In-Suit and Related Applications and Patents.

14.    All documents concerning the ownership, title, transfer or assignment of any rights associated with the Patents-In-Suit, including, without limitation, all documents concerning any equitable or other interest in, or lien against, the Patents-In-Suit.

15.    All documents concerning the IP Assets.

16.    All communications with, or documents reflecting communications with, Zoëtics or ZoEmail, including all draft agreements, proposals or term sheets exchanged or received from Zoëtics or ZoEmail.

17.    All documents concerning the negotiation of the IPA, the Security Agreement or any assignment or license of rights to Zoëtics or ZoEmail, including all draft agreements, proposals or term sheets relating thereto.

18.    All documents disclosed to Zoëtics or ZoEmail in any due diligence conducted concerning the IP Assets.

19.    All documents concerning actual or potential investment in, or financing of, Zoëtics or ZoEmail by AT&T or any other person or entity, including all documents concerning the solicitation of such investment or financing.

ny-805120

20.    All documents concerning the value or valuation of the Patents-In-Suit or the IP Assets.

21.    All documents concerning any actual, anticipated, estimated or projected revenue from licensing or litigation relating to the Patents-In-Suit.

22.    All documents concerning any efforts, by Zoëtics, ZoEmail or AT&T, to license, sell, facilitate the license or sale of, or otherwise monetize the Patents-In-Suit, the IP Assets or any other intellectual property or technology owned or purported to be owned by Zoëtics or ZoEmail.

23.    All documents concerning any efforts by or on behalf of AT&T, Zoëtics or ZoEmail to develop, commercialize, or market the IP Assets, the technology of the Patents-In-Suit, or any products, software or systems embodying or based upon any of the alleged inventions claimed in the Patents-In-Suit.

24.    All documents concerning any work done by or for AT&T or Robert J. Hall in collaboration with, on behalf of, pursuant to contract with, or otherwise relating to, Zoëtics or ZoEmail.

25.    All documents concerning any review, evaluation or analysis of the alleged inventions claimed in the Patents-In-Suit or any products, software or systems embodying or based upon any of the alleged inventions claimed in the Patents-In-Suit.

26.    All documents concerning the novelty, patentability, scope, validity or invalidity, enforceability or unenforceability of the Patents-In-Suit or the Related Applications and Patents.

27.    All documents concerning the alleged infringement, potential infringement or non-infringement of the Patents-In-Suit.

28.    All documents concerning the conception, development and reduction to practice of the inventions disclosed or claimed in U.S. Patent No. 6,301,608, attached hereto as Exhibit

9

___, including all disclosures, writings, and publications, whether internal or public, relating to such inventions.

29.    All documents concerning the prosecution of U.S. Patent No. 6,301,608, or any parent, continuation, continuation-in-part, foreign counterpart or other application related thereto.

30.    All documents concerning Robert J. Hall's knowledge of the inventions disclosed or claimed in U.S. Patent No. 6,301,608.

31.    All documents concerning the conception, development and reduction to practice of the inventions disclosed or claimed in U.S. Patent No. 6,643,686, attached hereto as Exhibit ___, including all disclosures, writings, and publications, whether internal or public, relating to such inventions.

32.    All documents concerning the prosecution of U.S. Patent 6,643,686, or any parent, continuation, continuation-in-part, foreign counterpart or other application related thereto.

33.    Documents sufficient to identify any person presently or formerly employed by or affiliated with AT&T having knowledge concerning the subjects identified above.

# EXHIBIT
1



US005930479A

# United States Patent [19]

## Hall

[11] Patent Number: 5,930,479

[45] Date of Patent: Jul. 27, 1999

[54] **COMMUNICATIONS ADDRESSING SYSTEM**

[75] Inventor: **Robert J. Hall**, Berkeley Heights, N.J.

[73] Assignee: **AT&T Corp**, Middletown, N.J.

[21] Appl. No.: **08/734,285**

[22] Filed: **Oct. 21, 1996**

[51] Int. Cl.⁶ ...................................... G06F 17/00
[52] U.S. Cl. ............................ 395/200.68; 395/200.36
[58] Field of Search ...................... 395/200.68, 200.7, 395/200.55, 200.36; 380/23, 24, 25

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,717,860 | 2/1998 | Graber et al. | 395/200.63 |
| 5,742,771 | 4/1998 | Fontaine | 395/200.55 |

### OTHER PUBLICATIONS

S. Kent, RFC 1422, "Privacy Enhancement for Internet Electronic Mail: Part II: Certificate-Based Key Management," Internet Engineering Task Force, Feb. 1, 1993, pp. 1–32.

Blum et al.: A Simple Unpredictable Pseudo-Random Number Generator, SIAM Journal of Computing, vol. 15 No. 2 p. 364 (May 1986).

Borenstein & Thyberg: Power, ease of use and cooperative work in a practical multimedia message system, Int'l J. Man–Machine Studies 34 (1) 229–259 (1991).

Dusse: S/MIME Message Specification, RSA Data Security Inc. (Sep. 1996).

Dusse and Matthews: S/MIME: Anatomy of a Secure E–mail Standard, RSA Data Security Inc., printed from http://www.ema.org/html/pubs/mmv2n4/s–mime.htm on Oct. 18, 1996, original publication date unknown.

Myers & Rose: Request for Comments 1725, Post Office Protocol—Version 3. University of California at Berkeley. http://cobweb.berkeley.edu/Web/Hyypertext/Popper/rfc1725.txt (Nov. 1994).

RSA Data Security, Inc.: S/MIME Implementation Guide, Interoperability Profile, Version 1, S/MIME Editor. ftp://ftp.rsa.com/pub/S–MIME/smimeimp.txt (Aug. 1995).

RSA Data Security, Inc.: S/MIME Central. Retrieved from the web, http://www.rsa.com/rsa/S–MIME on Oct. 18, 1996; original publication date unknown.

Schiller: MIT distribution site for PGP, http://web.mit.edu/network/pgp.html (Sep. 4, 1996).

University of California at Berkeley: popper–1.831 beta README file, http://avalon.phys.hokudai.ac.jp/pub/hp . . . –1.831beta/popper–1.831beta.README.html (1991).

University of California at Berkeley: popper Maintenance Procedures http://ptolemy.eecs.berkeley.educ/cgi–bin/man–?popper (Aug. 1990).

*Primary Examiner*—Ellis B. Ramirez

[57] **ABSTRACT**

A system and method is provided for sending and receiving authorized messages from a sender to a recipient in a network. The method and system makes use of a channelized address to send the message from the sender to the recipient. The channelized address comprises a common address portion that indicates the identity of the recipient in the network and a channel identifier portion for verifying that the message is authorized for delivery to the recipient.

**68 Claims, 11 Drawing Sheets**



## FIG. 1A
### (PRIOR ART)

frobboz@geewhiz.com

100    104    102

## FIG. 1B

116    114    106

frobboz-1G77IG9AQ9-@geewhiz.com

108    110    104    112

## FIG. 4

402    404    406    408    410

| CORRESPONDENT ADDRESS | OWN CHANNEL | CORRESPONDENT CHANNEL | OWN KEY | CORRESPONDENT KEY |
|---|---|---|---|---|
| frobboz@geewhiz.com | 1OXR7112PH | 1DDYWA7H7I | X9GWAAH4T | T7AA18MMN |
| jrandom@j.r.isp.net | 122PG3LWAW | 1CJX449HKV | ADWKBSA92 | |
| ------------- | 2AA47WX3BO | ------------- | ------------- | ------------- |
| ------------- | 2BZZ86A9FC | ------------- | ------------- | ------------- |
| . | . | | | |
| . | . | | | |
| info-hooha@sri.com | 0XTRR9Y6BO | ------------- | BZTGRTKI3 | ------------- |
| | . | | | |
| | . | | | |

## FIG. 5



| OPEN CHANNELS |
|---|
| 1OXR7112PH |
| 2AA47WX3BO |
| 122PGLWAW |
| . |
| . |
| 2BZZ86A9FC |

501



FIG. 2



FIG. 3

FIG. 6



602 — MAIL SERVER RECEIVES A MESSAGE FROM THE NETWORK

604 — IS THE RECIPIENT'S ADDRESS (WITHOUT THE CHANNEL ID) A KNOWN USER?

NO → 606 — REJECT THE MESSAGE AND RETURN AN "UNKNOWN USER" MESSAGE TO THE SENDER

YES

608 — IS THE CHANNEL ID IN THE RECIPIENT'S CHANNELS FILE?

NO → 610 — REJECT THE MESSAGE AND RETURN A "NO PERMISSION" MESSAGE TO THE SENDER

YES

612 — SEND THE MESSAGE TO THE PCA

614 — IS THIS THE FIRST MESSAGE FROM THIS SENDER?

YES → 616 — PCA ENTERS THE "FROM" CHANNEL INTO THE UCDB AS WELL AS OTHER NEEDED INFORMATION

NO

618 — PCA STRIPS OFF THE CHANNEL IDs FROM THE HEADER INFORMATION

620 — MESSAGE DELIVERED TO RECIPIENT

*FIG. 7*



702 — USER COMPOSES MESSAGE AND SENDS IT TO PCA

704 — PCA EXTRACTS RECIPIENT(S) LIST

706 — ARE ANY RECIPIENTS LEFT IN THE RECIPIENT'S LIST?

NO → END — 708

YES

710 — PCA CHOOSES THE FIRST RECIPIENT FROM THE RECIPIENT LIST AND REMOVES THAT RECIPIENT FROM THE RECIPIENT LIST

711 — IS THIS THE FIRST MESSAGE TO RECIPIENT?

YES → PLACE THE RECIPIENT IN THE UCDB AND GENERATE A PRIVATE OWN CHANNEL AND OWN KEY FOR THE RECIPIENT — 713

NO

712 — PCA CONSTRUCTS A NEW VERSION OF THE MESSAGE WHICH IS IDENTICAL TO THE ORIGINAL VERSION OF THE MESSAGE EXCEPT THAT
(1) THE "FROM" ADDRESS INCLUDES THE USER'S OWN-CHANNEL IDENTIFIER FOR THAT RECIPIENT AND
(2) THE RECIPIENT'S ADDRESS IS REPLACED WITH THE CORRESPONDENT CHANNEL ADDRESS IN THE MESSAGE HEADER

714 — PCA SENDS THE NEW VERSION OF THE MESSAGE TO THE SERVER DIRECTING THE SERVER TO SEND THE MESSAGE ONLY TO THAT RECIPIENT. AN SMTP ENVELOPE IS GENERATED FOR THAT SINGLE RECIPIENT ONLY



FIG. 8A

802 ── FROM: hall@research.att.com
803 ── TO:frobboz@geewhiz.com
804 ── Cc:jrandom@j.r.isp.net

805 {
CHUCK,
HAVE YOU HEARD FROM foo@bar.com
LATELY?
--BOB
}

FIG. 8B

810

802a ── FROM: hall-1BBSYC8YNL-@research.att.com
803a ── TO:frobboz-1G77IG9AO9-@geewhiz.com
804a ── Cc:jrandom@j.r.isp.net          812

805a {
CHUCK,
HAVE YOU HEARD FROM foo@bar.com
LATELY?
--BOB
}

FIG. 10A

TO:frobboz-1DDYWA7H7I-@geewhiz.com
FROM:someone-1OXR7112PH-@domain.com
----------------------
SEND YOUR KEY X9GWAAH4T

1001          1002

FIG. 10B

TO:someone-1OXR7112PH-@domain.com
FROM:frobboz-1DDYWA7H7I-@geewhiz.com
----------------------
MY KEY IS: T7AA18MMN

1004                    X9GWAAH4T

1006

## FIG. 9



901 — A's PCA CREATES A NEW CHANNEL FOR B AND PLACES THIS IN THE CHANNELS FILE

902 — IS B's KEY LOCATED IN A's UCDB?

YES

NO

904 — A's PCA SENDS A MESSAGE TO B's PCA REQUESTING B's KEY. THE MESSAGE INCLUDES A's KEY

906 — B's PCA SENDS A's PCA B's KEY AND INCLUDES A's KEY IN THE MESSAGE. A's KEY HAS BEEN COPIED FROM A's PREVIOUS MESSAGE

908 — A's PCA RECORDS B's KEY IN A's UCDB

910 — A's PCA SENDS A MESSAGE TO B's PCA TO SWITCH CHANNELS TO A NEW CHANNEL. A's PCA SENDS A COPY OF A's KEY AND B's KEY WITH THE MESSAGE

912 — B's PCA CHANGES B's UCDB TO REFLECT THE NEW CHANNEL TO BE USED FOR A AND SENDS AN ACKNOWLEDGEMENT (ON THE OLD CHANNEL BEING SWITCHED AWAY FROM) TO A THAT THE CHANNEL HAS BEEN CHANGED. THE ACKNOWLEDGEMENT MESSAGE INCLUDES A COPY OF B's KEY AND A's KEY

914 — A's PCA CLOSES THE OLD CHANNEL FOR B AND SETS THE NEW CHANNEL IN A's UCDB AS B's CHANNEL

### FIG. 10C

```
TO:frobboz-1DDYWA7H7I-@geewhiz.com
FROM:someone-1QXR7112PH-@domain.com
----------------------
CHANGE TO CHANNEL 1L3RG3592T
   1008⌐            T7AA18MMN ⌐
                    X9GWAAH4T      1010
                           ⌐1006
```

### FIG. 10D

```
TO:Someone-1QXR7112PH-@domain.com
FROM:frobboz-1DDYWA7H7I-@geewhiz.com
----------------------
ACKNOWLEDGE THE CHANGE TO CHANNEL 1L3RG3592T
   1011⌐       X9GWAAH4T ⌐        ⌐1012
               T7AA18MMN     1006
                      ⌐1010
```

### FIG. 10E



```
             1016
TO:someone-1L3RG3592T-@domain.com
FROM:frobboz-1DDYWA7H7I-@geewhiz.com
----------------------
DEAR TIM:
     HOW IS THE PROJECT PROGRESSING? PLEASE LET ME
KNOW AT YOUR EARLIEST CONVENIENCE.
                    JOAN
```

## FIG. 11





FIG. 12



FIG. 13

1301 — CALLER SENDS CALL SETUP REQUEST TO USER'S SERVER WITH USER ADDRESS (INCLUDING CHANNEL ID)

1302 — USER'S SERVER CHECKS ADDRESS FOR VALID USER?

NO → 1303 REFUSE CALL SETUP REQUEST

YES

1304 — VALID CHANNEL FOR USER? (i.e. CHANNEL ID IN CHANNELS FILE?)

NO → 1306 REFUSE CALL SETUP REQUEST

YES

1308 — SETUP CALL AS USUAL (RING USER'S PHONE, ETC.)

FIG. 14

1402 — USER DIALS ACCESS NUMBER OF PCA

1404 — USER AUTHENTICATES WITH PCA (e.g. ENTERS PIN)

1406 — USER ENTERS TOUCH TONE SEQUENCE IDENTIFYING CALL RECIPIENT TO PCA (e.g. 10-DIGIT PHONE NUMBER)

1408 — IS THE CALL RECIPIENT'S CHANNEL ID IN USER'S UCDB?

1410 YES ← PCA PLACES CALL TO CHANNELIZED TELEPHONE ADDRESS OF CALLER

1412 NO → PCA PLACES CALL TO ORIGINAL TOUCH TONE SEQUENCE ENTERED BY USER

1414 — CALL PROCEEDS AS USUAL

5,930,479

**1**

# COMMUNICATIONS ADDRESSING SYSTEM

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates generally to communications sent over a communication network, and more particularly, to a system and method for controlling the reception of communications from various entities having access to the network.

### 2. Description of the Related Art

Electronic mail ("e-mail") has become increasingly popular as a form of communication in today's society. This is true at least in part due to the popularity of the Internet. Users of e-mail may be referred to as "users". The user is generally referred to as a "recipient" when receiving e-mail and as a "sender" when sending e-mail to a recipient. The term "correspondent" may be used to refer to a person or persons who are sending e-mail to, or receiving e-mail from, the user in question.

To send e-mail over a communications network, a user must address an e-mail message to an intended recipient. For example, referring to FIG. 1A, a conventional e-mail address as used on the Internet is illustrated. The address usually has two parts, the user name 100 (also referred to as the "mailbox name") and the host (or domain) name 102. These two parts are part of a hierarchy of names; that is, the domain name 102 is of a higher level than the user name 100. The user name 100 may be described as the lowest-level name in the hierarchy. Typically, the user name 100 and the host name 102 may be separated by an "at" sign, "@", 104. To send e-mail over the Internet, the user addresses the e-mail message by placing the intended recipients' addresses in the "To" line (or field) of the message as is well know in the art. In addition, a user may "carbon copy" or "cc" (or "Cc") yet another intended recipient of the e-mail message by placing that recipient's address in the cc line (or field) as is also well known in the art. There is also typically a "from" line (or field) indicating who sent the message. All of these items together with other lines such as subject, date, etc., form what is known as a "header" of the e-mail message. Other options, also well known in the art, are available for various ways to address intended recipients of Internet e-mail. Analogous methods exist for addressing e-mail over other networks.

Unfortunately, as with other forms of communication, for example regular mail and facsimile, users of e-mail may receive a quantity of unwanted or "junk" mail. This may be in the form of "telemarketing" type e-mail (for example an advertisement or a survey). While this may only rise to the level of a mere nuisance or annoyance, in some situations, unwanted e-mail may actually rise to the level of harassment. For example, the user may receive unwanted offensive or obscene e-mail. A malicious e-mail sender could also possibly send "hate mail".

This type of activity, in some circumstances, may as a practical matter render the user's e-mail capabilities useless. For example, if a malicious e-mail sender barraged the e-mail user's mail box with a multitude of messages that the user would have to review, any wanted, or "non-junk" mail would be buried in a large amount of useless junk e-mail. The malicious e-mail sender could also send messages that were known to offend the recipient so that the recipient would not want to review any of the messages received, including legitimate messages.

The commercialization of the Internet further threatens the usefulness of e-mail. Today, it is easier than in the past

**2**

to collect address lists and inexpensive to mass-distribute messages. Every time a user sends a message to a public newsgroup or list, fills out a web form, or mails in a product registration card, the server inexpensively obtains an e-mail address and typically some indication of the user's interests. This information can then be sold to marketing firms who can easily automate unsolicited mass e-mailings of advertisements, surveys, and other annoyances that may cost the user connect time and, possibly worse, valuable attention span.

It would be desirable to be capable of restricting the receipt of unwanted e-mail and other types of messages sent over a network. In addition, when unwanted e-mail (or messages) is received, it would be beneficial to be able to determine in what manner the sender of the unwanted e-mail obtained the user's address.

One way to restrict unwanted e-mail is for the user to limit who he gives his e-mail address to. This is analogous to having an unlisted telephone number. Alternatively, a user might maintain multiple e-mail accounts, using different accounts for different purposes, such as one address for business purposes and another address for personal purposes. This "unlisted address" approach may be expensive and slow to recover from security breaches. For example, if an address that was supposed to be kept secret is leaked to a malicious e-mail sender (also referred to as an "adversary"), the "secret" address is no longer secret. The only way to stop this leak may be to pay a fee to the service provider to change the address. This may be a lengthy process and, once the address is changed, the user must attempt to notify all legitimate correspondents of the change while keeping it from the adversary.

Another approach to solving these problems is through the use of "kill files". This is accomplished by simply discarding all messages from a predetermined user, site, or even domain. Killing a site or domain prohibits messages from all of its users, even though only a subset may be undesirable. Undesirables can have other accounts with completely different addresses, or may forge messages in order to evade simple address checks such as these.

In addition to kill files, another prior art approach is to use an e-mail filter to discard undesired messages. This would include messages that do not satisfy user-defined criteria. A filter works by searching for syntactic patterns and eliminating (or filtering) messages that match. However, it is extremely difficult to define syntactic rules that can reliably distinguish advertisements and surveys from legitimate messages. For example, if the following message were received from an individual, a filter may assume that it is a legitimate question from a friend and fail to filter it out:

"Dear Bob, I have difficulty using software package X. It never seems to run in a multitasking environment!! Isn't this frustrating? Do you have the same problem? Maybe you should check out software package Y which will eliminate the problem. Talk to you soon, John"

This message, upon an initial review, appears to be a legitimate question and suggestion sent to "Bob". This could also represent a ploy by "John" to advertise a software package Y. It would be extremely difficult to write an e-mail filter that discards this message but lets through legitimate messages.

Another prior art method of restricting e-mail is cryptographic authentication. With this method, access is controlled by requiring all messages to be digitally signed by an authorized correspondent. A cryptographic filter would discard any unsigned or unauthorized messages. This

5,930,479

| 3 | 4 |

approach may provide protection against unauthorized messages. However, even though software packages exist to do the cryptographic operations necessary (for example PGP ["pretty good privacy"] available over the Internet from the Massachusetts Institute of Technology [see the World Wide Web Page located at http://web.mit.edu/network/pgp.html] or products that comply with S/MIME, which is a specification for secure e-mail [information about S/MIME may be obtained on the World Wide Web page "S/MIME Central" at http://www.rsa.com/rsa/S-MIME/]), reliably obtaining a public key of a correspondent is still problematic in that the public key transfer itself must also be digitally signed, which requires reliably knowing the signing key for that message. In addition, this method does not solve the problem of allowing messages from previously unknown correspondents, such as messages received from mailing lists. If the user wishes to be able to receive such messages, he must publish a single address. Even if a message to that address is digitally signed with a certified key, there is no guarantee that the message is not junk.

Yet another alternative is to accumulate a list of individuals who send junk e-mail, but adversaries may be able to evade this mechanism by registering several addresses and keys, or by having a different employee send each message.

There are also existing methods of augmenting the user name portion of an e-mail address. For example, the Andrew Message System, as described in Nathaniel S. Borenstein and Chris A. Thyberg, Power, ease of use and cooperative work in a practical multimedia message system, International Journal of Man-Machine Studies, Volume 34, Number 2, pages 229–259, February 1991, uses addresses of the form "user+info@host". Each user may write code in the Andrew Message System FLAMES language to process messages based on the content of the "info" field. For example, "urgent" may be placed in the info field indicating that incoming messages are urgent. With this system, it is up to the good will of the correspondent to not purposefully mischaracterize messages, for example by sending junk mail while using "urgent" in the "info" field. The "info" field is typically well-known, predictable or easily guessable.

Therefore, there is a need for an effective way of preventing undesirable e-mail and other network communications or messages. There is also a need for the ability to trace unwanted or undesirable e-mail (and communications or messages).

## SUMMARY OF THE INVENTION

The above mentioned shortcomings are overcome and a technical advance is made over the prior art through the system and method of the present invention. In a first aspect, the invention features a method for sending a message from a sender to a recipient in a network. The method comprises the step of using an address to send the message from the sender to the recipient. The address comprises a common address portion that indicates an identity of the recipient in the network and a channel identifier portion for verifying that the message is authorized for delivery to the recipient.

In another aspect of the invention, an improved address of the type having a hierarchy of names including a lowest-level name at the lowest level of the hierarchy is provided. The improved address comprises a channel identifier part of the lowest-level name that includes at least a substantially unguessable channel identifier.

In another aspect of the invention, a system for authenticating a received message from a network is provided. The system comprises a mail server for receiving and authenticating the message. A file is available to the mail server for determining whether the message is an authorized message. This determination is based upon a substantially unguessable portion of the address attached to the message.

In another aspect of the invention, a system is provided for sending a message on a network to a recipient. The system comprises a personal channel agent for automatically including a substantially unguessable portion in a recipient's address so that the recipient can determine whether the message is an authorized message that the recipient will receive.

In another aspect of the invention, a method of sending and receiving messages from one or more first correspondents to a second correspondent is provided. The method comprises the steps of: (1) the second correspondent forming a plurality of substantially unguessable extended addresses for messages sent from the first correspondent to the second correspondent; and (2) providing a received message to the second correspondent only if an address to the second correspondent associated with the received message matches one of the plurality of extended addresses.

## BRIEF DESCRIPTION OF THE DRAWINGS

The foregoing features and other aspects of the invention are explained in the following description taken in connection with the accompanying drawings, in which like reference characters refer to like parts throughout, and wherein:

FIG. 1A is a diagram of a conventional e-mail address;

FIG. 1B is a diagram of a channelized address according to an embodiment of the present invention;

FIG. 2 is a block diagram illustrating a system configured according to an embodiment of the present invention;

FIG. 3 is a block diagram illustrating a system configured according to an embodiment of the present invention;

FIG. 4 is a diagram illustrating a database used in connection with the system shown in FIG. 2;

FIG. 5 is a diagram illustrating a file used in connection with the system shown in FIG. 2;

FIG. 6 is a flow diagram illustrating the process of receiving an e-mail message;

FIG. 7 is a flow diagram illustrating the process of sending an e-mail message;

FIG. 8A is a diagram illustrating an e-mail message according to an embodiment of the present invention;

FIG. 8B is a diagram illustrating an e-mail message according to an embodiment of the present invention;

FIG. 9 is a flow diagram illustrating the process of switching e-mail channels;

FIG. 10A is a diagram illustrating a message according to an embodiment of the present invention;

FIG. 10B is a diagram illustrating a message according to an embodiment of the present invention;

FIG. 10C is a diagram illustrating a message according to an embodiment of the present invention

FIG. 10D is a diagram illustrating a message according to an embodiment of the present invention;

FIG. 10E is a diagram illustrating a message according to an embodiment of the present invention;

FIG. 11 is a diagram illustrating an interface according to an embodiment of the present invention;

FIG. 12 is a block diagram illustrating a system for using Packet Telephony configured according to other embodiments of the present invention;

FIG. 13 is a flow diagram illustrating the process for receiving a call on the system shown in FIG. 12; and

5,930,479

5

FIG. 14 is a flow diagram illustrating the process for placing a call on the system shown in FIG. 12.

## DETAILED DESCRIPTION

A preferred embodiment of the present invention utilizes "channelized addresses" to allow correspondents to send and receive e-mail. Channelized addresses create different "channels" that correspondents can use to send e-mail to the user. In other words, each user's e-mail account is made accessible via a user-controlled set of channels. Each channel has a distinct structured e-mail address that contains within it the account name and a cryptographically unpredictable or "unguessable" random string, known as a "channel identifier." Each legitimate correspondent is allowed to know one or more of these access addresses or channel identifiers.

The system according to the invention allows the user to reject any e-mail not arriving on a proper channel (with a proper channelized address). If unwanted e-mail does arrive on a valid channel, the user may turn the channel off and allow legitimate users of that channel to use another channel. In other words, legitimate users are "switched" to another channel.

The user (or account owner) is provided simple controls for opening a new channel, closing a channel (hence possibly retracting one or more correspondent's access privilege), and switching a channel (notifying selected correspondents that the current channel is being closed, but a new one is open for their use). This can be provided through an automated personal channel agent ("PCA"). The PCA also causes the received channelized e-mail to look and feel to the user exactly like conventional e-mail. The PCA provides various administrative controls. The PCA manages a database that keeps a correspondent's address to its assigned channel, as well as (when applicable) the channel assigned by the correspondent to the account owner.

Referring to FIG. 1B, a "channelized address" 106 according to a preferred embodiment is shown. This address is in the standard Internet domain name format. This format usually consists of a hierarchy of names, the domain name being of a higher level and the user name being of a lower level in the hierarchy. It should be understood that other known address formats can also be used. Indeed, virtually any address format that has a user name part may be used.

The channelized address 106 in FIG. 1B comprises at least three basic parts, the user name 108, the channel identifier (or channel ID) 110, and the host (or domain) name 112. Between the channel ID 110 and the host name 112 is an "at" sign, "@", 104. As shown in FIG. 1B, there is a hyphen ("-") immediately before and immediately after the channel ID 110. By comparison of FIG. 1A with FIG. 1B, it should be noticed that the prior art address (FIG. 1A) is somewhat similar in appearance to the channelized address of the preferred embodiment (FIG. 1B), except that the channelized address of the preferred embodiment contains the channel ID 110 to the left of the "at" sign 104. Thus, the channelized address 106 contains both traditional address information (e.g., user name 108 and host name 112), as well as the channel ID 110.

In a preferred embodiment, the administration of the channelized addresses 106 and the generation of the channel ID 110 is accomplished by a personal channel agent (or administrator) ("PCA"), which is described below in more detail with respect to other functions it performs.

Each channel identifier 110 comprises at least two parts, a security string 114 and a channel class indicator 116. The

6

channel class indicator 116 is an ASCII code for a digit indicative of a channel class. In a preferred embodiment, the security string 114 causes the channel identifier 110 to be practically unguessable (or even random), even when a malicious e-mail sender (or adversary) is aware of several of the user's other preexisting channel identifiers. That is, the channel identifier 110 should be unpredictable by an adversary. The security string 114 may be generated pseudorandomly. In alternate embodiments, the security string 114 may be generated randomly or selected by a user. Again, the important point is that the security string 114 be practically unguessable by an adversary, no matter how it is generated.

One method to generate random bits to be used in the security string 114 in a preferred embodiment is using the cryptographically unpredictable generator of Blum Blum and Shub ("BBS generator"), with a modulus size larger than 1024 bits (for example 1046 bits may be used in one embodiment). This method is disclosed in L. Blum, M. Blum, & M. Shub, A Simple Unpredictable Pseudo-Random Number Generator, Society for Industrial and Applied Mathematics Journal on Computing, Volume 15, No. 2, pages 364–383, May 1986, which is hereby incorporated by reference herein. Once the random bits are generated, they cannot simply be inserted into an e-mail address because typical e-mail protocols, including the Internet mail protocol, restrict the set of characters allowed in an address. Thus, to generate the security string 114 of a new channel ID 110, the system preferably first generates 45 random bits using the BBS generator method. These bits are then encoded into strictly alphanumeric ASCII characters 5 bits at a time, using only one case of the alphabet and the digits 3 through 8. (For example, in one embodiment, binary numbers 00000–11001 are mapped to uppercase letters A–Z respectfully and binary numbers 11010–11111 are mapped to numerals 3–8 respectively.) The reason for this is that when a message is received on a channel, alphabetic case is ignored in comparing the channel ID 110 in the channelized address 106 of the message to those of active channels. Using this method, by way of example, if a user maintains 128 ($2^7$) open channels, an adversary has approximately one chance in $2^{45-7}$ (about 275 billion) of guessing an open channel with one message. A brute force attack (sending 100 billion messages to the same host) is impractical in today's Internet.

Although generation of the security string 114 using the cryptographically unpredictable BBS generator method has been described as a preferred method, other possible random bit generators that are practically unpredictable could also be used.

The other part of the channel ID 110, the channel class indicator 116, gives an indication of how mail on that channel will be treated by the user/recipient. In a presently preferred embodiment, there are three classes of channels indicated by the channel class indicator 116: channel class 0 indicates a send-only channel, channel class 1 indicates a private channel, and channel class 2 indicates a public channel. These various classes are indicated in FIG. 1B by reference number 116 at the beginning of the channel ID 110. Thus, in the example illustrated in FIG. 1B, the channel class indicator 116 is set to "1", indicating a private channel.

A send-only channel (channel class 0) is one that is permanently closed to incoming e-mail. This may be useful when a user wants to send a message to a public or adversarial address without providing the recipient with any access channels or addresses to which the recipient could send unsolicited e-mail. A private channel (channel class 1) is used when the user expects only one or a limited number

5,930,479

7

of known or identified correspondents to send e-mail on that particular channel. A public channel (channel class 2) allows previously unknown correspondents to send on it.

One purpose for explicitly identifying the channel class indicator 116 in the channel ID 110 is as a courtesy to correspondents. Once a correspondent notices which channel is open for her use, she can determine her response options. For example, the correspondent will not bother trying to send a return message on a send-only channel (channel class 0).

Although three channel classes have been described herein, it is understood that any number of user-defined channel classes may be used. For example, as an alternative to the channel classes described above, the following classes could be implemented: channel class 0 for a send only channel; channel class 1 for a private channel; channel class 2 for a permanent public channel; channel class 3 for a temporary public channel; channel class 4 for a commercial channel; and channel class 9 for an introductory channel. A permanent public channel (channel class 2) is open for an unlimited time, whereas a temporary public channel (channel class 3) is open for a limited predetermined time. A commercial channel (channel class 4) may be used for commercial traffic.

In an embodiment with an introductory channel (channel class 9) (or alternatively, any public channel class), the introductory channel may be configured as a public, "pay-per-view" channel having a well-known address. Each channel user may use a powerful filtering agent (for example the Andrew Message System's FLAMES language discussed above) to establish a well-known public channel identifier, for example "9INTRODUCE". If a message to this channel does not contain an electronic money (or "e-money") payment, such as electronic checks or cash, of some reasonable fee (for example, $1.00), then the system could send an automatic message informing the correspondent that the user will not read the message unless the proper fee is forwarded. The reply would also inform the correspondent that, if after reading the message, the correspondent is found to be "friendly", or non-commercial (e.g., not "junk" e-mail), the fee will be refunded by the user. If the message is retransmitted and determined by the user to be junk or otherwise inappropriate, then the user may retain the fee. Alternatively, if the retransmitted message is a legitimate attempt at contact, the user refunds the fee. Such a channel address could be published in directories. The risk of unwanted e-mail is reduced by setting an appropriate access fee for unknown correspondents since there is presumably a price that advertisers will not pay for mass-mailings. This approach allows access to long-lost friends and relatives since the fee will be immediately refunded in the case of a "friendly" correspondent.

A user may allocate a number of the channelized addresses 106 having differing channel identifiers 110 for different correspondents. Other than the channel ID portion of the channelized address, the address may look the same for all correspondents. If a correspondent desires to send e-mail to the user, the correspondent must send the e-mail identifying the correct channel; that is, by using an open (or active) channelized address 106 with the proper channel identifier 110. If the correspondent sends to a channel that has not been opened or that has been closed as is described below, the e-mail from the correspondent will be rejected by the user's mail server and the user will never receive it. A goal is thus to control access to a user's mailbox by potential correspondents, not to ensure anonymity of the account owner/user, or to guarantee privacy of the messages.

8

Referring now to FIG. 2, the architecture for an embodiment implementing the system is illustrated. The hardware involved is connected to a network 200 for sending and receiving e-mail. This network may be the Internet, or any other network capable of transferring e-mail.

Connected to the network 200 is a mail server 202. In a preferred embodiment, this can be implemented with a Sun Work Station, and in particular a Sparc Station 2, available from Sun Microsystems running a UNIX operating system. It is understood, however, that other suitable computers may be used as the server 202.

The server 202 is connected to a personal channel agent host ("PCA host") 204, which is a computer that acts as a host machine for the personal channel agent ("PCA") 214. In a preferred embodiment, the PCA host 204 can be implemented with a Macintosh IIfx, available from Apple Computer, running a MAC OS operating system. It is also understood that other suitable computers could be used as the PCA host 204. The PCA 214 may be implemented in software code written, for example, in the Common Lisp language. It is also understood that the PCA 214 could be implemented using other software languages and also in hardware or in a combination of hardware and software.

The PCA host 204 is connected to a user machine 206. The user machine acts as the user interface to the network 200 for sending and receiving e-mail. In a preferred embodiment, the user machine 206 may be implemented with a personal computer, for example a Dell Pentium 90, available from Dell Computer Corporation, running a Windows 95 operating system available from Microsoft Corporation. It is understood that other suitable computers could be used for the user machine 206.

Within the mail server 202 is a mail receiver 208 and a mail sender 210. The mail receiver 208 and mail sender 210 can be implemented using a modified form of the Unix "Sendmail" program. In particular, the Sendmail program is modified as described with respect to steps 604 and 608 shown in FIG. 6. The mail receiver 208 is a "daemon" program. In other words, the mail receiver 208 constantly checks to determine whether any mail has arrived from the network 200. Preferably, the mail receiver 208 receives e-mail from the network 200 on path 220 using the Simple Mail Transfer Protocol ("SMTP"), although other conventional formats could also be used. The mail sender 210 preferably sends mail to the network 200 on the path 222 using the SMTP protocol, although other conventional formats could also be used. In the SMTP protocol, a message is transmitted with an envelope that specifies the sender and the recipient(s). The message itself comprises header lines (to, from, subject, date, etc.) followed by a blank line followed by the body of the message. The server 202 also contains a channels file 212, which is described below.

Within the PCA host 204 is the PCA 214. The PCA 214 receives mail from the mail receiver 208 via path 216. The PCA 214 is configured to periodically check the mail server 202 for new e-mail. Path 216 preferably uses the POP3 protocol to transfer the e-mail from the mail receiver 208 to the PCA 214. The POP3 protocol is enabled by running a software product, such as "POPPER" (which can be obtained from the Internet at ftp.CC.berkeley.edu) on the mail server 202. Other known implementations of the POP3 protocol, as well as other known protocols, could also be used. The PCA 214 also forwards e-mail to the mail sender 210 via path 218. Path 218 preferably uses the SMTP protocol to transfer e-mail from the PCA 214 to the mail sender 210. Other known protocols could also be used on

5,930,479

9

path 218. The PCA 214 also transfers data via path 224 to the channels file 212. In a preferred embodiment, this data is transferred using the File Transfer Protocol ("FTP") along path 224. Of course, other known protocols could be also used. The PCA 214 also has a User Channel Database ("UCDB") 226, which is described below.

Within the user machine 206 is a mail client 228. In a preferred embodiment, the mail client 228 may be implemented with the Netscape Mail Client and Browser available from Netscape Communications Corp. Of course, other well known mail clients could also be used. The mail client 228 communicates with the PCA 214 via paths 230 and 232. Path 230 is preferably used for receiving e-mail from the PCA 214 using the POP3 protocol. Path 232 is preferably used for sending e-mail from the mail client 228 to the PCA 214 using the SMTP protocol. Although paths 230 and 232 have been described using the POP3 and SMTP protocols, respectively, other known protocols may also be used.

Also within the user machine 206 is a web browser 234. In a preferred embodiment, the web browser 234 could be implemented with the Netscape Navigator provided by Netscape Communications Corp. The web browser 234 is used to administer the PCA 214 including the UCDB 226. The web browser 234 preferably communicates with the PCA 214 along path 236 using the Hypertext Transfer Protocol ("HTTP"), although other known protocols may also be used.

Other combinations of a user machine 206a, PCA host 204a, and mail server 202a, may also be connected to the network 200. Their configuration may be the same as that described for the combination of user machine 206, PCA host 204, and mail server 202. In FIG. 2, the interconnections and components of combination 206a, 204a, and 202a are the same as described for combination 206, 204, and 202. To illustrate this, components in combination 206a, 204a, and 202a are labeled with reference numerals corresponding to those in combination 206, 204, and 202, except that the suffix "a" is added at the end of each reference number. For instance, PCA 214 in combination 204, 204, and 202 corresponds to PCA 214a in combination 206a, 204a, and 202a. Corresponding components may be described in like fashion.

Although, FIG. 2 illustrates connections for two user machines 206 and 206a, it is understood that, as with any network, many other machines may be connected to the network 200 for sending and receiving e-mail. As illustrated in FIG. 3, many user machines 206, 206a, 206b, 306a, 306b, 306c, 306d, 312a, 312b, 312c, and 312d may be connected to the network 200. In addition, while the preferred embodiment has been illustrated in FIG. 2 as having one user machine 206 and one PCA host 204 used with one mail server 202, it is understood that in other embodiments, more than one user machine may be connected to a single PCA host. In FIG. 3, two different configurations for connecting multiple user machines to a server are shown. In one embodiment, separate PCA hosts 304a and 304b may be provided for connecting each corresponding user machine 306a and 306b to a single mail server 302. In another embodiment, a single PCA host 310 may be used for connecting multiple user machines 312a, 312b, 312c, and 312d to the mail server 308. This is also shown by user machines 306c and 306d connected to a single PCA host 304c and to the mail server 302.

Referring to FIG. 2, conceptually, the PCA 214 acts as an e-mail proxy, sitting between the user's mail client 228 and the mail server 202. Thus, all incoming and outgoing mes-

10

sages pass through the PCA 214, which uses appropriate protocols as discussed above to interact with the mail client 228 and mail server 202. This positioning allows the PCA 214 to autonomously perform various bookkeeping functions, thereby shielding the user from them.

The architecture described above and illustrated in FIG. 2 allows the PCA 214 to run on a PCA host 204 separate from the mail server's host 202 so that any additional computational load incurred by the PCA 214 can be appropriately distributed. The only additional load necessarily incurred by the mail server 202 when the PCA 214 is on its own host 204 is in parsing the address (dividing the channelized address into a user name and a channel ID), plus the time to check the channels file 212 as will be described below. This is only significant for large channels files or slow file access. If users want to keep open many channels, the file 212 may be compiled by the PCA 214 into a format supporting faster access than a flat file, which is used in one embodiment.

Although FIG. 2 (and FIG. 3) illustrate a preferred embodiment where the PCA 214 is located on a different piece of hardware (PCA host 204) than the server 202 and user machine 206, it is understood that the PCA 214 could alternatively be located on the user machine 206 or on the server 202, thus eliminating the need for the PCA host 204.

The user channel database (UCDB) 226 primarily records two mappings, the channel map and the correspondent address map. The channel map associates each correspondent with the channel on which that user expects to receive mail from that correspondent. The correspondent-address map associates each correspondent's user and host names with the channel ID (if one exists) on which the user is allowed to send to the correspondent.

The UCDB 226 (or 226a) is conceptually illustrated in FIG. 4. The headings in each column are not actually stored in the database 226, but are provided in FIG. 4 for illustrative purposes. For each correspondent address 402, the UCDB 226 may have one or more of the following entries: own channel 404, correspondent channel 406, own key 408, and correspondent key 410. A correspondent is simply another e-mail user that the user desires to send to or receive mail from. The correspondent address 402 is the standard e-mail address of the correspondent. The own channel 404 is the channel ID 110 used for the correspondent to send e-mail to the user. The correspondent channel 406 is the channel ID 110 that must be used by the user to send e-mail to the correspondent. The own key 408 is a key assigned by the user that is necessary to allow certain functions to be performed (as will be discussed below). The correspondent key 410 is a key assigned by the correspondent, which is also necessary to allow certain functions to be performed (as will also be discussed below). All of this information is placed in the UCDB 226 by the PCA 214 as it interacts with the mail server 202 and the user machine 206.

So, for example, as illustrated in FIG. 4, for the correspondent address 402 "frobboz@geewhiz.com", the following information is stored in the UCDB 226: own channel 404=1QXR7112PH; correspondent channel 406=1DDYWA7H7I; own key 408=X9GWAAH4T; and correspondent key 410=T7AA18MMN. For the correspondent address 402 "jrandom@j.r.isp.net", all of the entries are similarly filled except for the correspondent key entry 410. This is because the correspondent key information has not yet been received from the correspondent, possibly because it is not yet needed. Nevertheless, the UCDB 226 can store this correspondent key information when (and if) it is received.

5,930,479

11

12

The first two own channels 404 listed in FIG. 4, "1QXR7112PH" and "122PG3LWAW", begin with the number "1". This number is the channel class indicator 116 discussed above and preferably indicates (because it is set to "1") that these are private channels as described above. The next two own channels 404 listed in FIG. 4, "2AA47WX3BQ" and "2BZZ86A9FC", begin with the number "2". This channel class indicator 116 identifies these channels as public channels as described above. Therefore, these two channels do not require entries for correspondent address 402, correspondent channel 406, own key 408, or correspondent key 410, because any one of a number of correspondents may send e-mail on these public channels (using the public channel ID). The correspondent channel 406 associated with the correspondent address 402 "info-hooba@sri.com" shown in FIG. 4 is "0XTRR9Y680". Because this channel class indicator 116 begins with the number "0", this indicates that this channel is a send-only channel as described above. Therefore, there is no need for an entry for correspondent channel 404 or correspondent key 410 because no return messages will be accepted on this channel from any correspondent. In one embodiment, there is an own key entry 408 (in this case "BZTGRTKI3") because the system automatically generates an own key every time a new correspondent is entered into the UCDB. In the case of a send-only channel, this key would not be used.

In FIG. 4, a correspondent address such as "jrandom@j.risp.net" may have no entry for the correspondent channel field 406 if that correspondent does not use channelized addresses. In other words, that correspondent expects e-mail addresses as shown in FIG. 1A, or whatever the standard format is for that system.

Referring again to FIG. 2, the mail receiver 208 and mail sender 210 may be implemented in a preferred embodiment using a modified Unix "Sendmail" mail transfer program. It is understood that other mail transfer programs could also be used if analogous changes are made thereto. The modification involves changing the sendmail code so that when Sendmail is about to look up a user's name in the system's password file (a standard database defining the valid users of the system), it will first separate the address into a "true" user name and channel ID. Then, assuming the normal password file check succeeds for the true user name (FIG. 6, step 604, discussed below), the corresponding user's home directory is checked for a channels file 212 containing a list of open channels (FIG. 6, step 608, also discussed below). If the channel ID of an incoming message matches one of the lines in the channels file 212, the message is delivered to the user machine 206 through the PCA host 204. If the channels file 212 does not have a match, the message is refused with a "no permission" error. The message is also rejected if the address has no channel ID at all. The channels file 212 must be readable and writable only by the user and the Sendmail program to prohibit others from gaining unauthorized knowledge of open channels.

Referring now to FIG. 5, a conceptual diagram of the channels file 212 is illustrated. The heading on the column "Open Channels" is illustrative only, and such a heading is not actually stored in the channels file 212. The channels file 212 has a list of channels 501 that have been open by the user. Opening channels may be accomplished with a user interface as described with reference to FIG. 11. In the example shown in FIG. 5, the first channel listed is "1QXR7112PH". These channels are checked by the modified Sendmail program when a message is received by the mail receiver 208. The channels file 212 is updated regularly

by the PCA 214 from information that has been entered in the UCDB 226. This information is stored in the own channel field 404 of the UCDB, as shown in FIG. 4.

Referring now to FIG. 6 (with reference also to FIG. 2), the process of receiving a message will be described. In step 602, the mail server 202, through the mail receiver 208, receives a message from the network 200. The mail receiver 208 is implemented using the modified Sendmail program. In step 604, the system determines whether the recipient's address (without the channel ID) is the address of a known user of the system. This comparison is done without using the channel ID 110, therefore the system must first parse the address. If the recipient's address is not an address of a known user, in step 606, the system rejects the message and returns an "unknown user" message to the sender of the message. If the recipient's address is that of a known user, in step 608, the modified Sendmail program checks the channels file 212 to determine whether the channel ID 110 in the incoming message is in the recipient's channels file. If the channel ID 110 is not in the recipient's channels file 212, in step 610, the system rejects the message and returns a "no permission" message to the sender. If the channel ID 110 in the incoming message is in the recipient's channels file 212, in step 612, the message is sent to the PCA 214 via the path 216.

In step 614, the PCA 214 determines whether this is the first message from this sender. If this is the first message from the sender, the PCA enters the "from" channel into the UCDB 226 in step 616. This is entered in the correspondent channel field 406 illustrated in FIG. 4. The correspondent address field 402 is also filled in at this time. The system then proceeds to step 618. If, in step 614, it is determined that this is not the first message from this sender, the system also proceeds to step 618.

In step 618, the PCA 214 strips off the channel IDs from the header information (i.e. "to", "from", "cc", etc.) in the message. The PCA 214 then sends the e-mail message to the mail client 228 via path 230 in step 620.

Referring now to FIG. 7 (and also in part to FIG. 2), the process by which a user sends a message to a correspondent or a list of correspondents will now be described. In step 702, the user composes a message. The message will have a "to" field and a "from" field in a header as is known in the art. This message may be to more than one recipient or to a list of recipients, including people on a "cc" list. In any case, in step 702, the user sends the message from the mail client 228 to the PCA 214 through path 232. Next, in step 704, the PCA 214 extracts a list, called a "recipients list", of all the recipients who are to receive a copy of the e-mail message. In step 706, the PCA 214 determines whether there are any recipients left on the recipients list. If there are no remaining recipients, the process ends at step 708. If there are remaining recipients, in step 710, the PCA 214 chooses the first recipient from the recipients list and removes that recipient from the recipient list.

In step 711, the PCA 214 determines whether this is the first message sent to this recipient. If this is the first message to the recipient, the PCA enters a "to" (or own) channel into the UCDB 226 in step 713 which the PCA 214 automatically generates. This is entered in the own channel field 404 illustrated in FIG. 4. In addition the correspondent address field 402 and correspondent channel field 406 (if any) are filled in at this time as necessary. In a preferred embodiment, the PCA creates a private channel (class 1). The PCA also automatically at this point creates an "own key" and enters it in the own key field 408 of the UCDB 226. The system

5,930,479

13

then proceeds to step 712. If, in step 711, it is determined that this is not the first message sent to this recipient, the system also proceeds to step 712.

Next, in step 712, the PCA 214 constructs a new version of the message, which is identical to the original version of the message, except that the "from" address includes the user's own channel identifier for that recipient and the recipient's address is replaced with the correspondent's channelized address in the message header. That is, a channel ID 110 is added to that recipient's address. This information is taken from the UCDB 226. In particular, as shown in FIG. 4, the own channel address is taken from the own channel field 404 and the correspondent address is taken from the correspondent channel field 406. Next, in step 714, the PCA 214 sends the message to the mail server 202 and, in particular, the mail sender 210 via path 218, indicating in the SMTP envelope the single intended recipient. The mail sender 210 then sends the message to the intended recipient in the network 200. The system then returns to step 706 and determines whether any recipients are left on the recipients list. This continues until all recipients have been addressed and the message has been sent to all recipients. It should be noted that in step 712, if the recipient does not use channels, the PCA 214 will not insert the correspondent's channel in the recipient's address, as there would be no need to.

It will be observed that the PCA 214 rewrites the headers and envelope information if any (e.g. SMTP) of each message as it comes in (step 618, FIG. 6) and goes out (steps 712 and 714, FIG. 7). Essentially, the PCA 214 removes the channel ID's from all addresses in incoming messages (excluding those, if any, in the body portion of the message) before serving the message to the mail client 228 (step 618). This solves the problems relating to accidentally disclosing channel IDs to third parties when including a received message in an outgoing message such as when a reply or forward command is used. Thus, the user need not worry about editing the channels ID out of the message headers. Of course, since the message body is not altered by the PCA 214, there may be channel IDs in the body. However, these channel IDs must have been manually inserted to appear there.

For outgoing messages, the PCA 214 puts back channel IDs selectively before forwarding the message to the mail server 202 (step 712). For a single recipient message, the PCA 214 simply puts the channel ID of the recipient into the recipient (or "to") fields (obtained in the correspondent channel field 406 of the UCDB 226), and the return (or "own") channel allocated to the recipient into the address in the sender (or "from") field (step 712). Multi-recipient messages are copied, and each copy is tailored (as in the single-recipient case) to a specific recipient (steps 706, 710, 712). Then each tailored copy is sent to the designated recipient using a tailored SMTP envelope (step 714). This solves the problem of different recipients obtaining improper access to the recipient's private channels, because each recipient sees only information she already knows.

Thus, to the user of a PCA 214, virtually all messages appear without channel IDs, and hence e-mail looks and feels like traditional e-mail. This is illustrated in FIGS. 8A and 8B. FIG. 8A shows a version of an e-mail message that the sender and/or receiver actually views if they are both using a PCA 214. The sender merely inputs the "From" address or field 802, in this case "hall@research.att.com". This may preferably be automatically inserted by the mail client program. The user also inputs (possibly by using a keyboard) the "To" field 803, in this case "frobboz@geewhiz.com", and the "Cc" field 804, which is

14

in this case "jrandom@j.r.isp.net." The user may then input his message body 805. The PCA 214 converts this to what is shown in FIG. 8B for transmission to the recipient in the "To" field 803a. The PCA 214 adds to the "From" field 802a a channel identifier 810 and adds to the "To" field 803a a channel identifier 812 as described above. It should be noted that no channel identifier is added to the "Cc" field 804a because the first copy of this message will be sent to the recipient indicated in the "To" field 803a. Thus, there is no need for the "To" recipient 804a to receive the channel ID of the "Cc" recipient. The PCA 214 will then generate another version of this message to the "Cc" recipient 804a in which a channel ID will be inserted for the "Cc" recipient 804a but will be removed for the "To" recipient 803a. As can be seen in FIG. 8B, the message body itself 805a has not been changed. Upon receipt of the message, the PCA 214a will strip out the channel identifiers 810 and 812, and the message will appear again as in FIG. 8A.

Occasionally, it may be desirable to switch a correspondent from one channel to another, either because the old, multi-user channel is known to too many adversaries, or because the user wishes to "upgrade" that correspondent's access, for example from public to private (or in another embodiment, temporary to permanent). If the correspondent does not use a PCA 214, this requires notifying the correspondent to make a manual change in the correspondent's address book. In this case, the PCA 214 can help only in automatically sending out a notification as a normal message. However, if the correspondent also uses a PCA 214, the switching may be automated via the channel switching protocol shown in FIG. 9. This allows the user's PCA 214 to make a change in the correspondent-address map of the correspondent's UCDB 226a.

In a preferred embodiment, when both a user and a sender have PCAs (for example 214 and 214a in FIG. 2), the channel switching protocol of FIG. 9 may be used. To use this protocol, the user (108, FIG. 1B) and host (112, FIG. 1B) parts of the address must remain the same. The PCA will only change the channel ID part (110, FIG. 1B). This prohibits an adversary from, for example, tricking a PCA 214 into sending private messages to an embarrassing public forum. Also, in a preferred embodiment, the PCA 214 will be configured to allow channel changes only when the channel class indicator 116 does not increase in magnitude. Thus, for example, a private channel cannot be switched to a public channel. Thus, assuming the user's attention is higher for lower-numbered channel classes, the PCA 214 will not be tricked into downgrading a correspondent so that messages might be ignored longer than expected.

The protocol illustrated in FIG. 9 may secure against attacks by "non-eavesdroppers." Moreover, channel switches caused by eavesdroppers (e.g., those who are listening on or tapping the communication line) may be detected and the parties notified so that appropriate action may be taken.

Referring now to FIG. 9 and FIGS. 10A, 10B, 10C, 10D and 10E, the process for switching a channel when a user and a correspondent both have PCAs will now be described. In FIG. 9, the letter "A" refers to a user who wishes to change a channel that a correspondent, referred to as "B", uses for sending e-mail to user A. When referring to FIGS. 10A through 10E, user "B" is represented by "frobboz-1DDYWA7H7l-@geewhiz.com". Similarly, in FIGS. 10A through 10E, user A is represented by "someone-1QXR7112PH-@domain.com". In addition, FIG. 2 should also be referred to wherein it will be assumed by way of example that A is using user machine 206 and B is using user machine 206a.

5,930,479

15

Once a user (A) has decided that he wants to switch the channel that a correspondent (B) uses to communicate with the user (A), the system first, in step 901, creates and opens a new channel to be switched to. The new channel is placed in the channels file. Next, the system determines in step 902 whether correspondent B's key is located in user A's UCDB 226. In particular, the key would be located in the "correspondent key" field 410. If not, user A's PCA 214 sends a message to correspondent B's PCA 214a requesting correspondent B's key in step 904. The message also includes user A's key so that correspondent B can include it in the reply. This message is illustrated in FIG. 10A wherein a "send your key" message 1001 is sent. User A's key 1002 is included in this message.

Next, in step 906, correspondent B's PCA 214A sends user A's PCA 214 correspondent B's key and includes user A's key in the message. User A's key has been copied from user A's previous message (FIG. 10A). This allows user A to know that correspondent B's message is legitimate. In step 906, A's channelized address and B's key are taken from B's UCDB 226a. If B's UCDB 226a has no entry for user A, the message in step 906 is not sent. FIG. 10B illustrates the message sent in step 906. Correspondent B is sending a "my key is" message 1004 to user A so that user A acquires correspondent B's key, in this case "T7AA18MMN". In the message, user A's key 1006 is included for authentication. User A's PCA 214 records correspondent B's key in user A's UCDB 226 in step 908.

The system next proceeds to step 910, which is also where the system would proceed if in step 902 it was determined that correspondent B's key was already located in user A's UCDB 226. In step 910, user A's PCA 214 sends a message to correspondent B's PCA 214a to switch to a new channel. User A's PCA 214 sends a copy of correspondent B's key as well as A's own key in this message. Such a message is illustrated in FIG. 10C. In FIG. 10C, the message to change channels to a new channel 1008, in this case "1L3RG3592T", is forwarded to correspondent B. Included with this message is a copy of correspondent B's key 1010 so that user B knows correspondent A's message is legitimate. A's key is also included 1006.

Next, in step 912, correspondent B's PCA 214a changes correspondent B's UCDB 226a to reflect the new channel to be used to correspond with user A. Also, in step 912, correspondent B's PCA 214a sends an acknowledgement on the old channel to user A that the channel has been changed. The acknowledgement message includes a copy of user B's key for authentication as well as a copy of A's key. This type of message is illustrated in FIG. 10D. In FIG. 10D, an acknowledgement message 1011 is sent along with user B's key 1010 and A's key 1006 as well as the new channel 1012.

Next, in step 914, user A's PCA 214 closes the old channel for correspondent B and sets the new channel as B's channel in user A's UCDB 226. An exemplary message that could be sent from user A to correspondent B is illustrated in FIG. 10E. It should be noted that the new channel identifier 1016 is placed in the "To" field for sending to the user (A) who has switched channels.

This protocol illustrated in FIG. 9 can be used to detect eavesdroppers. For example, if user A's PCA 214 receives a second "my key is" message (for example like that shown in FIG. 10B) indicating correspondent B's key, as in step 906, which message includes user A's valid key, but a different key is indicated for correspondent B, then user A knows that an eavesdropper has sent one of these two messages. Thus, an eavesdropper has been detected and user A may alert

16

correspondent B of this situation. In addition, if user A's PCA 214 receives a "my key is" message (for example like that shown in FIG. 10B) (as in step 906) providing correspondent B's key that is not expected (i.e., step 904 has not occurred), then an eavesdropper detection can also be entered. Finally, if user A's PCA 214 receives an acknowledgement that a change in channels has occurred (for example like that shown in FIG. 10D) with a valid key from correspondent B, but the change in channel is unexpected, then an eavesdropper detection condition is also entered. When an eavesdropper detection condition is entered, user A may notify correspondent B and appropriate action may be taken. This notification preferably should include correspondent B's key so that correspondent B will know the message is legitimate. This notification could also take place outside of the e-mail environment, for example, by telephone.

Whenever either PCA (214 or 214a) receives a channel switch message not containing a correct key, it ignores it.

Keys are generated in the manner described for channel IDs except that the channel class indicator (116, FIG. 1) is omitted. The PCA 214 generates the own key when an entry for a correspondent or channel is created in the UCDB. In a preferred embodiment, the PCA generates a different key for each correspondent/channel.

In another embodiment, to accomplish channel switching the user's PCA 214 may send a digitally signed channel switch message containing the new channel ID to the PCA 214a of the correspondent, which verifies authenticity of the message, carries out the change, and then sends a digitally signed acknowledgement back to the user's PCA 214 on the old channel, so that the user's PCA 214 knows when to close the old channel. A digital signature is a string attached to document that is a non-forgable, non-repudiatable "signature" of a document that reliably associates an individual with that document. Digital signatures can be implemented, for example, using PGP or S/MIME compliant applications mentioned above.

When a user needs to open, close, create, delete or switch channels, the user may use the PCA's administrative interface which is illustrated in FIG. 11. The administrative interface may be used to allocate some new channels (for example for use in mailing lists or as temporary reply channels) or to close or switch channels. This administrative interface is used with the web browser 234 through path 236. The PCA acts as a web server, formatting each page of the administrative interface in Hypertext Markup Language ("HTML") and transmitting it using HTTP over path 236. This web interface allows the PCA 214 to be run on a machine different from the mail client 228 so that the user's mail client machine need not be connected to the network 200 in order for the PCA 214 to carry-out its processing. Moreover, existing browsers and mail clients, such as Netscape Navigator, available from Netscape Communications Corp. may be used with the PCA 214, obviating the need for learning a new native interface. In a preferred embodiment, each user's administrative interface should be password protected.

Referring now to FIG. 11, the administrative interface (shown as it would appear on a computer screen) provides a title 1101 indicating the owner of the UCDB 226 for which the interface has been accessed. The interface acts as a way to modify the UCDB 226, which holds most of the relevant data used by the PCA 214 for a given system user. There are two main components of the interface, a channel map component 1102 and a correspondent address map component 1104. The interface, in the channel map component

5,930,479

17

1102, provides various buttons for creating a "public" channel 1106, creating a "private" channel 1108, creating a "send only" channel 1110, closing a channel 1112, opening a channel 1114 and deleting a channel 1116. To use buttons 1112, 1114, or 1116, the user must first select an entry from the channel map display 1118.

The channel map display 1118, displays as entries the various channels that are active for that user. For example, the first entry in the channel map display 1118 of FIG. 11 indicates various information for the correspondent "mybuddy@geewhiz.com". In this example, the channel that the correspondent must use to send mail to the user (hall@research.att.com) is "1B8SYC8YNL". There is also an indication that this is a private channel and that it is open. Note, that the third entry in the channel map display 1118, which is accessed through channel "2BPDXY7P16", is a "public" channel as indicated. Therefore, no specific addresses are given for this channel because many users may send mail through the channel. The final entry on the channel map display 1118 is indicated as "closed." This means that no mail may be entered on this channel from a correspondent. Thus, any mail sent to this "closed" channel will be rejected by the PCA 214. It should be noted that simply closing a channel does not remove it from the UCDB, it may be reopened later.

The correspondent address map 1104 provides buttons for deleting a correspondent 1120, adding a correspondent 1122, and switching channels 1124. To use buttons 1120 or 1124, an entry must first be selected from the correspondent address map display 1126. The correspondent address map display 1126 provides various information to the user. For example, the first entry in the correspondent address map indicates the channel that "mybuddy@geewhiz.com" would use to send correspondence to the user; that is, "1B8SYC8YNL". In addition, the address that the user must use to send messages to this correspondent is indicated in its full form with the channel ID ("1GG8HIAQ7N") for sending to that correspondent.

The user interface may be used through a commonly known pointing device, such as mouse. The user "clicks" on the desired action (or entry or button) with a mouse as is known in the art. So, for example, if the user ("hall@research.att.com") desired to change the channel that "mybuddy-1GG8HIAQ7N-@geewhiz.com" used for sending mail to the user, the user would click on the entry for this correspondent on the correspondent address map display 1126. Then the user would click on the "switch channel" button 1124 and the PCA 214 would perform the channel change as described above. As another example, if the user wanted to create a private channel, the user would click on the "create private" button 1108 and enter the necessary data (e.g., correspondent, etc.) by, for example, using a keyboard or other known data entry device.

In another embodiment, a PCA 214 and channelized addresses 106 may be used with Packet Telephony. Packet Telephony is usable over various networks, for example, the Internet. Used on the Internet, it is sometimes referred to as "Internet phone." Channelized addresses may be used in this environment since addresses are not restricted to the standard telephone format.

Referring to FIG. 12, Packet Telephony may be used over a network 1202. There are at least two exemplary possibilities for using PCA's in combination with such a network 1202 to provide Packet Telephony. The first embodiment may be used with a personal computer ("PC") 1204. The PC 1204 includes a Packet Telephony server 1206 as is known

18

in the art, but modified as described below with reference to FIG. 13. The Packet Telephony server 1206 may preferably communicate with a voice input/output interface 1208. This voice input/output interface 1208 may include a speaker and microphone as is known in the art. The voice input/output interface 1208 is accessible to a user 1210 for "talking to" and "listening to" other users of the network 1202. The user would also have access to a web browser 1212, which may be used to administer the PCA 1214 as described with respect to the previously-described embodiments. The PCA 1214 also communicates with and modifies and updates a channels file 1216. The PCA 1214 also communicates with the Server 1206. The channels file 1216 is read by the Packet Telephony server 1206.

A telephone call may preferably be initiated using the web browser 1212 by providing a "place call" button on an administrative interface (similar to that shown in FIG. 11). A user would select a correspondent entry from a correspondent address map display and then select the "place call" button.

Alternatively, a user could use a standard telephone 1218 to dial up a PCA 1214a which is located remotely on a machine or computer 1217 at a service provider's facility. Using standard dual tone multifrequency ("DTMF") touch tones the user can place telephone calls with the telephone 1218. To administer the PCA 1214a so that it updates or changes a channels file 1216a or a UCDB, the user may access the PCA remotely through a standard web browser 1212a as described for the embodiment shown by 1204, except that a "place call" button would not be needed. This web browser 1212a may be located on a user's PC 1219. Again, as with the embodiment shown by 1204, the Packet Telephony server would be modified as described below.

The Packet Telephony servers 1206, 1206a may communicate with the network 1202 as is known in the art. In both embodiments 1204, 1217, the Packet Telephony server 1206, 1206a would refer to the channels files 1216, 1216a to determine whether or not an incoming call is to be accepted. In addition, although not shown in FIG. 12, the PCA's 1214, 1214a would each have a UCDB which would be the same as for the other embodiments described earlier. For outgoing calls, the UCDB may be referenced to add the appropriate channel ID (if any) to the intended recipient's address.

In FIG. 12, a "third party" 1220 is shown for use in explaining how telephone calls may be sent to and received from that third party 1220.

Referring now to FIG. 13 the process for receiving a packet telephone call, for example from third party 1220 will now be described. In this example, it is assumed that the call is directed to user 1210, but an indication of how the call would proceed to the telephone 1218 is also indicated parenthetically. In step 1301, the caller (third party 1220) transmits a call set-up request including the user's address to the recipients/user's telephony server 1206 (or 1206a). This will include the user's channel ID if the user uses channelized addresses for incoming calls.

In step 1302, the user's telephony server 1206 (or 1206a) checks the address sent by the third party 1220 to determine if the user it designates is an authorized user 1210 (or 1218) for that system. If in step 1302 the server determines that the address does not designate an authorized user 1210 (or 1218), the system refuses the call setup request in step 1303. If it is determined in step 1302 that the user is an authorized user, then the process proceeds to step 1304.

In step 1304, the server 1206 (or 1206a) checks the channels file 1216 (or 1216a) and determines whether or not

5,930,479

**19**

the channel ID provided by the third party **1220** is open. If the channel ID is not open, in step **1306**, the system will refuse the call set-up request from the third party. If, in step **1304** it is determined that the channel provided by the third party is valid and found as an open channel in the channels file **1216** (or **1216a**) the server **1206** (or **1206a**) will, in step **1308** set-up the call in a conventional manner. This will include in the embodiment shown by **1204** sending the information to the voice input/output interface **1208** so that the call may be listened to and responded to by the user **1210**. In the embodiment shown by **1217**, this will include ringing the user's telephone **1218** through the PCA **1214a** so that the user can pick up the telephone and communicate with the third party **1220**.

For the process illustrated by FIG. 13, the packet telephony server **1206** (or **1206a**) is modified from those known in the art in that it separates the channel ID from the address and checks the channels file to see if the channel ID is in the channels file **1216** (or **1216a**). This check is done in addition to any other checks or processing that the server **1206** (or **1206a**) may also perform as is known in the art.

Referring now to FIG. 14, the process for placing a packet telephone call from a standard telephone set **1218** (the embodiment shown by **1217**) will now be described. First, in step **1402**, the user dials on the telephone **1218** the access number of the PCA **1214a**. Next, in step **1404**, the user demonstrates that he is authorized to access the PCA **1214a**. This may be accomplished in a preferred embodiment, for example, by entering a "PIN" (personal identification number) number. In step **1406**, the user enters a touch tone sequence to identify the party to be called (or call recipient), for example a third party **1220**. This entry is accomplished using the standard touch tone keypad on the telephone **1218** and is entered into the PCA **1214a**. This may be accomplished using a standard 10-digit telephone number in one embodiment. In other embodiments, other addresses may be used.

In step **1408**, the PCA **1214a** determines whether the user/caller **1218** has a channel ID for the party to be called (or call recipient) in the user's/caller's UCDB. If there is an entry in the UCDB, in step **1410**, the PCA **1214a** places the call to a channelized telephone address of the caller. If, in step **1408**, it is determined that the caller does not have a channel ID for the call recipient in the UCDB then, in step **1412**, the PCA **1214a** places the call to the original telephone number sequence entered by the user. Whether the PCA placed the call to a channelized telephone address in step **1410** or without a channelized telephone address in step **1412**, the call then proceeds in a conventional manner in step **1414**. That is, the call is sent to the recipient over the network and, if the recipient uses channelized addresses, the process described with respect to FIG. 13 occurs. If the call recipient does not use channelized addresses, the call proceeds as is known in the art.

The process for sending a telephone call for the embodiment shown by **1204** is similar to that described for the embodiment shown by **1217** with reference to FIG. 14, except that steps **1402** and **1404** are not necessary and therefore omitted. Step **1406** is replaced by the user **1210** initiating the call by clicking "place call" in the administrative interface as described above.

It is understood that while a "PCA" has been described for the embodiments shown in FIGS. 12, 13 and 14, this PCA is different than the actual PCA used by the embodiments described earlier. The PCA of FIGS. 12, 13 and 14 is similar in overall function to the PCA's of the other embodiments,

**20**

but is configured to accommodate Packet Telephony. In another embodiment, the PCA may be configured to process both Packet Telephony calls and e-mail messages.

It is understood that the users sending packet telephone calls may use the standard ten digit telephone numbers, or longer numbers for overseas calls. In addition, the users may also use other types of addresses for sending calls to call recipients. These other types of addresses may comprise digits, letters, or any other combination thereof, including other types of characters. These other addresses may be longer (or shorter) than standard telephone numbers.

It is further understood that channelized addresses and PCAs according to the invention have many practical uses. For example, one may participate in a public forum, such as a mailing list or newsgroup, without giving away access information. At the time a user subscribes to a list, the user may send a public channel address to the list maintainer. All messages sent to the list (and therefore to the user) may be delivered on this public channel. To send a message to the list, however, the user sends the message from a "send-only" channel using a send-only address in the "from" header. Anyone wishing to reply must send the reply message to the list maintainer and thus to the entire list. If the user wishes to allow private replies, the user may allocate a limited-lifetime public channel and use it as the return address, perhaps explicitly indicating when it will be deactivated. People wishing to respond to a message sent to the list can do so privately for a short while, but firms collecting interest-based mailing lists will be left with closed channels after the timeout period. The user may always choose to "upgrade" a correspondent to a permanent channel once contact is made.

Channelized addresses and list servers on a network may be used together to implement private mailing lists. This would allow groups to confer without requiring that they all have direct channels to each other, while prohibiting outsiders from sending messages to the group. This may be implemented by establishing a list server with an unguessable (channelized) address known only to list members. List members need not have direct channels to each other. Therefore, this application may be useful, for example, when a single buyer needs to have a group discussion, such as an auction, with vendors who are mutually adversarial.

Channelized e-mail according to the invention may also enhance the effectiveness of e-mail filters and agents. This may be accomplished by providing a reliable categorization based on which classes of correspondents know which channels. For example, when filling out registration forms for products, one may use a particular public channel. Then, the filter could be instructed to classify all traffic on that channel as lower priority than traffic on more personal (or private) channels.

In a typical setting, the user's mail server and its local network should preferably not be systematically eavesdropped on by an adversary. This is most likely the case, for example, when the server is run by a reputable commercial on-line service. In that case, the server, the filesystem containing the user's channels file, and at least part of the network will typically reside in locked or secure rooms and other hard-to-access places. System administration will presumably be competent and careful. Finally, the inherent risks and costs of breaking into a secure server likely would not be justified by stealing easily changeable access channels. But, channelized addresses according to the invention do not require that the entire network be impervious to eavesdropping. For example, it is plausible that one or more

5,930,479

21

correspondents of a user may be "eavesdroppable." In this case, an adversary may gain access to the user by examining the messages of the legitimate correspondent. Moreover, since it is easy to forge Internet mail messages, it may be difficult to identify (at least initially) where the unauthorized messages are originating from or which correspondent "leaked" the channel ID. However, by systematically assigning correspondents to unique channels, the user can easily locate the leak. At that point, the user can deal with the correspondent directly to establish some means of authentication. For example, in an alternative embodiment, the legitimate correspondent could be assigned a channel and then a filter agent could accept messages on that channel only if the correspondent's digital signature can be verified.

Channelized addresses according to the invention may also be used without a PCA, but a PCA is preferred. The PCA eliminates the need to remember what channel to use as a return address for a particular correspondent. Also, when sending messages to multiple recipients, security is breached if one simply includes everyone's channelized addresses since it is unlikely all readers will be authorized for all of the other recipient's channels. For example, suppose one sends a message to a mailing list and cc's a friend's private channel address (because the friend does not read the list). The "Cc" will be visible to all list readers so they will all gain unauthorized access to the friend. The PCA eliminates all of these potential problems.

The PCA may also solve problems relating to replying to or forwarding messages. People frequently include a received message within a reply to, or forward of, the received message. If the original message contains channel IDs for recipients, then the user must remember (as a courtesy) to edit them out of the copied original. If the user has a PCA, the PCA will automatically take care of this.

It is understood that channelized addresses according to the invention may be used without a PCA. While a correspondent who does not use a PCA must directly use the user's channelized address which may be harder to remember, many mail clients provide for on-line address books or user-defined aliases, which would be used when a PCA is unavailable to simply address channelized e-mail. Using these address books or aliases will not solve all of the problems eliminated by the PCA, for example, when sending a "Cc" and reply, the channel ID may be "leaked" when the correspondent sends a multi-recipient message. In addition, automatic channel switching as described with reference to FIG. 9 is not provided for if the correspondent does not have a PCA. In this case, the user's PCA may be configured to automatically generate notification to each desired correspondent regarding the changing channel. Each correspondent would then have to update her address book.

It is useful to notice when correspondents send messages on channels they are not authorized for so that "leaks" can be isolated when they become a problem. However, the problem may take a while to appear (as more and more junk traffic builds up on a channel), while the original leaks will be long forgotten. In a preferred embodiment, the PCA checks each incoming message to determine whether the sender is authorized to send messages on the channel the message arrived on. Specifically, messages to private channels are checked to see whether the sender is a "member" of the channel. If not, the user is notified (preferably only once for a given user and channel) and the event is logged in the UCDB. This is not done for public channels because one expects previously unknown correspondents to send messages on public channels.

Channelized addresses according to the invention may also resolve a possible dilemma caused by directories of

22

e-mail addresses. An approach based on not telling everyone how to reach the user conflicts with the idea of directories, which tells everyone how to reach the user. Channelized addresses may actually help resolve this tension because one might be more willing to publish an easily changeable address than a permanent address. If traffic on a particular channel becomes voluminous (or "noisy"), the user may deactivate the published channel and (if desired) publish a replacement channel.

In another embodiment, channelized addresses according to the invention may be used in combination with cryptographic authentication. Cryptographically authenticated messages may be received on a public channel as an alternative to private channels for those users who wish to use cryptography. In addition, in an alternative embodiment, the user could create an "authenticated channel". Here, a filter rejects messages that are not digitally signed by an expected correspondent. An authenticated channel could even have a well-known channel ID such as "1 AUTHEN-TIC" since unauthenticated messages are discarded unseen.

In the presently preferred embodiment, each correspondent is preferably allowed at most one channel, although it is understood that multiple channels may be assigned to a single correspondent. While it may seem desirable to allow multiple channels per correspondent (for example, for different purposes), no security is gained by a single individual knowing two or more access channels for a correspondent. Instead, the logical separation of traffic from a single user may be implemented in an alternative embodiment using existing e-mail filtering techniques known in the art. In such combined architectures, an extended UCDB may accommodate the needs of both channels and e-mail filters by allowing multiple channels per correspondent. In this configuration, one channel should preferably be designated as the default for use when rewriting header and envelope information in outgoing messages.

In the presently preferred embodiment, the system rewrites the header information and (when applicable) the SMTP envelope information by adding/deleting channelized addresses. In an alternative embodiment, the system may simply rewrite the envelope information with the channelized address and leave the header information alone.

It is understood that rewriting the header information in addition to the envelope information may be preferable due to the ability to operate with non-channel using correspondents and non-SMTP mailers as well as user convenience. A nonchannel using correspondent expects a valid return address (in order to be able to use the client's reply command, for example) to appear in the "From" field (part of the header) of a message. Thus, if a PCA does not rewrite the header, the non-channel using correspondent may not receive the channel ID. Also, the non-channel using correspondent will provide a channelized address in the "To" field (part of the header) when originating a message. If the PCA is not configured to remove this channelized address from the header, security problems may result if the recipient forwards or replies to the message without manually removing the non-channel using correspondent's address from the message.

If the PCA does not rewrite the header but only the envelope, some non-SMTP mail systems may not be able to process the message if these systems do not separate header information from envelope information. For these mail systems to process the message, the correct addresses must appear in the header.

In the preferred embodiment, one convenient way for a user of channelized addresses and a PCA to enter a new

5,930,479

23

correspondent's channelized address into the UCDB for the first time is to type or otherwise input the full address into the "To" field of the outgoing message. The PCA can then record it as it passes through untouched. Subsequent messages may be rewritten by the PCA so that the user need no longer type in the channel ID part of the address. If the PCA did not rewrite header information, this convenience may be limited or eliminated. In addition, a PCA can infer a correspondent's channelized address when one is not known (in the UCDB) by reading it in the "From" field of a received message. If header information was not processed by the PCA, this convenience may also be limited or eliminated.

In an alternative embodiment, the channel ID may be placed in some other field of the message header. It is understood that this alternative is less preferable when a user wishes to use mailing lists because each contributor to the list may have to include channel IDs for all recipients. This may be a difficult task. In this alternative embodiment, a sophisticated list manager may be used to store the appropriate channel ID for each address subscribed and make a tailored copy of each message for each recipient. Currently, no existing list servers are known that operate in this manner. On the other hand, putting the channel ID in the address allows the channelized addresses to operate together with existing list servers.

As compared to prior art methods, channelized addresses or channels according to the invention offer many advantages. For example, as compared to "kill files," it is possible with channels to grant access individually or as a group to any set of individuals, while denying access to others. Forgery does not help an adversary evade the channel mechanism of the present invention. As compared to filters, any message that arrives must have the specific channel ID. No detailed searching of the content of the actual message is necessary.

Channels also allow the user to absolutely "shut off" the flow of messages from an adversary by closing all channels known to that adversary. To gain unauthorized access, the adversary must invest significant effort, risk, or money in eavesdropping or social engineering, while access can easily be prevented once again after receipt of one unwanted message.

It is to be understood that the above description is only of the preferred embodiments of the invention. Numerous other arrangements may be derived from one skilled in the art, without departing from the spirit and scope of the invention. The invention is thus limited only as defined in the accompanying claims.

I claim:

1. A method for sending a message from a sender to a recipient in a network, comprising the step of:

using an address to send the message from the sender to the recipient wherein the address comprises a common address portion that indicates the identity of the recipient in the network and a channel identifier portion for verifying that the message is authorized for delivery to the recipient.

2. The method of claim 1, wherein the message is an e-mail message.

3. The method of claim 1, wherein the message is a packet telephone call.

4. The method of claim 1, wherein the channel identifier portion comprises a substantially unguessable portion.

5. The method of claim 4, wherein the substantially unguessable portion is generated using random number generation.

24

6. The method of claim 4, wherein the substantially unguessable portion is generated using pseudorandom number generation.

7. The method of claim 4, wherein the substantially unguessable portion is generated by a user selecting the unguessable portion.

8. The method of claim 1, wherein establishing the channel identifier portion is controlled by the recipient.

9. The method of claim 1, wherein the channel identifier portion comprises a channel class indicator indicative of a class of message to be treated by the recipient in a predetermined manner.

10. The method of claim 9, wherein the channel identifier portion also comprises a substantially unguessable portion.

11. An improved address of the type having a hierarchy of names including a lowest-level name at the lowest level of the hierarchy, the improved address comprising a channel identifier part of the lowest-level name that includes at least a substantially unguessable channel identifier.

12. The improved address of claim 11, wherein the improved address is an e-mail address and the lowest-level name is a user name.

13. The improved address of claim 11, wherein the improved address is a telephone number for packet telephony.

14. The improved address of claim 11, wherein the channel identifier part further includes a channel class indicator which indicates at least how a recipient is to treat a received message which has the improved address.

15. The improved address of claim 14, wherein the channel class indicator indicates classes of messages that may be any one of public, private and send-only.

16. A system for authenticating a received message from a network, the message having an address attached to it, comprising:

a mail server for receiving and authenticating the message; and

a file available to the mail server for determining whether the message is an authorized message, wherein the determination is based upon a substantially unguessable portion of the address attached to the message.

17. The system of claim 16, wherein the message is an e-mail message.

18. The system of claim 16, wherein the message is a packet telephone call.

19. The system of claim 16, wherein establishing the substantially unguessable portion is controlled by a recipient of the message.

20. The system of claim 16, wherein the substantially unguessable portion is generated using random number generation.

21. The system of claim 16, wherein the substantially unguessable portion is generated using pseudorandom number generation.

22. The system of claim 16, wherein the substantially unguessable portion is generated by a user selecting the substantially unguessable portion.

23. The system of claim 16, wherein the substantially unguessable portion comprises a channel class indicator indicative of a class of message to be treated by the recipient in a predetermined manner.

24. The system of claim 16, further comprising a personal channel agent.

25. The system of claim 24, wherein the personal channel agent automatically removes the substantially unguessable portion from the message before delivering the message to a recipient.

5,930,479

25

26. The system of claim 24, wherein the personal channel agent accesses a database containing at least one or more substantially unguessable portions corresponding to one or more correspondents.

27. The system of claim 24, further comprising a web browser for administering the personal channel agent.

28. The system of claim 24, further comprising an administrative interface for administering the personal channel agent.

29. The system of claim 24, further comprising a user machine for displaying the message on a screen.

30. The system of claim 29, wherein the user machine is a personal computer.

31. The system of claim 29, wherein the user machine comprises a mail client for receiving the message.

32. The system of claim 16, further comprising means for changing the substantially unguessable portion so that a new substantially unguessable portion is established for determining whether the message is an authorized message.

33. The system of claim 32, wherein the means for changing the substantially unguessable portion is a personal channel agent.

34. The system of claim 33, wherein a key is required for changing the substantially unguessable portion.

35. The system of claim 34, wherein the key is provided by a recipient of the message.

36. The system of claim 33, wherein a first key and a second key are required to change the substantially unguessable portion.

37. The system of claim 36, wherein the first key is provided by a sender of the message and the second key is provided by a recipient of the message.

38. A system for sending a message on a network to a recipient, comprising:

a personal channel agent for automatically including a substantially unguessable portion in a recipient's address so that the recipient can determine whether the message is an authorized message that the recipient will receive.

39. The system of claim 38, wherein the message is an e-mail message.

40. The system of claim 38, wherein the message is a packet telephone call.

41. The system of claim 38, wherein establishing the substantially unguessable portion is controlled by the recipient.

42. The system of claim 41, wherein the substantially unguessable portion is generated by the recipient's personal channel agent using random number generation.

43. The system of claim 41, wherein the substantially unguessable portion is generated by the recipient's personal channel agent using pseudorandom number generation.

44. The system of claim 41, wherein the substantially unguessable portion is generated by the recipient selecting the substantially unguessable portion.

45. The system of claim 38, wherein the substantially unguessable portion comprises a channel class indicator indicative of a class of message to be treated by the recipient in a predetermined manner.

46. The system of claim 38, wherein the system further comprises a mail server.

47. The system of claim 38, wherein the personal channel agent includes the substantially unguessable portion by referring to a database.

48. The system of claim 47, wherein the database contains at least one or more substantially unguessable portions corresponding to one or more correspondents.

26

49. The system of claim 38, wherein the personal channel agent is administered using a web browser.

50. The system of claim 38, wherein an administrative interface is provided for administering the personal channel agent.

51. The system of claim 38, further comprising a user machine for inputting the message.

52. The system of claim 51, wherein the user machine is a personal computer.

53. The system of claim 51, wherein the user machine comprises a mail client for transmitting the message to the personal channel agent.

54. The system of claim 53, further comprising a mail server for transmitting the message from the personal channel agent to the network.

55. A method of sending and receiving messages from one or more first correspondents to a second correspondent comprising the steps performed in a message transmission apparatus of:

the second correspondent forming a plurality of substantially unguessable extended addresses for messages sent from the one or more first correspondents to the second correspondent; and

providing a received message to the second correspondent only if an address to the second correspondent associated with the received message matches one of the plurality of extended addresses.

56. The method of claim 55, further comprising the step of automatically adding an extended address as a return address of a first message when the second correspondent sends the first message to a first correspondent.

57. The method of claim 56, further comprising the step of the first correspondent storing the extended address from the first message.

58. The method of claim 57, further comprising the step of the first correspondent automatically adding the extended address from the first message to the address to the second correspondent.

59. The method of claim 55 further comprising the step of a first correspondent automatically adding an extended address to the address to the second correspondent.

60. The method of claim 55, further comprising the step of forwarding the received message to the second correspondent.

61. The method of claim 55, further comprising the step of automatically removing an extended portion of one of the plurality of substantially unguessable extended addresses.

62. The method of claim 55, further comprising the step of automatically removing any extended portions of any addresses.

63. The method of claim 55, wherein the extended address comprises an indication of a class of treatment for the messages.

64. The method of claim 55, wherein the messages are e-mail messages.

65. The method of claim 55, wherein the messages are telephone messages.

66. The method of claim 55 further comprising the step of associating each of one or more of the extended addresses with one or more destination addresses for the one or more first correspondents.

67. The method of claim 66, wherein a single extended address is associated with a single first correspondent.

68. The method of claim 67, further comprising the step of changing the single extended address to a new extended address.

*  *  *  *  *

# EXHIBIT
# 2



US006993574B2

(12) **United States Patent**   (10) Patent No.: **US 6,993,574 B2**
Hall                            (45) Date of Patent:    **Jan. 31, 2006**

(54) **WEB-BASED COMMUNICATIONS ADDRESSING SYSTEM AND METHOD**

(75) Inventor: **Robert Hall**, Berkeley Heights, NJ (US)

(73) Assignee: **Zoetics, Inc.**, New York, NY (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 612 days.

(21) Appl. No.: 09/884,646

(22) Filed: **Jun. 19, 2001**

(65)          **Prior Publication Data**
US 2002/0194308 A1    Dec. 19, 2002

(51) Int. Cl.
*G06F 15/16*      (2006.01)
(52) U.S. Cl. ...................................... **709/219; 709/207**
(58) Field of Classification Search ........ 709/206–207,
709/223–225, 217–219
See application file for complete search history.

(56)          **References Cited**

U.S. PATENT DOCUMENTS

5,555,346 A    9/1996  Gross et al.

| 5,627,764 A   | 5/1997  | Schutzman et al. |
|---------------|---------|------------------|
| 5,930,479 A   | 7/1999  | Hall |
| 5,999,967 A * | 12/1999 | Sundsted ...................... 709/206 |
| 6,185,551 B1* | 2/2001  | Birrell et al. ................ 707/3 |
| 6,266,692 B1* | 7/2001  | Greenstein ................ 709/206 |
| 6,546,416 B1* | 4/2003  | Kirsch ...................... 709/206 |
| 6,760,752 B1* | 7/2004  | Liu et al. .................. 709/206 |

* cited by examiner

*Primary Examiner*—Dung C. Dinh
*Assistant Examiner*—Victor Lesniewski
(74) *Attorney, Agent, or Firm*—David C. Jenkins; Eckert Seamans Cherin & Mellott, LLC

(57)          **ABSTRACT**

A system and method is provided for sending and receiving authorized messages from a sender to a recipient in a network utilizing a Web-based mail server. The Web-based mail server communicates with a user via HTML or another general purpose language. The mail system makes use of a channelized address to send the message from the sender to the recipient. The channelized address comprises a common address portion that indicates the identity of the recipient in the network and a channel identifier portion for verifying that the message is authorized for delivery to the recipient.

**2 Claims, 11 Drawing Sheets**



# *FIG. 1A*

## PRIOR ART



*FIG. 1B*

## PRIOR ART



*FIG. 2*

PRIOR ART

*FIG. 3*

PRIOR ART

| 302 CORRESPONDENT ADDRESS | 304 OWN CHANNEL | 306 CORRESPONDENT CHANNEL | 308 OWN KEY | 310 CORRESPONDENT KEY |
|---|---|---|---|---|
| frobboz@geewhiz.com | 1QXR7112PH | 1DDYWA7H7I | X9GWAAH4T | T7AA18MMN |
| jrandom@j.r.isp.net | 122PG3LWAW | 1CJX449HKV | ADWKBSA92 | |
| ------------ | 2AA47WX3BQ | ------------ | ------------ | ------------ |
| ------------ | 2BZZ86A9FC | ------------ | ------------ | ------------ |
| | ⋮ | | | |
| info-hooha@sri.com | 0XTRR9Y680 | ------------ | BZTGRTKI3 | ------------ |
| | ⋮ | | | |

*FIG. 4*

PRIOR ART



| OPEN CHANNEL |
|---|
| 1QXR7112PH |
| 2AA47WX3BQ |
| 122PGLWAW |
| ⋮ |
| 2BZZ86A9FC |

401

## FIG. 5
### PRIOR ART



FIG. 6

# FIG. 7



## FIG. 8



*FIG. 9*



*FIG. 10*



*FIG. 11*

# FIG. 12

1201



1230

PCA CONTROL PANE

NEW

MESSAGE HDRS (INBOX PANE)

1210

MESSAGE DISPLAY PANE

TO: XYZ
FROM: ABC
SUBJECT: —————

DEAR XYZ

1220

US 6,993,574 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# WEB-BASED COMMUNICATIONS ADDRESSING SYSTEM AND METHOD

## FIELD OF THE INVENTION

The present invention relates generally to communications sent over a communications network, and more particularly, to a Web-based system and method for controlling the reception of communications from various entities having access to the network.

## BACKGROUND OF THE INVENTION

Electronic mail ("e-mail") has become increasingly popular as a form of communication in today's society. This is due at least in part to the popularity of the Internet. Users of e-mail may be referred to as "users." The user is generally referred to as a "recipient" when receiving e-mail and as a "sender" when sending e-mail to a recipient. The term "correspondent" may be used to refer to a person or persons who are sending e-mail to, or receiving e-mail from, the user in question.

To send e-mail over a communications network, a user must address an e-mail message to an intended recipient. For example, referring to FIG. 1A, a conventional e-mail address as used on the Internet is illustrated. The address usually has two parts, the user name 100 (also referred to as the "mailbox name") and the host (or domain) name 102. These two parts are part of a hierarchy of names; that is, the domain name 102 is of a higher level than the user name 100. The user name 100 may be described as the lowest-level name in the hierarchy. Typically, the user name 100 and the host name 102 may be separated by an "at" sign, "@", 104. To send e-mail over the Internet, the user addresses the e-mail message by placing the intended recipients' addresses in the "To" line (or field) of the message as is well know in the art. In addition, a user may "carbon copy" or "cc" (or "Cc") yet another intended recipient of the e-mail message by placing that recipient's address in the cc line (or field) as is also well known in the art. There is also typically a "from" line (or field) indicating who sent the message. All of these items together with non-address portions such as subject, date, etc., form what is known as a "header" of the e-mail message. Other options, also well known in the art, are available for various ways to address intended recipients of Internet e-mail. Analogous methods exist for addressing e-mail over other networks.

Unfortunately, as with other forms of communication, for example regular mail and facsimile, users of e-mail may receive a quantity of unwanted or "junk" mail. This may be in the form of "telemarketing" type e-mail (for example an advertisement or a survey). While this may only rise to the level of a mere nuisance or annoyance, in some situations, unwanted e-mail may actually rise to the level of harassment. For example, the user may receive unwanted offensive or obscene e-mail. A malicious e-mail sender could also possibly send "hate mail."

This type of activity, in some circumstances, may as a practical matter render the user's e-mail capabilities useless. For example, if a malicious e-mail sender barraged the e-mail user's mail box with a multitude of messages that the user would have to review, any wanted, or "non-junk" mail would be buried in a large amount of useless junk e-mail. The malicious e-mail sender could also send messages that were known to offend the recipient so that the recipient would not want to review any of the messages received, including legitimate messages.

The commercialization of the Internet further threatens the usefulness of e-mail. Today, it is easier than in the past to collect address lists and inexpensive to mass distribute messages. Every time a user sends a message to a public newsgroup or list, fills out a Web form, or mails in a product registration card, the server inexpensively obtains an e-mail address and typically some indication of the user's interests. This information can then be sold to marketing firms who can easily automate unsolicited mass e-mailings of advertisements, surveys, and other annoyances that may cost the user connect time and, possibly worse, valuable attention span.

It is desirable to be capable of restricting the receipt of unwanted e-mail and other types of messages sent over a network. In addition, when unwanted e-mail (or messages) is received, it is beneficial to be able to determine in what manner the sender of the unwanted e-mail obtained the user's address.

In U.S. Pat. No. 5,930,479 ("the '479 patent"), issued Jul. 27, 1999, the disclosure of which is hereby incorporated by reference in its entirety herein, I disclose a method and system for sending messages utilizing "channelized addresses" to create different "channels" that correspondents can use to send e-mail to the user. In other words, each user's e-mail account is made accessible via a user-controlled set of channels. Each channel has a distinct structured e-mail address that contains within it the account name and a "channel identifier." Each legitimate correspondent is allowed to know one or more of these access addresses or channel identifiers.

The system described in the '479 patent allows the user to reject any e-mail not arriving on a proper channel (with a proper channelized address). If unwanted e-mail does arrive on a valid channel, the user may turn the channel off and allow legitimate users of that channel to use another channel. In other words, legitimate users are "switched" to another channel.

The user (or account owner) is provided simple controls for opening a new channel, closing a channel (hence possibly retracting one or more correspondent's access privilege), and switching a channel (notifying selected correspondents that the current channel is being closed, but a new one is open for their use). This can be provided through an automated personal channel agent or administrator ("PCA"). The PCA also causes the received channelized e-mail to look and feel to the user exactly like conventional e-mail. The PCA provides various administrative controls. The PCA manages a database that maps a correspondent's address to its assigned channel, as well as (when applicable) the channel assigned by the correspondent to the account owner.

Referring to FIG. 1B, a "channelized address" 106 according to a preferred embodiment is shown. This address is in the standard Internet domain name format. This format usually consists of a hierarchy of names, the domain name being of a higher level and the user name being of a lower level in the hierarchy.

The channelized address 106 in FIG. 1B comprises at least three basic parts, the user name 108, the channel identifier (or channel ID) 110, and the host (or domain) name 112. Between the channel ID 110 and the host name 112 is an "at" sign, "@", 104. As shown in FIG. 1B, there is a hyphen ("-") immediately before and immediately after the channel ID 110. By comparison of FIG. 1A with FIG. 1B, it should be noticed that the conventional address (FIG. 1A) is somewhat similar in appearance to the channelized address (FIG. 1B), except that the channelized address contains the channel ID 110 to the left of the "at" sign 104. Thus, the

US 6,993,574 B2

3

channelized address 106 contains both traditional address information (e.g., user name 108 and host name 112), as well as the channel ID 110.

The channel ID includes a security string that is practically unguessable (or even random) even when a malicious email sender (or adversary) is aware of several of the user's other preexisting channel identifiers. That is, the channel identifier should be unpredictable by an adversary. The security string may be generated pseudorandomly, may be generated randomly or may be selected by a user. The important point is that the security string be practically unguessable by an adversary, no matter how it is generated.

The administration of the channelized addresses 106 and the generation of the channel ID 110 are accomplished by the PCA, which is described below in more detail with respect to other functions it performs.

A user of the system described in the '479 patent may allocate a number of the channelized addresses 106 having differing channel identifiers 110 for different correspondents. Other than the channel ID portion of the channelized address, the address may look the same for all correspondents. If a correspondent desires to send e-mail to the user, the correspondent must send the e-mail identifying the correct channel; that is, by using an open (or active) channelized address 106 with the proper channel identifier 110. If the correspondent sends to a channel that has not been opened or that has been closed as is described below, the e-mail from the correspondent will be rejected by the user's mail server and the user will never receive it. A goal is thus to control access to a user's mailbox by potential correspondents, not to ensure anonymity of the account owner/user, or to guarantee privacy of the messages.

FIG. 2 illustrates the architecture of the system described in the '479 patent. The hardware involved is connected to a network 200, such as the Internet, for sending e-mail to correspondents and receiving e-mail from correspondents. Connected to the network 200 is a mail server 202. The server 202 is connected to a personal channel agent host ("PCA host") 204, which is a computer that acts as a host machine for the personal channel agent ("PCA") 214. The PCA host 204 is connected to a user machine 206. The user machine acts as the user interface to the network 200 for sending and receiving e-mail.

Within the mail server 202 is a mail receiver 208 and a mail sender 210. The mail receiver 208 and mail sender 210 can be implemented using a modified form of the Unix "Sendmail" program. In particular, the Sendmail program is modified to reject messages addressed to closed channels. The mail receiver 208 is a "daemon" program. In other words, the mail receiver 208 constantly checks to determine whether any mail has arrived from the network 200. Preferably, the mail receiver 208 receives e-mail from the network 200 on path 220 using the Simple Mail Transfer Protocol ("SMTP"), although other conventional formats could also be used. The mail sender 210 preferably sends mail to the network 200 on the path 222 using the SMTP protocol, although other conventional formats could also be used. In the SMTP protocol, a message is transmitted with an envelope that specifies the sender and the recipient(s). The message itself comprises header lines (to, from, cc, subject, date, etc.) followed by a blank line followed by the body of the message. The server 202 also contains a channels file 212. The term "file," as used throughout this disclosure, shall include data and databases stored on permanent or semipermanent media such as a disk, a tape or a ROM device, and shall also include data and databases resident in transient memory.

4

Within the PCA host 204 is the PCA 214. The PCA 214 receives mail from the mail receiver 208 via path 216. The PCA 214 is configured to periodically check the mail server 202 for new e-mail. Path 216 preferably uses the POP3 protocol to transfer the e-mail from the mail receiver 208 to the PCA 214. The POP3 protocol is enabled by running a software product, such as "POPPER" (which can be obtained from the Internet at ftp.CC.berkeley.edu) on the mail server 202. Other known implementations of the POP3 protocol, as well as other known protocols, could also be used. The PCA 214 also forwards e-mail to the mail sender 210 via path 218. Path 218 preferably uses the SMTP protocol to transfer e-mail from the PCA 214 to the mail sender 210. Other known protocols could also be used on path 218. The PCA 214 also transfers data via path 224 to the channels file 212. This data is transferred using the File Transfer Protocol ("FTP") along path 224. The PCA 214 also has a User Channel Database ("UCDB") 226, which is described below.

Within the user machine 206 is a mail client 228. In a preferred embodiment, the mail client 228 may be implemented with the Netscape Mail Client and Browser available from Netscape Communications Corp. Of course, other well-known mail clients could also be used. The mail client 228 communicates with the PCA 214 via paths 230 and 232. Path 230 is used for receiving e-mail from the PCA 214 using the POP3 protocol. Path 232 is used for sending e-mail from the mail client 228 to the PCA 214 using the SMTP protocol.

Also within the user machine 206 is a Web browser 234. In a preferred embodiment, the Web browser 234 could be implemented with the Netscape Navigator browser provided by Netscape Communications Corp. The Web browser 234 is used to administer the PCA 214 including the UCDB 226. The Web browser 234 communicates with the PCA 214 along path 236 using the Hypertext Transfer Protocol ("HTTP"), although other known protocols may also be used.

Referring to FIG. 2, conceptually, the PCA 214 acts as an e-mail proxy, sitting between the user's mail client 228 and the mail server 202. Thus, all incoming and outgoing messages pass through the PCA 214, which uses appropriate protocols as discussed above to interact with the mail client 228 and mail server 202. This positioning allows the PCA 214 to autonomously perform various bookkeeping functions, thereby shielding the user from them.

The user channel database (UCDB) 226 primarily records two mappings, the channel map and the correspondent address map. The channel map associates each correspondent with the channel on which the user expects to receive mail from that correspondent. The correspondent-address map associates each correspondent's user and host names with the channel ID (if one exists) on which the user is allowed to send to the correspondent.

The UCDB 226 (or 226a) is conceptually illustrated in FIG. 3. The headings in each column are not actually stored in the database 226, but are provided in FIG. 3 for illustrative purposes. For each correspondent address 302, the UCDB 226 may have one or more of the following entries: own channel 304, correspondent channel 306, own key 308, and correspondent key 310. A correspondent is simply another e-mail user that the user desires to send to or receive mail from. The correspondent address 302 is the standard e-mail address of the correspondent. The own channel 304 is the channel ID 110 used for the correspondent to send e-mail to the user. The correspondent channel 306 is the channel ID 110 that must be used by the user to send e-mail

US 6,993,574 B2

5

to the correspondent. The own key 308 is a key assigned by the user that is necessary to allow certain functions to be performed. The correspondent key 310 is a key assigned by the correspondent, which is also necessary to allow certain functions to be performed. All of this information is placed in the UCDB 226 by the PCA 214 as it interacts with the mail server 202 and the user machine 206.

Referring now to FIG. 4, a conceptual diagram of the channels file 212 is illustrated. The heading on the column "Open Channels" is illustrative only, and such a heading is not actually stored in the channels file 212. The channels file 212 has a list of channels 401 that have been opened by the user. Opening channels may be accomplished with a user interface. In the example shown in FIG. 4, the first channel listed is "1QXR7112PH". These channels are checked by the modified Sendmail program when the mail receiver 208 receives a message. The channels file 212 is updated regularly by the PCA 214 from information that has been entered in the UCDB 226. This information is stored in the own channel field 304 of the UCDB, as shown in FIG. 3.

Web-based e-mail services have recently become available for providing a mailbox address and mailbox functions through a server interacting with the client entirely through HTML protocol. Such an arrangement permits an email user to interact with the mail server from any client machine with a browser. Message composition, incoming message display and directory displays are transacted between client and server through HTML pages.

A typical Web-based mail server system, as illustrated in FIG. 5, includes a mail server 504 communicating with a user machine 500 running client software such as browser 501. Communication between the server 504 and user machine 500 is via HTTP protocol 502 transmitted over a network 503 such as the Internet or another public or private computer network.

E-mail messages to recipients (path 551) and from senders (path 550) are transmitted via the network 503 using SMTP protocol or another protocol suitable for mail transfer. Those messages are communicated with the user machine 500 via HTTP protocol through the network 503.

The Web-based mail server 504 contains a mail server portion 506 and a network interface layer 505. The mail server portion 506 includes an incoming message receiver 541 for receiving mail from the network 503, and an outgoing message queue and sender 542 for transmitting outgoing mail. Both the incoming message receiver 541 and outgoing message queue and sender 542 use SMTP protocol in sending and receiving mail messages to and from the network 503. A message store 540 in the mail server portion 506 provides file storage for received messages. The received messages are transferred directly (path 545) to the message store upon receipt.

The network interface layer 505 of the Web-based mail server 504 contains a series of HTML web pages for communicating with the user via browser software on the user machine. For example, the interface layer contains a message composition page 520 that may be presented via HTTP protocol through the network 503 to a user for composing a message. The page contains fields for the address of the message recipient, the subject of the message, message attachments and the message text. To compose a message, a user places information in the HTML fields as necessary and transmits the page with the additional information to the Web-based mail server 504 via HTTP protocol through the network 503. The network interface layer 505 recognizes the information contained in the fields of an incoming message composition page 520, formats the infor-

6

mation for transfer via SMTP protocol, and forwards the information (path 525) to the outgoing message queue and sender 542.

Similarly, an in-box page 521 is provided for communication of the contents of the message store 540 to the user via the network 503. Information is transferred via HTTP protocol between the inbox page 521 and the message store 540 via path 544. An in-box page may be transmitted to the user containing, for example, a list of the subject fields, senders and receipt dates for all messages in the in-box file of the message store. Unread messages are typically highlighted in the list to be brought to the user's attention. After a message is read, the user may use administrative controls of the HTML Web pages to delete the message from the message store or move the message from the in-box file to another file within the message store such as a subject matter file.

When a user wishes to read a message from the message store, the user requests that a message display page 522 containing the content of a particular message be transmitted to the user machine. The message contents are retrieved from the message store 540 via path 543 and are placed in appropriate fields of the HTML message display page 522 for transmission to the user machine 500.

In each case, because all information transferred between the user machine 500 and the Web-based mail server 504 utilizes HTTP protocol and is embedded within Web pages readable by a standard browser, no mail client is required at the user machine. Instead, the user may access her mail through any machine having a browser.

## SUMMARY OF THE INVENTION

A technical advance is made over the prior art through the system and method of the present invention. A first embodiment of the invention features a server for handling messages transmitted to and from a plurality of clients over a network. The messages have addresses attached to them. The server includes a network interface for communicating with the clients by transferring a markup language using a network protocol, and a mail server for sending and receiving messages over the network. The server also includes a channels assignment manager for assigning channel identifiers to be used as parts of the addresses, and a channel gateway for determining whether messages are authorized messages based upon the channel identifiers.

The network protocol used by the network interface may be a protocol for rendering using a markup language rendering tool. In that case, the markup language rendering tool may be a browser. Furthermore, the network protocol may be HTTP or WAP.

The markup language transferred by the network interface may be XML, HTML, SGML or WML. The server may further include a message store for storing the messages.

The messages received by the mail server from the network may be filtered by the channels gateway before being stored in the message store. In that embodiment, the channel processing server may perform a preliminary function on the messages before they are stored in the message store. That preliminary function may be stripping channel identifiers from the addresses, verifying digital signatures contained in the messages, or decrypting the message.

The server may include a personal channel agent for administering channels. In that embodiment, the network interface may have at least one channel control page for transmission to and from the client allowing the client to access the personal channel agent. The network interface

US 6,993,574 B2

7

may also include at least one email administration page for transmission to and from said client. The channel control pages and the email administration pages may be transmitted to the client as single markup language pages.

In another embodiment of the invention, a method is provided for presenting a message to a recipient in a network. In this embodiment, the message has an address for sending the message from a sender to the recipient. The address includes a common address portion that indicates the identity of the recipient in the network and a channel identifier portion for verifying that the message is authorized. In the method, information in the message, together with an identification of at least one correspondent from whom messages containing the channel identifier portion of the address are authorized, are transmitted to the recipient for simultaneous display.

That embodiment of the invention may also include a step of providing at least one function for the recipient to manipulate the identification of correspondents. The function may include a function for closing a channel identified by the identifier portion of the address.

The message information and correspondent identification may be transmitted using a markup language. The markup language may be XML, HTML, SGML or WML. The message information and correspondent identification may be transmitted using a network protocol for rendering using a markup language rendering tool. In that case, the markup language rendering tool may be a browser, and the network protocol may be HTTP or WAP. The channel identifier portion may be a substantially unguessable portion of the address.

In yet another embodiment of the invention, a method is provided for authenticating mail sent through a network from a first correspondent to a second correspondent. The method includes assigning a channel identifier for use by the first correspondent in sending messages addressed to the second correspondent. The channel identifier is stored in an open channel database.

A message addressed using a modified address of the second correspondent is then received through the network from the first correspondent. In that message, the address contains the channel identifier identifying the second correspondent in the network. It is then verified that the channel identifier in the modified address is in the open channel database. If so, then information derived from the message and information derived from the open channel database are transmitted through the network to the second correspondent for simultaneous display.

Another embodiment of the invention provides a method for presenting a message to a recipient in a network. The message has an address to send the message from a sender to the recipient. The address includes a common address portion that indicates the identity of the recipient in the network and a channel identifier portion for verifying that the message is authorized for delivery to the recipient. The method includes transmitting to the recipient for simultaneous display, an email administration pane and a channel administration pane.

These and other advantages of the invention will be apparent to those of ordinary skill in the art by reference to the following detailed description and the accompanying drawings.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1A is a diagram of a conventional e-mail address;
FIG. 1B is a diagram of a channelized e-mail address;

8

FIG. 2 is a block diagram illustrating a channelized e-mail system;

FIG. 3 is a diagram illustrating a database used in conjunction with the system shown in FIG. 2;

FIG. 4 is a diagram illustrating a file used in connection with the system shown in FIG. 2;

FIG. 5 is a block diagram illustrating a conventional Web-based e-mail system;

FIG. 6 is a block diagram illustrating a Web-based e-mail system according to the present invention;

FIG. 7 is a flow chart representing a method of sending a message in accordance with the present invention;

FIG. 8 is a flow chart representing a method of receiving a message in accordance with the present invention;

FIG. 9 is an illustration of a client user interface page for administering a PCA in accordance with the present invention;

FIG. 10 is another illustration of a client user interface page for administering a PCA in accordance with the present invention;

FIG. 11 is an illustration of a client user interface page showing detailed information about a channel; and

FIG. 12 is a diagram illustrating a client user interface page for use with a channelized Web-based e-mail system according to the present invention.

DETAILED DESCRIPTION

FIG. 6 illustrates an example of a Web-based e-mail system in accordance with one embodiment of the invention. The system includes a Web-based server 604 communicating with a user machine 600 running client software such as a browser 601. Communications between the server 604 and user machine 600 are through a network 603 via a connection 602. The network may be any public or private computer network such as the Internet.

Communications between the server and user machine utilize a markup language in transmitting information through the network. A markup language is a language that allows the insertion of delimiting characters between other information to define how that information will be displayed. Markup languages permit the transmission of a variety of information types, including text, graphics, audio, video and executable routines. Examples of markup languages presently in use include Hypertext Markup Language (HTML), commonly used on the World Wide Web, Extensible Markup Language (XML), which permits an unlimited number of data types to be transmitted, and Wireless Markup Language (WML), for use with small wireless devices. Markup languages are specified using the Standard Generalized Markup Language (SGML) standard. As used herein, the term "markup language" is also intended to encompass any interface description formalism that permits combinations of programming languages, traditional markup languages and data formats to be transmitted and rendered. For example, a markup language might define a formalism using HTML plus Javascript plus GIF, or HTML plus Javascript, or XML plus plain text plus ActiveX control.

Markup languages are transmitted through a network using a network protocol that permits the rendering of the transmitted information using a markup language rendering tool such as a browser. The protocol enables a markup language rendering tool to display, play, execute or otherwise render the information delimited by the markup language in an intended form. Examples of network protocols include Hypertext Transfer Protocol (HTTP) and Wireless Application Protocol (WAP).

US 6,993,574 B2

**9**

Information transmitted via a markup language is typically transmitted as one or more "pages." A page is a markup language file transmitted in response to a request. A markup language page may be displayed by itself, or may be displayed together with other pages using "frames" or another tool for rendering multiple markup language pages simultaneously.

Incoming e-mail messages (path 651) and outgoing e-mail messages (path 650) are transmitted via the network 603 using SMTP protocol or another mail transfer protocol. The server 604 transmits those messages to and from the user machine 600 via HTTP protocol as described below.

The Web-based mail server 604 contains a mail server 606, a network interface layer 605, a message storage layer 607 and a channel processing server 608. The network interface layer 605 of the Web-based mail server 604 comprises one or more email administration pages including a message composition page 620, an in-box display page 621 and a message display page 622 as described above. In addition to those email administration pages, the network interface communicates with the client machine 600 through one or more channel processing server control pages 683 that are used to set up and modify various aspects of the channel processing server 690 as described below.

The message store layer 607 contains a message store 695 for storage of messages including received messages, sent messages and draft messages. As is well known in the art, the message store may have a hierarchical file structure enabling a user to organize her messages according to subject matter, date or other criteria.

The channel processing server 608 of the Web-based mail server 604 includes one or more personal channel agents ("PCA's") 680 for performing the functions required for using and administering channelized email. Those functions and controls include, for example, opening and closing channels, managing the user channel database that maps a correspondent's address to its assigned channel, and mapping the channel assigned by a correspondent to the user.

The PCA 680 includes a channel assignment manager/outgoing message processor 691, a UCDB 693 and an incoming message processor 696. The channel assignment manager/outgoing message processor 691 receives messages from the HTML message composition page 620 of the network interface layer 605, via path 626. Those messages may contain conventional e-mail addresses (FIG. 1A) identifying the intended message recipient in the network. The channel assignment manager/outgoing message processor 691 looks up the recipient's address in the UCDB. If the address is in the UCDB, indicating that the recipient is a known correspondent, the channel assignment manager places a corresponding channel ID from the "own channel" field (FIG. 3) of the UCDB in the return address of the message, and, if the recipient is also a channels user, places a channel ID assigned by the recipient ("correspondent channel") in the "to" address. If the recipient is not found in the UCDB, then the channel assignment manager/outgoing message processor 691 creates a new open channel ID and places it in the return address. If the message is addressed to multiple recipients, an individual version of the message containing only the recipient's channel address is sent to each recipient. In that way, the channel used to send to one recipient is not revealed to the other recipients. In any case, the channel assignment manager forwards the message with channelized address(es) to the outgoing message queue and sender 647 through path 625.

The incoming message processor 696 of the PCA performs user interface-related operations on the messages

**10**

before forwarding them from the mail server 604 to the message store 695. Those operations may include, for example, removing the channels portion of the message addresses, decrypting messages that have been encrypted by other channels users, and verifying digital signatures that are contained in the messages. While the channel processing server 608 is illustrated as including an incoming message processor 696 for performing user interface-related functions, the channel processing server of the invention may alternatively contain only the basic functionality of the channel assignment manager/outgoing message processor 691, without other user interface functionality. In that case, additional functionality may be provided at the user machine or elsewhere, or may not be provided at all. The mail server 606 contains an incoming message receiver 641 and an outgoing message queue and sender 647 having functions similar to corresponding features of the known Web-based mail server described above with reference to FIG. 5. The incoming message receiver 641 furthermore includes a channel gateway 692 and open channel file 648 for controlling the flow of incoming messages through the mail server 606 based on a comparison of the addresses contained in the messages with data in the open channel file. If a message is addressed to an open channel, the message is transferred to the message store 695 via the incoming message processor 696 for viewing by the user. Only those messages having a valid channel address are forwarded to the message store. If the message is addressed to a closed channel, or contains no channel in the address, then the message is not transmitted beyond the mail server 606. A return message may be transmitted to the sender indicating that the address used by the sender is invalid or that the message is undeliverable.

Placing the channel gateway 692 in the mail server 606 allows for a distributed solution where one or more copies of the gateway reside on separate physical servers. The open channel file 648 contains a subset of the data contained in the UCDB 693 and the two databases are synchronized, for example, by sending control messages from the channel assignment managers 691 to the gateways 692 to update the open channel files. Alternatively, the channel gateway 692 may reside in the channels processing server 606, in which case the open channels file 648 is not needed because the gateway has direct access to the UCDB 693.

In a method for sending an electronic message as shown in FIG. 7, a user first composes a message (step 701) using the message composition page 620 (FIG. 6). The message composition page may contain a blank HTML form, Java-Script menu and button selections, animation in the form of Java applets, or other useability enhancements. The message composition page is transmitted by the Web-based mail server 604 to the client 601 via the network 603. The user completes the message composition page 620 by entering data in fields such as a recipient address field, a message body field and a message title field. After the user has entered data in one or more of the fields provided in the message composition page, the user transmits the page over the network 603 via HTTP protocol to the Web-based mail server 604 where the message data is extracted and sent to the channel processing server 608 (step 702).

Once the data is received at the channel processing server, the channel assignment manager at step 703 either creates a new channel for incorporation in the address of a new correspondent, or looks up a currently opened channel for incorporation in the address of a known correspondent. New "channelized" message versions are created for each addressee to avoid disclosure of channels where multiple recipients are listed. The channel processing server may

perform additional operations on the messages, such as encryption. The encryption key may be selected based on the channel used. The channelized message versions are then transferred to the mail server 606 (step 704) where the outgoing message queue and sender 647 sends the message versions (step 705) to the recipients via SMTP protocol.

In a method for receiving a message in accordance with the invention, shown in FIG. 8, a new message connection session is initiated (step 810) between a remote server and the mail server 606 (FIG. 6). A recipient address of the new message is transmitted by the remote server via SMTP and is received in step 801 by the incoming message receiver 641 of the mail server 606. The channel gateway 692 of the incoming message receiver checks whether the message address contains a valid channel ID (step 802). If the message is addressed to an invalid channel, or if the address contains no channel ID, then the message is rejected (step 805). If the address contains a valid channel ID, the message is received by the incoming message receiver 641 and is transferred (step 803) from the mail server 606 to the incoming message processor 696 of the channel processing server 608. The incoming message processor may execute one or more preliminary functions (step 804) on the message before forwarding it. For example, the incoming message processor may strip the channel portions of the addresses from the message to make the message look and feel more like a standard message. Further, the incoming message processor may perform a decrypting operation if the message had been previously encrypted, and may verify a digital signature contained in the message. The message then is transferred to a message store 695 (step 806). The user retrieves the message from the message store using the message display page 622 (step 807).

When a user needs to perform functions for manipulating channels such as opening, closing, creating, deleting or switching channels, the user may use the PCA's administrative interface which is illustrated in FIG. 9. The administrative interface may be used to allocate some new channels (for example for use in mailing lists or as temporary reply channels) or to close or switch channels. This administrative interface is used with the Web browser 601 through path 602. A user accesses the administrative interface through the channels control pages 683 of the network interface layer 605 (FIG. 6).

Referring now to FIG. 9, an exemplary administrative interface 900 (shown as it would appear on a computer screen) provides a title 901 indicating the owner "x" of the UCDB 693 for which the interface has been accessed. The interface provides a way to view and modify the UCDB 693, which holds most of the relevant data used by the PCA 680 for a given system user. The interface provides a channel map display 918, notices 935 of incoming and outgoing messages waiting, and various buttons for manipulating PCA data as described below. The buttons are displayed on the computer screen and are selected by a user with a pointing device such as a mouse or trackball.

The buttons 920 through 924 are positioned above the channel map display 918 and are general function buttons that do not apply to any one specific channel. For example, when the PROBE button 920 is selected, the mail server is immediately checked for new messages. That function is typically performed automatically on a periodic basis; the PROBE button permits checking without waiting for the next automatic cycle.

A SYNCH button 921 is provided to synchronize the open channels file with the UCDB. Like the PROBE function, the SYNCH function is carried out periodically by the PCA. A

user, however, may wish to update the open channels file without waiting, in order to implement changes made to the UCDB immediately. The SYNCH button causes the PCA to send a control message to the channels gateway to synchronize the open channels file with the UCDB.

The PASSPHRASE button 922 allows a user to input or change a security passphrase that is used in encrypting the user's information stored on local or publicly accessable storage. In that way, all user-specific information is encrypted when stored, and is only in clear form when placed in volatile memory.

A new channel may be opened manually using the NEW button 923. When manually opening a channel, a user enters the standard email address(es) of the correspondent(s) authorized to use the channel. The user may also enter a name or description of the channel for display in the channel map display 918. A user may have the ability to open a new channel with a particular user-chosen channel identifier string, making it easier for correspondents to remember. New channels are also created automatically when the user sends a message to a new recipient.

The "Don't Leak" checkbox 924 prevents channel addresses from being disclosed or "leaked" among multiple recipients of a single message. It has been found by the inventor that it is often preferable to permit channel addresses to be disclosed to multiple correspondents named in a message to permit responses to be sent to the group without creating individual channel addresses for each sender/receiver combination in the group. This feature may be turned off by using the "Don't Leak" button under circumstances where some or all of the correspondents are suspect.

Buttons 930 through 934 are located beneath the channel map display 918 and are used to perform functions on individual channels selected from the display. A channel is selected from the display using a pointing device such as a mouse. In the display shown in FIG. 10, the fourth channel 1010 of the display 918, entitled, "Java Developer Connection," has been selected.

A DELETE button 930 (FIG. 9) is provided to remove all information about a selected channel from the UCDB, and to send a message to the channel gateway 692 (FIG. 6) to remove the selected channel from the open channel file 648. After a channel has been deleted, it cannot be reopened because no information about that channel is available to the PCA.

A CLOSE button 931 closes a selected channel to incoming messages, but retains information about that channel in the UCDB. The closed channel continues to be displayed in the channel map display 918, where a notation indicated that the channel is closed. No incoming messages are accepted through a closed channel. Closed channels may be reopened.

The SWITCH button 932 is used to move a correspondent to a new channel. That is done most often when the original channel used by that correspondent has been compromised. The SWITCH button allocates a new channel, closes the original channel and informs the correspondent that the switch was made. Where the correspondent is also a channels user, a command is sent to the correspondent's PCA changing the channel ID for messages sent by the correspondent to the user. If the correspondent is not a channels user, then the user's PCA sends a human-readable message to the correspondent informing the correspondent that the channel ID of the user has changed, and instructing the correspondent to manually change the address of the user in the correspondent's directory.

US 6,993,574 B2

13                                           14

A DETAILS button 933 displays additional information about a selected channel. For example, details of the channel selected in FIG. 10 are shown in a display 1110 of FIG. 11. The name of the channel "Java Developer Connection" as it appeared in the channel map display 819 is provided in a title block 1120. The channels address 1121 "x-3JDCJD-CJDC-@channels.research.att.com", including the channels ID, is displayed in an upper pane 1111 of the display 1110. The upper pane 1111 also contains a channels address of the correspondent using the selected channel, if available. In the particular case illustrated in FIG. 11, it is noted in notation 1122 that the correspondent is not a channels user.

A lower pane 1112 of the display 1110 contains notes manually input by the user that apply to the selected channel or its associated correspondents. In the illustrated example, a user ID 1124 and password required for access to the correspondent are recorded for the user's convenience. Additionally, a "Don't Leak To" checkbox 1123 applies specifically to the correspondent(s) using the selected channel. When the box is checked, no channel ID's other that the channel ID assigned to the selected channel will be disclosed to the correspondent. The checkbox 1123 overrides not checking the general "Don't Leak" checkbox 924 appearing in the administrative interface (FIG. 9).

An ENCRYPTION function 934 is provided to allow the user to specify a key for encrypting messages sent to and from a channels-using correspondent on a selected channel. The key is separately (manually) transmitted by the user to the correspondent. Once set up, encryption and decryption of messages are conducted automatically by the PCA, and are transparent to the user.

The channel map display 918 contains a list of open and closed channels specific to the PCA. The channels may be scrolled up and down using the scroll bar 919, as is known in the art. The first through the tenth and the fourteenth channel names displayed in display 918 are names that have been manually entered, that is using the NEW button 923. Those names were chosen and manually typed by the user. The remaining channel names are displayed as standard email addresses; those channels were created by sending an email to a new correspondent. The standard email addresses of the correspondents were automatically assigned as channel names, and may be changed or edited by the user, if desired. In either case, for each channel, the display provides a unique name that is an identification of a correspondent or group of correspondents who are authorized to send the user messages using that corresponding channel. The channel names may be edited by the user for convenience. The display also indicates for each channel whether the channel is encrypted or is clear.

FIG. 12 shows an example of a mark-up language display 1201 that may be used for the transfer of information between a client and the Web-based mail server 604 (FIG. 6) of the invention. The display 1201 contains three panes: an in-box pane 1210, a message display pane 1220 and a channel processing server control pane 1230. Because control of the channel processing server and transfer of messages between the Web-based mail server and the client both utilize a protocol such as HTTP or WAP, it is efficient to present both user interfaces in the same window.

The inbox pane 1210 and message display pane 1220 present information regarding received messages as is known in the art. For example, the inbox pane may display "to" or "from" addresses, as well as non-address information from the headers of the messages such as the date and subject lines. The channel processing server control panel 1230 is an administrative interface enabling the user to perform various channel-related functions as described above with reference to FIGS. 9–11. The control panel 1230 may include a display of the available channel names, as described with reference to FIG. 11. Those functions performed by the control panel 1230 include closing a channel (i.e., disallowing the receipt of further messages on that channel) and switching a channel (i.e., notifying an intended correspondent to use a new channel while simultaneously opening the new channel and closing the old channel). The channel processing server control panel may present a text-based note document corresponding to a particular channel or correspondent, giving the user the ability to annotate the database. If the e-mail system has encryption capabilities, the control panel may allow the user to turn on or off encryption on a particular channel.

In the system and method of the present invention, e-mail and e-mail administration is transmitted to and from the user in the same protocol (HTTP or another such markup transfer protocol) as the channels administration pages, making it convenient and efficient to present information derived from both sources to the user in the same user interface window. By presenting the e-mail administration panes side-by-side with the channel administration pane, the system allows a user to easily recognize which channel to close when a spam message is received and to decide whether to switch that channel or simply to close that channel. The two panes may interact in order to facilitate such decisions. For example, when a message is selected in the e-mail administration pane, the channel through which that email was received may be highlighted in the channel administration pane.

A user can access his annotations for a given channel that may help in answering a question or in deciding how to treat a particular message received on that channel. By having message content available while using the channel administration pages, the user can create a new channel for a particular use (such as for use by all members of a cat-lovers interest group) in order to include it in a message. Moreover, the well-known features of email address books (such as the ability to define nicknames and lists of correspondents) can be advantageously combined with the channel-related information and functionality, so that a user can create simple nicknames for correspondents and groups that can be used in addressing messages.

Because the channels processing server, including all data that must be accessed by the channels processing server, is located at a Web-based mail server, a user is able to access his channels-protected mail from any machine that has a browser and is connected to the network. No special channels software is required at the client location, and the user-specific channels data such as that contained in the UCDB database is accessible via the channel processing server control pages 683, and so need not be stored at the client location.

The foregoing Detailed Description is to be understood as being in every respect illustrative and exemplary, but not restrictive, and the scope of the invention disclosed herein is not to be determined from the Detailed Description, but rather from the claims as interpreted according to the full breadth permitted by the patent laws. It is to be understood that the embodiments shown and described herein are only illustrative of the principles of the present invention and that various modifications may be implemented by those skilled in the art without departing from the scope and spirit of the invention. For example, the detailed description describes an embodiment of the invention with particular reference to electronic mail. However, the principles of the present invention could be readily extended to telephony. Such an

US 6,993,574 B2

15

extension could be readily implemented by one of ordinary skill in the art given the above disclosure.

I claim:

1. A server for handling messages transmitted to and from a plurality of clients over a network, the messages having addresses attached to them, the server comprising:

    a network interface for communicating with the clients by transferring a markup language using a network protocol;

    a mail server for sending and receiving messages over the network;

    a channels assignment manager for assigning channel identifiers to be used as parts of the addresses;

    a channels gateway for determining whether messages are authorized messages based upon said channel identifiers;

    a personal channel agent for administering channels;

    wherein the network interface comprises at least one channel control page for transmission to and from said client allowing the client to access the personal channel agent and at least one email administration page for transmission to and from said client; and

    wherein at least one of said channel control pages and at least one of said email administration pages are transmitted to the client as a single markup language page.

16

2. A server for handling messages transmitted to and from a plurality of clients over a network, the messages having addresses attached to them, the server comprising:

    a network interface for communicating with the clients by transferring a markup language using a network protocol;

    a mail server for sending and receiving messages over the network;

    a channels assignment manager for assigning channel identifiers to be used as parts of the addresses;

    a channels gateway for determining whether messages are authorized messages based upon said channel identifiers;

    wherein the network interface comprises at least one channel control page for transmission to and from said client allowing the client to access the personal channel agent and at least one email administration page for transmission to and from said client; and

    wherein at least one of said channel control pages and at least one of said email administration pages are transmitted to the client as a single markup language page.

* * * * *

# EXHIBIT
## 3

JUL.26'2004 12:02 908 221 4492        AT&T LAW DEPT                    #6668 P.001

FORM PTO-1595
Rev.5-93
OMB-0651-0011

U.S.DEPARTMENT OF COMMERCE
Patent and Trademark Office

## RECORDATION FORM COVER SHEET
# PATENTS ONLY

To the Director o the U.S. Patent and Trademark Office: Please record the attached documents or the new address(es) below.

| 1. Name of conveying party(ies): | 2. Name and address of receiving party(ies): |
|---|---|
| Zoetics, Inc. | Name:        AT&T Corp. |
| | Street Address: 32 Avenue of the Americas |
| Execution Date: May 13, 2002 | |
| Additional name(s) of conveying party(ies) attached? ☐ Yes ☒ No | City: New York   State: New York   ZIP: 10013-2412 |
| 3.  Nature of conveyance: | |
| ☐ Assignment          ☐ Merger | |
| ☒ Security Agreement  ☐ Change of Name | |
| ☐ Other | Additional name(s) & address(es) attached? ☐ Yes ☒ No |

4.  Application number(s) or patent number(s):

If this document is being filed together with a new application, the execution date of the application is _____

A. Patent Application No  09/884,646                    B. Patent No. (s)   5,930,479

                              Additional numbers attached? ☐ Yes ☒ No

| 5.  Name and address of party to whom correspondence concerning document should be mailed: | 6.  Total number of applications and patents involved: 2 |
|---|---|
| Name: Susan McGahan | 7.  Total fee (37 CFR 3.41) $80.00 |
| Street Address:  AT&T Corp. | ☐  Enclosed |
|                  Room 3A240 | X  Authorized to be charged to deposit account |
| City: Bedminster State: New Jersey  ZIP: 07921 | 8.  Deposit account number: 01-2745 |
| Phone Number: 908-532-1995 | |
| Fax Number: 908-532-1219 | (Attach duplicate copy of this page if paying by deposit account) |
| Email Address: smchala@att.com | Authorized User Name: Susan McGahan |

DO NOT USE THIS SPACE

9.  Signature:

*Susan McGahan*                                          7/26/04
                         Signature                                        Date

Name of Person Signing: Susan McGahan

Total number of pages including cover sheet, attachments, and document: 21

Documents to be recorded (including cover sheet) should be faxed to (703) 306-5995, or mailed to:
Mail Stop Assignment Recordation Services, Director of the USPTO, P.O. Box 1450, Alexandria, VA 22313-1450.

700101738                                     REEL: 014892 FRAME: 0516

JUL.26'2004 12:02 908 221 4492          AT&T LAW DEPT                    #6669 P.002

## Schedule F
## Security Agreement

THIS SECURITY AGREEMENT is made as of the _____ day of _____, 2002 by and between Zoetics, Inc., a New York corporation, (the "Debtor") and AT&T Corp., a New York corporation (the "Secured Party").

### WITNESSETH THAT:

WHEREAS, the Debtor has entered into simultaneously herewith an Intellectual Property Agreement as of the date hereof between the Secured Party and the Debtor, wherein the IP Assets (as hereinafter defined) have been assigned to Debtor in consideration for monetary payments to be paid to the Secured Party over an extended time period ; and

WHEREAS, to secure the payment of the indebtedness the Debtor owes to the Secured Party under the Intellectual Property Agreement, the Debtor and Secured Party shall enter into this Security Agreement covering the Collateral (as hereinafter defined);

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto hereby agree as follows:

Section 1. Definitions. The following terms shall have the following meanings:

"AT&T Patents" shall mean the United States patents and patent applications listed on Exhibit A attached hereto, including any divisionals, continuations, continuations-in-part, reissues, extensions or reexaminations, thereof and any foreign counterparts thereto filed or issued before, on, or after the date hereof, in any jurisdiction of the world.

"AT&T Copyright" shall mean the United States copyright registration listed on Exhibit B, and all renewals thereof.

"AT&T Know-How" shall mean all information about the Subject Software provided as of the Effective Date, orally or in writing by an AT&T researcher knowledgeable about the technology embodied in the Subject Software.

"Collateral" shall have the meaning ascribed to such terms in Section 2(a) below.

"Effective Date" shall be the date the Intellectual Property Agreement is executed.

"Fair Market Value" shall mean, with respect to payments received by Debtor for selling or otherwise providing a product or service that incorporates some or all of the IP Assets, the greater of (i) the payment actually collected obtained for selling or otherwise providing the product or (ii) the equivalent payment of any non-monetary exchange received in lieu of payment for providing a product. For the avoidance of doubt, the following events shall be exempted from the definition of Fair Market Value (a) internal uses by the employees of the Debtor for non-commercial purposes; and (b) commercial sales within the units of Debtor shall be treated under the "Internal Discounted Value" and (c) revenues paid as sales commissions to outside, unaffiliated third parties, including by way of example and not of limitation, media commissions paid to advertising agencies or media brokers.

"Gross Revenues" shall mean the sum of all Fair Market Value payments, Internal Discounted Value payments, or any other payments received by Debtor or any other company or person at the request of or on behalf of Debtor for selling or otherwise providing commercial product or services incorporating some or all of the IP Assets.

PATENT
REEL: 014892 FRAME: 0517

"**Internal Discounted Value**" means payments received for selling or otherwise providing a product or services by Debtor to its Subsidiaries for commercial sales or distribution.

"**Interest Calculation**" shall have the meaning given to the term for Overdue Payments in Section 2.3 of the Intellectual Property Agreement.

"**IP Assets**" shall be a collective term meaning the AT&T Copyright, the AT&T Patents, the Proprietary Information and the Subject Software.

"**Maximum Surcharge**" shall mean a penalty payable to the Secured Party not to exceed a total amount of Two Million Five Hundred Thousand Dollars ($2,500,000) under Debtor's Revised Obligations for the right to extend the payment schedule beyond that set forth in the Obligations.

"**Proprietary Information**" shall mean trade secrets or other technical information expressed in the source code of the Subject Software, AT&T Copyright or contained in the AT&T Know-How, including all documented features, and any other documentation, information or knowledge expressed therein, which is owned by Secured Party as of the Effective Date and is not generally known to the public.

"**Obligations**" shall mean the Debtor's payment obligations described in Section 2 of the Intellectual Property Agreement as modified by Sections 21.2 and 21.3 of the Intellectual Property Agreement.

"**Security Interests**" shall have the meaning ascribed to such term in Section 2(b) in this Security Agreement.

"**Subject Software**" shall mean the software, including object code and source code, of the software listed on Exhibit C, attached hereto, and any new version, modification, adaptation, or derivative work thereof owned by the Secured Party on the Effective Date.

Section 2.  The Security Interests.

(a)    In order to secure the due and punctual payment of the Obligations, the Debtor hereby pledges and assigns to the Secured Party, and grants to the Secured Party a continuing security interest in and lien on, all of the following rights, title and interests in the described intangible property, assets and rights (hereinafter collectively called the "Collateral"):

(A)    The IP Assets;

(B)    A percentage of Debtor's Gross Revenues to secure payment of the Accrued Unpaid Balance (defined in the Intellectual Property Agreement) due and owing the Secured Party under the Obligations in the Event of a Default, under the terms and otherwise as further set forth in Section 20 of this Security Agreement; and

(C)    All rights and remedies (including without limitation, all claims, damages and rights with respect to or arising out of any infringement of any of the IP Assets) which the Debtor might now or in the future exercise with respect to any of the foregoing. Notwithstanding anything contained in this Agreement, should Secured Party obtain by any proceeds by enforcement or exercise of its rights or remedies under this Section 2(a)(C) of the Security Agreement, the proceeds of such right or remedy shall first be used to reimburse Debtor for any attorney's fees and other costs incurred by Debtor in enforcing such right or remedy before the proceeds are distributed to the Secured Party.

(b)    The security interests granted pursuant to this Section 1 (the "Security Interests") are granted as security only and shall not subject the Secured Party to, or transfer to the Secured Party, or in any way affect

- 40 –
AT&T - Proprietary

**PATENT**
**REEL: 014892 FRAME: 0518**

or modify, any obligation or liability of the Debtor under any of the Collateral or any transaction which give rise thereto.

### Section 3. Filing; Further Assurance.

The Debtor will execute and deliver to Secured Party for filing and/or recording (in such manner and form as the Secured Party may require), or permit the Secured Party to file and record, in either case at the Secured Party's cost and expense, this Security Agreement (which the parties hereto agree shall be sufficient as a financing statement hereunder), any specific assignments or other paper that may be reasonably necessary or desirable, or that the Secured Party may request, in order to create, confirm, preserve, perfect or validate any Security Interest or to enable the Secured Party to exercise and enforce its rights hereunder or under applicable law with respect to any of the Collateral. The Debtor hereby appoints Secured Party as the Debtor's attorney-in-fact to execute in the name and on behalf of the Debtor such additional financing statements as the Secured Party may at any time reasonably request or require in respect of the Collateral. Upon satisfaction in full of the Obligations, Secured Party agrees to promptly take all action which may be necessary or useful to terminate any financing statements filed in connection with this Security Agreement.

### Section 4. Representations and Warranties of the Debtor.

The Debtor hereby represents and warrants to the Secured Party that all information, representations and warranties contained in Exhibit D attached hereto and made a part hereof are true, accurate and complete on the date hereof.

### Section 5. Covenants of the Debtor.

The Debtor hereby covenants and agrees that so long as any of the Obligations remain unpaid or unperformed:

(a)     The Debtor will not (either itself or through licensees) do any act, or omit to do any act, whereby the registration of any of the IP Assets may become abandoned or dedicated to the public.

(b)     Whenever the Debtor, either by itself or through any agent, employee, licensee or designee, shall file an application for the registration of a patent or copyright included within the IP Assets with the United States Patent and Trademark Office (the "PTO") or the United States Copyright Office or in any office or agency of any foreign country or political subdivision thereof, the Debtor shall report such filing to the Secured Party within five days after the last day of the calendar month in which such filing occurs. Upon request of the Secured Party, the Debtor shall execute and deliver any and all agreements, instruments, documents, and papers as the Secured Party may reasonably request to evidence the Secured Party's security interest in any patent, or copyright, and the goodwill and general intangibles, if any, of the Debtor relating thereto or represented thereby, and the Debtor hereby constitutes the Secured Party its attorney-in-fact to execute and file all such writings for the purposes of so evidencing the Secured Party's security interest (and the Secured Party agrees to notify the Debtor that any such filing has been made, provided that any failure to so notify shall not invalidate any such actions by the Secured Party), all lawful acts of such attorney being hereby ratified and confirmed; such power being coupled with an interest is irrevocable until the Obligations are paid in full. For the avoidance of doubt, Debtor's obligations under this paragraph do not relate to any patent or copyright related to the Debtor's "At My Request" technology or any other patent or copyright not part of the IP Assets.

(c)     In the event that any IP Asset included in the Collateral is materially infringed or misappropriated, the Debtor shall promptly notify the Secured Party after it learns thereof and shall take such actions as the Secured Party shall reasonably deem appropriate under the circumstances to protect such IP Asset.

(d)     The Debtor will defend the Collateral against all claims and demands of all persons (other than the Secured Party) at any time claiming any interest therein.

- 41 -
AT&T - Proprietary

**PATENT**
**REEL: 014892 FRAME: 0519**

(e)    The Debtor will not change its corporate name, identity or structure, or jurisdiction of organization without forty-five (45) days' prior written notice to Secured Party and the execution, delivery and filing of such documents as reasonably required by the Secured Party.

Section 6.    Records Relating to Collateral.

The Debtor will keep its records concerning the Collateral at its offices located at    270 Lafayette St., Suite 1202, New York, NY 10012, or at such other place or places of business as the Secured Party may approve in advance in writing.  The Debtor will hold and preserve such records and will permit representatives of the Secured Party at any time, on prior notice, during normal business hours to examine and furnish to the Secured Party, if requested, such information and copies of records regarding the Collateral in the possession or control of the Debtor as the Secured Party may from time to time reasonably request.

Section 7.    Events of Default.

The Debtor shall be in default under this Security Agreement upon the occurrence of any one or more of the following events (each such event is herein referred to as an "Event of Default"), after receiving thirty (30) days prior notice from the Secured Party:

(a)    at such time as Secured Party shall be entitled to perfect or enforce this Security Agreement pursuant to Section 2.1, or 21.1 or 21.2 of the Intellectual Property Agreement ; or

(b)    any material representation or warranty herein contained shall have been untrue or misleading in any material respect at the time it was made and such breach is not  cured within thirty (30) days after Debtor has received notice thereof from the Secured Party; or

(c)    any proceeding is instituted by or against the Debtor seeking to adjudicate it bankrupt or insolvent, or seeking reorganization, arrangement, adjustment or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking an appointment of a receiver, trustee, or other similar official for it or for any substantial part of its property and such proceeding is not stayed or dismissed within 90 days after commencement, or the Debtor takes any action to authorize or consent to any action described in this subsection (c).

Section 8.    Remedies Upon Event of Default.

(a)    If any Event of Default shall have occurred, the Secured Party may exercise all the rights and remedies of a secured party under the Uniform Commercial Code of New York (whether or not the Uniform Commercial Code is in effect in the jurisdiction where such rights and remedies are exercised).  Without limiting the generality of the foregoing, Secured Party, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by law referred to below) to or upon the Debtor or any person or entity (all and each of which demands, defenses, advertisements and notices are hereby waived), may forthwith collect, receive, or realize upon the Collateral, or any part thereof, and/or may forthwith sell, lease, assign, license, or otherwise dispose of and deliver the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, exchange, broker's board or office of Secured Party or elsewhere upon such terms and conditions as it may deem advisable and at such prices it may deem best, for cash or on credit or for future delivery without assumption of any credit risk.  Secured Party shall have the right upon any such public sale or sales, and to the extent permitted by law, upon any such private sale or sales, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption in the Debtor, which right or equity is hereby waived or released.  The Secured Party may require the Debtor to make the Collateral available to the Secured Party at a place to be designated by the Secured Party which is reasonably convenient.

(b)    In addition to and as part of the rights set forth above, Debtor hereby agrees that if an Event of Default shall occur, Debtor shall take all actions necessary, appropriate or proper to transfer ownership of the Collateral or any part thereof to Secured Party or its assigns, including without limitation, filing any and all assignments

- 42 -
AT&T - Proprietary

PATENT
REEL: 014892 FRAME: 0520

of patent with the PTO and assignments of copyrights with the Copyright Office or any similar office or agency in any other country or any political subdivision thereof whether in the form attached hereto as Exhibits E and F, respectively, or such other form as is deemed by the Secured Party to be necessary, appropriate or proper under the circumstances.

(c)     Debtor hereby constitutes and appoints the Secured Party (and any officer, employee or agent of the Secured Party, with a full power of substitution) the Debtor's true and lawful attorney and agent in fact, in the name of the Debtor, the Secured Party or otherwise, for the sole use and benefit of the Secured Party, but at the sole cost and expense of Debtor, to exercise and take, at any time, and from time to time, after any Event of Default has occurred, all or any of the following powers and actions with respect to all or any of the Collateral (which power shall be in addition and supplemental to any powers, rights and remedies of the Secured Party described herein or otherwise available to the Secured Party under any other document or otherwise under applicable law):

(i)     any of the actions described in subsection (b) above;

(ii)    to demand, sue for, collect, receive and give acquittance for any and all moneys due  to the Secured Party for payment of the accrual amount due under the Obligations as set forth in Section 20 of this Security Agreement; and

(iii)   to settle, compromise, compound, prosecute or defend any action or proceeding, with respect to infringement or otherwise.

Debtor covenants and agrees that any action described in this subsection (c) may be taken at the Secured Party's sole and absolute discretion, at any time and from time to time, and that Debtor hereby ratifies and confirms all actions taken.

(d)     The Debtor covenants and agrees that (i) the powers of attorney granted by this Agreement are coupled with an interest and shall be irrevocable until full and final payment in cash and performance of all the Obligations, (ii) said powers are granted solely for the protection of the Secured Party's interest and the Secured Party shall have no duty to exercise any of such powers, (iii) the decision whether to exercise any such powers and the manner of exercise shall be solely within the Secured Party's discretion, and (iv) neither Secured Party nor any of its directors, officers, employees or agents shall be liable for any act of omission or commission, or for any mistake or error judgment, in connection with any such powers, absent gross negligence or willful misconduct.

(e)     No remedy referred to in this Agreement is intended to be exclusive, and all rights and remedies contained herein shall be separate and cumulative and in addition to all other rights and remedies available to a secured party under other documents evidencing or securing any of the Obligations or otherwise applicable law, and the exercise of one shall not in any way limit or prejudice the exercise of any other such rights or remedies; and the Secured Party may exercise its remedies concurrently, independently or successively, without in any way affecting any other remedy.

Section 9. Application of Collateral and Proceeds.

The proceeds of any sale of, or other realization upon, all or any part of the Collateral shall be applied in the following order of priorities:

(a)     first, to pay the expenses of such sale or other realization, including reasonable commission to any agents or brokers, and all expenses, liabilities and advances incurred or made by the Secured Party in connection therewith, and any other unreimbursed expenses for which the Secured Party is to be reimbursed pursuant to Section 10;

(b)     second, to the payment of the Obligations in such order and manner as the Secured Party, in its sole discretion, shall determine; and

-43 -
AT&T - Proprietary

PATENT
REEL: 014892 FRAME: 0521

(c)    finally, unless applicable law otherwise provides, to pay to the Debtor, or its successors or assigns, or as a court of competent jurisdiction may direct, any surplus then remaining from such proceeds.

Section 10.  Expenses; Secured Party's Lien.

The Debtor will forthwith upon demand pay to the Secured Party: the amount of any and all reasonable out-of-pocket expenses, including the reasonable fees and disbursements of the Secured Party's counsel and of any agents not regularly in the Secured Party's employ, and all other expenses of Secured Party (including, without limitation, court costs, and the allocated costs of Secured Party's in-house counsel), which the Secured Party may incur in connection with (a) the collection or other disposition of any of the Collateral, (b) the exercise by the Secured Party of any of the powers, rights or remedies conferred upon it hereunder, or (c) any default on the Debtor's part hereunder.

Section 11.  Notices.

All notices, requests, demands and other communications provided for hereunder shall be in writing (including telegraphic communication) and mailed certified, return receipt requested, or telegraphed or delivered to the applicable party at the addresses indicated below:

(i)        If to the Debtor, to it at:
           Zoetics, Inc.
           270 Lafayette St., Suite 1202
           New York, NY 10012

           Attn:  Thelma Guy

with a copy to:

           Andrew F. Blumenthal, Esq.
           250 West 57th Street  –  Suite 332
           New York, New York 10107
           Phone: (212) 245-3860
           Fax: (212) 956-5463
And
           Stephen M. Foxman, Esq.
           Eckert Seamans Cherin & Mellott, LLC
           1515 Market St., 9th Floor
           Philadelphia, PA 19102
           Phone: (215) 851-8472
           Fax: (215) 851-8383

(ii)       If to the Secured Party, to it at:

           AT&T Labs
           180 Park Avenue
           Florham Park, NJ  07932
           Tel.: (973) 360-7300
           Fax: (973) 360-5800

           Attn:        Intellectual Property Vice President

with a copy to:

           Susan McHale-McGahan, Esq.
           AT&T Corp.

                    – 44 –
           AT&T - Proprietary

**PATENT**
**REEL: 014892 FRAME: 0522**

JUL.26'2004 12:05 908 221 4492          AT&T LAW DEPT                    #6668 P.008

293 North Maple Avenue
Rm. 325211
Basking Ridge, NJ 07920

or, as to each party, at such other address as shall be designated by such parties in a written notice to the other party complying as to delivery with the terms of this Section. All such notices, requests, demands and other communications shall be deemed given upon the earlier to occur of (a) the third day following deposit thereof in the United States mail or deposit thereof with the telegraph company as aforesaid, or (b) receipt by the party to whom such notice is directed.

### Section 12. Waivers; Non-Exclusive Remedies.

No failure on the part of the Secured Party to exercise, and no delay in exercising, and no course of dealing with respect to, any right, power or remedy under this Security Agreement shall operate as a waiver thereof, nor shall any single or partial exercise by the Secured Party of any right, power or remedy under this Security Agreement exhaust the same or preclude any other right, power or remedy. The remedies in this Security Agreement are cumulative and are not exclusive of any other remedies provided by law or otherwise available to the Secured Party. The Debtor, to the extent it may lawfully do so, hereby consents to the jurisdiction of the courts of the State of New York and the United States District Court for the District of New York for the purpose of any suit or proceeding brought in connection with or respect to this Security Agreement.

### Section 13. Consent and Waiver.

(A)    THE DEBTOR HEREBY WAIVES TRIAL BY JURY IN ANY ACTION BROUGHT ON OR WITH RESPECT TO THIS SECURITY AGREEMENT. NEITHER THE DEBTOR NOR ANY ASSIGNEE OF OR SUCCESSOR TO THE DEBTOR, SHALL SEEK A JURY TRIAL IN ANY LAWSUIT, PROCEEDING, COUNTERCLAIM, OR ANY OTHER LITIGATION OR PROCEDURE BASED UPON, OR ARISING OUT OF, THIS SECURITY AGREEMENT OR THE DEALINGS OR THE RELATIONSHIP BETWEEN OR AMONG THE PARTIES HERETO. NO PARTY WILL SEEK TO CONSOLIDATE ANY SUCH ACTION, IN WHICH A JURY TRIAL HAS BEEN WAIVED, WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED. THE PROVISIONS OF THIS SECTION HAVE BEEN FULLY DISCUSSED BY THE PARTIES HERETO, AND THESE PROVISIONS SHALL BE SUBJECT TO NO EXCEPTIONS. NO PARTY HAS IN ANY WAY AGREED WITH OR REPRESENTED TO ANY OTHER PARTY THAT THE PROVISIONS OF THIS SECTION WILL NOT BE FULLY ENFORCED IN ALL INSTANCES. NOTWITHSTANDING THE FOREGOING, NO ACTION UNDER THIS AGREEMENT SHALL PROCEED IN A COURT IF AN ARBITRATION PROCEEDING HAS BEEN INITIATED BY EITHER PARTY UNDER THE INTELLECTUAL PROPERTY AGREEMENT, PROVIDED THAT SUCH ACTION RELATES TO THE CASH PAYMENT OBLIGATIONS OF DEBTOR UNDER SECTIONS 2.1 OR AS MODIFIED BY SECTIONS 21.2 - 21.3 OF THE INTELLECTUAL PROPERTY AGREEMENT ("CASH PAYMENT DEFAULT") OR THE FACTS AND CIRCUMSTANCES UNDERLYING ANY OTHER BREACH OF THE INTELLECTUAL PROPERTY AGREEMENT CLAIMED BY SECURED PARTY AS A BASIS FOR THE ENFORCEMENT OF THIS SECURITY AGREEMENT. AND SUCH ARBITRATION PROCEEDING HAS NOT BEEN TERMINATED OR DISMISSED. NO ACTION IN A COURT SHALL BE MAINTAINED UNDER THIS SECURITY AGREEMENT BASED UPON AN ALLEGED CASH PAYMENT DEFAULT OCCURRING UNDER THE INTELLECTUAL PROPERTY AGREEMENT IF IN AN ARBITRATION PROCEEDING UNDER THE INTELLECTUAL PROPERTY AGREEMENT SUCH CASH PAYMENT DEFAULT IS FOUND NOT TO EXIST.

(B)    THE DEBTOR CONSENTS TO THE JURISDICTION AND VENUE OF ANY LOCAL, STATE OR FEDERAL COURT LOCATED WITHIN THE STATE OF NEW YORK AND WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS UPON THE DEBTOR, AND CONSENTS THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, DIRECTED TO THE DEBTOR AT THE ADDRESS STATED ABOVE AND SERVICE SO MADE SHALL BE DEEMED TO BE COMPLETED THREE (3) DAYS AFTER THE SAME SHALL HAVE BEEN POSTED AS AFORESAID. THE DEBTOR WAIVES ANY OBJECTION TO VENUE OF ANY ACTION INSTITUTED

AT&T - Proprietary

PATENT
REEL: 014892 FRAME: 0523

HEREUNDER AND CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY THE COURT. THE DEBTOR WAIVES, TO THE EXTENT PERMITTED BY LAW, ANY BOND OR SURETY OR SECURITY UPON SUCH BOND WHICH MIGHT, BUT FOR THIS WAIVER, BE REQUIRED OF THE SECURED PARTY. NOTHING CONTAINED IN THIS PARAGRAPH SHALL AFFECT THE RIGHT OF THE SECURED PARTY TO SERVE LEGAL PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR AFFECT THE RIGHT OF THE SECURED PARTY TO BRING ANY ACTION OR PROCEEDING AGAINST THE DEBTOR IN THE COURTS OF ANY OTHER JURISDICTION.

(C)      THE DEBTOR HEREBY WAIVES ALL DEFENSES AND RIGHTS TO INTERPOSE ANY SETOFF OR COUNTERCLAIM OF ANY NATURE EXCEPT ONLY A DEFENSE PERTAINING TO THE EXISTENCE OF AN EVENT OF DEFAULT OR A COUNTERCLAIM TO THE EXTENT THAT THE FAILURE TO SO ASSERT SUCH COUNTERCLAIM WOULD PERMANENTLY PRECLUDE THE PROSECUTION OR RECOVERY UPON THE SAME.

### Section 14. Changes in Writing.

Neither this Security Agreement nor any provision hereof may be changed, waived, discharged or terminated orally, but only by a statement in writing signed by the party against which enforcement of the change, waiver, discharge or termination is sought.

### Section 15. Choice of Law; Meaning of Terms.

This Security Agreement shall be construed in accordance with and governed by the internal laws (as opposed to conflict of law provisions) and decisions of the State of New York applicable to contracts made and performed in said State, except to the extent that remedies provided by the laws of any State other than New York are governed by the laws of said State. Unless otherwise defined herein, or unless the context otherwise requires, all terms used herein which are defined in the New York Uniform Commercial Code have the meanings therein stated.

### Section 16. Marshalling; Payments Set Aside.

The Secured Party shall be under no obligation to marshall any assets in favor of the Debtor or any other party or against or in payment of any or all of the Obligations. To the extent that the Debtor makes a payment or payments to the Secured Party or the Secured Party enforces its security interests or exercises its rights of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such enforcement or setoff had not occurred.

### Section 17. Severability.

Any provision of this Security Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

### Section 18. Headings.

The headings in this Security Agreement are for the purposes of reference only and shall not limit or otherwise affect the meaning, construction or effect of this Agreement or any provision of this Security Agreement.

PATENT
REEL: 014892 FRAME: 0524

### Section 19. Ownership and Use of IP Assets by Secured Party After Event of Default.

If, upon an Event of Default, the Secured Party exercises its rights under Section 8 of this Security Agreement and all rights, title and interest in the IP Assets revert back to the Secured Party, then in addition to the provisions of Section 8 of this Security Agreement, the following shall occur, but only in the event that the Debtor had, prior to the Event of Default, paid to the Secured Party a minimum of One Million Dollars ($1,000,000) of the Obligations:

(a)     Seller hereby grants to Debtor as of the date that the Secured Party is deemed the owner of all the IP Assets the following licenses (hereinafter the "Debtor Post-Default Licenses"), subject to the limitations set forth in this Section 19 of the Security Agreement,

(i)     a non-exclusive, world-wide, license under the AT&T Patents, with a limited right to sublicense as set forth in paragraph (c) below, to make, use, import, sell and offer to sell products and services;

(ii)     a non-exclusive, world-wide, license under the Subject Software, including the work registered in the AT&T Copyright, with a limited right to sublicense as set forth in paragraph (c) below, to use, copy, modify, develop Derivative Works, distribute, publicly perform or display works; and

(iii)     a non-exclusive, world-wide, license with a limited right to sublicense as set forth in paragraph (c) below to use and copy the Proprietary Information.

These licenses shall be non-transferable except as set forth in Section 15 of the Intellectual Property Agreement.

(b)     As consideration for the Debtor Post-Default Licenses, Debtor shall pay to Secured Party thirty days after the end of each quarter by the method in Section 2.2 of the Intellectual Property Agreement (which calendar quarter commences on the 1st day of the month in which Debtor is granted such licenses) the following royalties:

(i)     a seven percent (7%) royalty of Debtor's Gross Revenues until the aggregate royalties paid under this paragraph (b) of the Security Agreement plus the amounts paid to Secured Party under the Cash Payments in the Intellectual Property Agreement equal to Seven Million Seven Hundred Thousand Dollars ($7,700,000); and

(ii)     a five percent (5%) royalty of Debtor's Gross Revenues after Debtor has paid the Secured Party an aggregate amount of $7,700,000, until such amount reaches Ten Million Two Hundred Thousand Dollars ($10,200,000), which at that time, Debtor shall receive fully paid-up, royalty-free Debtor Post-Default Licenses.

(c)     The Debtor Post-Default Licenses shall be sublicensable to the extent it is necessary (i) to support existing sublicenses before the Secured Party exercised its remedies under Section 8 and (ii) to support any sublicenses after the exercise of such rights to the extent necessary for Debtor to market, sell and permit use of any products it has or will develop under the IP Assets. For the avoidance of doubt, Debtor shall have no right to grant sublicenses to the IP Assets that would permit a third party to create its own products or develop new technology based on the IP Assets.

(d)     Debtor shall pay the Secured Party interest based on the Interest Calculation for any late royalty payments due under Section 19 of this Security Agreement.

(e)     Debtor shall prepare, maintain and make written reports to the Secured Party, at the address indicated in Section 11 of this Security Agreement, along with the royalty payment each quarter. Each quarterly report shall indicate the amount of revenue received for the selling or otherwise providing commercial products or services incorporating some or all of the IP Assets, the accounts receivable, and any other information necessary to verify the

– 47 –
AT&T - Proprietary

PATENT
REEL: 014892 FRAME: 0525

L.26'2004 12:06 908 221 4492          AT&T LAW DEPT                    #6668 P.011

quarterly Gross Revenue of Debtor. Debtor shall keep detailed and accurate books, files and records, in electronic and paper form, adequate to determine and verify accurately the information contained in each quarterly report. The books and records shall be retained for at least five (5) years after the delivery to the Secured Party of the written report to which the books and records relate, provided there is no outstanding dispute regarding royalty fees, in which case said books and records shall be preserved by the Licensee pending the resolution of said dispute.

(f)    The Secured Party has the right to review and audit and/or to have reviewed and audited, upon reasonable notice and during normal business hours to Debtor, underlying documentation regarding all royalty payments due to the Secured Party under this Security Agreement up to once (1) times per year. Should Secured Party's audit conducted under this Section 19(f) find that the Debtor is in material non-compliance with the obligations set forth in Section 19(e), the Secured Party shall notify Debtor and Debtor shall (i) within five days of such notice cease using the IP Assets; and (ii) within five days of such notice cease selling products or services using the IP Assets to third parties; until the Debtor cures such breach of this Agreement, within thirty (30) days receipt of notice from the Secured Party.

Section 20.   Accrual Amounts Owed By Debtor at the Time of the Event of Default.

As to any Accrued Unpaid Balance due and owing the Secured Party at the time of the Event of Default, Debtor shall pay to Secured Party, in addition to the royalty specified in Section 19 in this Security Agreement, at the times the royalty specified in Section 19 is payable, a royalty equal to 2% of the Gross Revenues of Debtor, until such time as Debtor satisfies the Accrued Unpaid Balance under the Obligations.

IN WITNESS WHEREOF, this Security Agreement has been executed by the parties hereto all as of the day and year first above written.

WITNESS:

_____
AT&T Corp.

By _____
Name:  JOHN C. KLINGERT
Title:  VP VICE PRESIDENT

_____
Zoetics, Inc.

By _____
Name:  JOEL D. TACCIARONE
Title:  PRESIDENT

– 48 –
AT&T – Proprietary

PATENT
REEL: 014892 FRAME: 0526

4 12:06 908 221 4492          AT&T LAW DEPT                    #6669 P.012

**EXHIBIT A**
**AT&T Patents**

(See Schedule E to the Intellectual Property Agreement entered into between the Parties)

**EXHIBIT B**
**Copyright Registrations**

(See Schedule B to the Intellectual Property Agreement entered into between the Parties)

**EXHIBIT C**
**Subject Software**

(See Schedule C of the Intellectual Property Agreement entered into between the Parties)

-- 49 --
AT&T - Proprietary

PATENT
REEL: 014892 FRAME: 0527

:06 908 221 4492        AT&T LAW DEPT                    #6668 P.013

## EXHIBIT D
## Additional Representations And Warranties

1.      The exact title of the Debtor is: Zoetics, Inc.  The Debtor has not used any other corporate the previous ten (10) years.

2.      The Debtor uses in its business and owns the following trade names:

3.      The Debtor maintains its books and records relative to its accounts and its inventory at:

   270 Lafayette Street, New York, New York 10012

4.      The chief executive office of the Debtor is:

   270 Lafayette Street, New York, New York 10012

PATENT
REEL: 014892 FRAME: 0528

..26'2004 12:07 908 221 4492          AT&T LAW DEPT                    #6668 P.010

## EXHIBIT E
### Patent Assignment

This Assignment of Patent is by and between Zoetics, Inc. ("Zoetics"), having an office at 270 Lafayette Street, New York, New York 10012 ("Assignor") and AT&T Corp., a New York Corporation with an office located at 32 Avenue of the Americas, New York, New York 10013-2412 ("Assignee").

WHEREAS, Assignor is the owner of all right, title, and interest in and to the U.S. Patent No. 6,930,479 and pending U.S Application No. 09/884,648 (the "Patents").

WHEREAS, Assignee is desirous of acquiring all right, title, and interest in and to the Patents.

NOW THEREFORE, for good and valuable consideration, receipt and adequacy of which are hereby acknowledged, and intending to be legally bound hereby, Assignor hereby assigns to Assignee any and all of Assignor's right, title and interest in and to the Patents, including any division and continuation hereof and all corresponding foreign applications and patents, and Assignor hereby authorizes the Commissioner of Patents and Trademarks to issue any said United States Letters Patents that relate to the Patent to said Assignee, as the Assignee of the whole right, title and interest thereto.

IN WITNESS WHEREOF, Assignor has cause this Patent Assignment to be executed in a manner appropriate thereto effective as of _____, 200__.

**ASSIGNEE**                              **ASSIGNOR**

Given at Basking Ridge                    Accepted at _____
New Jersey, USA
on _____                       on _____
AT&T Corp.                                _____


By: _____                      By: _____

Name: _____                    Name: _____
Title:                                    Title:
Authorized Signatory                      Authorized Signatory


- 51 --
AT&T - Proprietary

**PATENT**
**REEL: 014892 FRAME: 0529**

**EXHIBIT F**
**Copyright Assignment**

    For good and valuable consideration, the receipt of which are hereby acknowledged, to ZOETICS, INC, 270 Lafayette Street, New York, New York 10012 ("Zoetics"), sells, assigns, and transfers to AT&T CORP., 32 Avenue of the Americas, New York, New York 10032 ("AT&T"), its successors and assigns, absolutely and forever, the entire right, title, and interest in and to a Copyright Registration No. TXU 945-297 entitled E-Mail Channels System owned by Zoetics ("the Copyright"), including, without limiting the generality of the foregoing, any moral rights, and to have and to hold said Copyright and all rights of whatsoever nature thereunder existing. To the extent that any moral rights cannot be sold, assigned or transferred to AT&T, Zoetics waives for all time any assertion of such rights.

    Zoetics represents and warrants that Zoetics is the sole and exclusive author of the Copyright, that Zoetics is the sole and exclusive owner of all right, title, and interest in and to the Copyright, and that Zoetics has not sold, assigned, or transferred any right, title, or interest in and to the Copyright to any other party.

**IN WITNESS WHEREOF,** AT&T has cause this Copyright Assignment to be executed in a manner appropriate thereto effective as of _____, 200__.

AT&T CORP.                                          ZOETICS, INC.

Given at Basking Ridge                              Accepted at _____
New Jersey, USA
on _____                                      on _____
                                                    _____

By: _____                                     By: _____

Name: _____                                   Name: _____
Title:                                              Title:
Authorized Signatory                                Authorized Signatory

– 52 –
AT&T – Proprietary

**PATENT**
**REEL: 014892 FRAME: 0530**

.26'2004 12:07 908 221 4492          AT&T LAW DEPT                    #6668 P.016

## Schedule A
## AT&T Patents

*UNITED STATES*

U.S. Patent No. 5,930,479; Record: 111671   Filed: 10/21/1996
Inventor: Robert J. Hall
Communications Addressing System

Application No. 09/884,648; Record ID 2001-0323   Filed: 6/18/2001
Inventor:  Robert J. Hall
Web-based Communications Addressing System and Method

PATENT
REEL: 014892 FRAME: 0531

.26'2004 12:07 908 221 4492         AT&T LAW DEPT                    #6668 P.017

**Schedule B**
**AT&T Copyright**

*UNITED STATES*

U.S. Copyright Registration No. TXU 945-297 covering a computer program
Author as a Work Made For Hire for Seller: Robert J. Hall
Title: "E-Mail Channels System"

PATENT
REEL: 014892 FRAME: 0532

JUL.26'2004 12:07 908 221 4492          AT&T LAW DEPT                    #6668 P.018

## Schedule C
## Subject Software

**The following software files shall be delivered to Buyer as of the Closing Date under this Agreement:**

[In the following file listing, names ending in a slash ('/') character represent (sub)directories that group files logically. All other names designate files containing text or binary information.]

    ChannelsCD/

**Binary Files**

[This is the Java byte-code archive containing the "binary" form of the AT&T Labs Research's Email Channels System v. 1.8c]

    ChannelsCD/Channels.jar

**Documentation Files**

[Files whose name start with "ChannelsCD/doc/" are documentation and example files describing or illustrating the configuration and use of AT&T Labs Research's Email Channels System v. 1.8c.]

    ChannelsCD/doc/

[Textual installation, configuration and usage instructions:]
    ChannelsCD/doc/README.txt

[Sample configuration files for Bouncer/Host component:]
    ChannelsCD/doc/bhost/
    ChannelsCD/doc/bhost/ServerData/
    ChannelsCD/doc/bhost/ServerData/config
    ChannelsCD/doc/bhost/runbhost.bash

[Sample configuration files for PCA component:]
    ChannelsCD/doc/PCA/
    ChannelsCD/doc/PCA/UserData/
    ChannelsCD/doc/PCA/UserData/config
    ChannelsCD/doc/PCA/runPCA.bash

**Source Code Files**

[The files whose names start with "ChannelsCD/src/" comprise the Java source code files of AT&T Labs Research's Email Channels System v. 1.8c]

    ChannelsCD/src/

[Java package source files containing highest level application and control logic for Bouncer/Host component:]
    ChannelsCD/src/bhost/

- 33 -
AT&T - Proprietary

**PATENT**
**REEL: 014892 FRAME: 0533**

```
ChannelsCD/src/bhost/app_bhost.java
ChannelsCD/src/bhost/bhost.java
ChannelsCD/src/bhost/controller_BHOST.java
ChannelsCD/src/bhost/translator.java
```

[Java package source files containing highest level application and
control logic for PCA component:]
```
ChannelsCD/src/chan/
ChannelsCD/src/chan/app_chproxy.java
ChannelsCD/src/chan/chproxy.java
ChannelsCD/src/chan/chproxy_window.java
ChannelsCD/src/chan/chproxy_window_details.java
ChannelsCD/src/chan/chproxy_window_editor.java
ChannelsCD/src/chan/chproxy_window_list.java
ChannelsCD/src/chan/chproxy_window_pp_editor.java
ChannelsCD/src/chan/chproxy_window_pw_editor.java
ChannelsCD/src/chan/controller_PCA.java
ChannelsCD/src/chan/initconfig.java
ChannelsCD/src/chan/translator.java
ChannelsCD/src/chan/uitest.java
ChannelsCD/src/chan/warningBox.java
```

[Java package source files for cryptographic utility classes and interfaces
used by all components:]
```
ChannelsCD/src/crypto/
ChannelsCD/src/crypto/aes128.java
ChannelsCD/src/crypto/CBCwithPKCS5Padding.java
ChannelsCD/src/crypto/cryptoFn.java
ChannelsCD/src/crypto/exception.java
ChannelsCD/src/crypto/symCoderInputStream.java
ChannelsCD/src/crypto/symmetricBlockCipher.java
ChannelsCD/src/crypto/symmetricCoder.java
```

[Java package source files for email proxy framework used to
build all components:]
```
ChannelsCD/src/proxy/
ChannelsCD/src/proxy/checkMessageQueuesEvent.java
ChannelsCD/src/proxy/console_window_quit.java
ChannelsCD/src/proxy/controller.java
ChannelsCD/src/proxy/proxy.java
ChannelsCD/src/proxy/version.java
```

[Java package source files containing miscellaneous utility classes,
interfaces, and functions:]
```
ChannelsCD/src/RJHTools/
ChannelsCD/src/RJHTools/base64InputStream.java
ChannelsCD/src/RJHTools/base64OutputStream.java
ChannelsCD/src/RJHTools/bbs_init.java
ChannelsCD/src/RJHTools/binaryPredicate.java
ChannelsCD/src/RJHTools/binaryPredicate_String.java
ChannelsCD/src/RJHTools/commandEvent.java
ChannelsCD/src/RJHTools/config.java
ChannelsCD/src/RJHTools/config_exception.java
ChannelsCD/src/RJHTools/cons.java
ChannelsCD/src/RJHTools/constants.java
ChannelsCD/src/RJHTools/counter.java
ChannelsCD/src/RJHTools/currentTime.java
ChannelsCD/src/RJHTools/db.java
ChannelsCD/src/RJHTools/db_exception.java
ChannelsCD/src/RJHTools/db_key_mismatch.java
ChannelsCD/src/RJHTools/db_property.java
```

AT&T - Proprietary

PATENT
REEL: 014892 FRAME: 0534

26'2004 12:08 908 221 4492          AT&T LAW DEPT                    #6668 P.020

```
ChannelsCD/src/RJHTools/db_property_BigInteger.java
ChannelsCD/src/RJHTools/db_property_Boolean.java
ChannelsCD/src/RJHTools/db_property_Integer.java
ChannelsCD/src/RJHTools/db_property_ListOfString.java
ChannelsCD/src/RJHTools/db_property_Object.java
ChannelsCD/src/RJHTools/db_property_RandomState.java
ChannelsCD/src/RJHTools/db_property_String.java
ChannelsCD/src/RJHTools/dbg.java
ChannelsCD/src/RJHTools/dbplist.java
ChannelsCD/src/RJHTools/dbtest.java
ChannelsCD/src/RJHTools/dshsl_holder.java
ChannelsCD/src/RJHTools/email_utils.java
ChannelsCD/src/RJHTools/encode257.java
ChannelsCD/src/RJHTools/event.java
ChannelsCD/src/RJHTools/eventException.java
ChannelsCD/src/RJHTools/eventQueue.java
ChannelsCD/src/RJHTools/eventQueueServer.java
ChannelsCD/src/RJHTools/eventQueueSubscriber.java
ChannelsCD/src/RJHTools/fn.java
ChannelsCD/src/RJHTools/getStringFromUser.java
ChannelsCD/src/RJHTools/getStringFromUser_Cancel.java
ChannelsCD/src/RJHTools/getStringFromUser_Done.java
ChannelsCD/src/RJHTools/indexedByteArray.java
ChannelsCD/src/RJHTools/line_buffer_Reader.java
ChannelsCD/src/RJHTools/list.java
ChannelsCD/src/RJHTools/mail_input_stream.java
ChannelsCD/src/RJHTools/mail_output_stream.java
ChannelsCD/src/RJHTools/msg.java
ChannelsCD/src/RJHTools/msg_body_table.java
ChannelsCD/src/RJHTools/msg_body_table_rec.java
ChannelsCD/src/RJHTools/msg_exception.java
ChannelsCD/src/RJHTools/msg_queue.java
ChannelsCD/src/RJHTools/msg_queue_manager.java
ChannelsCD/src/RJHTools/notifiable_window.java
ChannelsCD/src/RJHTools/POP3_getter.java
ChannelsCD/src/RJHTools/POP3_getter_exception.java
ChannelsCD/src/RJHTools/POP3_getter_process.java
ChannelsCD/src/RJHTools/POP3_server.java
ChannelsCD/src/RJHTools/POP3s_server_exception.java
ChannelsCD/src/RJHTools/POP3s_getter.java
ChannelsCD/src/RJHTools/POP3s_getter_process.java
ChannelsCD/src/RJHTools/POP3s_server.java
ChannelsCD/src/RJHTools/POP3s_server_process.java
ChannelsCD/src/RJHTools/pushable.java
ChannelsCD/src/RJHTools/pusher.java
ChannelsCD/src/RJHTools/RandomBits.java
ChannelsCD/src/RJHTools/RandomState.java
ChannelsCD/src/RJHTools/rdir.java
ChannelsCD/src/RJHTools/rdirException.java
ChannelsCD/src/RJHTools/recomp.java
ChannelsCD/src/RJHTools/SMTP_recipient_translator.java
ChannelsCD/src/RJHTools/SMTP_sender.java
ChannelsCD/src/RJHTools/SMTP_sender_process.java
ChannelsCD/src/RJHTools/SMTP_server.java
ChannelsCD/src/RJHTools/SMTPServerException.java
ChannelsCD/src/RJHTools/SMTPServiceThread.java
ChannelsCD/src/RJHTools/stoppable.java
ChannelsCD/src/RJHTools/TCP_server.java
ChannelsCD/src/RJHTools/TCP_server_monitor.java
ChannelsCD/src/RJHTools/timer.java
ChannelsCD/src/RJHTools/yOrNp.java
```

- 35 -
AT&T - Proprietary

PATENT
REEL: 014892 FRAME: 0535

26'2004 12:08 908 221 4492          AT&T LAW DEPT                    #6668 P.021

```
    ChannelsCD/src/RJHTools/yOrNp_No.java
    ChannelsCD/src/RJHTools/yOrNp_Yes.java

[Java package source files containing utility functions supporting
the logical functional theories used in implementing the components'
control modules:]
    ChannelsCD/src/Theories/
    ChannelsCD/src/Theories/BOUNCER.java
    ChannelsCD/src/Theories/CRYPTO.java
    ChannelsCD/src/Theories/HOST.java
    ChannelsCD/src/Theories/INTEGERS.java
    ChannelsCD/src/Theories/LISTS.java
    ChannelsCD/src/Theories/LOGICALS.java
    ChannelsCD/src/Theories/MSG.java
    ChannelsCD/src/Theories/PCA.java
    ChannelsCD/src/Theories/STRINGS.java
```

AT&T - Proprietary

RECORDED: 07/26/2004

PATENT
REEL: 014892 FRAME: 0536

/30/2003 16:45 FAX 412 566 6099          ECKERT SEAMANS                    Ø004

| Form PTO-1595<br>(Rev. 10/02)<br>OMB No. 0651-0027 (exp. 6/30/2005) | RECORDATION FORM COVER SHEET<br>PATENTS ONLY | U.S. DEPARTMENT OF COMMERCE<br>U.S. Patent and Trademark Office |
|---|---|---|

Tab settings ⇨ ⇨ ⇨     ▼     ▼     ▼     ▼     ▼     ▼     ▼

To the Honorable Commissioner of Patents and Trademarks: Please record the attached original documents or copy thereof.

**1. Name of conveying party(ies):**

AT&T Corp.

Additional name(s) of conveying party(ies) attached? ☐ Yes ☑ No

**2. Name and address of receiving party(ies)**

Name: Zoetics, Inc.

Internal Address: _____

Street Address: 270 Lafayette Street

City: New York  State: NY  Zip: 10012

Additional name(s) & address(es) attached? ☐ Yes ☑ No

**3. Nature of conveyance:**

☑ Assignment          ☐ Merger
☐ Security Agreement  ☐ Change of Name
☐ Other _____

Execution Date: June 6, 2002

**4. Application number(s) or patent number(s):**

If this document is being filed together with a new application, the execution date of the application is: _____

A. Patent Application No.(s) 09/884,646     B. Patent No.(s) 5,930,479

Additional numbers attached? ☐ Yes ☑ No

**5. Name and address of party to whom correspondence concerning document should be mailed:**

Name: David V. Radack, Esq.

Internal Address: _____

Eckert Seamans Cherin & Mellott, LLC

Street Address: 600 Grant Street, 44th Floor

City: Pittsburgh  State: PA  Zip: 15219

**6. Total number of applications and patents involved:** ☐1

**7. Total fee (37 CFR 3.41)..............$** 80.00

☐ Enclosed
☑ Authorized to be charged to deposit account

**8. Deposit account number:**

02-2556

DO NOT USE THIS SPACE

**9. Signature.**

Nancy Bayne
Name of Person Signing

_[signature]_
Signature

July 30, 2003
Date

Total number of pages including cover sheet, attachments, and documents: ☐3

Mail documents to be recorded with required cover sheet information to:
Commissioner of Patents & Trademarks, Box Assignments
Washington, D.C. 20231

700038430

**PATENT**
**REEL: 013835 FRAME: 0771**

)/2003 16:45 FAX 412 566 6099   ECKERT SEAMANS   ⊠005



### Schedule D
### Patent Assignment

This Assignment of Patent is by and between AT&T Corp., a New York Corporation with an office located at 32 Avenue of the Americas, New York, New York 10013-2412 ("Assignor") and Zoetics, Inc. ("Zoetics"), having an office at 270 Lafayette Street, New York, New York 10012 ("Assignee").

WHEREAS, Assignor is the owner of all right, title, and interest in and to U.S. Patent No. 5,930,479 and pending U.S Application No. 09/884,646 (the "Patents").

WHEREAS, Assignee is desirous of acquiring all right, title, and interest in and to the Patents.

NOW THEREFORE, for good and valuable consideration, receipt and adequacy of which are hereby acknowledged, and intending to be legally bound hereby, Assignor hereby assigns to Assignee any and all of Assignor's right, title and interest in and to the Patents, including any division and continuation hereof and all corresponding foreign applications and patents, and Assignor hereby authorizes the Commissioner of Patents and Trademarks to issue any said United States Letters Patents that relate to the Patent to said Assignee, as the Assignee of the whole right, title and interest thereto.

IN WITNESS WHEREOF, Assignor has cause this Patent Assignment to be executed in a manner appropriate thereto effective as of June 6, 2002.

ASSIGNOR

ASSIGNEE

Given at Basking Ridge
New Jersey, USA
on June 6, 2002
AT&T Corp.

Accepted at New York, New York

on June 12, 2002
Zoetics

By: _____

By: _____

Name: John K. Concert
Title: IP Vice President
Authorized Signatory

Name: Joel D. Tuccaroune
Title: President
Authorized Signatory

– 37 –
AT&T - Proprietary

**PATENT
REEL: 013835 FRAME: 0772**

03 16:44 FAX 412 566 6099        ECKERT SEAMANS                    002

PTO/82/97  (12-07)
Approved for use through 8/20/03. OMB 0651-0031
Patent and Trademark Office, U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

# ATTENTION: Assignment Recordation Services
(703) 306-5995

## Certificate of Transmission under 37 CFR 1.8

# TOTAL PAGES ATTACHED: 3

I hereby certify that this correspondence is being facsimile transmitted to the Patent and Trademark Office

on _____ July 30, 2003 _____
        Date

_____
              /Signature/

Nancy Bayne
Typed or printed name of person signing Certificate

Note:  Each paper must have its own certificate of transmission, or this certificate must identify each submitted paper.

Recordation Form Cover Sheet (two copies)
Assignment (one page)

Burden Hour Statement: This form is estimated to take 0.03 hours to complete. Time will vary depending upon the needs of the individual case. Any comments on the amount of time required to complete this form should be sent to the Chief Information Officer, Patent and Trademark Office, Washington, DC 20231. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Assistant Commissioner for Patents, Washington, DC 20231.

RECORDED: 07/30/2003

PATENT
REEL: 013835 FRAME: 0773